## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **AGUDAS CHASIDEI CHABAD OF UNITED STATES,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **CASE NO. 1:05-CV-01548-RCL** |
| | : | |
| **RUSSIAN FEDERATION, RUSSIAN MINISTRY OF CULTURE AND MASS COMMUNICATION, RUSSIAN STATE LIBRARY, and RUSSIAN STATE MILITARY ARCHIVE,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

---

### DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO DISMISS ON GROUNDS OF LACK OF SUBJECT MATTER JURISDICTION, FOREIGN SOVEREIGN IMMUNITY, FAILURE TO STATE A CLAIM (ACT OF STATE DOCTRINE) AND *FORUM NON CONVENIENS*

---

Defendants the Russian Federation, Russian Ministry Of Culture and Mass Communication ("RMCMC"), Russian State Library ("RSL") and Russian State Military Archive ("RSMA") (collectively, the "Russian Government Defendants" or "Defendants") respectfully submit the following brief pursuant to the Court's Order of November 23, 2005 (the "November 23 Order") requesting the parties to submit supplemental briefs restating and clarifying their arguments under applicable case law in the District of Columbia Circuit as to the Russian Government Defendants' pending and ripe motion to dismiss in this case transferred from the Central District of California after the completion of briefing under Ninth Circuit law.

## STATEMENT OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

#### A.     Prefatory Statement

Defendants' motion to dismiss poses a threshold central issue:  Is a lawsuit that would require the courts of the United States to review and scrutinize actions of a foreign sovereign, taken within its own territory as to its own nationals through its executive, legislative and judicial branches of government, as to property located within its sovereign territory, and which has never been present in the United States, cognizable in the courts of the United States under the Foreign Sovereign Immunities Act?[1]  The Russian Government Defendants submit that, as will be demonstrated below, an examination of the law in the District of Columbia Circuit, when combined with the results of the extensive jurisdictional discovery taken by Plaintiff and the briefing completed in the Central District of California, serves to confirm that the answer must be no.

In the introductory portion of their supplemental brief, to place their discussion of D.C. Circuit law in context, Defendants will, first, state the nature of the case and, second, set forth its procedural history before the Central District of California.  In the Argument section of this supplemental brief, Defendants will then analyze the jurisdictional facts and discuss the case law in the District of Columbia Circuit as it applies to their arguments in support of dismissal.

#### B.     Nature of the Case/Factual Background

The Russian Federation is a foreign state presumptively entitled to immunity from jurisdiction of the courts of the United States under the FSIA.  28 U.S.C. § 1604.  RMCMC is alleged to be a political subdivision of a foreign state and, as such, is treated as a foreign state

---

[1]     28 U.S.C. §§ 1330, 1602-1611 (FSIA or Act)

for all purposes under the FSIA.  28 U.S.C. § 1603(a).  RSL and RSMA are alleged to be agencies or instrumentalities of the Russian Federation and, as such, are also presumptively immune from the jurisdiction of the United States courts.  28 U.S.C. §§ 1603(b), 1604.

Plaintiff Agudas Chasidei Chabad of the United States ("Chabad") is a non-profit religious corporation, organized and existing since 1940 under the laws of the State of New York.  (Cmplt., ¶ 1 [Dkt. No. 1][2].)  Chabad has invoked the jurisdiction of the federal courts as to their claims against the Russian Government Defendants under the so-called expropriation exception of the FSIA, 28 U.S.C. § 1605(a) (3).[3]  (Cmplt., ¶¶ 36-39.)  Chabad seeks title to and possession of a library housed in Moscow at the RSL and an archive of writings housed in the RSMA, also in Moscow.   The Library, known as the Schneersohn Library, was accumulated by the first five of seven Rebbes of the Chabad Chasidism while in Russia, was confiscated by the USSR during the Bolshevik revolution and has been continuously held in the RSL since at least 1924.  (Cmplt., ¶¶ 8, 9, 11.)  The Archive consists of writings of the Rebbe that were recovered by the Russian Army from the German army and transferred to the RMSA at the end of World War II.  (Cmplt., ¶¶ 11(b), 17, 19.)

---

[2]     Unless otherwise indicated, all docket citations are to the pre-transfer civil docket in the Central District of California for Case No. 2:04-CV-09233 PA.

[3]     The provision reads:

> "(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case –
>
> (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]"

In 1990, during the last days of the USSR, Chabad representatives formed a Russian entity, Agudas Chabad Lubavitch Chassidim ("Russian Chabad"), to make efforts to obtain the Schneersohn Library from the RSL.  (Complt., ¶ 21 [Dkt. No. 1].)  To that end, in 1991, Russian Chabad instituted a proceeding before the State Arbitration Court (*Gosarbitrazh*) of what was then the Russian Soviet Federative Socialist Republic (now the Russian Federation) seeking to have the Schneersohn Library declared the property of, and transferred to Russian Chabad.  (*Id.*, ¶ 22.)  In 1992, that litigation was dismissed by the Deputy Chief Arbiter of the State Arbitration Court on grounds of lack of jurisdictional competence and Russian Chabad was left to its remedies in the Russian law courts.  (Kovaleva Decl. [Dkt. No. 15], ¶¶ 18-20.)  Chabad, however, pursued no further legal action in Russia as to the Schneersohn Library.

The collections housed in the RSL are important elements of the cultural heritage of the Russian Federation and, under Russian laws concerning the preservation of Russian culture, may not be sold or transferred.  (Decl. of Victor V. Fedorov [Dkt. No. 14], ¶ 2, Ex. A, B, C.)  On December 16, 1993, as a result of diplomatic efforts between the United States and the Russian Federation, representatives of the executive branches of the governments entered into a Memorandum of Understanding (the "1993 MOU") concerning the Schneersohn Library.  (*Id.*, ¶ 5.)  The MOU recited that the Schneersohn Library had been "taken possession of ('Nationalized') by Soviet authorities."  Under the MOU, the Russian Federation committed to move the Schneersohn Library to a new facility where members of Russian Chabad would have access to the Schneersohn Library for study and religious devotions.  Consistent with the terms of the MOU, the RSL has established a new Center for Oriental Literature.  The Center, which is intended to house, among other collections, the Schneersohn Library, includes separate rooms for Chassidic scholarship and a room for the conduct of prayers and religious ritual by members

of the Russian Chassidic community.  (*Id.*)

As for the Archive, on June 10, 2004, members of Russian Chabad sent a letter to President Vladimir V. Putin, identifying themselves as the appointees of the deceased Seventh Rebbe charged with bringing about "the return of his books, archives, manuscripts, and personal effects held by the Russian Government."  The letter from Russian Chabad requested that the Archive be sent to Chabad's headquarters in Brooklyn.  (Cmplt., ¶ 35.)  When Russian Chabad's June 10, 2004 letter to President Putin went unanswered, on November 9, 2004, Chabad filed the complaint in this action in the Central District of California alleging violations of international law as to both the Library and the Archive and seeking an order that the Russian Government Defendants turn over both to Chabad in New York.  (*Id.*)

**C.    Procedural History**

**1.    The May 2, 2005 Motion to Dismiss**

On May 2, 2005, the Russian Government Defendants moved to dismiss the complaint on grounds of lack of subject matter jurisdiction (foreign sovereign immunity), lack of personal jurisdiction,[4] improper venue, failure to state a claim (Act of State doctrine) and *forum non conveniens*.  (Dkt. No. 13.)  The motion to dismiss was supported by the concurrently filed Declaration of Victor V. Fedorov, the General Director of the RSL ("Fedorov Decl.") [Dkt. No.

---

[4]    Before the Central District, the Russian Government Defendants argued that the requirements of due process and a minimum contacts nexus between the defendant and the forum dictate that that the "commercial activity" that the defendant agency or instrumentality has to be "engaged in" the United States relate to the subject property.   In the D.C. Circuit, however, under *Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F. 3d 82, 95-96 (D.C. Cir. 2002), has held that under the FSIA subject matter jurisdiction establishes personal jurisdiction without regard for minimum contacts because a foreign state is not a "person" for due process purposes. Defendants, note however the D.C. Circuit has appeared to reserve the issue with respect to an agency or instrumentality, at least when the agency or instrumentality is not so controlled by the foreign state to make it an agent of the state. *TMR Energy Limited v. State Property Fund of Ukraine*, 411 F. 3d 296, 300-301 (D.C. Cir. 2005).  The RSL and the RSMA contend that they fall within that exception and therefore that a due process nexus is required as to them for purposes of FSIA jurisdiction; they therefore reserve the due process issue.

14], the Declaration of Vladimir N. Kouzelenkov, the Director of the RSMA ("Kouzelenkov Decl.") [Dkt. No. 17], the Declaration of Leonid N. Nadirov, the Deputy Minister of the RMCMC ("Nadirov Decl.") [Dkt. No. 16] and the Declaration of Tatiana K. Kovaleva, an Assistant Professor of Constitutional Law at Moscow State University ("Kovaleva Decl.") [Dkt. No. 15.].

Pursuant to the district court's order modifying a party stipulation, the hearing date on the motion to dismiss was set for June 27, 2005, eight weeks after the motion filing date, and Chabad's opposition brief was due to be filed on May 30, 2005.    This extended briefing schedule was established to give Chabad the opportunity to conduct limited jurisdictional discovery pertinent to the motion to dismiss, as both parties acknowledged was appropriate.[5]

### 2.    Chabad's Jurisdictional Discovery

Shortly after the filing of the Russian Government Defendants' motion to dismiss, Chabad commenced discovery, issuing on May 6, 2005 subpoenas to third parties in the United States for documents and testimony pertaining to their dealings with the Russian Government Defendant and, on May 10, 2005, propounding interrogatories and document requests to each of the Defendants.  In view of the volume of proposed discovery, after considering the stipulation and proposed order, Judge Anderson extended the time for the filing and service of Chabad's opposition to June 17, 2005, and the deadline for the filing of Defendants' reply to June 27,

---

[5]     The scope of the jurisdictional discovery agreed to by the parties and contemplated by the court was appropriately limited.  As this Court noted in *Price v. Socialist People's Libyan Arab Jamahiriya*,  "'In order to avoid burdening a sovereign that proves to be immune from suit, however, jurisdictional discovery should be carefully controlled and limited; it should not be authorized at all if the defendant raises either a different jurisdictional or [another] non-merits ground such as forum non conveniens or personal jurisdiction the resolution of which would impose a lesser burden upon the defendant.'" 274 F. Supp. 2d 20, 24 (D.D.C. 2003) (*quoting Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  Here, in addition to the jurisdictional grounds for the motion to dismiss, the Russian Government Defendants also moved on Act of State doctrine grounds and *forum non conveniens*.

