# UNITED STATES DISTRICT COURT

# DISTRICT OF COLUMBIA

AGUDAS CHASIDEI CHABAD OF
UNITED STATES,

          **Plaintiff,**

vs.

RUSSIAN FEDERATION; RUSSIAN
MINISTRY OF CULTURE AND MASS
COMMUNICATION; RUSSIAN
STATE LIBRARY; and RUSSIAN
STATE MILITARY ARCHIVE,

          **Defendants.**

CASE NO. 1:05-CV-01548 (RCL)

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS ON GROUNDS OF LACK OF
SUBJECT MATTER JURISDICTION, FOREIGN SOVEREIGN IMMUNITY,
FAILURE TO STATE A CLAIM (ACT OF STATE DOCTRINE)
AND *FORUM NON CONVENIENS*; AND REQUEST FOR ORAL ARGUMENT**

# TABLE OF CONTENTS

**Page**

STATEMENT OF POINTS AND AUTHORITIES ................................................................ 1

  I.    STATEMENT OF FACTS ................................................................................. 1

      A.    Introduction: "Hast Thou Killed and Also Inherited?"........................... 1

      B.    Chabad Accumulates Its Library And The First Five Rebbes Use It As Custodians Of A Community Library ................................ 4

      C.    The Fifth Rebbe Stores The Library In Time Of War ............................... 5

      D.    The Sixth Rebbe Is Prevented By Religious Persecution From Recovering The Library ................................................................ 5

      E.    The Nazis Seize The Archive .................................................................. 6

      F.    The Sixth Rebbe Flees From Poland To The United States ...................... 7

      G.    The Soviet Red Army Finds The Archive And Unilaterally Transports It To Russia ......................................................... 7

      H.    Chabad Seeks Relief In Russia ............................................................... 8

            1.    The Chabad Delegation.............................................................. 8

            2.    Gorbachev's And Yeltsin's Promises Remain Broken.................. 8

            3.    Chabad Prevails In The State Arbitration Court............................ 9

            4.    The Russian Federation Promises To Release The Library........... 9

            5.    Judicial Remedies In The Russian Federation Are Permanently Foreclosed ............................................................. 10

      I.    A Memorandum of Understanding Is Signed And Ignored..................... 11

      J.    This Lawsuit Is Filed After Defendants Fail To Return The Archive On Request ................................................................ 12

      K.    Chabad's Claims In This Action............................................................. 13

ARGUMENT.......................................................................................................... 14

  I.    The District Court Has Subject Matter Jurisdiction............................................ 14

      A.    Standard Of Review ............................................................................. 14

      B.    The Expropriation Exception ................................................................ 15

             1.    Tangible Property..................................................................... 15

             2.    Ownership ............................................................................... 16

**TABLE OF CONTENTS**
**(continued)**

Page

3. Illegal Taking ................................................................ 18

4. Exhaustion of Local Remedies ..................................... 21

C. Inapplicability Of "Act Of State" Doctrine ............................ 22

D. Existence Of Commercial Activity........................................ 26

1. Relation Between The Property And The Commercial Activity .................................................................. 27

2. The RSL's Commercial Activities In The United States............. 29

3. The RSMA's Commercial Activities In The United States......... 34

E. Forum Non Conveniens .......................................................... 37

1. Absence Of An Adequate Alternative Forum.............................. 37

2. Private Interest Factors ................................................ 38

3. Public Interest Factors................................................... 41

CONCLUSION................................................................................. 43

REQUEST FOR ORAL ARGUMENT ....................................... 43

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Agudas Chasidei Chabad v. Gourary*
  650 F. Supp. 1463 (E.D.N.Y. 1987) ........................................................... 4, 5, 6, 7, 8, 16, 17

*Alperin v. Vatican Bank*
  410 F.3d 532 (9th Cir. 2005) .............................................................................................. 24

*Altmann v. Republic of Austria*
  142 F. Supp. 2d 1187 (C.D. Cal. 2001) ............................................................ 18, 19, 30, 33

*Avianca, Inc. v. Corriea*
  1991 WL 496132 (D.D.C. May 31, 1991) .................................................................... 40, 41

*Beals v. SICPA Securink Corp.*
  1994 WL 236081 (D.D.C. May 17, 1994) ......................................................................... 39

*Bodner v. Banque Paribas*
  114 F. Supp. 2d 117 (E.D.N.Y. 2000) ................................................................... 19, 25, 40

*Coker v. Bank of America*
  984 F. Supp. 757 (S.D.N.Y. 1997) .................................................................................... 39

*Crist v. Republic of Turkey*
  995 F. Supp. 5 (D.D.C. 1998) ...................................................................... 18, 20, 23, 42

*Daliberti v. Republic of Iraq*
  97 F. Supp. 2d 38 (D.D.C. 2000) ...................................................................................... 23

*Dayton v. Czechoslovak Socialist Republic*
  834 F.2d 203 (D.C. Cir. 1987) ............................................................................. 20, 21, 26

*Deputy v. Long-Term Disability Plan of Sponsor Aventis Pharms.*
  2002 WL 31655328 (N.D. Cal. Nov. 21, 2002) ................................................................ 40

*El-Fadl v. Cent. Bank of Jordan*
  75 F.3d 668 (D.C. Cir. 1996) ....................................................................................... 37, 38

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*
  905 F.2d 438 (D.C. Cir. 1990) .......................................................................................... 14

*Gabay v. Mostazafan Found. of Iran*
  151 F.R.D. 250 (S.D.N.Y. 1993) ................................................................................. 27, 28

*Globe Nuclear Servs. & Supply, Ltd. v. AO Techsnabexport*
  376 F.3d 282 (4th Cir. 2004) ............................................................................................. 29

*Gorman v. Ameritrade Holding Corp.*
  293 F.3d 506 (D.C. Cir. 2002) .......................................................................................... 33

*Gulf Oil Corp. v. Gilbert*
  330 U.S. 501, 67 S. Ct. 839, 91 L. Ed. 2d 419 (1947) ................................................ 37, 39

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Kalamazoo Spice Extraction Co. v. Provisional Military Gov't of Socialist
Ethiopia*
616 F. Supp. 660 (W.D. Mich. 1985) ................................................................. 33

*Lueck v. Sundstrand Corp.*
236 F.3d 1137 (9th Cir. 2001) .......................................................................... 39

*Malewicz v. City of Amsterdam*
362 F. Supp. 2d 298 (D.D.C. 2005) ............................ 18, 20, 23, 27, 28, 29, 31, 42

*Manela v. Garantia Banking*
940 F. Supp. 584 (S.D.N.Y. 1996) ................................................................... 41

*Maritime Int'l Nominees Establishment v. Republic of Guinea*
693 F.2d 1094 (D.C. Cir. 1982) ....................................................................... 29

*McKesson Corp. v. Islamic Republic of Iran*
1997 WL 361177 (D.D.C. June 23, 1997) ............................ 18, 20, 22, 23, 25, 42

*Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*
995 F. Supp. 14 (D.D.C. 1998) ....................................................................... 21

*Mutambara v. Lufthansa German Airlines*
2003 WL 1846083 (D.D.C. March 24, 2003) ............................................. 38, 42

