The Fifth Rebbe was deprived of control over the Chabad Library in 1917, but Chabad has persistently sought to reclaim its Library in the ensuing years. The repeated denials of Chabad's requests by the Communist government and by the Russian Federation (see Cmplt. ¶ 29; Cunin Decl. ¶ 11; Fuerth Decl. ¶ 11), were reprehensible "takings." *See Bodner*, 114 F. Supp. at 135-136. The refusal to relinquish property which a possessor has no lawful right to hold is an illegal taking on the second, third, fourth or fifth occasions just as it is when the valued asset was first purloined. *See McKesson Corp.*, 1997 WL 361177, at *1, 12.

The RSL refused to surrender the Library to Chabad following the 1991 ruling from the State Arbitration Court, affirmed by the Chief State Arbiter. That refusal constituted its own discrete "taking." Following the collapse of the Soviet Union in December 1991, the Deputy Chairman of the Government of the Russian Federation accepted Chabad's request for transfer of the Chabad Library in January 1992, and the RSL responded to the Chabad Delegation sent to retrieve the Library with incitement of an anti-Semitic mob to block its recovery (Cmplt. ¶ 29; Cunin Decl. ¶ 11; Fuerth Decl. ¶ 11). Once more this conduct constituted a discrete "taking." And the decree of the Deputy State Arbiter on February 14, 1992, on his own and without notice to anyone, rescinding the findings of the State Arbitration Court by denying jurisdiction to the State Arbitration Court to rule, together with the declaration by the Supreme Soviet immediately thereafter on February 19, 1992, that the judicial and executive branches of the Russian Federation were divested of all jurisdiction to entertain further claims by Chabad for recovery of the Chabad Collection, was yet another discrete "taking." (Cmplt. ¶¶ 30, 31; RJN at pp. 83-85; Irina-Kogan Decl. ¶¶ 12-15, Ex. J; Grossman Decl. Exs. 17-21, 24-28.) Each of these actions served no public purpose, each was undertaken

for discriminatory reasons, and no compensation was ever extended. (Cmplt. ¶¶ 41-45.)

Hence, the January 1959 date of the Second Hickenlooper Amendment is not an obstacle

to this Court's authority to hear Chabad's claim to the Library. The same is true of the

Archive which was the subject of a recent request for its return to New York. (Cmplt. ¶

35; 7/14/05 Gerber Decl. Ex. B, at pp. 11-14.) Chabad's demand has been stonily

ignored. (*See* pp. 12-13, supra; *see also* 7/8/05 Gerber Decl. Ex. B, at pp. 18-23.)

Persistent official stonewalling regarding an unlawful taking that gave wrongful

possession to the expropriator are confiscations for which a lawsuit may be brought under

the expropriation exception to the FSIA.

       Defendants' reliance upon *Dayton* is unavailing. Unlike the facts of that case,

there is no operative claims settlement agreement which has resulted in any compensation

to Chabad. *Dayton*, 672 F. Supp. at 12, *aff'd*, 834 F.2d 203 (D.C. Cir. 1987).

Furthermore, the plaintiffs in *Dayton* brought a claim for unjust enrichment because the

textile production plant that was nationalized in Czechoslovakia could not be moved to

the United States. *Id.* In contrast, Chabad seeks the return of its Collection of sacred

books and manuscripts and this Court has the power and ability to order its return to

Chabad's library in New York. *See* Cmplt. ¶ 55 (stating that Chabad seeks injunctive

relief mandating the immediate return of the Collection to Chabad).

    **D.**    **Existence Of Commercial Activity**

       The second clause of Section 1605(a)(3) of the FSIA, which confers subject

matter jurisdiction, requires a showing that the agency or instrumentality which owns or

operates the property at issue are "engaged in a commercial activity in the United States"

in order to subject a "foreign state" to suit in federal court. This Circuit recognized in

*Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 95-96 (D.C. Cir. 2002),

*aff'd*, 389 F.3d 192 (2004), that foreign states and their political subdivisions have been accorded Due Process protections once the claimant has established subject matter jurisdiction and accomplished proper service.[6]  *See* 28 U.S.C. § 1330(b).  Defendants do not challenge service of process (6/17/05 Gerber Decl. ¶¶ 3, 7), but they contend that the requisite "commercial activity" to establish subject matter jurisdiction is lacking.

      **1.**      **Relation Between The Property And The Commercial Activity**

The FSIA's expropriation exception to sovereign immunity, 28 U.S.C. § 1605(a)(3), requires that, if expropriated property is not "present in the United States," the foreign agency or instrumentality which "owns or operates" the property be "engaged in a commercial activity in the United States."  Moreover, under the expropriation exception, even a single commercial transaction satisfies this requirement.  *See Malewicz*, 362 F. Supp. 2d at 313-14; *Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250, 255 (S.D.N.Y. 1993); 28 U.S.C. § 1603(d), (e).