2005, and continued the hearing on the motion to dismiss to July 11, 2005. Pursuant to a further stipulation to facilitate the depositions of Defendants' declarants, the depositions went forward by video conference between June 20 and June 23 with the witness' and Defendants' counsel in Moscow and Plaintiff's counsel in Los Angeles. In order to retain the July 11 hearing date, Judge Anderson kept the due dates for the Opposition and Reply of June 17 and June 27, respectively, but permitted supplemental briefing on the subject of testimony of the Defendants' four declarants.[6]

As a result of these agreements by the parties and the Central District's scheduling orders, Chabad was able to conduct, and did conduct, substantial and extensive jurisdictional discovery between May 2, 2005 and July 14, 2005 (the date on which, after taking the motion to dismiss under submission, Judge Anderson ordered the case transferred to the District of Columbia under the mandatory venue provisions of the FSIA). In the 48 days between the time specific jurisdictional discovery was first mentioned in a letter from counsel for Plaintiff on May 5, and the filing of Defendants' Reply Memorandum, there were non-party depositions set on ten different days in various locations from Seattle to New York and two day-long depositions of third party witnesses in New York, including one on four days' notice. All of these proposed depositions of a total of six non-party witnesses were set by Plaintiff. In addition, there has been one set of interrogatories to each defendant and one set of document requests for a total of eight; all were responded to by responses and objections on the initial due date. Finally, the depositions of the four declarants that supported Defendants' Motion to Dismiss, all of whom are located in Moscow, the Russian Federation, were taken by video conference from Moscow for a day each.

---

[6]     Stipulation Re: Video-Conferencing of Depositions And Submission of Such Testimony; Order Thereon (filed June 13, 2005 and entered on June 15, 2005) [Dkt. No. 32].

All of the results of this discovery were before Judge Anderson when he took Defendants' motion to dismiss under submission on July 12, 2005.

### 3.    The Central District's Transfer Order

On July 14, 2005, the court issued its ruling, agreeing with the Russian Government Defendants that venue in this action was improper in the Central District of California and ordering that the case be transferred to the District of Columbia under 28 U.S.C. § 1391(f)(4) and 28 U.S.C. 1406(a) (the "July 14, 2005 Order").  [Dkt. No. 56.]

## II.    ARGUMENT

### A.    Standard of Review

In their briefs to the Central District of California, the parties disagreed on the standard of review the district court was to apply to the motion to dismiss under Ninth Circuit law.[7]  With the transfer of this case to the District of Columbia, the court should apply the standard of review followed in the D.C. Circuit.   *See Hartline v. Sheet Metal Workers' Nat'l Pension Fund*, 286 F.3d 598, 599 (D.C. Cir. 2002) ("When a case that is governed by federal law is transferred from one federal court to another, the transferee court should decide the federal claim based on its own circuit's interpretation of the law"); *In re Korean Air Lines Disaster*, 829 F.2d 1171, 1174 (D.C. Cir. 1987) (same).

Under D.C. Circuit authority, in assessing its jurisdiction under the FSIA, the district court is not bound by conclusory allegations of the complaint '[w]here such allegations are challenged by the sovereign." *Foremost-McKesson, Inc. v. Republic of Iran*, 905 F.3d 438, 448

---

[7]    *Compare* Plaintiff's Opposition Memorandum [Dkt. No. 45] at 13 (arguing under Ninth Circuit authority that the court need not decide whether the taking actually violated international law, as long as a claim is substantial and non-frivolous, citing *Siderman v. Republic of Argentina*, 965 F.2d 699, 711 (9th Cir. 1992) *and* Defendants' Memorandum of Points and Authorities in Reply to Plaintiff's Opposition to Motion to Dismiss, at 4-6 [Dkt. No. 46] (in assessing factual assertion of jurisdiction, district court must look to the substance of the allegations and the evidence to determine whether an FSIA exception applies).

(D.C. Cir. 1990).  "Where, as with foreign sovereigns, immunity involves protection from suit, not merely a defense to liability, more than the usual is required of trial courts in making pretrial factual and legal determinations."  *Id.* at 449.  Thus, in this Circuit, a district court errs "in accepting as true the jurisdictional facts alleged by the Plaintiff.  Instead, the court should … settle[] any contested jurisdictional facts necessary [a foreign sovereign's motion to dismiss for lack of FSIA jurisdiction]."  *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 38 (D.C. Cir. 2000).  Here, the Russian Government Defendants have challenged Chabad's essential allegations in support of FSIA jurisdiction.  Accordingly, in ruling on their motion to dismiss, the Court cannot simply accept as true Chabad's allegations, but must settle the disputed jurisdictional facts in ruling on the motion.

### B.        Chabad's Claims Are Not Covered By The FSIA's Expropriation Exception

The FSIA is the sole basis for jurisdiction over a foreign state.  *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989).  Under the FSIA, a foreign state, defined to include its agencies and instrumentalities, is absolutely immune from jurisdiction in the United States unless one of the Act's exceptions applies.  28 U.S.C. § 1604.  "Sovereign immunity under the FSIA is thus a gateway issue, not simply a plea in defense to a claim: if the foreign state is entitled to immunity with respect to the claim asserted, then the district court lacks both subject matter and personal jurisdiction, and must dismiss the case.  *Practical Concept, Inc. v. Republic of Bolivia,* 811 F.2d 1543, 1544 (D.C. Cir. 1987).

The sole exception to immunity that Chabad urges in this case is the expropriation exception of FSIA § 1605(a)(3).  The D.C. Circuit has held a claim must meet three requirements to fit within this statutory exception:

> "At issue must be (1) 'rights in property' that (2) were taken in
> violation of international law and (3) the property at issue (or any
> property exchanged for it) must either (a) be present in the United

> States 'in connection with a commercial activity carried on in the
> United States by the foreign state' or (b) 'owned or operated by an
> agency of the foreign state and that agency or instrumentality
> engages' in commercial activity in the United States."

*Peterson v. Kingdom of Saudi Arabia*, 416 F.3d 83, 84 (D.C. Cir. 2005) (affirming dismissal of

Plaintiff's expropriation claim under 28 U.S.C. § 1605(a)(3) for failure to meet the first two

requirements, rights in property and a taking in violation of international law, at the pleading

stage). As will be demonstrated below, Chabad's claims cannot meet these three requirements.

### 1.     Chabad Has No Vested Rights In The Subject Property

In construing the first requirement, rights in property, the D.C. Circuit has recently made

clear that to meet this element, a Plaintiff's claim of right must be as to a vested right in property.

*Peterson v. Kingdom of Saudi Arabia*, *supra*, 416 F.3d 83.[8]   In *Peterson*, plaintiff, over the

course of his employment in Saudi Arabia from 1979 to 1990 had made substantial contributions

(5% of wages) to, and had substantial contributions (8% of wages) made on his behalf by

employers, to the General Organization of Social Insurance (GOSI) established by Saudi Royal

Decree in 1969, to provide workers in Saudi Arabia (including foreign workers) with retirement

and death benefits (the Annuities Branch of GOSI). Peterson sued Saudi Arabia in the District of

Columbia for conversion, contending that Saudi Arabia had violated international law when it

issued a Royal Decree in 1987 declaring foreign workers ineligible for the retirement and death

benefits of the Annuity Branch of GOSI and returned to him only the 5% portion of his total

contributions to the Annuity Branch of GOSI. Peterson contended that Saudi Arabia had taken

his property in the form of his contributions to GOSI and his expectation of payments from

GOSI in violation of international law and invoked federal court jurisdiction under the

expropriation exception of FSIA § 1605(a)(3).

---

[8]     *Peterson* was decided after Defendants filed their motion to dismiss.

In dismissing Peterson's claims for lack of subject matter jurisdiction under section 1605(a)(3), the district court had relied on a distinction between tangible and intangible property and concluded that because Peterson's rights were intangible, they were not property falling within the provisions of section 1605(a)(3). *Peterson v. Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 197 (D.D.C. 2004), *aff'd* 416 F.3d 83. In affirming the district court's judgment, the D.C. Circuit found that quite without regard to whether the alleged property interest was tangible or intangible, "Peterson ha[d] failed to allege sufficient facts demonstrating that the contributions constitute a 'righ[t] in property' in the first place." 416 F.3d at 88. The Court of Appeals noted that Peterson's contributions were never placed in a private account in his name; that his rights to payment under GOSI were only available if GOSI had remained in force with respect to foreign workers, which could have been eliminated by the Saudi government at any time. *Id.* As in *Peterson*, Chabad had and has no vested rights in the subject property.

Chabad, which was not incorporated and did not exist until 1940, has never had possession of either the Library or the Archive -- the Library having been in the possession of the RSL or its predecessors since 1917 and the Archive having been left behind in Poland by the Sixth Rebbe when he emigrated in 1939. (Cmplt., ¶¶ 1, 16, 17; Federov Decl. [Dkt. No. 14], ¶ 4.) Nor has the Library or the Archive been held by any person in the name of Chabad. Given these facts, Chabad strains to create rights in the property at issue. Chabad premises its claim of rights to the Library and the Archive on the allegation that "the Collection [including the Library held by RSL and the Archive held by RSMA] is and has historically been recognized as held in charitable trust by Chabad for the benefit of the worldwide Chabad" under the authority of *Agudas Chasidei of U.S. v. Gourary*, 833 F.2d 431 (2d Cir. 1987). (Cmplt. ¶ 10 [Dkt. No. 1.])