*Ohntrup v. Firearms Ctr. Inc.*
516 F. Supp. 1281 (E.D.Pa. 1981) .................................................................. 29

*Owens v. Republic of Sudan*
374 F. Supp. 2d 1 (D.D.C. 2005) ..................................................................... 22

*Pain v. United Techs. Corp.*
637 F.2d 775 (D.C. Cir. 1980) ......................................................................... 39

*Peterson v. Civil Action Royal Kingdom of Saudi Arabia*
332 F. Supp. 2d 189 (D.D.C. 2004) ................................................................. 15

*Phoenix Consulting, Inc. v. Republic of Angola*
216 F.3d 36 (D.C. Cir. 2000) ........................................................................... 14

*Piper Aircraft Co. v. Reyno*
454 U.S. 235, 102 S. Ct. 252, 70 L. Ed. 2d 419 (1981) .................................... 37

*Price v. Socialist People's Libyan Arab Jamahiriya*
294 F.3d 82 (D.C. Cir. 2002) ........................................................................... 27

*Republic of Argentina v. Weltover*
504 U.S. 607, 112 S. Ct. 2160, 119 L. Ed. 2d 394 (1992) ......................... 28, 29

*Riggs Nat'l Corp. Subsidiaries v. Comm'r of the IRS*
163 F.3d 1363 (D.C. Cir. 1999) ....................................................................... 22

*Saudi Arabia v. Nelson*
507 U.S. 349, 113 S. Ct. 1471, 123 L. Ed. 2d 47 (1993) .................................. 29

## TABLE OF AUTHORITIES
### (continued)

Page

*Siderman de Blake v. Republic of Argentina*
   965 F.2d 699 (9th Cir. 1992) .................................................................. 18

*Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res.*
   196 F. Supp. 2d 21 (D.D.C. 2002) ......................................................... 39

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*
   411 F.3d 296 (D.C. Cir. 2005) .......................................................... 27, 41

*U.S. v Portrait of Wally*
   2005 WL 553532 (S.D.N.Y. April 12, 2002) ........................................ 24

*United Euram Corp. v. USSR*
   461 F. Supp. 609 (S.D.N.Y. 1978) ........................................................ 33

*Verlinden B.V. v. Cent. Bank of Nigeria*
   461 U.S. 480, 103 S. Ct. 1962, 76 L. Ed. 2d 81 (1983) ....................... 24

*Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*
   133 F. Supp. 2d 1 (D.D.C. 1999) ........................................ 22, 30, 31, 35

*W.S. Kirkpatrick & Co, Inc. v. Envtl. Tectonics Corp., Int'l*
   493 U.S. 400, 110 S. Ct. 701, L. Ed. 2d 816 (1990) ............................ 22

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*
   116 F. Supp. 2d 98 (D.D.C. 2000) ........................................................ 22

*Wyatt v. Syrian Arab Republic*
   362 F. Supp. 2d 103 (D.D.C. 2005) ...................................................... 14

### FEDERAL STATUTES

22 U.S.C. § 2370(e)(2) ..................................................................................... 24

28 U.S.C. § 1330(b) ......................................................................................... 27

28 U.S.C. § 1391(f) .......................................................................................... 34

28 U.S.C. § 1391(f)(4) ..................................................................................... 42

28 U.S.C. § 1602 .............................................................................................. 42

28 U.S.C. § 1603(a) ......................................................................................... 15

28 U.S.C. § 1603(b) ........................................................................................... 3

28 U.S.C. § 1603(d) .................................................................................... 15, 27

28 U.S.C. § 1603(e) .................................................................................... 27, 28

28 U.S.C. § 1604 .............................................................................................. 14

28 U.S.C. § 1605 .............................................................................................. 14

28 U.S.C. § 1605(a)(2) ..................................................................................... 27

28 U.S.C. § 1605(a)(3) ............................................. 3, 15, 18, 26, 27, 28, 34

## TABLE OF AUTHORITIES
### (continued)

Page

28 U.S.C. § 1605(d) ................................................................................... 28

28 U.S.C. § 1607 ....................................................................................... 14

28 U.S.C. § 1610(a)(3) .............................................................................. 41

28 U.S.C. § 1610(b)(2) .............................................................................. 41

28 U.S.C. § 1610(d)(2) .............................................................................. 41

Fed. R. Civ. P. 32(a)(3) ............................................................................ 40

Fed. R. Civ. P. 45(c)(3) ............................................................................ 39

## OTHER AUTHORITIES

H.R.Rep. No. 1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code & Admin.
News at 6613 ..................................................................................... 15, 30

## STATEMENT OF POINTS AND AUTHORITIES

I.    **STATEMENT OF FACTS**

   A.    **Introduction: "Hast Thou Killed and Also Inherited?"**

This lawsuit seeks the return to Chabad, a world-wide religious community, of two components of its precious and irreplaceable spiritual treasure of original books and manuscripts (the "Chabad Collection"): *First* is a library of more than 12,000 books and 381 manuscripts that was accumulated since Chabad began and was severed from the community when its leader, then personally resident in Russia, was temporarily deprived during wartime of custody of the treasure (the "Chabad Library"). The defendant Russian Federation is the successor to the Bolshevik government that prevented Chabad from recovering these treasured books and manuscripts when the Bolsheviks implemented, in the 1920's, an official policy of religious persecution and discrimination which ultimately resulted in the arrest and flight from Russia of Chabad's spiritual leader. The attempt by the current Russian government to justify its retention of this treasure notwithstanding the shameful role of its predecessor in depriving Chabad of the custody and access to that which it has been entitled is reminiscent of the royal conduct Biblically reported in *Kings I*, chapter 21, when Queen Jezebel arranged for the execution of Naboth, the owner of a vineyard that was coveted by King Ahab, so that the vineyard would escheat to the King. On Divine instruction, the Prophet Elijah condemned the royal conduct with a challenge that applies to this case: "Hast thou killed and also inherited?" The Russian sovereign of the 1920's was responsible for a campaign to eliminate Jewish observance that has deprived the faithful for eight decades of the physical embodiment of Chabad's spiritual legacy. The Russian sovereign of 2006 may not now invoke that reprehensible history to claim legal entitlement to the treasure.

The defendants demean this case by arguing it as if it concerned a random selection of valuable antique books that were privately owned in 1915 and in the 1920's by a Russian citizen. That is a blatant mischaracterization. This is not a routine property case seeking to recover for the descendant of an individual Russian ancestor some valuable personal possession that was lost to the Russian Communist regime. It cannot be compared to a suit over an Old Master painting or an antique silver tea set or some trove of valuable collectibles.

The *second* subject of the Complaint is an Archive consisting of over 25,000 handwritten pages authored by a succession of Chabad's spiritual leaders or "Rebbes" (the "Chabad Archive"). The Chabad Archive was taken by the Nazi occupiers of Poland during the Second World War and was transported in 1945 by the victorious Soviet Red Army from a German castle to Moscow, where it was retained secretly until after the collapse of the Soviet Union in December 1991. Here, too, the Russian government's custody over these irreplaceable treasured original documents is rooted in total illegality - - first that of the Nazis and then that of the Soviet looters. The Prophet Elijah's lament is applicable, as well, to the Chabad Archive.