Defendants construe the language "engaged in a commercial activity" in the second clause of the expropriation exception as broader than the comparable language regarding a claim "in connection with a commercial activity carried on" found in the language of the commercial activity exception to the FSIA, 28 U.S.C. § 1605(a)(2).  The

---

      [6] In *Price*, 294 F.3d at 95-96, the D.C. Circuit held that foreign states are not entitled to any greater Due Process protection.  Moreover, a foreign state's agencies and instrumentalities are similarly not entitled to any greater Due Process protection "where the foreign state so extensively controlled the instrumentality 'that a relationship of principal and agent is created," or where "adher[ing] blindly to the corporation form . . . would cause . . . injustice."  *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301 (D.C. Cir. 2005).  Here, Defendants concede that the RMCMC is a Ministry within the Government of the Russian Federation, and that the RSL and RSMA are "federal state institutions" which are supported by Government funding.  (Nadirov Decl. ¶¶ 2-3; Fedorov Decl. ¶¶ 2-3; Kouzelenkov Decl. ¶¶ 2-3.)  Hence, Defendants have properly been accorded the full measure of Due Process to which they are entitled upon an adequate showing that the RSL and RSMA are "engaged in a commercial activity in the United States."

defendants' effort to read the second clause of the expropriation exception expansively to require at least, and possibly more, than "substantial contact with the United States" (28 U.S.C. § 1603(e)), rests on an outdated Black's Law Dictionary definition of a quite different and inapplicable phrase ("engaged in commerce") found in the Fair Labor Standards Act and Federal Employers' Liability Act, but not in the FSIA.[7]

Black's Law Dictionary, Eighth Edition, defines the word "engage" to mean "[to] employ or involve oneself, to take part in, to embark on." (Plaintiff's Request for Judicial Notice filed herewith, Ex. B.) Webster's Dictionary defines "engaged" to mean, among other things, "occupied, busy, employed, without leisure." (*Id.* Ex. C.) The "commercial activity" occurring in the United States at the time of suit that a defending foreign agency or instrumentality is "taking part in," or is "involved" with, can thus be isolated, or multiple, and can, but need not, relate to the expropriated property in question. *See Malewicz*, 362 F. Supp. 2d at 313-14; *Gabay*, 151 F.R.D. at 255; 28 U.S.C. § 1605(a)(3).

The FSIA provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular act, rather than by reference to its purpose." *See* 28 U.S.C. § 1605(d). The issue, then, is "not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives." *See Republic of Argentina v. Weltover,* 504 U.S. 607, 614, 112 S. Ct. 2160, 2167, 119 L. Ed. 2d 394 (1992). Rather, the pertinent inquiry is "whether the particular actions that the foreign state performs (whatever the

---

[7] Defendants omit the following underlined language from the definition of "engaged in commerce": "To be 'engaged in commerce' for purposes of Fair Labor Standards Act and Federal Employers' Liability Act, an employee must be actually engaged in the movement of commerce or the services he performs must be so closely related thereto as to be for all practical purposes an essential part thereof, rather than an isolated local activity. [Citations omitted.]" (Plaintiff's Request for Judicial Notice filed herewith, Ex. A.)

motive behind them) are the *type* of actions by which a private party engages in trade and

traffic or commerce." *Saudi Arabia v. Nelson*, 507 U.S. 349, 360-61, 113 S. Ct. 1471,

123 L. Ed. 2d 47 (1993)(quoting *Weltover*, 504 U.S. at 614); *Malewicz*, 362 F. Supp. 2d

at 313. Here, the record is clear that at the time of suit, the RSL and RSMA were each

engaged in "a commercial activity" in the United States.

### 2.    The RSL's Commercial Activities In The United States

The General Director of the RSL, Victor Fedorov, provided a declaration, under

oath, which states: "The RSL does not engage in any commercial activities in the United

States." (Declaration of Victor Fedorov filed 5/02/05 ("Fedorov Decl.")[CA Dkt. No. 14]

¶ 3.) After Chabad obtained third-party documents in jurisdictional discovery

establishing the RSL's direct involvement in commercial activities in this country,

General Director Fedorov testified that the RSL has publishing contracts with United

States entities and has received royalties and payments for services performed pursuant to

those contracts. (Grossman Decl. Exs. 2-3, 5.) The evidence thus makes it abundantly

clear that the RSL is (and was at the time of suit) engaged in "a commercial activity" –

indeed, a series of commercial activities – in the United States. *See Maritime Int'l*

*Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1109 n.24 (D.C. Cir.

1982)(citing *Ohntrup v. Firearms Ctr. Inc.*, 516 F. Supp. 1281, 1285-86 (E.D.Pa.

1981)(stating that sales agreement calling for manufacture and delivery of pistols in

Turkey was intended to be one with substantial contact with the United States)); *Globe*

*Nuclear Servs. & Supply, Ltd. v. AO Techsnabexport*, 376 F.3d 282, 285, 289 (4th Cir.