This allegation cannot withstand scrutiny.  Indeed, so far as it is relevant to this case, *Gourary* establishes that Chabad can have no rights in the Library at the RSL or the Archive at the RSMA.  The district court's opinion in *Gourary,* 650 F. Supp. 1463 (E.D.N.Y. 1987), affirmed by the Second Circuit, provides a useful history and detailed description of the origins of Chabad Chasisidism in Russia, the succession of the Seven Lubavitcher Rebbes, all of whom were from the same extended rabbinical family and each of whom was born in Russia, and their accumulation of both the Library that is housed at the RSL and the Archive that is housed at the RSMA.  650 F. Supp. 1463, 1465-70.

In 1915, the Fifth Rebbe fled Lubavitch, leaving the Library in Moscow.  (Cmpt. ¶ 13 [Dkt. No. 1.])  After the October Revolution of 1917, the Library was expropriated.  (Fedorov Decl. ¶ 4.)  In 1919 and 1920, the Council of People's Commissars of the USSR issued a series of decrees that had the effect of nationalizing the Library.  (Kovaleva Decl. ¶¶ 4-9, Exs. E-G.)  In 1920, the Library was transferred to the predecessor of defendant the Russian State Library, where it remains today.  (Fedorov Decl. ¶ 4; RJN [Dkt. No. 18], Exh. 1, tab E at 35, tab F at 39.)

In 1925, the Sixth Rebbe purchased the beginnings of a new library to replace the books that had been confiscated and nationalized in 1919 and 1920 (the "New Library").  *Gourary*, 650 F. Supp. at 1446.  The Sixth Rebbe took the New Library and the Archive with him when he moved to Latvia in 1927.  (Cmplt. ¶¶ 15-17.)  Both the Archive and the New Library moved with the Sixth Rebbe when he moved to Poland in 1933.  (*Id.*)  In 1939, the Sixth Rebbe fled Poland and by March 1940 had made his way to the United States, where he lived until his death in 1950.  (Cmplt. ¶¶ 15, 16; *Gourary*, 833 F.2d at 432-32.)  He left the New Library and the Archive behind in Poland.  (Cmplt. ¶ 17.)  In 1946, the New Library was brought to the United States, where the Sixth Rebbe created a charitable trust for the benefit of Plaintiff, with the New

Library as the initial corpus of the trust.  (*Gourary*, 650 F. Supp. at 1470.)  At the conclusion of World War II, the portion of the Archive at issue went to the defendant Russian State Military Archive, where it remains today.  (Cmplt. ¶ 19.)  Other portions of the Archive were obtained by Chabad from the Government of Poland after the Sixth Rebbe's death.  (*Gourary*, 650 F. Supp. at 1473-1474; Cmplt. ¶ 19.)

        At issue in *Gourary* were competing claims between Chabad, on the one hand, and the Sixth Rebbe's descendents, on the other hand, over ownership of the New Library raised many years after the Sixth Rebbe had died in 1950 without a will.[9]  In ruling for Chabad, the district court found that the Sixth Rebbe had held the New Library in trust for Chabad, a trust created when he delivered the New Library to Chabad after his arrival in New York in March 1940, and, therefore, the New Library was not part of the Rebbe's estate at the time of his death.  *Gourary,* 650 F. Supp. at 1475 fn.10.  This finding by the *Gourary* district court as to the New Library has no import as to Chabad's claims as to the Library or the Archive for several reasons.  First, rights in the Library and the Archive were not at issue before the district court in *Gourary*.  Second, neither the RSL nor the RSMA was a party to the *Gourary* case.  Finally, the *Gourary* court held that only the books that the Sixth Rebbe delivered to Chabad in New York during his lifetime were held by him in trust for Chabad and were rightfully Chabad's.  Thus, for example, as to 25 crates of the Rebbe's books that had arrived in the United States only after his death in 1950, the district court found that these "remained property of the Rebbe during his lifetime and formed

---

[9]        The *Gourary* lawsuit was filed by Chabad for replevin and conversion as to books that were part of the New Library that Chabad discovered had been taken, and some of which had been sold, by Barry Gourary, the grandson of the Sixth Rebbe.  Barry Gourary as defendant and his mother, Hanna Gourary, the Sixth Rebbe's daughter, as an intervenor brought a counterclaim against Chabad for a declaration that the New Library belonged to them by reason of inheritance. 833 F.2d at 433.

part of this [sic] estate at the time of his death." *Gourary*, 650 F. Supp. at 1474 n.9. Accordingly, if *Gourary* has anything to say on the subject of Chabad's claims to the Library now housed at the RSL, or for that matter the Archive that is now housed at the RSMA, it is that both were not and are not owned by Chabad.[10]

2.    <u>**Chabad Cannot Establish a Taking In Violation of International Law**</u>

Even if Chabad were able to establish ownership rights in the subject property, it must also establish that the property was "taken in violation of international law."  As to what constitutes a violation of international law, the FSIA in general and its expropriation exception in particular are not substantive, but are procedural (or jurisdictional) in nature. *Republic of Austria v. Altmann*, 541 U.S. 677, 695 (2004) ("the FSIA merely opens the United States courts to plaintiffs with pre-existing claims against foreign states; the Act neither 'increase[s those states'] liability for past conduct' nor 'impose[s] new duties with respect to transactions already completed.") (*quoting Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994)).  Thus, section 1605(a)(3) itself contains no substantive standards for determining when property is to be deemed "taken in violation of international law." As the Supreme Court has recently instructed, efforts of the federal courts to develop new law under the rubric of international law "should be undertaken, if at all, with great caution." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727-28 (2004).

---

[10]    Chabad also appears to base its claim of rights in the Library on the Second Decision in the Russian proceedings, the November 18, 1991 decision by the Chief Arbiter of the State Arbitration Court (which Chabad mistakenly describes as the "Russian Supreme Court"). (Cmplt. ¶ 27.)  As the Declaration of Tatiana K. Kovaleva in Support of Defendants' Motion to Dismiss [Dkt. No. 15] establishes, Chabad's characterizations of the Russian proceedings are replete with misstatements and error.  Putting to one side for the moment that the Chief Arbiter's decision was vacated by the final or Third Decision of the State Arbitration Court, the Chief Arbiter's decision did not find Chabad to be the owner of the Library.  Rather, he reversed the lower court decision to the degree that it purported to address proprietary rights in the Library and, finding that the Library is considered part of the Russian National Treasure, ordered that it be turned over, not to Chabad, but to a newly formed entity in Russia, the Jewish National Library.  (Kovaleva Decl. ¶ 17.)

In *Sosa*, the court addressed the scope of federal court jurisdiction in civil actions under the Alien Tort Statute (ATS), 28 U.S.C. § 1350, establishing federal jurisdiction "for a tort only, committed in violation of the law of nations." In construing the jurisdictional grant of the ATS narrowly and finding no jurisdiction as to the claims before it, the *Sosa* court identified five reasons for which it counseled the lower courts to move cautiously in effecting remedies under the rubric of international law: First, the modern view of the common law is that it is made or created by judges and involves a substantial element of discretion that may be inappropriate in an international context; second, the limited institutional role of the federal courts in fashioning federal common law after *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938); third, private rights of action are more appropriately the creation of legislatures, not courts; fourth, the risk of adverse foreign policy consequences associated with the judicial creation of private rights of action and remedies for perceived violations of international law; fifth, the federal courts have no congressional mandate to seek out and define new and debatable violations of the law of nations. *Id.*, 542 U.S. at 725-28. Each of these reasons applies in this case. Proceeding with the requisite degree of judicial caution commanded by the Supreme Court, this Court should come to the conclusion that there has been no taking in violation of international law as to either the Library or the Archive.

<blockquote>

**a.      The Library Was Taken From the Fifth and Sixth Rebbes When They Were Citizens of Russia; A Taking By A Foreign State From Its Own Nationals Does Not Implicate International Law Principles**

</blockquote>

There is a consensus view in the federal courts and the international law community that "'violation of international law' does not cover expropriations of property belonging to a country's own nationals." *Republic of Austria v. Altmann*, 541 U.S. at 713 (Breyer, J., concurring) (*citing Altmann* v. *Republic of Austria*, 317 F.3d 954, 960 (9th Cir. 2002);

*Restatement (Third) of Foreign Relations of the United States* § 712 (1986)).  *See also de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1395-96 (5th Cir. 1985). The case law in the D.C. Circuit reflects that consensus.

Thus, in a recent opinion dismissing claims brought under the expropriation exception of the FSIA, this Court cited and quoted the Fifth Circuit's decision in *de Sanchez* for the proposition that "[t]he doctrine that international law does not generally govern disputes between a country and its own nationals rests on fundamental principles." *Rong v. Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 102 (D.D.C. 2005) (*citing de Sanchez*, 770 F.2d at 1397).[11]  Quoting *de Sanchez* favorably, this Court noted in *Rong*,

> "It may be foreign to our way of life and thought, but the fact is that governmental expropriation is not so universally abhorred that its prohibition commands the 'general assent of civilized nations.'  We cannot elevate our American-centered view of governmental taking of property without compensation into a rule that binds all 'civilized nations.'"

*Ibid. See also Dayton v. Czechoslovak Republic*, 672 F. Supp. 7, 9 (D.D.C. 1986) ("There was no violation of international law in 1945 when the government nationalized the property of its citizens ....'), *aff'd*, 834 F.2d 203 (D.C. Cir. 1987).

Here, the Library was unmistakably taken or (to use Chabad's preferred word) confiscated in 1917 or 1924 at the latest.  It was taken by the Russian government (the USSR) from the Sixth Rebbe, a Russian citizen until at least 1927 (when he moved to Latvia), and never returned to him.  "'Under international law, the date of taking is fixed by the date of the expropriation decrees and/or the date of physical seizure, and not by a subsequent date of repudiation of an undertaking to provide compensation.'"  *Dayton v. Czechoslovak Socialist Republic*, 834 F.2d 203, 206-207 (D.C. Cir. 1987)  (quoting letter from Richard Fairbanks, Asst. Secretary of State For Congressional Relations (Oct. 2, 1981), reprinted in REP No. 211, 97th

---

[11]    *Rong* is currently on appeal to the D.C. Circuit.