Chabad is an international over-200-year-old Jewish religious community (now operated under the auspices of a non-profit New York religious corporation) which follows and teaches the spiritual tenets of the Rebbes. (Cmplt. ¶ 9.) Chabad is a Hebrew acronym for *Chochma* ("wisdom"), *Bina* ("understanding"), and *Da'as* ("knowledge"). Its adherents are Orthodox Jews belonging to Chassidic Judaism as defined by the Chabad teachings of the Rebbes. As early as the late 18th century, Chabad had adherents in Jerusalem, Belarus, and other countries. Although the first five Rebbes lived in Russia, and the sixth resided there until he was forced to flee from a death sentence

imposed by the Communists on account of his religious beliefs and teachings, the Chabad community has flourished in the United States, where its earliest branches were founded prior to the 1920s. As of today, Chabad has 2,500 centers in over 65 countries serving the needs of the local Jewish communities worldwide. (Cmplt. ¶ 1; Declaration of Rabbi Boruch S. E. Cunin filed 6/17/05 ("Cunin Decl.") ¶ 3 [U.S.D.C. C.D. Cal. Case No. 2:04-CV-09233-PA-PLA ("CA Dkt.") No. 35].) The central headquarters of the international Chabad community has, since the Second World War, been in Brooklyn, New York. (*Id.*)

Except for seven books on "indefinite loan" to the United States Library of Congress ("USLOC"), and currently located in Chabad's central library in New York (Cunin Decl. ¶ 12; Declaration of Leon Fuerth filed 6/17/05 ("Fuerth Decl.")[CA Dkt. No. 37] ¶ 8), the Chabad Library is presently being held at defendant Russian State Library ("RSL") in Moscow. (Cmplt. ¶ 11(a).) A large portion of the Chabad Archive is presently being held at defendant Russian State Military Archive ("RSMA") in Moscow. (*Id.* ¶ 11(b).) The RSL and RSMA are "agencies or instrumentalities" of the Russian Federation, which are, and at all relevant times have been, under the authority of defendant Russian Ministry of Culture and Mass Communication ("RMCMC"). (Cmplt. ¶¶ 2-5, 7, 11.) *See* 28 U.S.C. §1603(b).

Chabad has brought claims against the Russian Federation, RMCMC, RSL, and RSMA (collectively, "Defendants") under the second clause of the expropriation exception (28 U.S.C. § 1605(a)(3)) to the Foreign Sovereign Immunities Act ("FSIA"), which allows claimants to pursue in the U.S. federal courts the return of expropriated property where a foreign state's agency or instrumentality owns or operates the property and is engaged in a commercial activity in the United States.

In September 1991, Chabad commenced litigation in the former Soviet Union and received favorable rulings—the arbitration court held that the Chabad Library was never nationalized. Before Chabad could recover its Library, however, the Soviet Union collapsed in December 1991. In early 1992, Defendants repeatedly thwarted attempts by Chabad to retrieve its Library. Chabad pressed its claim in the Russian State Arbitration Court, only to have the finding of the lower courts declared null and void in a secret *ex parte* pronouncement by the Deputy Chief State Arbiter on the ground that the arbitration court lacked jurisdiction. Immediately thereafter, the Supreme Soviet of the newly formed Russian Federation decreed on February 19, 1992, that all Russian courts were henceforth divested of jurisdiction to resolve Chabad's claims. Left without judicial remedies in Russia, Chabad has turned to this United States District Court to enforce international law and secure the return of its foundational religious texts.

Defendants have played fast and loose with the Court and exhibited a remarkable lack of candor in their statements under oath. In their declarations, they have testified falsely by claiming an absolute lack of commercial activities in the United States, and by alleging their inability to determine the circumstances under which they acquired the Chabad Archive. It was only through independent third-party discovery, and cross-examination at oral depositions, that the truth was revealed.

## B.    Chabad Accumulates Its Library And The First Five Rebbes Use It As Custodians Of A Community Library

From its inception, the Chabad Library was used by the Rebbes as the textual source for their religious teachings. (Cmplt. ¶¶ 8-10.) As the District Court for the Eastern District of New York noted in *Agudas Chasidei Chabad v. Gourary*, 650 F. Supp. 1463, 1466 (E.D.N.Y. 1987), *aff'd*, 833 F.2d 431 (2d Cir. 1987), "the library came to be

conceived as one to be used for the benefit of the religious community of Chasidism by the leader of the community, the Rebbe." Funds to purchase books for the Library came from contributions called "*Ma'amad*" made by members of the community. *Gourary*, 650 F. Supp. at 1467-1468. These contributions came to the central headquarters of Chabad - then located in Russia - from all over the world, including the United States. (Cmplt. ¶ 10.) In addition, as noted by the District Court in the *Gourary* case (650 F. Supp. at 1467) and as will be shown in the trial of this case, books were contributed to the institutional Chabad Library from benefactors all over the world.

### C.    The Fifth Rebbe Stores The Library In Time Of War

In 1915, as a result of the German army's advance and military operations in the First World War, Rabbi Sholom Dovber Schneersohn (the "Fifth Rebbe") was forced to flee his home in the village of Lubavitch and he placed the Chabad Library for "safekeeping" in a private warehouse in Moscow. (Cmplt. ¶ 13; Defendants' Request for Judicial Notice filed 5/02/05 ("Defs.' RJN")[CA Dkt. No. 18] at p. 32.) The Bolshevik Revolution and subsequent civil wars prevented him from recovering the Library. (Cmplt. ¶ 13.) On February 27, 1920, the Soviets placed the Chabad Library in storage at the State Rumyantsev Museum. (Defs.' RJN at pp. 35 & 39.) In 1920, the Fifth Rebbe passed away and his son, Rabbi Joseph Isaac Schneersohn, succeeded him as Chabad's leader (the "Sixth Rebbe"). *Gourary*, 833 F.2d at 436. (Cmplt. ¶ 15.)

### D.    The Sixth Rebbe Is Prevented By Religious Persecution From Recovering The Library

In 1921, the Soviet Union formally resolved to return the Chabad Library to the Sixth Rebbe. (Cmplt. ¶¶ 14 & 25; Defs.' RJN at pp. 32, 70-71; Declaration of Marshall Grossman filed 7/01/05 ("Grossman Decl.")[CA Dkt. No. 51] Exs. 17-23.) Lacking

funds at the time to pay the actual costs to retrieve the large crates containing the Chabad Library, the Sixth Rebbe notified the Museum that, while then unable to accomplish recovery, the Chabad Library had not been abandoned. (Defs.' RJN at pp. 32, 70-71.) In 1924, the Soviets moved the Chabad Library to the Lenin State Library. (Cmplt. ¶ 14; Declaration of Seth Gerber filed 6/17/05 ("6/17/05 Gerber Decl.")[CA Dkt. Nos. 33 & 34] ¶ 10, Ex. 2.) Thereafter, in February 1925, the Sixth Rebbe again notified Soviet officials that, while recovery was still not feasible, Chabad had not abandoned its Library. (Defs.' RJN at p. 41.)