2004)(stating that Russian Federation's instrumentality's entrance into a contract to

supply a utility customers in the United States with uranium hexafluoride is a

"commercial activity" carried on in the United States).

The bylaws of the RSL fully permit it to undertake "commercial activities" (Grossman Decl. Ex. 5), and it has shown no reluctance to do so. [8] For example, the RSL has entered into several written contracts with Norman Ross Publishing ("NRP"), a New York corporation. (Declaration of Scott Widitor filed 6/17/05 ("Widitor Decl.")[CA Dkt. No. 42], ¶¶ 1-21, Exs. A-N.) Two of those contracts state that they were executed in and are governed by the laws of the State of New York. (*Id.* Exs. H, I.) Moreover, pursuant to their ongoing contractual relationship, the RSL and NRP jointly applied for and obtained an existing U.S. copyright (Reg. No. TX 3 498 090) for an encyclopedia. (Widitor Decl. ¶ 11, Ex. E.) *See Altmann,* 317 F.3d at 969 (copyright evidence of commercial activity). The RSL receives royalties for sales of that encyclopedia in the United States. (Widitor Decl. ¶ 12, Ex. F.)

On August 21, 2000, the RSL and NRP entered into a separate written contract expressly establishing a principal-agent relationship between the contracting parties for the sale of RSL microfilm to customers in the United States. (6/17/05 Gerber Decl. Ex. 63, Widitor Decl. Ex. G.) *See Virtual Def.,* 133 F. Supp. 2d at 5-6 (concluding that the actions taken by foreign sovereign's agent satisfied the commercial activity exception to sovereign immunity). The contract requires that NRP wire-transfer monies obtained thereunder to the RSL's corresponding bank in New York. (6/17/05 Gerber Decl. Ex. 63, p. 895.) This contract is currently in full force and effect, and represents "commercial activity" of the sort contemplated under the FSIA's expropriation exception

---

[8] The Mellon Foundation awarded the RSL a grant of approximately $1.3 million to improve international users' access to the information resources of the RSL, and the receipt of such financing is a type of action by which a private party engages in trade and traffic or commerce. (Grossman Decl. Ex. 4; 6/17/05 Gerber Decl. Ex. 9.) *See* H.R. Rep. No. 1487, 94th Cong., 2d Sess. 17 (1976, U.S. Code Cong. & Admin. News 1976, pp. 6604, 6615, 6616.)

notwithstanding that the published materials do not involve the Chabad Collection. *See*
*Malewicz,* 362 F. Supp. 2d at 313-314.

ProQuest Information & Learning Company ("ProQuest"), a Delaware
corporation, assumed NRP's obligations under the aforesaid contract on November 7,
2002. (Declaration of Robert E. Lee filed 6/17/05 ("Lee Decl.")[Dkt. No. 39] ¶¶ 1, 7;
6/17/05 Gerber Decl. Ex. 64.) Through its agent ProQuest, the RSL has sold and
distributed RSL microfilm to customers in the United States. (Lee Decl. ¶ 14, Ex. K;
Widitor Decl. ¶14, Ex. G). *See also Virtual Def.,* 133 F. Supp. 2d at 5-6. To date, as near
as we can determine, ProQuest has paid at least $21,931.42 USD to the RSL for services
rendered pursuant to the contract. (6/17/05 Gerber Decl. Ex. 70, p. 962; 7/08/05 Gerber
Decl. Ex. B, pp. 66-75.) In addition, all indications are that RSL received an additional
$5,359.83 USD in royalties from sales of RSL microfilm in 2003, including sales by the
RSL through its agent ProQuest to customers in the United States. (Lee Decl. ¶¶ 15-16,
Exs. L, M.) Documents regarding royalties received in other years (specifically, 2000-02
and 2004-05) were also requested but were not produced by Defendants. (6/17/05 Gerber
Decl. Ex. 60, at pp. 827-832.)

In addition to these contracts, the RSL's "indefinite loan" of seven books from the
Chabad Collection to the USLOC is "a commercial activity in the United States," and,
while not necessary for jurisdictional purposes, does, indeed, pertain directly to the
property at issue here. *See Malewicz*, 362 F. Supp. 2d at 313-314 n.5 (holding that the
lending of artwork between non-profit museums constitutes a commercial activity).[9] The

---

[9] A loan of materials can, of course, lead to future sales or other agreements, such
as the RSL's subsequent "Meeting of Frontiers" agreement with the USLOC. By way of
further example, when the RSL loaned posters to the Museum of Modern Art ("MOMA")
in New York in 1997, it also entered into a four-year licensing agreement, governed by
the laws of New York, to allow MOMA to manufacture and sell merchandise licensed by

seven books were delivered to and remain located at Chabad's central library in New

York. (Cunin Decl. ¶ 12.) The RSL has also entered into a written "Meeting of

Frontiers" agreement with the USLOC, which was ongoing when this action was initiated

in November 2004. (6/17/05 Gerber Decl. Ex. 62, pp. 880-891.) General Director

Fedorov may have executed this agreement in Washington. (Grossman Decl. ¶ 3.) He

traveled to the United States to meet USLOC officials for the purpose of founding the

"Meeting of Frontiers" website. (Grossman Decl. Ex. 3.) Pursuant to the agreement, the

USLOC has paid at least $37,607.16 USD to the RSL via wire transfer from Washington

to Moscow for personnel expenses and costs. (6/17/05 Gerber Ex. 62, pp. 881-82, Ex.