Cong. 1st Sess. 4-5 (1981)).

Chabad, apparently recognizing the obstacle the taking of the Library from the Fifth and Sixth Rebbes as Russian citizens presents to the international law strand of their claim, simply ignores it. Chabad would have the Court view the taking of the Library at issue, not as a taking that occurred entirely in Russia from a Russian citizen in the early part of the last century, but as a taking that occurred in 1992 when Chabad was unsuccessful in its litigation efforts in Russia to obtain the Library. In advancing this position, Chabad must ignore too much.

The record before the Court is replete with evidence that the Sixth Rebbe, not Chabad, was the owner of the Library. Indeed the letters Chabad places before the Court with the Declaration of Veronika R. Irina-Kogan ("Irina-Kogan Decl.") make it plain that the Sixth Rebbe viewed himself as, and was, the owner of Library. (*See, e.g.,* Irina-Kogan Decl. [Dtk. No. 40] Ex. C, p. 14 (Letter dated Nov. 22, 1922 from J. Schneerson) ["my collection of Jewish books"; "My library consists exclusively of Jewish religious books"]; Ex. D (Letter dated Feb. 5, 1925 from J. Schneersohn) ["I transported my vast collection of original books written in the ancient Hebrew language"; "My collection of religious books"].)

Moreover, there is simply no case authority for the proposition that a purported U.S. successor-in-interest to property confiscated by a foreign sovereign from one of its citizens long ago may claim that the foreign sovereign's subsequent refusal to turn the property over to the alleged U.S. successor is actionable under the FSIA as a violation of international law. Were it otherwise, one can envision a stream of claimants to confiscated property all over the world lining up at the federal courthouse doors staking claims and invoking the jurisdiction of the federal district courts to aid them in the recovery of property taken by foreign sovereigns from their citizens ages ago.

There is nothing in Chabad's allegations, evidence or, for that matter, the *Gourary* case, that raises Chabad's claims to the Library (or the Archive) to the level of claims for property taken in violation of international law (i.e., property taken by a foreign sovereign from an alien) that may now be sued upon by Chabad under the FSIA.

**b.     There Has Been No Taking of the Archive From Chabad**

For the same reasons that Chabad cannot claim a taking from Chabad of the Library, so too it cannot claim a taking of the Archive.  Chabad, which did not even exist until 1940, never owned or had possession of the Archive.  Moreover, even if Chabad has actionable rights as to the Archive (which for the reasons stated above, it does not), it has not alleged a taking of the Archive from Chabad in violation of international law.  Chabad's sole contention on that point is that the Russian government has not responded to a letter dated June 10, 2004 that Chabad Russia sent on behalf of the late Seventh Rebbe, contending that the Archive belonged to the Seventh Rebbe and requesting that the Archive be delivered to Chabad.  (Cmplt., ¶ 35.)  As discussed above, it is difficult to see how the non-response by the Russsian government to a letter written by a Russian entity, Russian Chabad with an address in Moscow, making claims as to materials asserted to belong to the deceased Seventh Rebbe, constitutes a taking, much less a taking in violation of international law.

Defendants know of no authority for the proposition that silence in response to an assertion of rights in property constitutes a taking of the property.  To the contrary, this Court has noted more than once that "a claimant cannot complain a 'taking' . . . violates international law unless the claimant has first pursued and exhausted domestic remedies in the foreign state." *Millicom International Cellular v. Republic of Costa Rica*, 995 F. Supp. 14, 23 (D.D.C. 1998). If there has been a taking of the Archive, whether from Russian Chabad or Chabad (which there has not been), there is no apparent legal bar to Russian Chabad's (or Chabad's) pursuit of

remedies it may have in the Russian Federation.   (Deposition of T. Kovaleva, Ex. C. to Declaration of Lan Quach (filed June 27, 2005) [Dkt. No. 46] at pp. 23-29.) Under the facts of this case, as Justice Breyer's concurring opinion suggested in *Republic of Austria v. Altmann*, the Court should be extremely hesitant to conclude that there has now been a taking of the Archive that is presently cognizable under the FSIA.  541 U.S. at 714 ("A plaintiff who chooses to litigate in this country in disregard of the postdeprivation remedies in the 'expropriating' state may have trouble showing a 'tak[ing] in violation of international law.'  28 U.S.C. § 1605(a)(3).") (Breyer, J. concurring).

> **3.     Chabad's Claims Do Not Satisfy The Third Requirement of The Expropriation Exception Under 28 U.S.C. § 1605(a)(3)**
>
> > **a.     Neither the Library Nor The Archive Are Present in the United States**

Assuming satisfaction of the first two requirements of section 1605(a)(3) (rights in property, taken in violation of international law), Chabad may bring this case within the expropriation exception to FSIA immunity only if its claims fall within one of the two categories of cases described under the alternative phrasings of the first and second clauses of section 1605(a)(3):  the "present in the United  States in connection with a commercial activity" clause or the "owned and operated by an agency or instrumentality engaged in a commercial activity in the United States" clause.  Here, because neither the Library nor the Archive is present in the United States – whether in connection with a commercial activity carried on by the Russian Federation, RMCMC, RSL or RSMA or otherwise – plainly the first clause of § 1605(a)(3) cannot furnish a basis for FSIA jurisdiction as to Chabad's claims.

The question, then becomes whether the second clause of § 1605(a)(3) can supply a basis for FSIA jurisdiction.  The second clause of section 1605(a)(3) certainly cannot furnish a basis for jurisdiction premised upon the activities of the RMCMC for two reasons.  First, RMCMC is

not alleged to be an agency or instrumentality of the Russian Federation, but rather a political subdivision of the Russian Federation. Therefore, it may be a source of FSIA jurisdiction only under the first clause of section 1605(a)(3), which is inapplicable because the property is not present in the United States.

Second, RMCMC does not have jurisdiction over the RSL and the RSMA where the Library and Archive are kept and maintained. (Nadirov Decl. [Dkt. No. 16] ¶ 2.) Accordingly, neither the Library nor Archive is "owned or operated" by the RMCMC. With RMCMC removed from the FSIA jurisdictional analysis, the issue then becomes, do the activities of the RSL and the RSMA, which do "own or operate" the Library and the Archive, for FSIA purposes, furnish a basis for jurisdiction. They do not because, as the record demonstrates, neither RSL nor RSMA "is engaged in a commercial activity" in connection with the property or otherwise as they must be to fall within § 1605(a)(3).

> **b.** **Neither the RSL Nor the RSMA is Engaged In A Commercial Activity In The United States**

Chabad's sole basis for contending that the Russian Government Defendants are not immune under section 1604 of the FSIA is the contention that the second prong of the third exception to the jurisdictional immunity of a foreign state—the Agency or Instrumentality Owned or Operated exception—as set out in FSIA § 1605(3) applies to this case. Chabad's analysis, however, does not focus on the actual provisions of that exception, but rather blurs important distinctions by citing cases and concepts applicable to the general "commercial activity" exception [FSIA §1605 (2)], and to the first prong of the expropriation exception. The difference is significant. See Memorandum of Points and Authorities in Opposition to Defendants' Motion to Dismiss ("Opposition") [Dkt. No. 45] at pp. 20-25.

All three prongs of the general "commercial activity" exception [FSIA § 1605(2)] require the action to be **based** upon an act related to "commercial activity", either in the United States or elsewhere, and having an effect in the United States. Cases involving this exception thus focus on what "commercial activity" is and its impact in well-defined circumstances. *See, e.g., Peterson v. Saudi Arabia, supra*, at 89-91. The first prong of the expropriation exception [FSIA § 1605(3)] on the other hand, requires that the expropriated property (or property exchanged for it) be both **present** in the United States **and** that its presence be in connection with a "commercial activity carried on in the United States by the foreign state."[12] In that situation, the commercial activity has to have "substantial contact with the United States" (*Malewicz v. City of Amsterdam,* 362 F. Supp. 2d 298, 315 (D.D.C. 2005)) based on the statutory definition of "commercial activity carried on in the United States" [FSIA § 1603 (e).].

By contrast, the second prong of the expropriation exception requires that the expropriated property be owned or operated by an agency or instrumentality **and** "that agency or instrumentality **is engaged** in a commercial activity **in the United States**."[13] (emphasis added). Assuming *arguendo* that under the second prong the expropriated property does not have to be in the United States, the undefined term "is engaged" must, at the very least, require a level of

---

[12]    The Russian Government Defendants know of only one case in which the first prong is involved; for obvious reasons it would be foolhardy to bring disputed expropriated movables to the United States for any remotely commercial purpose in view of this exception. The one case is *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298 (D.D.C. 2005), appeal pending, Case No. 05-5145 where the foreign state believed it had immunity based on a separate statute relating to a State Department determination allowing the property to be exhibited in the United States without being subject to seizure.

[13]    The few cases involving this second prong do not engage in any reasoned analysis of the "engaged in" requirement because they can either be disposed of , and immunity granted, on other grounds [such as the "property" being intangible; *See, e.g. Yang Rong v. Liaoning Provincial Government*, 362 F. Supp. 2d  83, 101]  or are obvious cases where the agency or instrumentality was engaged in commercial activity in the United States. *See e.g. Altmann v. Republic of Austria*, 317 F. 3d 954.

activity equal to standard established by the phrase "carried on" of the first prong and, accordingly, require "substantial contact" with the United States.  The contrary conclusion would mean that there would be a requirement of more commercial activity when the property is in the country than when it is not, a construction of the statute that makes no sense.