In 1927, the Soviets arrested, imprisoned, and sentenced the Sixth Rebbe to death by firing squad *because of his religious beliefs and teaching*. (Declaration of Seth Gerber In Support of Plaintiff's *Ex Parte* Application filed 7/08/05 ("7/08/05 Gerber Decl.")[CA Dkt. No. 68] ¶ 3, Ex. B, p. 18; Cmplt. ¶ 15; Defs.' RJN at pp. 44-56; Grossman Decl. Ex. 16.) His death sentence was commuted and he fled the Soviet Union leaving behind the Chabad Library. (*Id.*) The Sixth Rebbe was, however, able to secure the Chabad Archive and bring it with him to Latvia, where he settled and became a citizen. (Cmplt. ¶ 15; Defs.' RJN at p. 57; Grossman Decl. Ex. 16.) In 1933, the Sixth Rebbe moved from Latvia to Poland and brought the Chabad Archive with him. *See Gourary*, 833 F.2d at 434-35.

### E.    The Nazis Seize The Archive

On September 1, 1939, the Second World War began in Europe pursuant to the Hitler-Stalin Pact when Nazi Germany invaded Poland from the west. (Cmplt. ¶ 16.) On September 17, 1939, the Soviet Union invaded Poland from the east. (*Id.*) During the attack, the Sixth Rebbe found refuge in Warsaw but was unable to take the majority of the Chabad Archive with him to Warsaw. (*Id.* ¶ 17.) *See Gourary*, 833 F.2d at 435.

Between 1939 and 1946, the Sixth Rebbe made written requests to Chabad officials and others to locate and recover the Archive portion of the Collection, declaring Chabad ownership and directing that the documents should be sent to New York. (Cmplt. ¶ 10.) *See Gourary*, 833 F.2d 435-37.

During the Second World War, the Nazis murdered six million Jews and systematically looted Jewish assets. (Cmplt. ¶ 18.) At some point during the Holocaust, the Nazis took the Chabad Archive from Poland to a Gestapo-controlled castle in Germany. (Cmplt. ¶ 18; Grossman Decl. Ex. 14.) The fate of the Chabad Archive remained unknown to Chabad for decades. (Cmplt. ¶ 19.)

### F.    The Sixth Rebbe Flees From Poland To The United States

With the assistance of the U.S. government, the Sixth Rebbe escaped Nazi-occupied Poland and arrived in the United States on March 19, 1940, where he became a citizen. (Cmplt. ¶ 16.) *See Gourary*, 833 F.2d at 435. Out of the conflagration of Nazi-occupied Europe, the Sixth Rebbe formally incorporated Agudas Chasidei Chabad in 1940 as a New York corporation to administer Chabad from its new headquarters in Brooklyn, New York. (Cmplt. ¶¶ 1, 16.) In 1941, approximately 90 boxes of the Chabad Archive arrived in the United States from sources unknown. *See Gourary*, 833 F.2d at 435.

### G.    The Soviet Red Army Finds The Archive And Unilaterally Transports It To Russia

In 1945, towards the end of the Second World War in Europe, the Soviet Red Army took a large portion of the unreturned Chabad Archive as "trophy documents" from the Gestapo-controlled castle in Germany and subsequently moved them to a "Special Archive" in Moscow, where they were analyzed and translated in secret by the NKVD,

the precursor to the KGB. (Grossman Decl. Ex. 14; Cmplt. ¶¶ 17, 19.) The Soviets kept the existence of the Chabad Archive a secret until 1992. (Grossman Decl. Exs. 14-15.) On February 25, 1946, the Sixth Rebbe confirmed that a portion of the Chabad Archive still remained in Europe and requested that it be located and sent to New York.[1] *See Gourary*, 833 F.2d at 436. (Supplemental Declaration of Marshall Grossman filed herewith ("Suppl. Grossman Decl.") ¶ 7, Ex. E.)

### H.    Chabad Seeks Relief In Russia

#### 1.    The Chabad Delegation

In December 1990, Rabbi Menachem Mendel Schneerson (the "Seventh Rebbe") designated Rabbi Yosef I. Aronov, Rabbi Boruch Shlomo Cunin, Professor Veronika R. Irina-Kogan, Rabbi Isaac I. Kogan and Rabbi Shalom Dovber Levine (collectively, the "Chabad Delegation"), to obtain the return of the Library and Archive for Chabad. (Cmplt. ¶ 12; Defs.' RJN at pp. 66-67; Declaration of Veronika R. Irina-Kogan filed 6/17/05 ("Irina-Kogan Decl.")[CA Dkt. No. 40], ¶ 4.) Chabad also formed the Jewish Community of Lubavitch Chassidim (the "JCLC") as its representative in the former Soviet Union, with the aim of securing the return of the Chabad Library to New York. (Cmplt. ¶ 21; Irina-Kogan Decl. ¶ 8.)

#### 2.    Gorbachev's And Yeltsin's Promises Remain Broken

On September 6, 1991, Soviet President Mikhail Gorbachev instructed the Lenin State Library to return the Library to Chabad. (Cmplt. ¶ 22; Cunin Decl. ¶ 6.) President Yeltsin also made a commitment to President Bush through Secretary of State James Baker that the Chabad Library would be returned. (Fuerth Decl. ¶ 3.) Notwithstanding

---

[1] Poland found some 25 crates containing a portion of the Chabad Archive in 1974, and, in contrast to the Soviets' actions, returned the documents to Chabad's central library in New York. (Cmplt. ¶ 19; Defs.' RJN at p. 65.) *See Gourary*, 833 F.2d at 436.

these promises, the Russian Federation has not returned the Collection to Chabad.

### 3.  Chabad Prevails In The State Arbitration Court

On September 26, 1991, the JCLC petitioned the State Arbitration Court of the Russian Soviet Federative Socialist Republic ("RSFSR") of the Soviet Union for an order directing the return of the Chabad Library, Case No. 350/13-H. (Cmplt. ¶¶ 23-24; Irina-Kogan Decl. ¶ 9, Ex. E.)  The State Arbitration Court concluded on October 8, 1991, that "[t]he documents provided do not confirm the fact of Schneerson Library acquiring a status of National property," and ordered the return of the Library to the JCLC. (Cmplt. ¶ 25; Irina-Kogan Decl. ¶ 10, Ex. F.)  The Lenin State Library and Attorney General of the RSFSR appealed on the grounds that the Chabad Library had allegedly been nationalized. (Cmplt. ¶ 25; Irina-Kogan Decl. ¶ 11, Ex. G.)  On November 18, 1991, the Chief State Arbiter denied the appeal on the merits. (Cmplt. ¶ 27; Irina-Kogan Decl. ¶ 11, Ex. G.)

Two days later, when the Chabad Delegation attempted to recover the Chabad Library, staff members of the Lenin State Library taunted the Chabad Delegation with anti-Semitic slurs and threats of violence. (Cunin Decl. ¶ 10.)  The Lenin State Library's police officers then brutally attacked the Chabad Delegation and their supporters. (*Id.*) As a result, Chabad was unable to recover its Library prior to the collapse of the Soviet Union on December 25, 1991.  After the collapse of the Soviet Union, the Russian Federation was immediately established and the Lenin State Library was renamed the Russian State Library (the "RSL"). (Plaintiff's Request for Judicial Notice filed 6/17/05 [CA Dkt. No. 36], at p. 12; 6/17/05 Gerber Decl. ¶ 10, Ex. 2.)