70, pp. 961-966; 7/08/05 Gerber Decl. Ex. B, pp. 29-49, 54-65, 76-93.) The "Meeting of

Frontiers" website provides the RSL's contact information so that users may purchase,

for a fee, images from the RSL's collections published on the website.[10] (6/17/05 Gerber

Decl. Ex. 62, p. 882.)

Pashkov Dom publishing house is part of the RSL, and its sales of books to

libraries in the United States is yet another "commercial activity" here in which the RSL

is engaged. (Grossman Decl. Ex. 6; 6/17/05 Gerber Decl. Exs. 3-4.) Defendants seek to

distance the RSL from any direct involvement in its Pashkov Dom's U.S. book sales.

However, General Director Fedorov, when asked during his deposition whether the RSL

has sold any books to any libraries located in the United States, testified, "I think yes,

---

the RSL to customers in the United States. (7/08/05 Gerber Decl. Ex. B, pp. 50-53;
7/14/05 Gerber Decl. Ex. B, pp. 15-43.) Although Fedorov's declaration states that the
"RSL has not put on or sponsored any exhibitions in the United States of its collection"
(Fedorov Decl. ¶ 3), he testified "there were certain exhibits that were exhibited . . . in
New York." (Grossman Decl. Ex. 2.)

[10] *See* the website page at http://frontiers.loc.gov/ intldl/mtfhtml/mfabout/
mfcopy.html#RSL_eng.

probably." (Grossman Decl. Ex. 6; 6/17/05 Gerber Decl. Ex. 5.) *See Altmann*, 317 F.3d

at 969 (stating that publication and marketing of books is a commercial activity); *United*

*Euram Corp. v. USSR*, 461 F. Supp. 609, 611 (S.D.N.Y. 1978); *Kalamazoo Spice*

*Extraction Co. v. Provisional Military Gov't of Socialist Ethiopia*, 616 F. Supp. 660, 664

(W.D. Mich. 1985). Pashkov Dom publications are also available for sale through East

View, a Minnesota corporation. (Declaration of Stacey May filed 6/17/05 ("May

Decl.")[CA Dkt. No. 41] ¶¶ 1-6, Exs. A-E.) Additionally, Pashkov Dom books currently

are offered for sale on the RSL's English language website, which targets U.S. citizens

and advertises a variety of merchandise. (Grossman Exs. 7-8; 6/17/05 Gerber Decl. Exs.

4, 6-7.) The RSL's website includes a "book shop" and "price list," and a webpage that

includes an "order form," telephone and fax numbers, and a click-through e-mail address

to facilitate orders directly through the Internet.[11]  (6/17/05 Gerber Decl. ¶ 11(b), Ex. 4, p.

46.) The RSL's website is interactive and shows conclusively that Pashkov Dom

continues to target and sell books, posters, and other merchandise to U.S. customers.[12]

*See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 512-14 n.5 (D.C. Cir. 2002).

    Defendants allege that Judge Anderson's ruling on venue is binding on this

Court's determination as to subject matter jurisdiction. Judge Anderson, however, did

not make any findings as to whether the RSL or RSMA are "engaged in a commercial

---

[11] Defendants failed to produce any e-mails sent to pashkov_dom@rsl.ru.

[12] Additionally, the RSL's Russian Courier service, located at the RSL, is a RSL
formed company, with Fedorov as an organizer, and provides fee-based services to
customers in the U.S., including through an interactive website. (Grossman Decl. Ex. 9;
6/17/05 Gerber Decl. Exs. 11-14.) *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d
506, 512-13 (D.C. Cir. 2002)(concluding that a website is interactive based on users'
ability to open accounts and purchase and sell securities online). Because Russian
Courier service is an agent of the RSL, Russian Courier's ongoing commercial activities
in the United States are attributable to the RSL. *See BPA Int'l, Inc. v. Sweden*, 281 F.
Supp. 2d 73, 81 (D.D.C. 2003).

activity in the United States" within the meaning of the expropriation exception of the FSIA, 28 U.S.C. § 1605(a)(3).   His ruling addressed only whether the RSL and RSMA are "doing business" in *the Central District of California* for purposes of the venue statute, 28 U.S.C. § 1391(f).