Indeed, one may conclude that because the phrase "carried on in the United States" is used in the same subparagraph as "is engaged in…in the United States", Congress must have intended the use of the term "is engaged" to impose a higher standard of contact with the United States.  This follows from the standard definition of "engaged" which requires the activity "to be so closely related thereto as to be for all practical purposes an essential part thereof" [Black's Law Dictionary, 6th Ed., definition of "engaged in commerce."].  *See* discussion of interpretation of FSIA exceptions in *Flatow v. The Islamic Republic of Iran,* 76 F. Supp. 2d 16, 22-23 (D.D.C. 1999 ["To effectuate this purpose, the statute creates various narrow windows of federal jurisdiction over foreign states."].  Thus, in determining whether the agency or instrumentality prong of FSIA § 1605(3) applies to the RSL and the RSMA, the proper focus is not solely (or even usually) on the nature of the allegedly "commercial activity" but on the closeness of the relationship of that activity to the United States; to whether it is an essential part of activity in the United States.

Accordingly, as a preliminary matter, all of the references by Chabad to commercial, or purportedly commercial, activities of RSL and RSMA in Russia or elsewhere outside the United States can safely be ignored.  This would include, for example, the RSL's involvement in "joint publishing projects" with "foreign participation" [no evidence was submitted that it is United States participation that is the "foreign participation"], RSL and RSMA contracts to provide in Russia materials for microfilming or use in publications, [all cited in  Opposition (Dkt. No. 45),

at pp. 22, 23 and 25[14]], the fact that RSL's bylaws permit "commercial activity" and the fact that the RSMA's contracts permitting microfilming of documents in Russia by an American company recite that RSMA's activities in Russia, under the contract, are "commercial" [cited in Chabad's Supplemental Memorandum in Opposition to Motion (Dkt. No. 50)], RSL's sale of books and souvenirs at the library in Russia, and the provision of copying services in Russia at the library for library users.  None of this activity has any relevance at all to determination of whether either the RSL or the RSMA "**is engaged** in a commercial activity **in the United States**." (Emphasis added.)  The balance of this section of this brief will detail the evidence that shows that none of the alleged activity of the RSL or the RSMA relied upon by Chabad shows that either "is engaged in a commercial activity in the United States."

        **c.**        <u>**RSL Is Engaged In No Commercial Activity In The United States.**</u>

In Chabad's complaint, the factual allegations that the RSL "[is] engaged in commercial activity in the United States [and in the Central District of California]…" are that (1) the RSL advertises and sells its books, other historical documents, and other items on an interactive website; and (2) the RSL collect entrance fees and accepts U.S. dollars, credit cards and travelers checks (in Russia).[15]  (Cmplt., ¶¶ 4, 39 (f) (g) and (h)).

---

[14]      Many of Plaintiff's record references are not supported by the Declaration of Seth M. Gerber in Opposition to Motion to Dismiss ("Gerber Decl.") [D.C. Cal. Dkt. No. 33, 34] and  its exhibits.  This declaration of 29 pages with 72 exhibits contains Chabad's analysis of the alleged facts regarding "commercial activity" engaged in by RSL and RSMA in the United States which are only briefly referred in Chabad's Opposition Memorandum.   These references are analyzed extensively in the Declaration of Don A. Proudfoot in Support of Defendants' Reply ("Proudfoot Decl.") [Dkt. No. 48], which is in reply to the Gerber declaration.  Since Chabad choose to rely principally upon the Gerber declaration for argument and analysis of Chabad's claim that RSL and RSMA were engaged in commercial activities in the United States, close review of these declarations is helpful in understanding the factual issues.

[15]      The complaint also alleges that the RSL receives donations for American charitable sources.  Chabad, however, never offered any authority or analysis to suggest that receipt of

The evidence does not support these allegations as a basis for concluding that the RSL "is engaged in commercial activity in the United States." The RSL does not charge entrance fees to library visitors or users [Declaration of Victor V. Fedorov ("Fedorov Decl") [Dkt. No. 14] ¶3] and even if it did, since the RSL is in Moscow and has no branches in the United States (*Id.*), it would be activity "engaged in" Russia, not the United States.

The RSL English language web-site is passive, not interactive (*Id.*) A passive website is not a basis for concluding that an entity is engaged in commercial activity in all or any of the jurisdictions from which the website can be accessed; the RSL website provides only an address, phone number and an invitation to communicate by email. Chabad has provided no evidence that there is any location on the website where there is an active interchange of information or ability to purchase online. *GTE New Media Services, Inc. v. Bellsouth*, *Corp.,* 199 F.3d 1343, 1348-9 (D.C. Cir. 2000) ["Additionally, personal jurisdiction surely cannot be based solely on the ability of District residents to access the defendant's websites….This theory simply cannot hold water. Indeed, under this view, personal jurisdiction in Internet-related cases would almost always be found in any forum in the country."][relying, in part, on *Cybersell, Inc. v. Cybersell, Inc.*, 130 F. 3d 414, 419-20 (9th Cir. 1997).]

After extensive jurisdictional discovery was provided to Chabad, Chabad also contended that RSL "is engaged in commercial activity in the United States" because : (1) books published by RSL's publishing imprint, Pashkov Dom, are found listed in card catalogs in libraries in the United States; (2) that RSL has entered into contracts with Norman Ross Publishing ("NRP"), and with Proquest Information & Learning ("Proquest"); (3) that RSL lent seven books from the Schneersohn Library to the Library of Congress to lend to Chabad [which books have never

---

charitable donations in Russia, whether from the United States or elsewhere can be considered being "engaged in commercial activity in the United States."

been returned as agreed];  (4) that RSL lent some posters to MOMA  in New York for an exhibit; and (5) that an independent non-profit document retrieval company, Russian Courier, charges fees for retrieving documents from RSL [Opposition (Dkt. No. 45)] at pp. 22, 24].[16]

None of these claims provides evidence that RSL "is engaged in commercial activity in the United States."  The books listed in library card catalogs may or may not be available at the libraries and, in any event, there is absolutely no evidence that the books were acquired by the libraries either in the United States or even directly from the RSL in Russia [See, e.g., paragraph 15 to Proudfoot Decl. [Dkt. No. 48] and supporting Exhibit 1, and paragraph 6 to Declaration of Don A. Proudfoot, Jr. in Support of Supplemental Reply ("Proudfoot Supp. Decl.") and supporting exhibit E [Dkt. No. 54]].

The contracts with NRP and Proquest were all entered into in Russia.  The NRP contracts and the Proquest contracts are contracts under which NRP and its assignee produce and sell microfilm products based on materials and microfilm in the RSL.  RSL has no role in the production, marketing or sale of these materials, it receives only a passive royalty in Russia. Proudfoot Decl. ¶ 21 [Dkt. No. 48].   The supposed copyrights were applications by NRP and the books were published in the United States  and sold by NRP.  See, Objections to Declaration of Scott S. Widitor, [¶7] and supporting July 6th Declaration of Lan T. Quach ¶ 2 [Dkt. Nos. 57 and 64, respectively].

Chabad has provided no authority or analysis that would support the contention that RSL's loan of seven books to the Library of Congress to be in turn lent to Chabad constitutes commercial activity in the United States, much less substantial commercial activity.  The *City of*

---

[16]      The Opposition erroneously indicates that the Exhibit was in 2002; it in fact was in 1997. See, Exhibit B, p. 15-25 to Supplemental Declaration of Seth M. Gerber in Support of Plaintiff's *Ex Parte* Application [Dkt. No.70].

*Amsterdam* case, *supra,* offers no such support.  In that case, there was evidence of the custom and practice with respect to art exhibits; in this case, there is no evidence that an interlibrary loan from one national library to another has any customary commercial purpose and it would be perverse, indeed, to allow the loan of books intended to be and actually passed on to Plaintiff Chabad (and not returned as agreed) to be the basis of finding jurisdiction under FSIA. Moreover, the *City of Amsterdam* case, *supra*, relied upon by Chabad in this regard is a first prong expropriation case, not a second prong case; as such, the commercial activity only has to involve substantial contact of a commercial nature with the United States.  Unlike in the *City of Amsterdam*, the commercial conduct in this case has to be a substantial one by an entity, "engaged in" commercial activity in the United States.  Hence, the fact that the art in the *City of Amsterdam* case was lent from Amsterdam was not critical to the analysis in *City of Amsterdam.*

The **1997** loan of posters by famous Russian graphic artists to MOMA in New York, even assuming it involved "commercial activity," certainly does not show the RSL "**is engaged**" in such activity in the United States in **2004** when the suit was filed.  *See*, Exhibit B, p. 15-25 to Supplemental Declaration of Seth M. Gerber in Support of Plaintiff's *Ex Parte* Application [Dkt. No.70].  *See Dole v. Patrickson*, 538 U.S. 468, 478 (2003) (construing the FSIA's use of the present tense in defining an agency or instrumentally as confining the Act's application to the present status of the entity).  In addition, the same analysis of the *City of Amsterdam* case applicable to the loan of books, *supra*, is equally applicable here; the *City of Amsterdam* is a first prong expropriation case and this case is a second prong case and thus the standard of analysis is different.

Finally, Russian Courier is simply a red herring.  The evidence clearly shows that while Russian Courier's office is located at the RSL, and that the RSL was one of several founders of

Russian Courier, that Russian Courier is an independent, autonomous non-profit [but fee based] organization which is neither controlled by nor financed by RSL and from which RSL derives no income. Proudfoot Decl. ¶20 [Dkt. No. 45] and June 27 Declaration of Lan T. Quach, Exhibit F (Bylaws of Russian Courier) [Dkt. No.47]. Chabad presented no evidence that in these circumstances the acts of Russian Courier could be attributed to RSL.

All of these same issues, on the identical evidence, were presented to and decided by Judge Anderson of the Central District in deciding to transfer venue of the case to this Court. Judge Anderson's ruling and order are instructive[17] on a key issue still before this Court: whether either the RSL or the RSMA "is engaged in commercial activity in the United States," as they must be for the expropriation exception to foreign sovereign immunity under 28 U.S.C. § 1605(a)(3) to apply at all. In addressing the issue of whether the RSL and RSMA were doing business in the Central District for venue purposes, Judge Anderson necessarily considered whether the RSL and the RSMA were engaged in commercial activity.