### 4.  The Russian Federation Promises To Release The Library

On January 29, 1992, the Deputy Chairman of the Government of the newly formed Russian Federation accepted a request by Chabad's officials to deliver the

Chabad Library to the Jewish Academy of Maimonides, where it would be placed under the control of Chabad Delegation member Veronika Irina-Kogan, the school's rector, and copy of the documents would be made for the RSL. (Irina-Kogan Decl. ¶ 1; Declaration of Tatiana Kovaleva filed 5/02/05 ("Kovaleva Decl.")[CA Dkt. No. 15], Ex. D; Cmplt. ¶ 29.) However, when the Chabad Delegation attempted to inspect the Chabad Library at the RSL, officials of the RSL prevented the inspection by inciting a mob carrying anti-Semitic signs and by shouting death threats through a bullhorn at the Chabad Delegation. (Cmplt. ¶ 29; Cunin Decl. ¶ 11.) The RSL never delivered the Library to the academy.

### 5.  Judicial Remedies In The Russian Federation
### Are Permanently Foreclosed

On or about February 14, 1992, without any notice to Chabad, B.I. Puginsky, the Deputy Chief State Arbiter, unilaterally and secretly purported to nullify the arbitration court rulings in Chabad's favor. (Cmplt. ¶ 30; Irina-Kogan Decl. ¶¶ 12-14, Ex. H; Grossman Decl. Exs. 17-21, 24-26.) Defendants contend that Puginsky dismissed the litigation on the grounds of lack of jurisdictional competence and that Chabad was left to its alleged remedies in the Russian law courts. However, only five days later, on February 19, 1992, the Supreme Soviet of the Russian Federation abolished the Deputy Chairman's order dated January 29, 1992, to transfer the Chabad Library, and divested all Russian courts and the executive branch of government of any jurisdiction to resolve Chabad's claims to recover the Collection. (Cmplt. ¶ 31; Irina-Kogan Decl. ¶ 15, Ex. J; Grossman Decl. Exs. 27-28.)

The Supreme Soviet's decree bars any further litigation over the Chabad Collection in the Russian Federation by mandating that its movement shall be made "solely on the bases of the legislation of the Russian Federation and the provisions of

international law," and by ordering commissions of the Supreme Soviet to "speed up the development of draft laws which ensure the State protection and safety of the national heritage of the Russian Federation." (Irina-Kogan Decl. ¶ 15, Ex. J) (emphasis added).

A few months later, on April 6, 1992, Chabad's synagogue and office in Moscow where the Chabad Delegation studied, prayed, worked and slept was firebombed with Molotov cocktails. (Cunin Decl. ¶ 15; Fuerth Decl. ¶ 12.) Two days earlier, the building was defaced by the painting of a swastika near the front door along with the words "Smert Jiden" ("Kill the Jews"). (Cunin Decl. ¶ 15.)

On or about May 31, 1992, all one hundred United States Senators signed a letter adopting a State Department statement asking that President Yeltsin fulfill his promise to Secretary of State Baker and return the Library to Chabad. (Cmplt. ¶ 20(e).) On October 29, 1992, U.S. Secretary of State Lawrence Eagleburger certified that the RSL is in violation of the Freedom Support Act because of its refusal to return the Chabad Library. (Cmplt. ¶¶ 32-33.) Following the White House's negotiations with the Russian government, a single book from the Chabad Library was released to Vice President Al Gore, who delivered it to Chabad. (Fuerth Decl. ¶ 8.)

**I.      A Memorandum of Understanding Is Signed And Ignored**

On December 16, 1993, Leon Fuerth, then Assistant to United States Vice President Al Gore for National Security Affairs, and Evgeny Sidorov, then Minister of Culture of Russia, entered into an interim agreement titled Memorandum of Understanding ("MOU"). (Fuerth Decl. ¶¶ 1-9; Grossman Decl. Exs. 32-33; Defs.' RJN at pp. 88-89.) The MOU provides that the Chabad Library would be transferred to a new facility by March 31, 1994, and the RMCMC would then proceed to catalog and microfilm the Library "as soon as possible." (Fuerth Decl. ¶¶ 9-12; Defs.' RJN at pp. 88-

89.) This has not been accomplished to date, over ten years later. (Fuerth Decl. ¶¶ 9-12; Grossman Decl. Ex. 34.)

The MOU was, by its terms, to be an interim measure, pending full disposition of the Chabad Library, and was not to prejudice the position of anyone on that point. (Fuerth Decl. ¶ 9; Defs.' RJN at pp. 88-89.) Thus, the language in the MOU which states "taken possession of ('nationalized')" was not determinative of either nationalization or ownership. (*Id.*) Chabad was not a party to the MOU. (*Id.*) The location of the Chabad Archive was not known and it was not a subject of the MOU. (*Id.*) The Russian Federation and RMCMC violated many terms of the MOU. (*Id.*; Grossman Decl. Exs. 33-34; Defs.' RJN at pp. 88-89.) Thus, whatever the effect of the MOU at the time of signing, it is no longer operative.

**J.    This Lawsuit Is Filed After Defendants Fail To Return The Archive On Request**

On June 10, 2004, four members of the Chabad Delegation (as the appointees of the Seventh Rebbe) sent a letter to President Vladimir Putin, the Minister of Foreign Affairs, and the Minister of Culture of the Russian Federation, requesting that the Government of the Russian Federation return the Archive to Chabad's central library in New York. (Cmplt. ¶ 35; Supplemental Declaration of Seth Gerber filed 7/14/05 ("7/14/05 Gerber Decl.")[CA Dkt. No. 70], Ex. B, p. 14.) On June 24, 2004, the Russian Ministry of Foreign Affairs acknowledged receipt of the letter dated June 10, 2004 and asked for assistance from others within the Russian government in preparing a report for President Putin. (7/14/05 Gerber Decl. Ex. B, pp. 9-10.)

In response, the Director of the RSMA, Vladimir Kouzelenkov, prepared a certificate on July 15, 2004, stating that the RSMA "houses Fund No 706/k 'Schneerson

Iossel Itzka – Ancient Jewish Philosophy Researcher, Chief Rabbi of Riga, 1928-1932," which "contains 98 units dating back to 1907-1935, all totaling 10530 pages" that are written in "Hebrew, Yiddish, Russian, Latvian, ancient Hebrew and English languages." (7/08/05 Gerber Decl. Ex. B, pp. 18-19.) The certificate also states that a "[s]ignificant part of the Fund (40 units containing total of 5757 pages) are manuscripts, including printed, that have been written by Schneerson on various religious subjects: creation of Chasidism, Chasidic traditions, rituals and religious practices, Jewish religious and spiritual values, biblical scenes, religious education, etc.; religious text, recitals, memoirs." (*Id.*) It also confirms that the Chabad Archive was received "in 1945 as part of the German trophy documents." (*Id.*) With full knowledge that the Chabad Archive was looted by the Soviet Red Army during the Second World War, Defendants did not respond to Chabad's June 10, 2004 letter. (Cunin Decl. ¶ 17; Cmplt. ¶ 35.)