Notably, Judge Anderson determined that while the contacts between NRP, ProQuest, and East View do not support *venue in the Central District of California because those corporations are not headquartered or incorporated in California*, Judge Anderson also commented that NRP is located in New York; its agreements with the RSL state that they were entered into and governed under the laws of New York; ProQuest is incorporated in Delaware; and East View is a Minnesota corporation.   Similarly, while Judge Anderson concluded that the RSL's loan of seven books from the Collection to the USLOC does not establish *venue in California*, he did not make any determination as to whether the loan constitutes "a commercial activity" within the meaning of the FSIA.

### 3.    The RSMA's Commercial Activities In The United States

The Director of the RSMA, Vladimir Kouzelenkov, provided a declaration, under oath, which states: "The RSMA does not engage in any commercial activities in the United States." (Declaration of Vladimir Kouzelenkov filed 5/02/05 ("Kouzelenkov Decl.")[CA Dkt. No. 17] ¶ 3.)   However, only weeks later Kouzelenkov directly contradicted his sworn declaration, <u>testifying at his deposition</u> that the RSMA has entered into four written contracts with two United States companies, Primary Source Media and Yale University Press, contracts which provide for the publication and sale of RSMA microfilm and books worldwide, including to customers in the United States.   (Grossman Decl. Ex. 11.)

Primary Source Media ("PSM") is a Connecticut Division of Thomson Information, Inc., a publisher organized and doing business under the laws of the State of Florida. (Declaration of Joseph Bucci filed 6/17/05 ("Bucci Decl.")[CA Dkt. No. 38] ¶ 1.) The PSM contracts were signed in 1999 and do not expire until 2009. (*Id.* ¶¶ 4-6, Exs. A-C.) They provide that RSMA's royalty payments thereunder are to be calculated in U.S. Dollars. (Bucci Decl. Exs. A-C; Grossman Decl. Ex. 11.) Article 14 of each of the microfilm contracts waives sovereign immunity and acknowledges that the activities contracted for are "commercial in nature." (*Id.*) Director Kouzelenkov actually conceded the point in his deposition testimony, albeit grudgingly. (Grossman Decl. Ex. 13.) In connection with the contracts, the RSMA has received at least $60,000 in advance royalties from PSM. (*Id.* Ex. 12.) Royalty statements forwarded by PSM to the RSMA over the years account for "Sales of papers of Leon Trotsky, U.S.;" "Sales of papers of the White Army, U.S.;" Sales Red Army Intelligence Reports, U.S.;" and "Sales US & UK." (Bucci Decl. Exs. ¶¶ 7-8, D-E; Grossman Decl. Ex. 12.) Furthermore, in connection with their contractual endeavors, the RSMA and PSM jointly created a Guide for the RSMA microfilm that was sold to U.S. customers which bears the imprint of the RSMA and includes a warning under the "copyright law of the United States." (May Decl. ¶ 8, Ex. G, p. 130.) There is thus no question that the involvement of RSMA with PSM is "a commercial activity in the United States" within the meaning of the second clause of the expropriation exception to the FSIA. *See Virtual Def.,* 133 F. Supp. 2d at 5-6.

Additionally, in or about 1995, RSMA personnel attended a conference at Yale University. (Widitor Decl. Ex. A, p. 23.) Growing out of this conference, there was negotiated in 1997, a written agreement between the RSMA and Yale University Press

("Yale"), a Connecticut corporation, which does not expire until 2027. (Grossman Decl. Ex. 11; 6/17/05 Gerber Decl. Ex. 69.) The contract's stated purpose is to carry out the "joint preparation and publication" of documents entitled *The Spanish Civil War* in the English and Russian languages. (*Id.*) The RSMA is granted publication and distribution rights to Yale in all countries, except for Russia; and all payments under the agreement are to be made in "U.S. dollars." (*Id.*) Yale made an advance against royalties to the RSMA in the amount of "10,000 US dollars." (*Id.*) The agreement is governed by the law of the Russian Federation and by the law of the State of Connecticut, U.S.A. (*Id.*)

The RSMA's and Yale's jointly selected team of scholars, who were affiliated with the RSMA, identified the materials to be published under the contract. (6/17/05 Gerber Decl. Ex. 69.) Pursuant to paragraph 3.4 of the contract, the RSMA sent copies of the materials so identified to Yale for translation and publication in the United States. (*Id.*) Royalty Statements produced on discovery confirm that there were "U.S. Regular Sales" pursuant to this contractual relationship. (*Id.*) This, then, is yet another "commercial activity in the United States," and one that is ongoing, in which the RSMA has chosen to engage.

Accordingly, because the Chabad Collection (the expropriated property in question) was seized in its several parts in violation of international law, and, despite all efforts by Chabad representatives to secure its return from Defendants, has been denied to them, even to the point of foreclosing all further assertion of Chabad's claims of ownership through the Russian courts, the present suit against Defendants, who have been shown to be engaged in commercial activity in the United States, should be allowed to proceed under the FSIA, and the motion to dismiss should be denied.