Thus, in that portion of the court's ruling entitled "RSL's Commercial Activity," Judge Anderson addressed "various commercial activities [allegedly] engaged in by RSL, including website hosting, publishing, copyrighting, loaning of books, and selling research and information." (July 14, 2005 Order, pp. 5-8 [Dkt. No. 56].) As to the RSL's website, the court correctly held, relying on *Cybersell, supra*, that hosting a passive information-only website in Russia accessible from the United States did not constitute doing business in Los Angeles. (*Id.* at 5-6.) As to the fact that books published by the non-profit publishing arm of the RSL,

---

[17]     The "law of the case" doctrine applies with respect to a transferred case, although it is not "a limit to their power". Thus, " [a]court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was 'clearly erroneous and would work a manifest injustice.'" *Christiansonl v. Colt Industries Operating Corp,*. 486 U.S. 800, 817 (1988).

Pashkov Dom, are available in the United States through the independent activities of third parties such as Norman Ross Publishing, Inc., ProQwest and East View Information Services, the court correctly found that there was no evidence that RSL or Pashkov Dom participated in or was directly involved in those sales. (*Id.* at 6.)  As to the activities of Russian Courier, an autonomous non-profit organization located at the RSL, that offers a fee-based supply of documents, information and research to various institutions, organizations and private parties, the court found that the activities of Russian Courier through its passive website could not be attributed to RSL.  (*Ibid.*)  Finally as to the RSL's participation in exhibits in New York in 1997 and Los Angeles in 1999, the court found these to be irrelevant to current circumstances and the issue of whether the RSL "<u>is</u> doing business" in Los Angeles.  (*Id.* at 7 (emphasis in original).)

As demonstrated above, Judge Anderson's ruling was fully justified by the evidence before him and now before this Court.  None of the evidence would support a determination that RSL "is engaged in commercial activity in the United States."

### d.    RSMA Is Engaged In No Commercial Activity In The United States

The situation with the RSMA is exactly the same as with the RSL except that Chabad makes far fewer allegations and claims with respect to commercial activity by RSMA.    The three claims that are put forward by Chabad with respect to whether RSMA "engages in commercial activity in the United States" are that: (1) the RSMA has an interactive web site; (2) the RSMA collects entrance fees; and (3) RSMA has contracts with Yale University ("Yale") and Primary Source Media ("PSM.").  Complaint ¶ 5 and Opposition, p. 25 [Dkt. Nos 1 & 45 respectively].

Once again, there is no supporting evidence that would indicate that RSMA is engaged in commercial activity in the United States.  The RSMA web site, just like that of the RSL, is

passive; indeed, Chabad makes no argument to the contrary to counter the Declaration of Valdimir Kouzelenkov, the Director General of the RSMA, that its website is not interactive and that it charges no fees to researchers entitled to use its archival materials. See, ¶¶ 3 and 4 [Dkt. No.17].

With respect to the contracts, the full extent of the information and argument provided by Chabad in its Opposition with respect to the Yale contract is that it was entered into in 1997 and expires in 2027. Opposition, p. 25 [Dkt. No. 45] What Chabad does not say is why this contract shows RSMA engages in commercial activity in the United States, or even what the contract is about. The contract on its face shows that it is one where scholars will work at the archive on materials relating to the Spanish Civil War and that from that work, "Yale will print, publish and distribute 'The Spanish Civil War' at Yale's sole expense" and that the duties of the RSMA are all to be performed at the RSMA. Gerber Decl., exhibit 69, ¶¶ 3 and 4 respectively [Dkt. No. 33] and that for the year 2004 (the year of filing of the complaint) the net royalty earned by the RSMA for sales worldwide was $56.43.[18] (*Id*. at p. 945)

With respect to the PSM contracts, the contracts themselves provide that everything RSMA is required to do is done in Russia and that the microfilming of archival documents was done in Russia by PSM. The microfilm was produced, published and sold by PSM. The governing contract document is in Russian, Russian law applies to the contract and royalty payment is made to RSMA's bank account in Russia in rubles. The Bucci declaration submitted by Chabad confirms that the "reels of microfilm [are] published and produced by Primary Source Media from documents Primary Source Media copied in Russia at the RSMA…" (Bucci Decl. ¶ 7.) [Dkt. No. 38], Proudfoot Decl. ¶¶ 4-8 [Dkt. No.48]. Chabad makes much of the fact that

---

[18]     The royalties were charged to a pre-paid royalty account.

RSMA retains some commercial rights to limited distribution but there is no evidence that those rights were ever utilized, not to mention utilized with respect to the United States. *Cf.* Proudfoot Decl. ¶ 8(c), Ex. 2, p. 23 [Dkt. No. 48]. This evidence clearly demonstrates that with respect to the PSM contracts, RSL is not "engaged in commercial activity in the United States"; its duties and performance were all in Russia and all it did was passively receive royalties for the use of its archival records.

The issue of the RSMA's commercial activities was also before Judge Anderson when he made his ruling on the venue motion and order of transfer of the case to this Court. Once again, Judge Anderson concluded that as to the agreements between Yale and RSMA, and PSM and RSMA, even though there was some evidence that Yale and PSM were selling products derived from RSMA archival materials, there was no evidence that RSMA was directly involved in these transactions. Accordingly, Judge Anderson concluded there was "no evidence that RSMA was "doing business in this District." Ruling on Venue Motion [Dkt. No. 56]. Similarly, the lack of any evidence of direct involvement by RSMA in transactions in the United States leads inevitably to the conclusion that RSMA is not engaged in commercial activity in the United States.

Since the evidence does not demonstrate that either RSL or RSMA "is engaged in commercial activity in the United States", the second prong of the expropriation exception to sovereign immunity does not apply and under FSIA §1604, the RSL and RSMA (and hence all of the Russian Government Defendants) are immune from this Court's jurisdiction.

## C. Adjudication of Chabad's Claims in the United States Is Barred By The Act of State Doctrine

"The sovereign immunity recognized in the FSIA is supplemented by the 'Act of State Doctrine' which 'precludes the courts of this country from inquiring into the validity of the

public acts [of] a recognized foreign sovereign power committed within its own territory.'"
*Dayton*, *supra*, 672 F. Supp. at 12-13 (*quoting Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).  As the Supreme Court explained in *Sabbatino*, under the Act of State doctrine,

> "the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law."

*Banco Nacional de Cuba v. Sabbatino*, 376 U. S. 398, 428 (1964).  The case at bar presents a "paradigmatic setting for the act of state doctrine."  *Dayton,* 834 F.2d at 206 (Ginsburg, J.) Whether viewed as a taking in 1917, 1992 or 2004, the actions that Chabad seeks to call into question are as to property taken and held by a foreign sovereign within its own territory.  The district court's opinion in *Dayton*, 672 F. Supp. 7, *aff'd*, 834 F.2d 203, is instructive on the application of the Act of State doctrine in the FSIA context under similar facts.

In *Dayton*, plaintiffs, who were citizens of Czechoslovakia when their textile production plants were nationalized by the Czechoslovak government in 1945, had been promised compensation by the nationalizing regime.  After the nationalization of their plants, between 1946 and 1948, plaintiffs emigrated and became citizens of the United States.  In 1948, a Communist government came to power in Czechoslovakia and refused to honor the promises made by its predecessor government of compensation to plaintiffs.  672 F. Supp. at 8.  In 1981, plaintiffs received a small portion of the value of their plants as determined by the U.S. Foreign Claims Settlement Commission from funds obtained by the United States in a claims settlement agreement reached between the government of the United States and that of Czechoslovakia.  *Id.* at 8, nn.1-2.  Plaintiffs later brought suit in the District of Columbia against the government of Czechoslovakia and  a government controlled textile trading company, Centrotex, to recover the

"unpaid balance" of the value of their plants, asserting jurisdiction under the FSIA expropriation exception.

In addition to finding, as discussed above, that the plaintiffs had failed to bring their claims within the expropriation exception of the FSIA, because Centrotex, the agency or instrumentality on whose alleged commercial activities in the United States FSIA jurisdiction was premised, did not own or operate the plants or property exchanged for the plants, the district court in *Dayton* found that the act of state doctrine particularly applicable. The court noted, "These cases arise over Czechoslovakia's nationalization of the property of persons who were citizens of that country at the time their property was seized. Moreover, the Czechoslovakian nationalization program has been the subject of extensive negotiations between the United States and Czechoslovakia, negotiations which resulted in a large settlement." 672 F. Supp. at 12. In response to plaintiffs' assertions that the doctrine was inapplicable because they were not seeking to undo nationalization decrees but rather an equitable remedy of restitution for the failure of the then current Czech regime to honor the promises of its predecessor, the *Dayton* court stressed, "Clearly, this Court lacks the power to return the plaintiff's property to them; therefore the only possible remedy the plaintiffs could be seeking is damages." Here, on the other hand, the only true remedy Chabad seeks is delivery of the Library and Archive,[19] This Court's ability to provide that remedy is doubtful. The FSIA provisions on sovereign immunity from execution on judgments and "execution immunity" provide exceptions to execution immunity only as to property of the foreign state (again defined to include an agency or

---

[19]     In its prayer for judgment, Chabad seeks declaratory relief that Defendants are in wrongful possession of the Library and the Archive, a mandatory injunction compelling their "return" to Chabad and the imposition of a constructive trust upon the Library and the Archive. (Complaint at 22:6-18.) Chabad's claims and prayer for damages are as to "fees and expenses incurred to recover the Collection..." (Complaint ¶ 48.)

instrumentality of the state) that is in the United States.  28 U.S.C. §§ 1609-1610.  Accordingly, as in *Dayton*, the Court is  precluded under the act of state doctrine from adjudicating Chabad's claims.