### K.    Chabad's Claims In This Action

On November 9, 2004, Chabad filed its Complaint against Defendants, alleging claims for (1) violations of international law (Cmplt. ¶¶ 1-49); (2) declaratory relief (*id.* ¶¶ 1-48, 50-53); and (3) injunctive relief (*id.* ¶¶ 1-48, 54-59). The Complaint seeks an order compelling the return of the Library and Archive to Chabad's central library in New York. (*Id.* ¶ 55.) Defendants do not challenge service of process. (6/17/05 Gerber Decl. ¶¶ 3, 7.) On May 2, 2005, Defendants filed a motion to dismiss. On July 14, 2005, the United States District Court for the Central District of California transferred this action to this Court in the interests of justice and declined to rule on any issues raised in Defendants' motion to dismiss other than venue. [CA Dkt. No. 56.] Pursuant to a stipulated briefing schedule, this Court ordered Defendants to file their Supplemental Brief on or before December 23, 2005. [DC Dkt. No. 11.] Defendants' Supplemental

Brief was filed on December 24, 2005. [DC Dkt. No. 14.]

## ARGUMENT

I.     **THE DISTRICT COURT HAS SUBJECT MATTER JURISDICTION**

    A.     **Standard Of Review**

"Once the defendant has asserted the jurisdictional defense of immunity under the FSIA, the Court's focus shifts to the exceptions laid out in 28 U.S.C. §§ 1604, 1605, and 1607." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). "[T]he defendant bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Id.* A court may dismiss a complaint under the FSIA only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *See Wyatt v. Syrian Arab Republic*, 362 F. Supp. 2d 103, 108 (D.D.C. 2005).

If the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff. *Phoenix Consulting, Inc.*, 216 F.3d at 40. If the defendant challenges the factual basis of the court's jurisdiction, however, "the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff." *Wyatt*, 362 F. Supp. 2d at 109. "Instead, the court must resolve any disputed issues of fact, the resolution of which is necessary to a ruling upon the motion to dismiss." *Id.* The court must give the plaintiff "ample opportunity" to secure and present evidence relevant to the existence of such jurisdiction. *Id.*; *see also Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990).

**B.**    **The Expropriation Exception**

At issue in the present motion is the second clause of expropriation exception to the FSIA, which states that a "foreign state" (defined as including its political subdivisions, agencies and instrumentalities) shall not be immune from the jurisdiction of the courts of the United States in any case "in which rights in property taken in violation of international law are in issue" and "[a] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and [b] that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3);[2] *see also* 28 U.S.C. § 1603(a), (d). Under this second clause of the expropriation exception, the property at issue need not be present in the United States. *See* H.R.Rep. No. 1487, 94th Cong., 2d Sess., *reprinted in* 1976 U.S. Code & Admin. News at 6613.

**1.**    **Tangible Property**

The expropriation exception requires that the claim involve rights in "tangible property." *See Peterson v. Civil Action Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 197 (D.D.C. 2004), *aff'd,* 416 F.3d 83 (D.C. Cir. 2005). Here, Chabad seeks the return of its Collection of rare and irreplaceable rabbinic books, archives, and

---

[2] Defendants acknowledge that the RSL and RSMA "own or operate" the Chabad Collection for FSIA purposes, but argue that the RMCMC does not and is therefore entitled to immunity. (Defs.' Suppl. Br. at p. 20.) The expropriation exception, however, explicitly includes "its political subdivisions" within the definition of a covered "foreign state." 28 U.S.C. §§ 1603(a), 1605(a)(3). The RMCMC is a "political subdivision" of the Russian Federation now, and was a "political subdivision" when it had "operational responsibility" for the RSL and the RSMA during the time that the takings occurred and at least through June 17, 2004. (Declaration of Leonid Nadirov filed 5/02/05 ("Nadirov Decl.")[CA Dkt. No. 16] ¶¶ 2-3; Fuerth Decl. ¶¶ 9-10.) Thereafter and presently, the RMCMC maintains authority over the agencies which are now said to have "operational responsibility" for the RSL and the RSMA. (Grossman Decl. Ex. 31.) Accordingly, the RMCMC is clearly a proper defendant.

manuscripts on Chabad Chassidic philosophy, Jewish religious law, prayer and tradition.
(Cmplt. ¶¶ 9, 55.)  Because this case involves the rights to physical property (i.e., books,
archives, and manuscripts), this case satisfies the "tangible property" requirement of the
expropriation exception.

### 2.    Ownership

Chabad has ownership rights to the entire Collection.  Chabad is an over-200-
year-old Jewish organization which follows and teaches the spiritual tenets of seven
generations of Rebbes.  (Cmplt. ¶¶ 1, 8).  The Rebbes, who wrote many of the sacred
texts in the Collection, and had physical possession of the Collection for decades, always
held it in trust as custodians for the Chabad community.[3]  (Cmplt. ¶¶ 1, 10-13, 15-17.)
*See Gourary*, 833 F.2d at 434-35.  During the Second World War, Chabad relocated its
worldwide headquarters to New York.  (Cmplt. ¶¶ 1, 16.)  Thereafter, the Sixth and
Seventh Rebbes repeatedly affirmed Chabad ownership in the entire Collection and urged
the recovery of all portions lodged elsewhere and the transfer of them to New York.
(Cmplt. ¶¶ 10, 12; Defs.' RJN at pp. 66-67; Irina-Kogan ¶ 4.)  *See Gourary*, 833 F.2d
435-37.

Specifically, on February 25, 1946, the Sixth Rebbe wrote that the Nazis had
seized three large boxes of manuscripts that "are <u>registered under the names of the
Rabbis, members of Agudas Chasidei Chabad</u>, Rabbi Israel Jacobson, and his son-in-law,
Rabbi Shlomo Zalman Hecht, both American citizens (who are) the official owners of

---

[3]  Defendants erroneously contend (without support) that a purported "New
Library" arrived in the United States in <u>1946</u>, and only that portion of the Chabad
Collection was placed in charitable trust.  (Defs.' Suppl. Br. at p. 12.)  In fact, part of the
Chabad Collection arrived in the United States five years earlier, in <u>1941</u>.  *See Gourary*,
833 F.2d at 435.  Thereafter, the Sixth Rebbe wrote that the remaining portion of the
Chabad Collection that was seized by the Nazis is also owned by Chabad and should be
brought to New York.  *Id.*  (Suppl. Grossman Decl. ¶ 7, Ex. E.)

this property." *See Gourary*, 833 F.2d at 436. (Suppl. Grossman Decl. ¶ 7, Ex. E.) He went on to describe the books that were still missing: "Books: Several thousand books, among them many ancient books of great value and very rare. These books are the property of Agudas Chasidei Chabad of America and Canada." *Id.* Similarly, in December 1990, the Seventh Rebbe appointed the Chabad Delegation to recover the Collection from the former Soviet Union and have it sent to Chabad's central library in New York. (Cmplt. ¶ 12; Defs.' RJN at pp. 66-67; Irina-Kogan Decl. ¶ 4.)