### E. *Forum Non Conveniens*

Defendants' *forum non conveniens* claim for dismissal should be denied. A party invoking the doctrine of *forum non conveniens* carries the burden of first demonstrating the existence of an available and adequate alternative forum. *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676-677 (D.C. Cir. 1996). If that showing is made, the Court must balance the relevant private and public interest factors. *Id.* Defendants bear the burden of persuasion on all elements of the *forum non conveniens* analysis. *Id.* at 677. Where, as here, the effort is to transfer the case to a foreign jurisdiction, there is a strong presumption in favor of an American plaintiff's choice of forum in the United States. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 n.22, 102 S. Ct. 252, 266, 70 L. Ed. 2d 419, 435 (1981). Accordingly, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509, 67 S. Ct. 839, 843, 91 L. Ed. 2d 419 (1947).

### 1. Absence Of An Adequate Alternative Forum

Defendants have the burden of establishing there is a foreign court that provides Chabad an available and adequate alternative forum. *El-Fadl*, 75 F.3d at 677. The fact that Chabad filed a claim in the Soviet arbitration court nearly 15 years ago is not evidence that a Russian court today is an adequate alternative forum. The Deputy Chief State Arbiter ruled *ex parte* and without notice on February 14, 1992, that the State Arbitration Court was jurisdictionally incompetent to entertain Chabad's claims, and the court's rulings favorable to Chabad were declared null and void. Even more telling, immediately thereafter, the Supreme Soviet of the Russian Federation decreed that the Russian courts were divested of all authority to entertain an action to recover the Collection, reserving all consideration of such matters for the legislative branch and

taking it from the judicial branch. (Irina-Kogan Decl. ¶ 15.) Chabad is thereby

foreclosed from pursuing this action in any Russian court.[13] *See Mutambara v. Lufthansa*

*German Airlines*, 2003 WL 1846083, at *4 (D.D.C. March 24, 2003) (holding that vague

and unsupported statements that the defendant is amenable to service of process in an

alterative forum do not satisfy the defendants' burden on this issue); *see also El-Fadl*, 75

F.3d at 678-79 (holding that affidavit stating that Jordanian courts are open to the

plaintiff did not sufficiently demonstrate that Jordan was an alternative forum).

    Defendants' reliance on the declaration and deposition testimony of their expert

Tatiana Kovaleva to refute the preclusive effect of the 1992 decree is unavailing. When

Kovaleva was asked the straightforward question whether the 1992 decree prevents

Chabad from pursuing this litigation in Russia, she had no answer. She was openly

unprepared to claim that the 1992 decree was not preclusive of further judicial action by

Chabad in Russia. (Declaration of Lan Quach filed 6/27/05 ("Quach Decl.") [CA Dkt.

No. 47], ¶ 8; Kovaleva Decl. ¶ 22; Defs.' Suppl. Brief at p. 37.)

## 2.    Private Interest Factors

    Even if there was an available and adequate alternative judicial forum in Russia,

the Court on a *forum non conveniens* claim is required to balance the following private

interest factors: (1) relative ease of access to sources of proof; (2) the availability of

compulsory process for attendance of unwilling witnesses, and cost of obtaining

attendance of willing witnesses; (3) possibility of viewing subject premises; and (4) all

---

[13] Defendants seem to suggest that the "jurisdictional" decision of the Deputy
Chief Arbiter regarding the Russian arbitration courts still left the Chabad free to pursue
its claims in the law courts of Russia. (Irina-Kogan Decl. ¶¶ 12-14). The Supreme
Soviet's 1992 decree plainly foreclosed that alternative, however, leaving the Chabad
with no judicial recourse in any Russian court. (Cmplt. ¶ 31; Irina-Kogan Decl. ¶15, Ex.
J; Grossman Decl Exs. 27-28.) *See El-Fadl*, 75 F.3d at 678 (dismissal would not be
appropriate where the alternative forum does not permit litigation of the subject matter of
the dispute.")

other factors that render trial of the case expeditious and inexpensive. *Gulf Oil*, 330 U.S. at 508, 67 S. Ct. at 843. The Court should balance the private factors with a "'strong presumption against disturbing plaintiffs' initial forum choice.'" *Beals v. SICPA Securink Corp.*, 1994 WL 236081, at *2 (D.D.C. May 17, 1994)(Lamberth, J.) (*quoting Pain v. United Techs. Corp.*, 637 F.2d 775, 784 (D.C. Cir. 1980)). Here, the private factors weigh against dismissal.

Defendants can easily access the documents which are in their possession, custody, or control. (6/17/05 Gerber Decl. Exs. 11-14.) *See Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res.*, 196 F. Supp. 2d 21, 36 (D.D.C. 2002) (stating "the location of documents, given modern technology, is less important in determining the convenience of the parties"); *see also Coker v. Bank of America*, 984 F. Supp. 757, 766 (S.D.N.Y. 1997) (stating "[i]n today's era of photocopying, fax machines and Federal Express, [the defendant's] documents easily could be sent to New York.") Indeed, Defendants have already produced 167 pages of documents which date back to the 1920s, and the RSL's Russian Courier service can locate and electronically transmit documents to the United States. (6/17/05 Gerber Decl. ¶¶ 49(c), 50.)