Chabad has previously argued that the act of state doctrine is inapplicable due to Congressional enactment of the Second Hickenlooper Amendment, 22 U.S.C. § 2207(e)(2).[20] The Court need not tarry over that argument.  First, the Second Hickenlooper by its terms does not apply to claims that are based upon or traced back through confiscations occurring before January 1, 1959.  Here Chabad's claims are based upon and traced back to confiscations in 1917, in the case of the Library, and 1945, in the case of the Archive.  Second, the Second Hickenlooper Amendment, by its terms, does not apply to takings that are not in violation of international law. Here, as demonstrated above, there has been no taking in violation of international law.  Third, as this Court, following the lead of the Fifth and Second Circuits, has recently held:  "the Amendment is inapplicable [where] the property at issue is not located in the United States."  *Rong v. Liaoning Provincial Gov't.*, *supra*, 362 F. Supp. 2d at 99 (*citing Compania de Gas de Nuevo Laredo, S.A. v. Entex, Inc.*, 686 F.2d 322, 327 (5th Cir. 1982) and *Empresa de Cubana Exportadora De Azucary Sus Derivados v. Lamborn & Co.*, 652 F.2d 231, 237 (2d Cir. 1981)).

---

[20]    The statute reads in pertinent part:

> "Notwithstanding any other provision of law, no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party … based upon (or traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law, …. Provided, that this subparagraph shall not be applicable (1) in any case in which an act of a foreign state is not contrary to international law. . . ."

**D.**     **Forum Non Conveniens**

Even assuming that jurisdiction is proper, this Court should decline to exercise jurisdiction over this matter on the ground of *forum non conveniens* as this case would more appropriately be heard in Russia.  Under the doctrine of *forum non conveniens*, a court can decline to hear a case despite the high level of deference ordinarily accorded to the plaintiff's choice of forum if (1) there is an adequate alternative forum and (2) the presumption in favor of the plaintiff's choice of forum is outweighed by certain private and public interest factors.  *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506-509, 67 S. Ct. 839, 842-845, 91 L. Ed. 1055, 1061-1063 (1947); *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 250, 102 S. Ct. 252, 263, 70 L. Ed. 2d 419, 432 (1981); *Pain v. United Techs. Corp.*, 637 F.2d 775, 784 (D.C. Cir. 1980).

Plaintiff's choice of forum should be given less deference in this case because the usual presumption of convenience attributed to a U.S. resident's choice is not applicable in this case. In *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc), the Court of Appeals clarified the degree of deference that courts should afford to a U.S. resident's choice of forum when that plaintiff files suit in a district other than the one in which the plaintiff resides. The Court of Appeals concluded that:

> On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons -- such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, . . . the plaintiff's popularity or the defendant's unpopularity in the region, . . . -- the less deference the plaintiff's choice commands . . . .

*Id.* at 72.  Here, as Judge Anderson's venue ruling suggests, it appears that Plaintiff's choice of a U.S. forum was motivated by forum-shopping rather than by reasons that the law recognizes as valid.

No matter what level of deference is accorded a plaintiff's choice of forum, however, a court should still dismiss for *forum non conveniens* if the factors weigh in favor of dismissal. *See, e.g., Reyno*, 454 U.S. at 256 n.23 ("A citizen's forum choice should not be given dispositive weight....Citizens or residents deserve somewhat more deference than foreign plaintiffs, but dismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." [citations omitted].).

As will be shown below, Russia is an adequate alternative forum and the inconvenience to Defendants of a D.C. forum clearly outweighs any convenience to Plaintiff.  Accordingly, the Court should dismiss this dispute on the ground of *forum non conveniens*.

### 1.    Russia Is An Adequate Alternative Forum

The first requirement a Court must consider in deciding whether to apply the doctrine of *forum non conveniens* is whether an alternative forum is available in the foreign country.  *See, e.g., Reyno*, 454 U.S. at 255 n.22; *Pain*, 637 F.2d at 768.  An alternative forum is deemed adequate if the defendant is amenable to process in the foreign forum and the foreign forum permits litigation of the subject matter of the dispute.  *See Gilbert*, 330 U.S. at 506-507; *Reyno*, 454 U.S. at 253-254.  The Russian Federation is obviously amenable to process in Russia. Similarly, the remaining Defendants, the RMCMC, the RSL, and the RSMA, political subdivisions or agencies and instrumentalities of the Russian Federation, are also amenable to process in Russia.  (Dkt. No. 1, ¶¶ 3-5.)

It is also clear that the Russian Federation permits litigation of the subject matter of this dispute; Plaintiff previously filed and prosecuted a similar action in Russia from 1991-1992. (Dkt. No. 1, ¶¶ 23-30.)  The existence and interpretation of the various prior legal proceedings in

Russia means this Court, if it proceeds, will be required to delve into the details of the law in, and legal system of, the Russian Federation.  It is directly put in issue by the Complaint itself. This complexity, including issues of comity, res judicata and deference to prior judicial actions, is a prime factor in indicating that a forum with no real contact with the problem should not spend its resources in this manner.

Defendants have submitted a declaration of Ms. Tatiana K. Kovaleva, an Assistant Professor of Constitution Law at M.V. Lomonosov Moscow State University, a position she has held since 1997.  (Kovaleva Decl. [Dkt. No. 15], ¶ 1.)  Ms. Kovaleva has practiced law as an attorney in the Russian Federation since 1990.  (*Id.*)  Ms. Kovaleva also had her deposition taken in this case on June 22, 2005.  (Dkt. Nos. 47, ¶ 7; 65.)  Ms. Kovaleva explained that in 1991 and 1992, there were two systems of courts in the Russian Federation, State Arbitration Courts, which resolved economic disputes between legal entities and could not resolve claims over title to and ownership of property involving individuals, and General Jurisdiction Courts, which resolved all other cases.  (Kovaleva Decl., ¶¶ 11-12).  The proceeding Chabad filed in Russia was brought in the State Arbitration Courts, which rendered a decision (the "First Decision") holding that the Chabad Community had ownership rights as to the Schneersohn Library and ordered the Library delivered to the Chabad Community.  The Second Decision reversed the First Decision to the extent that it purported to address the proprietary rights to the Schneersohn Library and ordered the transfer of the Schneersohn Library to the Jewish National Library and not the Chabad Community.  (*Id.* at ¶¶ 14-17.)  After facts were presented that the Jewish National Library did not have a legal existence, Deputy Chief Arbiter Puginsky rendered the Third and final decision and revoked all prior rulings because he found that they were in excess of the State Arbitration Court's jurisdiction because decisions as to the ownership of property of

individuals were for the General Jurisdiction Courts. (*Id*. at ¶¶ 18-20.) The ruling by Deputy Chief Arbiter Puginsky was within the scope of his authority. (*Id*. at ¶ 20.) Thus, Chabad is in its current position because it brought the Russian proceeding in the wrong court.

Ms. Kovaleva further testified that a foreign party may sue the Russian Federation in a Russian court (Quach Decl. [Dkt. No. 47], ¶ 7) and that Decree No. 2377-1, dated February 19, 1992, a copy of which is attached as Ex. E to Ms. Kovaleva's declaration, does not prevent Chabad from bringing an action in a Russian court with respect to the return of the Schneerson collection. (*Id*. at ¶ 8; Kovaleva Decl., ¶ 22.)

Plaintiff's evidence with respect to whether Russia is an alternative forum is the declaration of Ms. Veronika Irina-Kogan, who is one of the five individuals designated by the Seventh Rebbe to obtain the "return" of the Library to New York, attempting to argue that the Third Decision was improper because notice was not given to Chabad in the Russian proceeding. (Irina-Kogan Decl. [Dkt. No. 40], ¶ 12.) However, as testified by Ms. Kovaleva, if a party claims that it never received notice of a proceeding by a court, there is a "proper way of challenging court decisions issued in the incorrect procedural manner," and "the first way is to go to the procurator office, because general procurator office has a special department in Russia which is in charge to challenge the legality of the action of the court or courts in the Russian Federation." (Quach Decl. [Dkt. No. 47], ¶ 9.)

Other courts have found Russia to be an adequate forum. *See Base Metal Trading SA v. Russian Aluminum*, 253 F. Supp. 2d 681, 707, n.22 (S.D.N.Y. 2003) (rejecting argument that the Russian forum is corrupt and its procedural safeguards are inadequate to assure fair resolution of disputes and finding Russia to be an adequate alternative forum). Russia is clearly an adequate alternative forum to adjudicate this dispute.

2.    **The Private And Public Interests Favoring Russia As The Alternative Forum Outweigh Plaintiff's Choice Of Forum**

The next requirement in a *forum non conveniens* analysis is to show that the balance of the private and public interest factors favor dismissal.  *See Reyno*, 454 U.S. at 256. The Court may dismiss the case "[i]f the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court" (*Id*. at 256 n.23) or when the "chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems."  (*Id*. at 241.)

a.    **The Private Interest Factors Weigh In Favor Of Dismissal**

The private interest of the litigant includes factors such as (1) the relative ease of access to sources of proof; (2) availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) possibility of view of premises, if view would be appropriate to the action; (5) the convenience of the witnesses; and (6) all other practical problems that make trial of a case easy, expeditious and inexpensive."  *Gilbert*, 330 U.S. at 508-509; *Pain*, 637 F.2d at 782; *BPA Int'l, Inc. v. Sweden*, 281 F. Supp. 2d 73, 86 (D.D.C. 2003).

The private interest factors dealing with access to sources of proof and availability of compulsory process for attendance of unwilling witnesses favor the forum in which the events at issue in the lawsuit took place, because often the bulk of the witnesses and the physical evidence are located in the same place.  *See, e.g., BPA Int'l, Inc.*, 281 F. Supp. 2d at 86 (in granting the motion to dismiss for *forum non conveniens*, noting that "[b]ecause BPA International's claims arose out of actions occurring in Sweden, access to sources of proof would be much easier if the case were heard in Sweden rather than Washington, D.C.  Many, if not most, of the potential witnesses and much of the evidence will likely be located in Sweden and therefore will likely be

beyond the reach of this Court's compulsory process.")