        Defendants initially conceded, for purposes of this motion, that Chabad has a valid ownership interest in the entire Collection. (Defs.' Motion to Dismiss filed 5/02/05 [CA Dkt. No. 13], at p. 10, lines 12-14.) They have now revised their position, and seek to claim a right to the Chabad Library because, after it was physically taken by the Communist government sometime in or after 1917 from a private warehouse, it was purportedly nationalized (without the provision of any compensation) in 1919 or 1920. But this "nationalization" claim lacks evidentiary support and is refuted by evidence that, until the Sixth Rebbe's flight in the face of religious persecution, the Library was to be returned to Chabad. Similarly, the Chabad Archive was stolen by the Nazis in Poland and subsequently looted and taken in 1945 by the Soviet Red Army to Moscow as "German trophy documents." It was secretly held until after the collapse of the Soviet Union in December 1991. (Grossman Decl. Ex. 14.) Chabad's ownership right to its sacred religious texts is unquestionably superior to Defendants' possessory claim founded on the unauthorized retention and looting of property during time of war and during the darkest upheaval in our history.

### 3.    Illegal Taking

At the jurisdictional phase, Chabad need only make a substantial and non-frivolous claim that the taking of the Chabad Collection violates international law because it was not for public purpose, <u>or</u> was discriminatory, <u>or</u> the foreign state did not provide for just compensation. *See McKesson Corp. v. Islamic Republic of Iran*, 1997 WL 361177, at \*15 (D.D.C. June 23, 1997); *see also Crist v. Republic of Turkey*, 995 F. Supp. 5, 11 (D.D.C. 1998)(Lamberth, J.) (*citing Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 711 (9th Cir. 1992)); *Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 306-307 (D.D.C. 2005). The foreign state against whom a claim is made need not be the sovereign that took the property at issue. *See Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1202 (C.D. Cal. 2001), *aff'd*, 541 U.S. 677 (2004); 28 U.S.C. § 1605(a)(3) (excepting claims regarding property "taken in violation of international law" rather than excepting claims against foreign states that have taken property in violation of international law). Under the legal doctrine of "creeping expropriation," a foreign state's taking of private property may result from a series of interferences with that property. *See McKesson Corp.*, 1997 WL 361177, at \*1, 12.

Here, the former Soviet Union's takings of the Chabad Collection are unlawful on all fronts: they were not for public purpose, were for discriminatory reasons, and no compensation whatsoever was tendered, let alone paid. (Cmplt. ¶¶ 43-45.) With reference to the Library portion of the Chabad Collection, as indicated, it fell into the hands of the Soviets during the Bolshevik Revolution in 1917, was never nationalized (Cmplt. ¶¶ 13-14, 25, 27; Irina-Kogan Decl. ¶¶ 6-7, 10-11, Exs. C, D, F, G), and, despite official recognition of Chabad's claim to ownership and right to the Library's return—by Soviet decree issued in 1921, and the promise of Premier Gorbachev much later in 1991

(Cmplt. ¶ 22; Fuerth Decl. ¶ 3; Cunin Decl. ¶ 6)—it has never been. When Chabad pursued litigation in the former Soviet Union to recover its Library, the arbitration court in 1991 yet again made it clear that "the documents provided do not confirm the fact of Schneerson Library acquiring the status of National property." (Cmplt. ¶ 25; Irina-Kogan Decl. ¶ 10, Ex. F; Grossman Decl. Exs. 17, 21-23.)

The conclusion is no different with respect to the Chabad Archive. The Nazis took the Chabad Archive from Poland to a Gestapo-controlled castle in Germany. (Grossman Decl. Ex. 14.) *See Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 134 (E.D.N.Y. 2000) (stating that the confiscation of private property during the Holocaust was a violation of customary international law). The Nazis' seizure was blatantly discriminatory, not for any legitimate public purpose, neither offered nor provided compensation, and clearly violated international law. (Cmplt. ¶¶ 43-45.) *See Altmann*, 142 F. Supp. 2d at 1202; 28 U.S.C. § 1605(a)(3). The former Soviet Union again violated international law when its armed forces looted the Chabad Archive from a Nazi castle in Germany in 1945 and transferred it to a "Special Archive" in Moscow, and then to the RSMA, where the documents were kept secret until after the collapse of the Soviet Union in December 1991. (Grossman Decl. Exs. 14-15.) Defendants contend that the Complaint does not allege these facts.[4] To the contrary, the Complaint expressly alleges

---

[4] The RSMA tried to hide these facts by providing a materially false response to interrogatory one: "Due to the passage of time and the change in government, the [RSMA] is presently unable to determine the circumstances under which the Archive was acquired and consequently whether the Archive has been nationalized." (6/17/05 Gerber Decl. Ex. 57, p. 735)(emphasis added.) The Deputy Director of the RSMA, Vladimir Korotaev, verified the response even though he had previously authored a certificate dated July 23, 2004 stating that the Chabad Archive was received in 1945 as part of "German trophy documents." (7/08/05 Gerber Decl. Ex. B, pp. 22-23.) Defendants did not produce Korotaev's certificate until *after* Chabad filed its opposition and supplemental briefs in the California federal court. *See* Chabad's *Ex Parte* Application filed 7/08/05 [CA Dkt. No. 68].

that the former Soviet Union took the Chabad Archive as "war booty" and that the refusal to return archival materials that were looted during the Second World War violates international law. (Cmplt. ¶¶ 19, 41, 46, 47.) International law condones no such behavior. *See McKesson Corp.*, 1997 WL 36117, at *15; *Crist*, 995 F. Supp. at 11; *Malewicz*, 362 F. Supp. 2d at 306-307. *See also* Cmplt. ¶ 47 (former Soviet Union and Russian Federation have executed numerous international treaties stating that it violates international law to take religious or cultural items during wartime).

Defendants rely upon *Dayton v. Czechoslovak Socialist Republic*, 834 F.2d 203, 206-207 (D.C. Cir. 1987) for the notion that the date of a taking is fixed by the date of expropriation decrees and/or the date of physical seizure, not by a subsequent date of repudiation of an undertaking to provide compensation. This discussion in *Dayton* was limited to the court's analysis of the applicability of the treaty exception to the Act of State doctrine. *Id.* Moreover, the quotation relied on by Defendants was merely an explanation by the State Department to justify why it would not espouse the plaintiff's claims under an ambiguous treaty between the Czech and U.S. governments, which is irrelevant to this action. *Id.*

In *Dayton,* the district court rejected the defendant's argument that there was no violation of international law because the plaintiffs were Czech citizens on the date their property was nationalized by Czechoslovakia. *See Dayton v. Czechoslovak Socialist Republic*, 672 F. Supp. 7, 9-10 (D.D.C. 1986), *aff'd*, 834 F.2d 203 (D.C. Cir. 1987). The district court stated:

> This argument, however fails to recognize that the nationalization of the plaintiff's property proceeded in two steps. There was no violation of international law in 1945 when the government nationalized the property of its citizens and promised to compensate them. When the government

> repudiated this promise in 1948, however, the plaintiffs were American
> citizens.  This repudiation of the promise to compensate may constitute a
> separate "taking" of the plaintiff's property which was in violation of
> "international law."

*Id.*  The district court concluded that this issue cannot be resolved on a motion to dismiss,

and the Circuit court adopted the district court's reasoning.  *Dayton*, 672 F. Supp. at 10,

13 n.5, *aff'd*, 834 F.2d at 205.

### 4.    Exhaustion of Local Remedies

Chabad has exhausted its domestic remedies and the Supreme Soviet's decree on

February 19, 1992, divested all Russian courts of jurisdiction to resolve Chabad's claims.