Defendants do not dispute that witnesses in the Russian Federation could be compelled to testify in this action. They have identified *four* witnesses in their "limited" Rule 26(a) disclosures. (6/17/05 Gerber Decl. ¶ 25, Ex. 27.) Because Fedorov, Kouzelenkov, and Nadirov are employees or representative of the parties, they can either be compelled to testify or expected to cooperate in testifying in this District. Fed. R. Civ. P. 45(c)(3); *Lueck v. Sundstrand Corp.*, 236 F.3d 1137, 1147 (9th Cir. 2001). The convenience of Defendants' purported expert witnesses (Kovaleva) is given little weight. *See Deputy v. Long-Term Disability Plan of Sponsor Aventis Pharms.*, 2002 WL

-39-

31655328, at *4 (N.D. Cal. Nov. 21, 2002). Moreover, Defendants cannot establish that the cost of obtaining testimony from Russian witnesses is unduly burdensome in light of the Stipulation dated April 13, 2005 [CA Dkt. No. 12] to produce these witnesses on the east coast of the United States, or in London, England, or in Paris, France; and Chabad's agreement to pay the reasonable roundtrip coach airfare and hotel costs. Furthermore, pursuant to a separate Stipulation [CA Dkt. No. 32], the parties conducted depositions of Defendants' four witnesses by videoconference link between Los Angeles and Moscow, and the transcripts may be submitted at trial pursuant to Rule 32(a)(3). (6/17/05 Gerber Decl. ¶ 48, Ex. 53.) *See Bodner*, 114 F. Supp. 2d at 132. With respect to Chabad's Rule 26(a) witnesses, only two of them reside in the Russian Federation. (6/17/05 Gerber Decl. ¶ 24, Ex. 26.) Seven of them live in North America and one resides in Israel. They can be deposed abroad if they do not wish to appear at trial in the United States. *See Avianca, Inc. v. Corriea*, 1991 WL 496132, at *3 (D.D.C. May 31, 1991)(Lamberth, J.).

Defendants have not identified any experts that will need to travel to the Russian Federation on their behalf, and it certainly is not inconvenient for the Russian Federation (or any of the other Defendants) to examine the Collection in the Russian Federation. The potential need to have the parties and their experts examine the Collection does not weigh in favor of dismissal.

Defendants argue that "many if not all" of the evidentiary documents are written in "Russian or Hebrew." (Defs.' Suppl. Brief at p. 41.) Such logic would warrant dismissal on *forum non conveniens* grounds of virtually every case under the FSIA because there are thousands of languages that are spoken in the world. The Hebrew documents will need to be translated if the case is dismissed in favor of a Russian forum. Many Russian language documents have already been translated into English and such

translation services are readily accessible. (Defs.' RJN at pp. 32-43, 57-62, 68-87.) *See*

*Manela v. Garantia Banking*, 940 F. Supp. 584, 594 (S.D.N.Y. 1996). Furthermore, the

deposition transcripts of Defendants' four witnesses are in English, not Russian. *See*

*Avianca, Inc*, 1991 WL 496132, at *3 (Lamberth, J.).

      Defendants assert this Court does not have the power to enforce a judgment in this

action. (Defs.' Suppl. Brief at p. 42.) To the contrary, there are diverse means of

enforcing a judgment against foreign defendants. For example, the FSIA provides this

Court with the power to attach "any property" in aid of execution of a judgment against a

foreign state. Additionally, there is legislative recourse. (Cmplt. ¶¶ 32-33.) *See TMR*

*Energy Ltd.*, 411 F.3d at 303 (stating that "the possibility that the judgment of the district

court may go unenforced does not bear upon whether that court is an inconvenient forum

in which to defend"); 28 U.S.C. § 1610(a)(3), (b)(2), (d)(2). Defendants further contend

that they may be more willing to comply with a Russian court's orders than any orders

from this Court. Such a statement is disingenuous given that the RSL's police officers

attacked the Chabad Delegation, and the RSL's manuscript director incited an anti-

Semitic mob to avoid complying with the orders of the Soviet arbitration court and the

Russian Federation's Deputy Chairman to transfer the Library. (Cmplt. ¶ 30; Cunin

Decl. ¶¶ 10-11.) Accordingly, Defendants have not satisfied their burden of proving that

any of the private interest factors weigh in their favor.