Here, the alleged taking by Defendants of the Library and the Archive occurred in Russia and Poland or Germany and the bulk of the witnesses and the primary physical evidence, the Library and the Archive themselves, are located in Russia. Thus, access to the physical evidence in Russia and other sources of proof clearly favor dismissal.

Assuming witnesses located in a foreign forum are willing to testify at trial in the district court, the district court should consider the cost of obtaining their presence at a trial in the United States. *See BPA Int'l, Inc.*, 281 F. Supp. 2d at 86 ("obtaining witnesses' attendance will be significantly less costly if the case were heard in Sweden rather than the District"); *Blanco v. Banco Indus. De Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir. 1993) (obtaining presence of Venezuelan witnesses at trial in New York that "would entail considerable expense" weighed in favor of dismissal.)

The witness costs associated with litigating this dispute in the United States would be substantial. The Russian Government Defendants would need to bring witnesses and evidence to Washington, D.C., as all of the underlying events occurred, and all the documents are located, in Russia. Most of the witnesses will be Russians who reside in Russia, and, thus, the cost to bring them to attend the trial in Washington, D.C. would be a very heavy burden. Requiring Defendants to bear these large costs is particularly inappropriate in view of the fact that Plaintiff has previously brought a similar case in Russia where these costs were avoided.

In a case in which a view of the premises is appropriate, the possibility of viewing the premises will weigh in favor of dismissal if the premises are located in the alternative forum. *See Reyno*, 454 U.S. at 241, n.6; *Pain*, 637 F.2d at 786. In this case, Plaintiff seeks a declaration that it is the rightful owner of the "Collection." (Cmplt., [Dkt. No. 1], ¶ 51.) In making any such

determination, the Court must first determine what books and documents are part of the "Collection." In July 2000, Rabbi Shalom Dovber Levine examined the Library's contents at the Russian State Library and allegedly identified 4,354 books belonging to the Library. (Dkt. No. 18, RJN, Exh. 1, tab T at 90.) Since Rabbi Levine's examination of the Library was allegedly not completed in 2000 (see *id*.), any determination by a court of the content of the Collection must include evidence of the contents of the Library and the Archive. Thus, the Library and the Archive, both located in Russia, must be examined by the parties and their experts. This factor favors the Russian forum as that is where the "Collection" is located.

When documentary evidence is in a language other than English (and that other language is used in the alternative court), the cost of having to translate the documents (as well as trial and deposition testimony) into English if the case were retained militates in favor of dismissal. *See Baumgart v. Fairchild Aircraft Corp.*, 981 F.2d 824, 836 (5th Cir. 1993), *cert. denied*, 508 U.S. 973 (1993); *Meridian Seafood Prods., Inc. v. Fianzas Monterrey, S.A.*, 149 F. Supp. 2d 1234, 1239 (S.D. Cal. 2001) (affirming dismissal by considering, among other things, the "[s]imilar waste [that] would result from the parties' need to translate virtually every document and much of the testimony involved in this litigation into English."). Here, several documents have already had to be translated from Russian to English: the writings of the Sixth Rebbe regarding the Library, mandates regarding the Library, and the decisions with respect to the case brought before the State Arbitration Court. (Dkt. No. 18, Exh. 1 tabs. D-G at pp. 32-42, O-R at pp. 68-86.) In addition, various declarations in support of Defendants' motion to dismiss have been translated from English to Russian. (*See* Decls. of Fedorov [Dkt. No. 14], Kouzelenkov [Dkt. No. 17], and Nadirov [Dkt. No. 16].) Furthermore, translators were required at the deposition of three of Defendants' declarants, Messrs. Fedorov, Kouzelenkov, and Nadirov, which were taken

in Moscow by video conference on the limited issue of jurisdiction. If this matter is permitted to proceed in this district, it is anticipated that many more depositions, requiring translators, will be taken and will be taken in Russia. In fact, Chabad has already indicated that if the motion to dismiss is denied, it anticipates taking approximately 20 depositions[21], which would include the deposition of Victor Fedorov (General Director of RSL), Vladimir Kouzelenkov (Director of RSMA), Vladimir Korotaev (Deputy Director of RSMA), Nina Khakhaleva (Deputy Director General of RSL), Leonid Nadirov (Deputy Minister of RMCMC), Meri Trifonenko (Director of RSL's Oriental Literature Centre), and Tatiana Kovaleva, all Russian residents. (Joint Report of Early Meeting [Dkt. No. 71], ¶ 5c].)

Defendants, on the other hand, anticipate taking the deposition of, at a minimum, Veronika Irina-Kogan (citizen of the Russian Federation), Leon Fuerth, and Rabbi Cunin. It should also be noted that information regarding many of the issues presented in this case, such as the Russian Federation's acquisition of the "Collection", would need to be acquired from foreign sources, including Russian witnesses. This illustrates the continuing burden litigation in this forum will place on Defendants, a burden that would not exist if the case were being adjudicated in Russia.

Additionally, many, if not all, of the evidentiary documents in this case are in Russian or Hebrew (including the writings of the Fifth Rebbe and the Sixth Rebbe and the Library and Archive) and, thus, must be translated into English if this case is tried in this forum. While Plaintiff has translated some documents with respect to this motion, Defendants will also need to translate those documents as there will likely be disputes regarding which translation is accurate. Moreover, the potential witnesses to this dispute are Russians and their deposition and trial

---

[21]     Defendants do not concede that Chabad would be entitled to these depositions.

testimony would need to be translated into English if this dispute were to be tried in the United States. Thus, the high cost of having to translate the foreign language documents and the trial and deposition testimony into English if this case were retained in the United States favors dismissal.

Moreover, if the subject of the dispute is located in the foreign forum, plaintiff may encounter problems in enforcing this District Court's judgment. *See Dayton*, 672 F. Supp. at 13 (in FSIA case, Court states it "lacks the power to return the plaintiffs' property to them [the remedy plaintiff seeks here]; therefore the only possible remedy the plaintiffs could be seeking is damages"); s*ee also Fluoroware, Inc. v. Dainichi Shoji K.K.*, 999 F. Supp. 1265, 1271-1273 (D. Minn. 1997) (dismissal on the ground of *forum non conveniens* was granted when majority of witnesses and evidence was located in Japan, lawsuit involved defendant's conduct in Japan, and it was unclear whether district court's judgment would be enforceable in Japan). Since the "Collection" is located in Russia, any judgment that Plaintiff may obtain requiring the Russian Defendants to transfer ownership of the "Collection" to Plaintiff would have a far greater chance of being enforced in Russia if it were to come from a Russian court rather than a U.S. court.

## b.    The Public Interest Factors Weigh in Favor of Dismissal

In evaluating a *forum non conveniens* motion, courts consider the following public interest factors: (1) administrative difficulties due to court congestion; (2) the local interest in having localized controversies decided at home; (3) the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; and (4) the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law. *Gilbert*, 330 U.S. at 508-509; *Pain*, 637 F.2d at 782; *BPA Int'l, Inc.*, 281 F. Supp. 2d at 85-86 (in concluding that the public interest favors dismissal, the Court notes that "[n]one of the events and none of the parties has a connection with Washington, D.C., except Sweden which has an Embassy here.

The local community is unlikely to have any special interest in this litigation whereas the citizens of Sweden have a much more significant interest because the case involves Swedish corporations and the Kingdom of Sweden itself, and stems almost entirely from events that occurred in Sweden".)

The public interest factors weigh against maintenance of this action in Washington, D.C. Although some residents of Washington, D.C., especially those who follow the Chabad beliefs, may have an interest in the Library and the Archive, this interest is outweighed when compared to the time and resources the District Court in the District of Columbia would expend if it were to retain jurisdiction over this dispute. Furthermore, the Russian Federation's interest in the outcome of this litigation is extremely high.  First, this dispute involves an alleged taking that occurred in Russia.  (Dkt. No. 1, ¶¶ 13-19.)  Second, the Library is an important element of the cultural heritage of the people of the Russian Federation.  (Dkt. No. 14, ¶ 2.)  Moreover, the Library is being used by various individuals and entities, including the Russian Chassidic community.  (Dkt. No. 14, ¶ 5.)  Thus, the outcome of this case has a significant importance to Russia and its citizens, including the Jewish faith community in Russia.

Thus, this Court should decline to exercise jurisdiction over this dispute on the ground of *forum non conveniens* as it is clear that Russia is an adequate alternative forum and the balance of private and public interests factors heavily favor dismissal.

III.    **CONCLUSION**

For all of the foregoing reasons, the Russian Government Defendants respectfully request

that the Court grant their motion to dismiss on one or all of the grounds asserted.


Dated:  December 23, 2005                    Respectfully submitted,


                                             Donald T. Bucklin (DC Bar No. 1628)
                                             Squire, Sanders & Dempsey L.L.P.
                                             1201 Pennsylvania Avenue, N.W.
                                             P.O. 407
                                             Washington, D.C. 20044-0407
                                             Telephone No.: (202) 626-6600
                                             Facsimile No.: (202) 626-6780
                                             E-mail: dbucklin@ssd.com

                                             James H. Broderick, Jr.
                                             Don A. Proudfoot, Jr.
                                             Lan T. Quach
                                             Squire, Sanders & Dempsey L.L.P.
                                             801 South Figueroa, 14th Floor
                                             Los Angeles, CA  90017-5554
                                             Telephone No.: (213) 624.2500
                                             Facsimile No.: (213) 623.4581
                                             E-mail: jbroderick@ssd.com

                                             Attorneys for Defendants
                                             Russian Federation, Russian Ministry of
                                             Culture and Mass Communication,
                                             Russian State Library, and Russian State
                                             Military Archive

LOSANGELES/200895.2

- 44 -

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION, FOREIGN SOVEREIGN IMMUNITY, FAILURE TO STATE A CLAIM AND FORUM NON CONVENIENS has been served by U.S. First Class Mail and facsimile, on counsel for Plaintiff this 23rd day of December, 2005.

James H. Broderick, Jr.