(Cmplt. ¶ 31; Irina-Kogan Decl. ¶ 15, Ex. J; Grossman Decl. Exs. 27-28.)  In any case,

Chabad is not required to exhaust domestic remedies because the allegations and

evidence establish that the takings violated international law because they were

discriminatory and not for a public purpose, and not based solely on failure to provide

adequate compensation.[5]  (Cmplt. ¶¶ 43-44.)  *See Crist*, 995 F. Supp. at 10-11.

Additionally, Chabad is not required to exhaust domestic remedies because the takings by

Nazi Germany and the Soviet Union violated international law and those governments no

longer exist, and Defendants firmly deny responsibility for Chabad's injury, as indicated

by the RSMA's response to interrogatory one, which falsely states that the RSMA is

---

[5] Defendants misquote *Millicom Int'l Cellular, S.A. v. Republic of Costa Rica*,
995 F. Supp. 14, 23 (D.D.C. 1998) on page 18 of their Supplemental Brief by
conspicuously omitting the underlined language from the following quote:  "[A] claimant
cannot complain that a 'taking' or other economic injury has not been fairly
compensated, and hence violates international law unless the claimant has first pursued
and exhausted domestic remedies in the foreign state that is alleged to have caused the
injury."  *Id.*  Defendants misleadingly imply that one must exhaust domestic remedies
anytime one alleges a taking.  However, *Millicom* requires that one exhaust domestic
remedies only when the taking is alleged to violate international law based solely on the
foreign state's failure to provide adequate compensation.  This suit is not for
"compensation;" the Chabad Collection is the priceless heritage of a religious institution
and its people—it is not for sale.

"presently unable to determine the circumstances under which the Archive was acquired." (6/17/05 Gerber Decl. Ex. 57, p. 735.) *See McKesson Corp.*, 1997 WL 361177, at *15 n.25 (*quoting* Restatement § 713 cmt. f). Accordingly, Chabad has made a substantial and non-frivolous claim and established multiple takings of its Collection in violation of international law.

### C.    Inapplicability Of "Act Of State" Doctrine

The Act of State doctrine bars consideration of claims when the resolution of the case turns on the legality or illegality of official action taken by a foreign sovereign within its own territory. *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 116 F. Supp. 2d 98, 104 (D.D.C. 2000) (Lamberth, J) (citing *W.S. Kirkpatrick & Co, Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 406, 110 S. Ct. 701, 107 L. Ed. 2d 816 (1990)), *aff'd in part, remanded in part*, 296 F.3d 1154 (D.C. Cir. 2002). In making the determination whether the doctrine forecloses a given case, courts in this Circuit look to (1) the degree of consensus concerning a particular area of international law, (2) the potential significance of any implications that the issue may have on the foreign relations of the United States, and (3) whether the government that perpetrated the challenged act is still in existence." *See Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 26 (D.D.C. 2005); *Riggs Nat'l Corp. Subsidiaries v. Comm'r of the IRS*, 163 F.3d 1363, 1367 (D.C. Cir. 1999).

Defendants must carry the burden upon invoking the defense. *See World Wide Minerals, Ltd*, 116 F. Supp. 2d at 104; *Virtual Def. & Dev. Int'l, Inc. v. Republic of Moldova*, 133 F. Supp. 2d 1, 8 (D.D.C. 1999). They cannot make the requisite showing in this case. *First*, the Act of State doctrine does not apply because there is a consensus (and numerous treaties regarding controlling legal principles executed by the Soviet

Union and Russian Federation) that a taking violates international law where it is not for a public purpose, or is discriminatory, or where compensation is not provided. *See McKesson Corp.*, 1997 WL 361177, at *15; *see also Crist*, 995 F. Supp. at 11; *Malewicz*, 362 F. Supp. 2d at 306-307. (Cmplt. ¶¶ 46-47.) *Second*, the Archive was seized by both the Nazis and the Soviet Red Army outside Soviet territory. *Third*, the Nazi and Soviet governments no longer exist. *Fourth*, as we have previously explained (pp. 16-17, *supra*), the Library was not the personal property of a Soviet national, but was at all times the treasured property of an international religious organization, with its principal branches situated in numerous locations outside of Russia prior to 1940 and headquartered thereafter in New York. Nor was there even a formal nationalization of the Library in 1919 or 1920. It was separated from the Chabad Rebbes (whose superior claim to ownership on behalf of Chabad's followers was recognized officially by Soviet decree in 1921) by the informal conduct of the Communist government's failure to return it. Thereafter, when the Sixth Rebbe fled, the Communist government's act of keeping the Library was a violation of international law because it was an expropriation for discriminatory reasons, serving no public purpose, and without compensation.

Nor is this a case in which return of expropriated property would damage the foreign relations of the United States. *See, e.g., Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 55 (D.D.C. 2000); *see also* Cmplt. ¶ 20. Leading governmental officials in the United States have endorsed Chabad's claim to the Collection. The executive branch and several U.S. Presidents have supported Chabad's position. (Cmplt. ¶ 20; Fuerth Decl. ¶¶ 1-9.) *See* letters signed by the **entire** United States Senate on May 31, 1992, and February 24, 2005, and by **over 300** Members of Congress on May 5, 2005. (Cmplt. ¶ 20; Suppl. Grossman Decl. ¶ 4, Ex. B.) The same sentiment was expressed in a letter

dated July 11, 2005 received by Chabad's counsel of record from Ronald Bettauer,

Deputy Legal Advisor to the U. S. Department of State, which states in pertinent part:

> The Department has for many years been concerned with the situation that underlies your court case. We understand that the Chabad community considers the Schneerson collection to be very important and have worked closely with Chabad and the Russian government to resolve the issue. For over ten years, the White House and State Department have requested the Russian government to agree to a satisfactory resolution. Our Embassy in Moscow has engaged repeatedly with its Russian interlocutors on behalf of Chabad. We will continue to support the Chabad community in our discussions with the Russian authorities and will hope for a breakthrough.

> The Department has given very careful consideration to your request [for a so-called 'Bernstein' letter]. We have concluded, however, that we are not in a position to write the letter you request. The Foreign Sovereign Immunities Act was enacted in significant part to eliminate the need for the executive to be involved in suits against foreign sovereigns. Moreover, were we to write a letter to the court on this issue it would be difficult to avoid engaging on other legal issues that we are not prepared to comment on at this time.

> The Department will continue to follow this case closely and we look forward to remaining in close contact with you.

(Suppl. Grossman Decl. ¶¶ 3-4, Ex. A.)  *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461

U.S. 480, 488, 103 S. Ct. 1962, 1968, 76 L. Ed. 2d 81 (1983) (White House support is

entitled to weight). Hence, there is no basis to deprive this Court of the authority to

resolve this dispute pursuant to the expropriation exception to the FSIA. *See Alperin v.*

*Vatican Bank*, 410 F.3d 532, 557-558 (9th Cir. 2005); *U.S. v Portrait of Wally*, 2005 WL

553532, at *8-9 (S.D.N.Y. April 12, 2002).

Nor, under the Second Hickenlooper Amendment (22 U.S.C. § 2370(e)(2)) would

the Act of State doctrine foreclose an action based upon a confiscation after January 1,

1959. It is untrue, as Defendants contend, that Chabad's claim rests on pre-1959

confiscations.