### 3.    Public Interest Factors

      Courts also consider the following public interest factors when dismissal is sought

on such grounds: (1) administrative difficulties flowing from court congestion; (2) local

interest in having localized controversies decided at home; (3) avoidance of unnecessary

choice of law problems; and (4) unfairness of burdening citizens in an unrelated forum

with jury duty. *See Mutambara*, 2003 WL 1846083, at *3. Defendants concede that "residents of Washington, D.C., especially those who follow the Chabad beliefs, may have an interest in the Library and the Archive." (Defs.' Suppl. Br. at p. 43.) And Congress designated this Court as the proper venue for cases against foreign states under the expropriation exception to the FSIA. 28 U.S.C. § 1391(f)(4). Defendants also concede that "venue can be proper in this case only in the District of Columbia." (Defs.' Reply Brief, at p. 18, lines 21-22 [CA Dkt. No. 46].) Additionally, because claims under the FSIA are not triable to a jury, this lawsuit imposes no burden on prospective jurors in the community. *See* 28 U.S.C. § 1602. Thus, Defendants have not satisfied their burden to establish the existence of any administrative difficulties.

Nor is there a serious choice-of-law problem. The law governing the recovery of property that has been taken and withheld in violation of international law is well-established. *See McKesson Corp.*, 1997 WL 361177, at *15; *Crist*, 995 F. Supp. at 11; *Malewicz*, 362 F. Supp. 2d at 306-307; 28 U.S.C. § 1605(a)(3). And this Court will not be required to interpret Soviet decrees issued in 1919 and 1920 because the Soviet arbitration court has already held that under Soviet law the Library was never nationalized. And Defendants do not and can not contend that the Chabad Archive was nationalized.

Furthermore, Defendants do <u>not</u> contend that the Chabad Archive was taken in Russia, or that it is part of the cultural heritage of the Russian Federation, or that it is being used by individuals and entities in the Russian Federation. With respect to the Chabad Library, it is entirely disingenuous for Defendants to contend that the religious writings of Chabad's leaders reflect the cultural heritage of the very country which sentenced the Sixth Rebbe to death <u>because of his religious beliefs,</u> and kept the Library

-42-

in poor conditions for decades. (Fuerth Decl. ¶ 12; 7/08/05 Gerber Decl. ¶ 3, Ex. B, p.

18; Cmplt. ¶ 15; Defs.' RJN at pp. 44-56; Grossman Decl. Ex. 16.) Indeed, even today's

Russian Federation has been shown to be a hostile environment for Chabad's followers as

recently as January 11, 2006 where an assailant entered the Chabad synagogue in

Moscow shouting "I will kill!" and then stabbed eight worshipers, including Chabad

Delegation member Rabbi Kogan. (Suppl. Grossman Decl. ¶ 6, Ex. D.) Accordingly, the

wishes of Chabad's leaders must be fulfilled, not only because it is required by

international law, but because justice demands that the entire Chabad Collection be

returned to Chabad's worldwide headquarters and central library in New York.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss should be denied.

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Civil Rule 7(f), Chabad respectfully requests an oral hearing on

Defendants' Motion to Dismiss.

Dated: January 23, 2006

| | | |
|---|---|---|
| ALSCHULER GROSSMAN STEIN & KAHAN, LLP | Respectfully submitted,<br><br>LEWIN & LEWIN, LLP | HOWREY, LLP |
| By _____<br>Marshall B. Grossman<br>(*Pro Hac Vice*)<br>Seth M. Gerber<br>(*Pro Hac Vice*)<br>Jonathan E. Stern<br>(*Pro Hac Vice*)<br>The Water Garden<br>1620 26th St.<br>4th Floor, North Tower<br>Santa Monica, CA 90404<br>Telephone: (310) 907-1000<br>Facsimile: (310) 907-2000<br>E-mail: mgrossman@agsk.com | By _____<br>Nathan Lewin<br>(D.C. Bar No. 38299)<br>Alyza D. Lewin<br>(D.C. Bar No. 445506)<br>1828 L Street NW, Suite 901<br>Washington, DC 20036<br>Telephone: (202) 828-1000<br>Facsimile: (202) 828-0909<br>E-mail: nat@lewinlewin.com | By _____<br>Wm. Bradford Reynolds<br>(D.C. Bar No. 179010)<br>1299 Pennsylvania Avenue NW<br>Washington, DC 20004<br>Telephone: (202) 783-0800<br>Facsimile: (202) 383-6610<br>E-mail: reynoldsw@howrey.com |

Attorneys for Plaintiff Agudas Chasidei Chabad of United States

-43-

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of PLAINTIFF'S SUPPLEMENTAL BRIEF IN

OPPOSITION TO DEFENDANTS' MOTION TO DISMISS ON GROUNDS OF LACK

OF SUBJECT MATTER JURISDICTION, FOREIGN SOVEREIGN IMMUNITY,

FAILURE TO STATE A CLAIM (ACT OF STATE DOCTRINE) AND *FORUM NON*

*CONVENIENS*; AND REQUEST FOR ORAL ARGUMENT has been served by U.S.

First Class Mail and facsimile on counsel for Defendant on this 23rd day of

January, 2006.

_____
Nathan Lewin