## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

AGUDAS CHASIDEI CHABAD OF            )
UNITED STATES,                       )
                                     )
        Plaintiff,                   )
                                     )
    v.                               )        Civ. Action No. 05-01548 (RCL)
                                     )
RUSSIAN FEDERATION, *et al.*,        )
                                     )
        Defendants.                  )
_____)

## MEMORANDUM OPINION

The plaintiff, Agudas Chasidei Chabad of United States ("Chabad"), is a non-profit religious corporation incorporated under the laws of the State of New York. On November 9, 2004, Chabad commenced this action in the United States District Court for the Central District of California against the Russian Federation and several Russian[1] state agencies (collectively "defendants").[2] Chabad alleges that the defendants violated international law by illegally taking and continuing to hold an invaluable collection of Jewish religious books and manuscripts, a collection that Chabad claims to rightfully own. Chabad seeks declaratory and injunctive relief mandating the return of the collection and damages incurred because of the defendants' violation of international law. The defendants moved to dismiss for lack of jurisdiction under the Foreign

---

[1]  Various events providing the factual backdrop for this action took place on the territory of the former Union of Soviet Socialist Republics ("USSR" or "Soviet Union") under the governments of the Russian Empire (pre-1917), the USSR (between 1917 and 1991), and the Russian Federation (post-1991). This opinion refers to the defendant state and its agencies and instrumentalities as either Russian or Soviet, depending on when particular events in question took place.

[2]  In addition to the Russian Federation, the other named defendants are the Russian Ministry of Culture and Mass Communication (RMCMC), the Russian State Library (RSL), and the Russian State Military Archive (RSMA).

Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq*., under the act of state doctrine, and under the doctrine of *forum non conveniens*.

On July 14, 2005, the U.S. District Court for the Central District of California transferred the present case to this Court pursuant to 28 U.S.C. § 1406(a), declining to rule on the remaining issues raised in the motion to dismiss.  (Order [Cal. 56][3] to Transfer Action.)  Adhering to this Court's Order [2] of November 23, 3005, the parties filed supplemental briefs to address legal precedent in the District of Columbia Circuit.  Now before this Court are: the defendants' motion [Cal. 13] to dismiss, the plaintiff's opposition [Cal. 45] thereto, the defendants' reply [Cal. 46], and the parties' supplemental briefs [14; 15].  This Court heard oral argument on August 30, 2006.  Upon consideration of the parties' filings and oral arguments, the applicable law, and the entire record herein, this Court concludes that it has jurisdiction over some, but not all, of Chabad's claims.  Therefore, and in accordance with this Memorandum Opinion, this Court shall grant in part and deny in part the defendants' motion to dismiss.

## I. BACKGROUND

Long before Chabad was incorporated as a non-profit corporation under the laws of the State of New York, it was an organization of Jewish religious communities located worldwide, with origins in the Russian Empire.  The United States District Court for the Eastern District of New York had the occasion to describe the history of Chasidic religious thought and of Chabad Chasidism, *see Agudas Chasidei Chabad of United States v. Gourary*, 650 F. Supp. 1463, 1464 (E.D.N.Y. 1987), *aff'd*, 833 F.2d 431 (2d Cir. 1987), which is useful for a fuller understanding of the issues before this Court:

---

[3]  This notation refers to the filing's docket number in the civil docket of this case in the United States District Court for the Central District of California (Western Division - Los Angeles).

Chasidism, the movement of Chasidim (literally, the "righteous"), was founded in the mid-18th Century in Eastern Europe by Rabbi Israel ben Eliezer, known as the Baal Shem Tov ("Master of the Good Name"). The teachings of the Baal Shem Tov emphasized the presence of God in all things, including the most mundane. The movement was in its origin intensely community oriented and centered on leaders, generally disciples of the Baal Shem Tov, who served as mediators between the Chasid, God and the society outside the community. *The movement divided itself into several groups centered on individual leaders and local communities, one of which was Chabad Chasidism*, which became known as Lubavitch Chasidism after the town in Russia in which the movement was centered in its early years.

*Id.* at 1464 n.1 (emphasis added).

Rabbi Schneersohn . . . was until his death the sixth in a line of rabbis who led a movement of Orthodox Jews known as Chabad Chasidism. Chabad is an acronym for the Hebrew words "*cochma*," "*bina*" and "*daas*," meaning wisdom, knowledge and understanding. As its name suggests, Chabad Chasidism has been considered as placing a greater emphasis on the intellect in the study of the Torah and the Kabbale than is the norm in Chasidism.

Chabad Chasidism was formed in 1775 by Rabbi Schneur Zalman, considered the first Lubavitcher Rebbe and known as the Alter Rebbe. The Alter Rebbe was a disciple of the successor of the Baal Shem Tov. The founder's son and successor, Rabbi Dov Baer, who died in 1827 and was known as the Mittler Rebbe, settled in the Russian town of Lubavich and, hence, gave the movement its present name. The third leader of the group was the son-in-law of Dov Baer and the son of the daughter of Schneur Zalman. This Rebbe, known as the Tzemach Tzedek, after the title of his major written work, was Rabbi Menahem Mendel, who died in 1866. The fourth Lubavitcher Rebbe was the youngest son of Menahem Mendel, Rabbi Samuel Schneersohn, known as the Maharash. *He was succeeded by his son, [the Fifth Rebbe] Rabbi Shalom Dov Baer, known as the Rashab, who died in 1920. The sixth Rebbe . . . was the son of Rabbi Shalom Dov Baer and succeeded his father on his father's death*.

*Id.* at 1464 (emphasis added). The court noted that the "family relationship between the . . .

succeeding Lubavitcher Rebbes may explain why . . . the distinction between property of the

3

religious institutions of Chabad Chasidism and the personal property of the Rebbe is not a distinction which has had to be made with any regularity in the movement's history."  *Id.*

At issue in this case are two distinct sets of property: the "Library" and the "Archive."[4] The Library, the origins of which date back to 1772, consists of more than 12,000 books and 381 manuscripts.  (*Id.* ¶ 11(a).)  It "was established, maintained and augmented by the first Five Chabad Rebbes . . . ."  (*Id.* ¶ 11(a).)  The Archive is comprised of over 25,000 pages of Chabad Rebbes' handwritten teachings, correspondence, and other records.  (*Id.* ¶ 11(b).)  The contents of the Archive passed down from Rebbe to Rebbe, and the *Gourary* court quoted testimony exemplifying its significance:

> [T]he *ksovim* that are original manuscripts or manuscripts used by the Rebbe himself, assume a sanctity about them, that they are kind of the essential legacy.  I would compare it to the crown jewels.  It's something concrete that is passed on in a symbolic way, and in a way incorporates in itself both the sanctity, the very presence, the very personality of the Rebbe himself.

650 F. Supp. at 1465.  The term "Collection," as used by the parties and in this memorandum, is primarily a term of convenience and refers to both the Library and the Archive.

In 1915, the Fifth Rebbe, Rabbi Shalom Dov Baer, fleeing Lubavitch from the advancing German army, took some books and manuscripts from the Library with him and sent the rest to be stored in a private warehouse in Moscow.  (Compl. ¶ 13; Defs.' Request [Cal. 18] for Judicial Notice in Support Mot. Dismiss Ex. 1 [hereinafter "Defs.' RJN"] at 32, 41.)  The upheavals associated with the Bolshevik Revolution of 1917 and the Russian Civil War prevented the Fifth

---

[4]  Although the parties, at times, weave their arguments about the Library and the Archive into a single thread, the law applies differently to each.  These two sets of property came into the defendants' possession at different times and by different means; hence, this Court must consider the legal principles applicable to the Library and the Archive separately.

Rebbe from reclaiming the Library during that time.  (Compl. ¶ 13; Defs.' RJN 32, 41.)  In early 1920*,* the Soviet Department of Scientific Libraries ("SDSL") moved the Library to a state facility.  (Opp'n [Cal. 45] Mot. Dismiss 4; Compl. ¶ 14; Defs.' RJN 32-43.)  The Fifth Rebbe passed away in 1920 and his son, Rabbi Joseph Isaac Schneersohn, succeeded him as the Sixth Rebbe.  (Opp'n Mot. Dismiss 4.)  In 1921, the SDSL approved the return of the Library to the Sixth Rebbe, who, however, lacked the funds for its return.[5]  (*Id.* at 4.)  The Library thus remained in the possession of the SDSL.  In 1927, the Soviet authorities arrested the Sixth Rebbe and sentenced him to death; later that year, bowing to international pressure, they allowed him to leave Russia for Latvia, then an independent nation, where he became a citizen.  (*Id.* at 5; Compl. ¶ 15.)  While the Sixth Rebbe brought the Archive with him to Latvia, the Library remained behind.  (Opp'n Mot. Dismiss 5; Compl. ¶ 7.)  In 1933, the Sixth Rebbe moved from Latvia to Poland, bringing the Archive with him.  (Opp'n Mot. Dismiss 5; Defs' RJN 57-60)

On September 1, 1939, Nazi Germany attacked Poland; the Soviet Union invaded Poland shortly thereafter.  When the Sixth Rabbi fled to the United States in 1940, he was unable to bring the Archive.  (Opp'n Mot. Dismiss 6; Compl. ¶¶ 16-17.)  He arrived in the United States on March 19, 1940.  (Compl. ¶ 16).  On July 25, 1940, Agudas Chasidei Chabad was incorporated in New York.  (*Id.* ¶ 1.)  The Sixth Rebbe made numerous efforts to retrieve the contents of the Archive left behind in Poland, affirming Chabad's ownership of the Archive.  (Pl.'s Suppl. Br. 7 (citing *Gourary*, 833 F.2d 435-37); Defs.' RJN 61.)  A portion of the Archive's contents arrived in the United States in unknown circumstances in 1941.  (Pl.'s Suppl.

---

[5]  The document the defendants cite in support of this claim is a 1922 letter from the Sixth Rebbe to the Director of the Rumyantsev Museum, asking that the Library be returned to him.  (Defs.' RJN 32.)  This letter mentions the 1921 SDSL resolution approving the return of the Library to the Sixth Rebbe and explains that the Rebbe "didn't have the means to remove [the books] from the [Department of State Libraries] within the time frame specified in the resolution."  *Id.  See also infra* note 14 for additional details about this event.

Br. 7 (citing Gourary, 833 F.2d. at 435).)  The rest of the Archive was taken by Nazis in Poland

and moved to a "Gestapo-controlled castle in Germany."  (*Id.*)  In 1945, the Archive was taken

by the Soviet Army as German "trophy documents" or "war booty" and transferred to the RSMA

in Russia.  (Opp'n Mot. Dismiss 6-7; Pl.'s Suppl. Br. 7-8; Compl. ¶ 19.)  A portion of the

Archive found in Poland that was not taken by the Soviet Army was returned to Chabad by the

Polish government in 1974.[6]  (Opp'n Mot. Dismiss 7; Compl. ¶ 19.)

In 1990, Chabad formed the Jewish Community of Lubavitch Chassidim ("JCLC") as its

representative in the Soviet Union.  (Compl. ¶ 21.)  According to Chabad, on September 6, 1991,

Soviet President Mikhail Gorbachev instructed the RSL to return the Library to Chabad.  (*Id.* ¶

22; Pl.'s Suppl. Br. 8.)  On September 26, 1991, the JCLC petitioned an arbitration court to order

the RSL to return the Library; the same day the court placed a lien on the Library.  (Compl. ¶ 23;

Defs.' RJN 68.)  On October 8, 1991, a State Arbitration Tribunal of the RSFSR[7] held that the

Soviet government had failed to prove that the Library "acquir[ed] a status of National

property."  (Opp'n Mot. Dismiss 8; Compl. ¶ 25; Defs.' RJN 70-71.)  The tribunal further held

that the Library "cannot be declared ownerless, as for a number of years, starting from 1922, the

owner of books and manuscripts applied to various bodies of the Soviet State, requesting their

return."  (Defs.' RJN 71.)  The court ordered the return of the Library to Chabad within one

month.  (*Id.*)  Chabad stresses that on November 18, 1991, the Chief State Arbiter of the RSFSR

affirmed this decision on appeal.  (Opp'n Mot. Dismiss 8.)  In fact, the Chief State Arbiter

reversed in part the lower tribunal, holding that Chabad had failed to show that it, rather than the

---

[6]  Unless noted otherwise, the term "Archive," as used throughout the rest of this memorandum, refers to the part of the Archive in the defendants' possession.

[7]  RSFSR (Russian Soviet Federative Socialist Republic) was one of the fifteen former Soviet Republics and encompassed Moscow and the seat of the Soviet government.  After the collapse of the Soviet Union, the RSFSR effectively became what today is the Russian Federation.

Rebbe, owned the Library, and ordered the Lenin State Library (the RSL's predecessor) to

transfer the Library to the Jewish National Library.  (Defs.' RJN 74-77.)

The Soviet Union dissolved on December 25, 1991, and was replaced by the Russian

Federation.  Chabad alleges that "[o]n January 29, 1992, the Deputy Chairman of the Russian

Federation ordered the [RSL] to give the Library to the Chabad Delegation." [8]  (Compl. ¶ 29.)

The Delegation, however, encountered a group of anti-Semitic hooligans incited by an RSL

director when it attempted to take possession of the Library.  (*Id.*)  Shortly thereafter, on

February 14, 1992, the Deputy Chief State Arbiter of the Russian Federation nullified the

previous court orders that mandated the RSL's relinquishment of the Library and closed the case.

(*Id.* ¶ 30; Pl.'s Suppl. Br. 10; Defs.' RJN 83-85.)  Chabad argues that this ruling was made

"unilaterally and secretly" and was procedurally defective.  (Pl.'s Suppl. Br. 10; Decl. [Cal. 40]

Veronika R. Irina-Kogan Opp'n Mot. Dismiss [hereinafter "Irina-Kogan Decl."] ¶ 12.)  On

February 19, 1992, the Supreme Soviet of the Russian Federation abolished the January 29,

1992, order and decreed that "the safety, movement and use of the holdings available to the

[RSL be effectuated] solely on the basis of the legislation of the Russian Federation and the

provisions of international law."  (Irina-Kogan Decl. Ex. J at 54.)  Chabad claims that this decree

divested Russian courts of jurisdiction to hear Chabad's claims by only allowing the legislative

branch to authorize any movement of books in the RSL's possession.  (Opp'n Mot. Dismiss 15;

Pl.'s Suppl. Br. 10; Irina-Kogan Decl. ¶ 15.)

---

[8]  The defendants counter that the January 29, 1992 regulation only provided for the transfer of the Library from the
RSL to the State Jewish Academy, another Russian state institution.  (Decl. [Cal. 15] Tatiana K. Kovaleva Supp.
Mot. Dismiss [hereinafter "Kovaleva Decl."] at 10.)

On December 16, 1993, Leon Fuerth, the national security advisor to Vice President Al Gore, entered into an agreement, entitled Memorandum of Understanding ("MOU"), with the Minister of Culture of Russia, Evgeny Sidorov.  (Decl. [Cal. 37] Leon Fuerth Opp'n Mot. Dismiss [hereinafter "Fuerth Decl."] ¶ 9.)  The MOU provided for the transfer of the Library to a new facility, where RSL staff with the assistance of Chabad, would catalog the Library's contents.  (Pl.'s Suppl. Br. 11-12.)  The MOU was an interim agreement between the Russian and United States governments and Chabad was not a party to it.  (Fuerth Decl. ¶ 9.) Although Chabad claims that the Russian side failed to live up to its obligations under the MOU, that does not bear on the present case as the MOU was agreed to be non-prejudicial to any future resolution of the Library's fate.  (*Id.*)

## II. DISCUSSION

*A.  Standard of Review*

When reviewing a Rule 12(b)(1) motion to dismiss, a court must assume the truth of all factual allegations in the complaint, construing them in the light most favorable to the plaintiff, even if some are subject to dispute by the opposing party.  *See Republic of Austria v. Altmann*, 541 U.S. 677, 681 (2004); *Saudi Arabia v. Nelson*, 507 U.S. 349, 351 (1993); *Kalil v. Johanns*, 407 F. Supp. 2d 94, 96-97 (D.D.C. 2005).  A court may rely on materials outside the pleadings to determine whether it has jurisdiction.  *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 n.3 (D.C. Cir. 1997); *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987) ("[I]t has been long accepted that the judiciary may make appropriate inquiry beyond the pleadings to satisfy itself on authority to entertain the case." (citation and internal quotation marks omitted)).

*B.  Jurisdiction under the FSIA*

*1.  Legal Standard for FSIA's Expropriation Exception*

The Foreign Sovereign Immunities Act provides the exclusive basis for asserting jurisdiction over a foreign state in a United States court.  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-35 (1989) (citing 28 U.S.C. § 1604 and 28 U.S.C. § 1330(a)); *accord Peterson v. Royal Kingdom of Saudi Arabia*, 416 F.3d 83, 85 (D.C. Cir. 2005) [hereinafter *Peterson II*].  In enacting the FSIA, Congress codified the longstanding tradition of foreign sovereign immunity, *see Amerada Hess*, 488 U.S. at 434 n.1; accordingly, unless one of the statutory exceptions enumerated in § 1605 is satisfied, a foreign state is immune from suit in United States courts.  *See* § 1604; *Amerada Hess*, 488 U.S. at 434-35 & n.3 (clarifying that in an action against a foreign state, a district court cannot have subject matter jurisdiction, unless one of the general exceptions to immunity in § 1605 applies).

The defendant-state has the ultimate burden of establishing immunity under the FSIA. *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1171 (D.C. Cir. 1994).  Once the defendant makes a prima facie showing that it is a foreign state, the plaintiff bears the burden of asserting at least some facts showing that one of the FSIA exceptions applies.  *Crist v. Republic of Turkey*, 995 F. Supp. 5, 10 (D.D.C. 2000) (Lamberth, J.).  The burden then shifts back to the defendant to prove, by a preponderance of the evidence, that the alleged exception does not apply.[9]  *Id.*

---

[9]  Few courts have discussed the evidentiary burden on the defendant, other than noting that the defendant carries the ultimate burden of persuasion.  This Court has previously stated that the defendant bears the burden of proof by a preponderance of the evidence, which is representative of the consensus of other Circuits.  *Crist v. Republic of Turkey*, 995 F. Supp. at 10; *accord Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.*, 179 F.3d 1279, 1290 (11th Cir. 1999); *Joseph v. Office of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1021 (9th Cir. 1987); *Alberti v. Empresa Nicaraguense De La Carne*, 705 F.2d 250, 256 (7th Cir. 1983).

Chabad relies on the FSIA's expropriation exception, § 1605(a)(3), to challenge the defendants' assertion of sovereign immunity. This exception consists of two distinct clauses and Chabad maintains that this Court has jurisdiction under the second clause.[10] (Compl. ¶ 37; Pl.'s Suppl. Br. 15.) Thus, in order to have jurisdiction, this Court must find that: (1) "rights in property" are at issue; (2) the property was "taken in violation of international law"; and (3) "the property at issue (or any property exchanged for it) [is] . . . 'owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality' engages in commercial activity in the United States." *Peterson II*, 416 F.3d at 86-87 (quoting § 1605(a)(3)). This Court will first address the second prong of the expropriation exception before moving on to the other two.

### 2. *Taking in Violation of International Law*

The second requirement of the FSIA's expropriation exception is that the property in question must have been "taken in violation of international law." 28 U.S.C. § 1605(a)(3); *see also Peterson II*, 416 F.3d at 86. A taking violates international law if: (1) it was not for a public purpose; (2) it was discriminatory; or (3) no just compensation was provided for the property

---

[10] Section 1605(a)(3) states, in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

The first clause (omitted here) does not apply in the present case, as it requires that the "property or any property exchanged for such property [be] present in the United States." § 1605(a)(3).

taken.[11]  *See Crist*, 995 F. Supp. at 10-11 (citing *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 711 (9th Cir. 1992), and RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 712 (1987) [hereinafter RESTATEMENT]); *see also* H.R. REP. NO. 94-1487, at 19-20 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6618 (providing the legislative history of the FSIA).  At the jurisdictional stage, this Court is not required to determine whether the property in question was taken in violation of international law as long as Chabad's claim to this effect is substantial and non-frivolous.  *See Crist*, 995 F. Supp. at 11 (citing *Siderman de Blake*, 965 F.2d at 711).

Chabad asserts that the "Soviet Union's takings of the Chabad Collection are unlawful on all fronts."  (Pl.'s Suppl. Br. 18.)  However, because, as noted above, the Library and the Archive came into the defendants' possession at different times and by different means, this Court must analyze the history of the Library and the Archive separately to determine whether the criteria for a taking are satisfied with regard to each.

### a. Was the Library taken in violation of international law?

The defendants do not dispute that the Library's taking was not for a public purpose, was discriminatory, and was not followed by just (or any) compensation.  Any one of these claims, if substantial and non-frivolous, satisfies the taking requirement of the expropriation exception.  *See Crist*, 995 F. Supp. at 11 (citing *Siderman de Blake*, 965 F.2d at 711).  Rather than refute Chabad's allegations, the defendants rely on the principle that international law does not govern disputes between a sovereign nation and its citizens.  (Defs.' Suppl. Br. 16 (quoting *Rong v.*

---

[11]  Quoting from *Sosa v. Alvarez-Machain*, 542 U.S. 692, 725-728 (2004), the defendants note that "efforts of the federal courts to develop new law under the rubric of international law 'should be undertaken, if at all, with great caution'" and urge this Court to "move cautiously in effecting remedies under the rubric of international law." (Defs.' Suppl. Br. 14-15.)  The legal criteria for what constitutes a taking under international law for the purposes of the FSIA's expropriation exception are well established and this Court is but following ample precedent.

*Liaoning Provincial Gov't*, 362 F. Supp. 2d 83, 102 (D.D.C. 2005) (citing *de Sanchez v. Banco Central De Nicaragua*, 770 F.2d 1385, 1397 (5th Cir. 1985)), *aff'd*, 452 F.3d 883 (D.C. Cir. 2006)).)  The parties agree that the Library first "fell into the hands of the Soviets during the Bolshevik Revolution of 1917."  (Defs.' Suppl. Br. 16; Pl.'s Suppl. Br. 18; Defs.' RJN 66.)  The Fifth Rebbe was a Russian (and then Soviet) citizen until his death and the Sixth Rebbe was a Soviet citizen until at least 1927, when he became a citizen of Latvia.  (Opp'n Mot. Dismiss 5.)  Therefore, the defendants assert, the Soviet government's expropriation of the Library cannot have violated international law and thus cannot form the basis of jurisdiction under the FSIA's expropriation exception.  (Defs.' Suppl. Br. 16.)

     Chabad avers that the taking of the Library by the defendants occurred in 1992 when Chabad first claimed title to the Library after the November 18, 1991, ruling.  (Compl. ¶ 42; Opp'n Mot. Dismiss 15.)  Chabad argues that the Soviet Union's physical taking of the Library was not a taking in the legal sense, because the Soviet Union allegedly never nationalized the Library after first coming into its possession sometime around 1920.  The Sixth Rebbe reasserted his non-abandonment of the Library in communications to Soviet authorities in 1922 and 1925, and "[b]etween 1924 and late 1991, the Soviets did not claim an ownership interest in the Library."  (Opp'n Mot. Dismiss 4-5, 14.)  In support, Chabad cites the October 8, 1991, arbitration court finding that the Soviet government had not nationalized the Library, and the November 18, 1991, appellate decision which affirmed that the Lubavitcher Rebbe[12] was the rightful owner of the Library.  (*Id.* at 8, 14-15.)  The key events, according to Chabad, were the Russian Federation Deputy Chief State Arbiter's February 14, 1992, nullification of the earlier

---

[12]  This ruling most likely refers to the Seventh Rebbe, although this is not entirely clear.  (Defs.' RJN 77.)

court orders, which allegedly mandated the return of the Library to Chabad (Compl. ¶ 30), and the official Russian decree that "the safety, movement and use" of RSL holdings could only be made on the basis of Russian legislation (Opp'n Mot. Dismiss 15). These unilateral, and allegedly illegal decisions, Chabad claims, constituted the taking of the Library.

Chabad avoids basing its taking claim on the Soviet government's confiscation of the Library in the 1920s, which, according to the defendants (Defs.' Suppl. Br. 16), is precisely the act that constituted the taking. Were Chabad to agree, its claim would contravene the principle relied on by the defendants that "[w]hile takings of property without compensation violate American public policy regardless of the nationality of the property owner, they violate international law only where the property owner is an alien." *de Sanches*, 770 F.2d at 1397 & n.17 (discussing the relation between a foreign country's taking of its citizen's property and the FSIA); *see also id.* at 1397 ("It may be foreign to our way of life and thought, but the fact is that governmental expropriation is not so universally abhorred that its prohibition commands the 'general assent of civilized nations.' We cannot elevate our American-centered view of governmental taking of property without compensation into a rule that binds all 'civilized nations.'" (quoting *Jafari v. Islamic Republic of Iran*, 539 F. Supp. 209, 215 (N.D. Ill. 1982) (internal citations omitted))); *Rong*, 362 F. Supp. 2d at 102 ("[C]onfiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law." (quoting *F. Palicio y Compania, S.A. v. Brush*, 256 F. Supp. 481, 487 (S.D.N.Y. 1966))); *cf. United States v. Belmont*, 301 U.S. 324, 332 (1937) ("What another country has done in the way of taking over property of its nationals . . . is not a matter for judicial consideration here. Such nationals must look to their

13

own government for any redress to which they may be entitled."), *quoted in Rong*, 362 F. Supp. 2d at 102.

There is some logic to Chabad's proposition that regardless of whether there was a taking of the Library in the 1920s, once the Russian government undertook to return it through court orders in 1991 or by decree in 1992, the Library again became Chabad's property.  The subsequent refusal to return the Library to Chabad in 1992 could then constitute a taking, as Chabad was an alien in relation to the government accused of the taking..  In support of its argument, Chabad relies on *Dayton v. Czechoslovak Socialist Republic*, which dealt with a dispute concerning textile plants previously owned by the plaintiffs and expropriated by the Czechoslovak government.  672 F. Supp. 7, 8 (D.D.C. 1986), *aff'd*, 834 F.2d 203 (D.C. Cir. 1987).  The Czechoslovak government promised to compensate the plaintiffs, but the communist regime, which replaced it, refused to honor the earlier promise.  *Id*.  The court's analysis is helpful to an understanding of the case:

> Defendant argues that it is not a violation of "international law" for a state to take the property of one of its own citizens.  The Commission has already determined that plaintiffs were Czechoslovakian citizens on October 27, 1945, the date their property was nationalized. Therefore, according to Centrotex [a co-defendant government company], there is no possible violation of "international law."  This argument, however, fails to recognize that the nationalization of the plaintiffs' property proceeded in two steps. There was no violation of international law in 1945 when the government nationalized the property of its citizens and promised to compensate them.  When the government repudiated this promise in 1948, however, the plaintiffs were American citizens. This repudiation of the promise to compensate may constitute a separate "taking" of the plaintiffs' property which was in violation of "international law." This issue can not be resolved on a motion to dismiss.

14

*Id.* at 9-10.  Chabad stresses the parallels between the Czechoslovak government's refusal to honor its earlier promise to compensate the plaintiffs and the Russian government's nullification of the earlier Soviet court orders allegedly mandating the return of the Library to Chabad.

The strength of Chabad's allegations does not rise to the level of the plaintiffs' claims in *Dayton*.  According to Chabad, the January 29, 1992, order by the Deputy Chairman of the Russian Federation provided for the return of the Library to Chabad, whereas the defendants maintain that it directed that the Library be moved to a different state institution, where it would be more accessible for research purposes.  *See supra* note 8 and accompanying text.  The parties also dispute the legitimacy of the February 14, 1992, order by the Deputy Chief State Arbiter of the Russian Federation, which nullified the earlier court orders and closed Chabad's case in the Russian courts.  *Compare* Irina-Kogan Decl. ¶¶ 12-14 (asserting that this order lacked legal justification and was not binding), *with* Kovaleva Decl. ¶¶ 18-20 (asserting that under applicable court rules, there was a lawful basis for this decision).  Notably, the November 18, 1991, appellate court order, which Chabad relies on, denied Chabad's ownership claims, stating that the Rebbe, rather that Chabad, was the rightful owner of the Library.  (Defs.' RJN 77.)  In sum, the abovementioned orders and rulings issued in 1991 and 1992 cannot be read as giving Chabad ownership of the Library and Chabad should not be able to predicate its taking claim on them.

This finding is supported by the D.C. Circuit's affirmance of *Dayton*: the court quoted a State Department letter stating that "[u]nder international law, the date of taking is fixed by the date of the expropriation decrees and/or the date of physical seizure, and not by a subsequent date of repudiation of an undertaking to provide compensation."  *Dayton*, 834 F.2d at 206-07, *quoted in* Defs.' Suppl. Br. 16.  There is some tension between this statement and the reasoning

15

of the district court, quoted *supra*, which the circuit court explicitly adopted. *Id.* at 206. This tension can be reconciled by noting that the district court did not find that the government's repudiation of its earlier promise to compensate was a taking, but rather that a motion to dismiss was not the proper vehicle to decide this question.[13] *Dayton*, 672 F. Supp. at 10. Moreover, *Dayton* dealt specifically with a promise to provide compensation for nationalized property, whereas the dispute in this case is precisely about whether the Library was nationalized before 1992.

This Court concludes that the Library's taking took place in or around 1920, when the Soviet government sealed it and moved it to a state facility, or, at the latest, in 1921, when, in unclear circumstances, the Sixth Rebbe had the opportunity to retrieve it but could not afford to.[14] Chabad's arguments that the taking took place in 1992 are irreconcilable with the Soviet government's actions in the 1920s. Chabad suggests that the 1992 Russian nullification of previous Soviet court orders was not a legitimate exercise of judicial or legislative power. But even if the overturned October and November 1991 court decisions, which concluded that the Library was never nationalized, were valid, they do not negate the Soviet Union's de facto taking of the Library in the 1920s. Chabad's contention that there cannot be a taking in the absence of an official nationalization decree is without merit, as a physical expropriation alone may well satisfy the legal criteria for a taking violating international law. As the defendants note, if a state can take possession of private property and hold it indefinitely without it becoming a taking,

---

[13] The *Dayton* court never reached this question as it dismissed the action on other grounds. 672 F. Supp. at 12-13.
[14] A passage in the district court's decision in *Gourary* provides some interesting information: "The large library of the Fifth Rebbe, . . . inherited by Rabbi Joseph Isaac Schneersohn, was confiscated by the communist government in the Soviet Union. According to Mrs. Gourary [the Sixth Rebbe's daughter,] the Sixth Rebbe attempted to repurchase the library, but the Soviet government 'wanted too much money. My father didn't have the money, so he couldn't redeem the library.'" *Gourary*, 650 F. Supp at 1466.

"there would never be an issue of jurisdiction under the FSIA for an expropriation because there would never be any 'taking.'" (Mot. Dismiss 12-13.) The Library's possession and control by the Soviet authorities for over 70 years strongly support the finding that it was, indeed, expropriated in the 1920s, when its owner was a Soviet citizen, and its taking thus did not violate international law.

### b. Was the Archive taken in violation of international law?

As for the Archive, Chabad has made substantial and non-frivolous claims of its taking in violation of international law. Although Chabad asserts that "[t]he 'taking' of the Archive occurred in 2004 when defendants Russian Federation, Russian Ministry of Culture, and Russian Military Archive ceased all dialogue with Chabad concerning the Archive" (Compl. ¶ 42), this Court bases its jurisdiction over Chabad's claims to the Archive on Nazi Germany's illegal appropriation of the Archive in Poland during World War II and its subsequent illegal appropriation by the Soviet Army in Poland in 1945.

For the purposes of the FSIA, the defendant-state need not be the state that took the property in violation of international law. *See* § 1605(a)(3) (using passive voice to focus on the act of the taking rather than on the actor involved); *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1202 (C.D. Cal. 2001), *aff'd*, 317 F.3d 954 (9th Cir. 2002), *aff'd*, 541 U.S. 677 (2004). Nazi Germany's seizure of the Archive clearly violated international law as it was discriminatory, not for a public purpose, and did not result in payment of just compensation. *See Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 134 (E.D.N.Y. 2000) (noting that "the confiscation of private property during the Holocaust was a violation of customary international law" (citing *State of Netherlands v. Fed. Reserve Bank of New York*, 201 F.2d 455, 459 n.4 (2d

Cir. 1953))); *Altmann*, 142 F. Supp. 2d at 1203 (finding the Nazi taking of the plaintiff's art collection "undeniably a taking in violation of international law"). The defendants aver that because Chabad did not exist until 1940, it never owned the Archive and thus cannot argue that the Archive was taken from it. (Defs.' Suppl. Br. 18.) This argument is discussed *infra* Section II.B.3 and has no bearing on whether a taking violating international law did or did not take place. Because the Nazis' taking of the Archive clearly violated international law, it serves to satisfy the second requirement of the FSIA's expropriation exception.

In addition, the Soviet Army's 1945 seizure and appropriation of the Archive from its Nazi captors as spoils of war was also a taking in violation of international law. The Archive was neither taken nor held for a public purpose, as the Soviet Union did not make it available for public use and long denied that it even had it. (Compl. ¶ 43; Opp'n Mot. Dismiss 18.)[15] And regardless who the legal owner of the Archive was at the time, the Soviet Union neither provided nor offered compensation for it. This taking took place in Poland after the Sixth Rebbe had become a Latvian citizen (Opp'n Mot. Dismiss 5; Compl. ¶ 15) and Chabad had been formed as a New York corporation (Compl. ¶ 15), defeating any possible argument that this matter is outside the purview of international law. *See supra* Section II.B.2.a.

Either Nazi Germany's taking of the Archive or its taking by the Soviet Army in Poland in 1945 constitutes a taking in violation of international law. Chabad's claim that the Archive was taken in violation international law is substantial and non-frivolous, and thus adequately satisfies the second requirement of the FSIA's expropriation exception.

---

[15] It is unnecessary for this Court to address the issue of whether the Archive's taking by the Soviet Union was discriminatory (the second prong of the illegal taking analysis), because the Soviet Union's appropriation of the Archive satisfies the other two criteria for a violation of international law.

### c. Exhaustion of Local Remedies

The defendants argue that a plaintiff cannot claim a taking in violation of international law without first "exhaust[ing] domestic remedies in the foreign state."  (Defs.' Suppl. Br. 18. (quoting *Millicom Int'l Cellular v. Republic of Costa Rica*, 995 F. Supp. 14, 23 (D.D.C. 1998)).) *Millicom*, however, explicitly only addresses takings that are based on a state's failure to provide just compensation.  995 F. Supp. at 23.  And the sources cited in *Millicom*—Restatement § 713 cmt. f[16] and two district court cases, both of which also rely on the same part of the Restatement—further clarify the applicable legal standard.  995 F. Supp. at 23.

Not only does the exhaustion requirement contain several exceptions,[17] but § 713(1) of the Restatement, to which it applies, deals with actions between states on behalf of their nationals.  *See* Restatement § 713(1); *cf.* Restatement § 713 Reporters' Note 5 (citing cases between sovereign states to illustrate the exhaustion requirement).  Only a handful of district courts have referred to the exhaustion requirement in the context of the FSIA's expropriation

---

[16]  Comment f (titled "Exhaustion of remedies") states, in relevant part:

> Under international law, ordinarily *a state is not required to consider a claim by another state for an injury to its national* until that person has exhausted domestic remedies, unless such remedies are clearly sham or inadequate, or their application is unreasonably prolonged. There is no need to exhaust local remedies when the claim is for injury for which the respondent state firmly denies responsibility, for example a claim for injury due to the shooting down of a foreign commercial aircraft where the respondent state contends that the act was justified under international law. When a person has obtained a favorable decision in a domestic court, but that decision has not been complied with, no further remedies need be exhausted.

Restatement § 713 cmt. f (emphasis added).

[17]  These exceptions appear to apply to Chabad, as it first pursued this matter in Russian courts and now avers that Russian legislation prevents it from filing suit in Russia. *See Malewicz v. City of Amsterdam*, 362 F. Supp. 2d 298, 308 (D.D.C. 2005) (holding the exhaustion requirement inapplicable where the Dutch statute of limitations may have barred suit in the Netherlands).  In addition, Russia firmly contends that its taking of the Collection was justified under international law, and the RSL has, in the past, allegedly refused to comply with Russian courts' rulings mandating transfer of the Library.

exception and this Court is not willing to make new law by relying on a misapplied, non-binding international legal concept, which the FSIA, the controlling statute for the jurisdictional question in this case, has not incorporated.

### 3. Rights in Property

In their motion to dismiss, the defendants conceded, for jurisdictional purposes only, Chabad's claims of right to the entire Collection.[18]  (Mot. Dismiss 10 & n.7.)  Nevertheless, this Court has considered the defendants' arguments, raised in their supplemental brief, as to Chabad's ownership of the Collection.  The defendants frame these arguments in light of D.C. Circuit law, which was not dispositive when the motion to dismiss was filed in the Central District of California, and at which time *Peterson II*, one of the cases they now rely on, had yet to be decided.

The parties disagree about the proper interpretation of the "rights in property" requirement.  According to Chabad, the FSIA's expropriation exception requires this Court to determine that *at issue* in the claim are "rights in property taken in violation of international law," tracking closely the language of the statute.  Chabad asserts that the property at issue, the Library and the Archive, is physical, and thus "tangible" property, satisfying the first

---

[18]  Specifically, the defendants stated:

> Here, for the purposes of this motion only, the first prong [of the expropriation exception] (right in property at issue) is not disputed, inasmuch as Plaintiff's claims of right to the Library and the Archive are placed in issue by Plaintiff's complaint.[FN7] . . .
> [FN7]  Obviously, the Defendants vigorously deny that Plaintiff has any right of ownership or possession of either the Library or the Archive.

(Mot. Dismiss 10 & n.7.)

20

requirement of the expropriation exception.[19]  (Pl.'s Suppl. Br. 15-16.)  The defendants argue

that to meet the first requirement of the expropriation exception, Chabad's "claim of right has to

be as to a vested right in property."  (Defs.' Suppl. Br. 10 (citing *Peterson II*, 413 F.3d 83).)  The

defendants suggest that in order to assume jurisdiction under the expropriation exception, this

Court must find that the *plaintiff's* rights in subject property, taken in violation of international

law, are in issue, and contend that Chabad does not meet this requirement because it has no

vested right in the Library or the Archive.  (*Id.* at 10-11.)  *Peterson II*, which the defendants rely

on, dealt with the speculative nature of the plaintiff's future benefits from Saudi Arabia's

retirement benefits scheme rather than any tangible property he had possessed.  416 F.2d at 88.

The plaintiff's employers contributed a certain percentage of the plaintiff's income, in his name

and for his benefit, to a retirement fund established by a state agency for foreign workers.  *Id*. at

84-85.  After the Saudi Arabian government eliminated non-citizens' eligibility to these

retirement benefits and failed to provide a full refund of his contributions to the plaintiff, he

brought suit under the FSIA, asserting that his contributions constituted a right in property within

the meaning of the expropriation exception.  *Id*. at 85-86.  The D.C. Circuit's opinion clarified

that the expropriation exception requires that rights in property be in issue in the claim, whereas

the plaintiff in that case had "failed to allege sufficient facts demonstrating that the contributions

constitute a 'right in property' in the first place" because there was no guarantee of any return of

his contributions.  *Peterson II*, 416 F.3d at 86-87.  The plain language of § 1605(a)(3) supports

---

[19]  While the "tangible property" requirement does not appear in the language of § 1605(a)(3), a number of courts, including this one, have read it into the statute.  *See, e.g.*, *Peterson v. Royal Kingdom of Saudi Arabia*, 332 F. Supp. 2d 189, 197 (D.D.C. 2004) (Bates, J.) (citing cases from other districts), *aff'd*, 416 F.3d 87.  The D.C. Circuit has clarified, however, that the tangible-intangible distinction is subsidiary to the question of whether the there is a "'right in property' at issue in the first place."  *Peterson II*, 416 F.3d at 87-88 (declining to settle the question of the effect of the "tangible/intangible distinction [on] subject matter jurisdiction under FSIA's expropriation exception").

Chabad's position—it is silent as to the identity of the owner of the subject property and solely requires that the property in question be "in issue." *See* § 1605(a)(3) (granting jurisdiction "in any case . . . in which rights in property taken in violation of international law *are in issue*" and which satisfies the other two requirements of this exception) (emphasis added).

Both parties rely on the district and circuit courts' decisions in *Gourary* to support their arguments about Chabad's ownership of the Collection. An important caveat is that this case was decided under New York state trust laws, and primarily concerned the status, at the Sixth Rebbe's death in 1950, of the books that were brought to Chabad in New York before then. *See Gourary*, 650 F. Supp. at 1474 ("The conclusion is inescapable that the library was not held by the Sixth Rebbe *at his death* as his personal property . . . .") (emphasis added); *id.* at 1473 ("The treatment of the library at the time of [the Sixth Rebbe's] death supports the conclusion that the library was no longer considered by him or by those familiar with his thought on the matter as his personal property."). In addition, the Library was not before the court in *Gourary*, as the Sixth Rebbe had left it behind in Russia when he was allowed to leave Russia for Latvia.[20]

Nevertheless, the *Gourary* decisions shed some light on the relation between the Sixth Rebbe, the Collection, and the Chabad community. The Sixth Rebbe's efforts, starting in 1939 and lasting until his death, to recover the books and manuscripts he left behind when fleeing the German invasion of Poland, including the Archive, demonstrate that he considered them to be the possession of Chabad and was trying to recover them for Chabad's benefit. *See, e.g.*, *Gourary*, 833 F.2d at 435-36 (quoting the Sixth Rebbe's November 27, 1939, letter, referring to the Archive as "three boxes of sacred manuscripts, which are the property of Agudas Chabad and

---

[20]  What the *Gourary* court refers to as the "library" were the books and manuscripts in the Sixth Rebbe's possession before he fled Poland after the German invasion; these included the Archive.

should be sent straight to New York"). While the New York state law of charitable trusts, applied in *Gourary*, is irrelevant to the present case, the gist of both courts' discussions is that the Sixth Rebbe had held the Archive and other religious books on behalf of Chabad, and after his arrival in the United States in 1940, what remained of the Collection attained the corresponding legal status. *See Gourary*, 650 F. Supp. at 1475 (noting that "[w]hile each of the Rebbes appear[ed] to have treated the library as personal property, . . . there can be no question that the library came to be conceived as one to be used for the benefit of the religious community of Chasidim by the leader of the community"); *id.* at 1476 ("[T]he library was never held by the Rebbe as personal property for his personal benefit and his private, as opposed to religious, purposes. It was held as personal property for the community's benefit and for charitable uses."); *id.* at 1745 & n.10 (finding that the establishment of a legally enforceable relationship between the Sixth Rebbe, his library of books and manuscripts, and the followers of Chabad was "a result of a need to articulate for the benefit of others the precise nature of the relationship between the library and the Chabad Chasidic community," "a necessity imposed on the Rebbe, not by his followers, but by the events of the mid-twentieth century").

The import of the district and circuit courts' decisions is that even before he was forced to leave the Archive behind in Poland, the Sixth Rebbe did not consider it to be his personal property, but had rather held it "in trust for the benefit of the religious community of Chabad Chasidism." *Gourary*, 650 F. Supp. at 1474. A logical inference of *Gourary* is that had the Sixth Rebbe managed to retrieve the Archive from Poland, it would have become the property of Chabad, just as those books that were the subject of litigation in that case.

23

Chabad's claims are rooted in the defendants' alleged illegal taking and possession of the Archive and it has presented sufficient facts, for jurisdictional purposes, that it has a right in property in the Archive. This is consistent with the FSIA's aim, as the expropriation exception simply establishes a court's jurisdiction over the foreign state as a party to the action; a court does not at this stage decide on the merits of the substantive claims.[21] An allegation of a foreign state's expropriation of property is likely to involve significant factual dispute as to the ownership of this property. In these circumstances, a Rule 12(b) motion to dismiss, even when accompanied by limited jurisdictional discovery, is not a proper avenue for the resolution of this dispute. This Court finds that Chabad's rights in this property are in issue, satisfying the first requirement of § 1605(a)(3).

### 4. Commercial Activity in the United States

The third requirement of the FSIA's expropriation exception requires a commercial activity nexus between the foreign state, or its agency or instrumentality that owns or operates the property at issue, and the United States. § 1605(a)(3). The first clause of the expropriation exception, not at issue in this case, requires that the "commercial activity [be] *carried on* in the United States by the foreign state." *Id*. (emphasis added). The FSIA defines "commercial activity *carried on* in the United States by a foreign state" as "commercial activity carried on by such state and having substantial contact with the United States." § 1603(e) (emphasis added). The second clause, relied on by Chabad, requires that the entity that owns or operates the

---

[21] In fact, the defendants' motion to dismiss supports this reading of the statute. The defendants conceded that the "rights in property" requirement of the expropriation exception was "not disputed, inasmuch as Plaintiff's claims of right to the Library and the Archive are placed in issue by Plaintiff's complaint," even as the corresponding footnote made it clear that defendants would challenge Chabad's claim of ownership of the Collection. (Mot. Dismiss 10 & n.7.)

property at issue "*be engaged in* a commercial activity in the United States." § 1605(a)(3) (emphasis added).

The FSIA defines a commercial activity as "either a regular course of commercial conduct or a particular commercial transaction or act." § 1603(d). Congress gave the courts broad discretion to "determin[e] what is a 'commercial transaction' for purposes of" the FSIA. *See* H.R. REP. NO. 94-1487, at 16 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6604, 6615. Whether an act is commercial depends on the nature of the course of conduct rather than its purpose. § 1603(d). It is immaterial whether the foreign state possesses a profit motive, "[r]ather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in trade and traffic or commerce." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (internal quotation marks omitted). The term "commercial" is used to distinguish governmental acts from those a private person or entity can engage in—"when a foreign government acts . . . in a manner of a private player within [a market], the foreign sovereign's acts are 'commercial' within the meaning of the FSIA." *Id.* (noting, as an example, that a state's "issuance of regulations limiting foreign currency exchange" is not a commercial activity because it cannot be performed by a private actor, whereas a state's contract to buy goods is a commercial activity because private companies can do the same).

Despite this broad definition of "commercial activity," the defendants maintain that this Court should interpret the second clause of the expropriation exception narrowly, by requiring a "higher standard of contact with the United States" than that required in the first clause of § 1605(a)(3). (Defs.' Suppl. Br. 21-22.) The defendants attempt to divine what "Congress must

have intended" by its use of "engaged in" and "carried on," and argue, based solely on the language of § 1605(a)(3), that the statute only "makes sense" if the term "engaged in" is construed to require a level of commercial activity at least equal to that of "carried on."  (Defs.' Suppl. Br. 21-22.)

The defendants' construction of the statute is unconvincing.  The language of the statute implies that the phrase "engaged in" should be simply read together with the definition of "commercial activity" in § 1603(d), and Congress' intentional omission of a definition for "engaged in a commercial activity" supports this interpretation.  By its plain language, the second clause of § 1605(a)(3) bears on the commercial activities of a foreign state's agency or instrumentality, which owns or operates the property in question, and does not require a nexus between the taking and the commercial activity in the United States.  Hence, this Court must determine whether the RSMA was engaged in "either a regular course of commercial conduct or a particular commercial transaction or act," § 1603(d), in the United States, at the commencement of this action.[22]

The RSMA entered contracts with two American companies for the reproduction and sale of RSMA materials worldwide, including in the United States.  (Pl.'s Suppl. Br. 34.)  As a result, the RSMA received royalties from U.S. sales of its materials, denoted as such, through at least December of 2004.  (*Id.* at 35.)  One of these agreements, with Yale University Press ("Yale"), a unit of Yale University and located in Connecticut, is for a "joint preparation and publication of a volume of documents entitled *The Spanish Civil War*."  (Decl. [Cal. 51] Marshall B. Grossman Supp. Pl.'s Suppl. Mem. P. & A. [hereinafter "Grossman Decl."]. Ex. 11, ¶ 1 at 276.)  The

---

[22]  Because this Court found that the Library was not taken in violation of international law, it does nor address the issue of the RSL's commercial activities in the United States.

26

agreement gives Yale the right to distribute this volume worldwide, other than in Russia (*Id.* Ex. 11, ¶ 2.1 at 276), and is valid until December 31, 2027 (*Id.* Ex. 11, ¶ 5.1 at 278). The parties agreed for this agreement to be "governed by the law of the Russian Federation and by the law of the State of Connecticut, U.S.A." (*Id.* Ex. 11, ¶ 11.4 at 282.) The record shows that the RSMA received royalties from "US Regular Sales" stemming from this agreement as late as December, 2004. (*Id.* Ex. 11, ¶ 5.1 at 275.)

In 1999, the RSMA also entered a contract with Primary Source Media (PSM), a Connecticut division of Thomson Information, Inc. (Decl. [Cal. 38] Joseph Bucci Opp'n Mot. Dismiss Ex. A at 5.) This contract called for "the preparation and publication of a collection of documents pertaining" to Russian and Soviet history, such as the Civil War in Russia and the papers of Leon Trotsky. (*Id.* Ex. A at 5.) Under this contract, PSM would sell reproductions of materials in the RSMA's archives, and PSM paid the RSMA at least $60,000 in advance royalties. (*Id.* Ex. A at 5-7, Ex. E at 66-68.) Royalty statements provided by PSM to the RSMA show sales to several universities in the United States, including Harvard, Yale, Ohio State University, and the University of California in Los Angeles. (*Id.* Ex. D.)

The RSMA intended to and generated income from the sales of its materials, in the preparation of which it participated under these contracts, in the United States. The contract the RSMA signed with Yale is governed by Connecticut law and intended for Yale to sell jointly-prepared reproductions of the RSMA's materials in countries including the United States. The contract with PSM, albeit governed by Russian law, contains similar terms. The RSMA received royalties specifically in consideration of the sale of reproductions of its materials in the United States. Consequently, this Court finds that the RSMA "engaged in a commercial activity in the

United States." § 1605(a)(3).  The defendants suggest that the royalty amount[23] is insufficient to

amount to a jurisdictional basis under FSIA (Defs.' Suppl. Br. 29); however, the statutory

definition of "commercial activity" clearly states that it can be a "*particular* commercial activity

or act," § 1604(d) (emphasis added), and the Supreme Court provided an example, in *Weltover,*

*Inc.*, 504 U.S. at 614, of a single contract for goods being adequate to satisfy this requirement.

*C.  Act of State Doctrine*

The act of state doctrine directs courts in the United States to presume the validity of

"acts of foreign sovereigns taken within their own jurisdictions." *See W.S. Kirkpatrick & Co. v.*

*Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990).  This is a prudential doctrine, premised

on "'the strong sense of the Judicial Branch that its engagement in the task of passing on the

validity of foreign acts of state may hinder' the conduct of foreign affairs." *Id*. at 404, (quoting

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 423 (1964)).  The doctrine thus precludes a

court from ruling on a claim when its resolution turns upon the legality of a foreign sovereign's

official action within its own territory.  *id.* at 406.  The act of state doctrine applies even if the

plaintiff alleges that a foreign sovereign's action violated international law.  *Sabbatino*, 376 U.S.

at 430-431.  The defendants bear the burden of establishing that dismissal under the act of state

doctrine is appropriate in the given circumstances.  *See World Wide Minerals Ltd. v. Republic of*

*Kazakhstahn*, 116 F. Supp. 2d 98, 104 (D.D.C. 2000) (Lamberth, J.) ("The party raising the act

of state defense has the burden of establishing the facts required under the doctrine.") (citing

*Riggs Nat'l Corp. & Subsidiaries v. Comm'r of IRS*, 163 F.3d 1363, 1367 & n.5 (D.C. Cir.

1999)).

---

[23]  For the 2004 calendar year, the RSMA's royalties from U.S. sales were $114.15.  (Grossman Decl. Ex. 11, ¶ 5.1 at 275.)

a.  *The Archive*

The act of state doctrine does not apply to Chabad's claims concerning the Archive.  The

Nazi taking of Jewish property during the Holocaust was manifestly illegal.  *See Bodner*, 114 F.

Supp. 2d at 134.  It is not clear whether the Soviet Army's taking of the Archive as spoils of war

at the conclusion of World War II was an official government act, but irrespective, it occurred in

Poland and not in Soviet territory.  (Compl. ¶ 19.)  Were this Court to eventually decide in

Chabad's favor, declaring the taking of the Archive a violation of international law, this ruling

would not have the effect of declaring illegal any official Soviet or Russian action in its own

territory.  *See W.S. Kirkpatrick & Co.*, 493 U.S. at 409 ("The act of state doctrine does not

establish an exception for cases and controversies that may embarrass foreign governments, but

merely requires that, in the process of deciding, the acts of foreign sovereigns *taken within their*

*own jurisdictions* shall be deemed valid.") (emphasis added).  The defendants' arguments with

respect to the act of state doctrine mostly relate to the taking of the Library,[24] and counsel for the

defendants admitted during oral argument that the act of state doctrine has less force with respect

to the Archive. Based on the parties' written and oral arguments on this issue, this Court finds

that the act of state doctrine does not apply to the taking of the Archive.

---

[24]  For example, the defendants' supplemental brief simply summarizes the application of the act of state doctrine in *Dayton*, 672 F. Supp. 7-13, without any specific references to the taking of the Archive.  (Defs.' Suppl. Br. 30-33.) In fact, one of the defendants' few references to the facts of this case in the "Act of State" section of their brief states that: "[w]hether viewed as a taking in 1917, 1992, or 2004, the actions that Chabad seeks to call into question are as to property taken and held by a foreign sovereign within its own territory."  (*Id*. at 31.)  This comment clearly refers to the Library, and just as clearly has no bearing on the Archive's taking.

b. *The Library*

Chabad premises its claims of the Library's taking in part on the alleged unlawfulness of the Russian Chief Arbiter's Final Decision, which overturned the decisions reached by tribunals below.  An official judicial decision, even one tainted by allegations of impropriety, as Chabad alleges this one was (Pl.'s Suppl. Br. 10, 25), is an official act of a sovereign nation.  Chabad is in effect asking this Court to sit in review of the Deputy Chief State Arbiter of the Russian Federation.  That this Court cannot do.  Chabad also attempts to paint the February 19, 1992 decree by the Supreme Soviet of the Russian Federation, allegedly divesting the Russian courts from adjudicating claims for the recovery of the Collection, as another discrete taking.  (*Id.* at 25.)  Legislative acts of a foreign sovereign are quintessential official government action and Chabad's claim premised on the impropriety of this legislation is also barred by the act of state doctrine.  Were Chabad to have argued that the Library's taking occurred in the 1920s, as this Court has found, the act of state doctrine would squarely apply because the Library's appropriation and transfer to state facilities was done in accordance with official government directives.  (Defs.' RJN 32-43; Compl. ¶ 14.)

The application of the act of state doctrine results in the same outcome as the application of the FSIA's expropriation exception.  This Court has no jurisdiction over Chabad's claims to the Library, and even were it to have jurisdiction, these claims would be barred by the act of state doctrine.  However, this Court does, under the FSIA, have subject matter jurisdiction over Chabad's claims to the Archive, and the act of state doctrine does not preclude these claims.

D. *Forum non Conveniens*

In addition to their arguments as to this Court's jurisdiction, the defendants urge that the doctrine of *forum non conveniens* should compel this Court to dismiss the case. A determination under the doctrine of *forum non conveniens* is a discretionary one. *See Am. Dredging Co. v. Miller*, 510 U.S. 443, 453 (1994) (noting that the doctrine of *forum non conveniens* is "a supervening venue provision, permitting displacement of the ordinary rules of venue when, in light of certain conditions, the trial court thinks that jurisdiction ought to be declined"). Under the doctrine of *forum non conveniens*, a court must first determine whether there is an adequate alternative forum for the dispute and, if so, must then balance both private and public interest factors in favor of the respective forums. *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 & n.22 (1981). There is a substantial presumption in favor of the plaintiff's choice of forum, and "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947).

1. *Adequate Alternate Forum*

The burden is on the defendants to satisfy the threshold requirement of demonstrating the existence of an adequate alternate forum with jurisdiction over the case. *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996). The defendants' briefs contain conclusory statements as to whether this case can be brought in a Russian court and the record is not clear whether the February 19, 1992, decree precludes Chabad from filing suit in the Russian Federation. *Compare* Irina-Kogan Decl. ¶ 15 (asserting that the 1992 decree prevents Chabad from pursuing any judicial remedy in the Russian Federation to recover the Collection), *with* Reply Opp'n Mot. Dismiss 12 (arguing that the 1992 decree does not bar litigation in the

Russian Federation with respect to either the Library or the Archive). Chabad paints the legislation as applying to both the Library and the Archive (Pl.'s Suppl. Br. 10-11; Irina-Kogan Decl. ¶ 15), but on its face, the legislation only affects RSL holdings (*i.e.*, the Library) and does not mention the RSMA, where the Archive is stored (Irina-Kogan Decl. Ex. J at 54). Chabad also implies that adjudication in the Russian Federation may take a long time and may be biased against its claim (Pl.'s Suppl. Br. 37), but a foreign forum "is not inadequate merely because it has less favorable substantive law," "employs different adjudicative procedures," or on the basis of "general allegations of corruption." *El-Fadl*, 75 F.3d at 678.

Nevertheless, the burden is on the defendants to "'provide enough information to enable the District Court' to evaluate the alternative forum." *Id*. at 677 (quoting *Piper Aircraft*, 454 U.S. at 258)). At oral argument, the parties failed to shed more light on the adequacy of Russian courts to hear this dispute or on the effect of the 1992 legislation on this question. *See id*. at 678 ("[I]f the foreign forum would deny [the plaintiff] access to its judicial system on the claims in his complaint, dismissal on *forum non conveniens* grounds is inappropriate."). Having conducted jurisdictional discovery and presented their oral arguments, the defendants had ample opportunity to make a showing of the existence of an adequate alternate forum. However, the defendants' conclusory statements about adequacy of a Russian forum fall short of the required showing for *forum non conveniens*.

### 2. Private and Public Interests

Even if this Court were to find that the alternate forum is adequate, it must then balance the relevant private and public interest factors at play. *Mutambara v. Lufthansa German Airlines*, 2003 WL 1846083, at *2 (D.D.C. Mar. 24, 2003). Some relevant private interests are:

(1) "relative ease of access to sources of proof"; (2) "availability of compulsory process for attendance of unwilling" witnesses; (3) cost of attendance of witnesses; (4) enforceability of a judgment, if obtained; and (5) "other practical problems that make trial of a case easy, expeditious and inexpensive." *Am. Dredging*, 510 U.S. at 448 (quoting *Gulf Oil.*, 330 U.S. at 508). Relevant public interest factors include: (1) the preference for deciding local controversies at home, and conversely (2) the preference for resolving significant issues in a more central forum; (3) in diversity cases, the familiarity of the forum with applicable state law; and (4) the burden of jury duty on citizens of a forum unrelated to the case. *Id.* at 448-49 (quoting *Gulf Oil.*, 330 U.S. at 508-09). This Court is mindful of the "strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." *Piper Aircraft*, 454 U.S. at 255.

> a. *Private Interest Factors*

While it may be relatively easier and less costly for a Russian court to gain access to some sources of proof, such as witnesses and tangible evidence, this factor does not weigh in favor of dismissal. Although the taking of the Library occurred in the Soviet Union, the Archive's taking took place in Poland—first when it was taken by the Nazis and then by the Soviets. While some of the evidence is undoubtedly located in the Russian Federation, it is likely that other evidence exists in Poland and in Germany. This Court heeds the defendants' argument that in addition to ease of access, the cost of making the witnesses and evidence available to a court in the United States may be substantial. (Defs.' Suppl. Br. 38-39.) Chabad allays some of these concerns by noting that the defendants can easily access many of the documents in question, which are in their possession (Pl.'s Suppl. Br. 39), and in light of modern

technology, the location of documents is not a significant factor.  *See Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Res., Inc.*, 196 F. Supp. 2d 21, 36 (D.D.C. 2002).  Regardless of the forum, these documents will have to be provided to Chabad and its counsel, located in New York, the District of Columbia, and California; in fact, various Soviet-era documents, some dating back to the 1920s, have already been provided to Chabad as part of jurisdictional discovery.  Chabad also points to an earlier stipulation between the parties in which the defendants agreed to produce any foreign employees or private citizens for deposition "on the east coast of the United States, or in London, England, or Paris, France," and Chabad agreed to pay reasonable airfare and hotel costs for these deponents.  (Stipulation and Order [Cal. 12] ¶ 3.e at 2.)

The fact that many of the evidentiary documents are in Russian does not clearly weigh in favor of the defendants' choice of forum.  The cost of translating Russian documents into English may well be significant.  (Defs.' Suppl. Br. 40.)  However, many Russian documents have already been translated, with translation services being readily available for other documents.  (Pl.'s Suppl. Br. 40-41.)  In addition, some evidentiary documents are in Hebrew, and there are likely some in German, which will have to be translated whether the forum is in the Russian Federation or the United States.  As for translation costs in relation to witness testimony, while defendants argue that potential witnesses in this case are Russian and their depositions will require translation into English, Chabad points out that most of its witnesses reside in North America, and their depositions will require translation into Russian if this case is dismissed in favor of a Russian forum.  Additionally, the defendants' allegation that the parties and their experts will have to examine the Collection to determine its exact contents (Defs.' Suppl. Br. 39-

40) does not shift the balance, as the examination of the Collection, if necessary, will occur in Russia regardless of the location of the trial. (Pl.'s Suppl. Br. 40.)

Finally, the defendants note that "[s]ince the 'Collection' is located in Russia," any judgment requiring the defendants to transfer the Collection to Chabad "would have a far greater chance of being enforced in Russia if it were to come from a Russian court rather than a U.S. court." (Defs.' Suppl. Br. 42.) The defendants appear to be suggesting that this Court should divest itself of jurisdiction because if it rules against the defendants, they may refuse to abide by its judgment. Such an argument is an affront to this Court and does not militate in favor of dismissal on the grounds of *forum non coveniens*.

### b. Public Interest Factors

The public interest analysis leans in favor of maintaining the present forum. The defendants' argue that most District of Columbia residents have no interest in this dispute. (Defs.' Suppl. Br. 43.) The Russian Federation, claim the defendants, has a strong interest in the outcome of this dispute, as the Library "is an important element of the heritage of the Russian Federation" and it "is being used by various individuals and entities, including the Russian Chassidic community." (Defs.' Suppl. Br. 43.)

It is no mere coincidence that this case is being heard in the District of Columbia, as Congress has designated this Court to be a proper forum for all actions brought under the FSIA. § 1391(f)(4). The District of Columbia is the seat of the United States government, and is the location of various foreign embassies, including the Russian one. There is a public interest in resolving issues of significant impact in a more central forum, such as this one. *See Gulf Oil.*, 330 U.S. at 509. The general public interest in this case is evidenced by the demonstrated

interest and involvement of the United States government in pushing for a resolution of the

dispute surrounding the Collection.  The national security adviser to a former Vice President of

the United States stated that the return of the Collection was frequently brought up by the Vice

President and President of the United States in meetings with their Russian counterparts, as well

as by a "succession of United States Ambassadors."  (Fuerth Decl. ¶ 7.)  The MOU addressing

the Library's storage conditions was signed at the highest levels between the United States and

Russian governments.  (*Id.* ¶ 9.)

More recently, multiple letters addressed to Russian Presidents Yeltsin and Putin, signed

by all one hundred United States Senators and by over three hundred members of the United

States House of Representatives, as well as a letter from the State Department expressing its

concern about the situation, comprise significant evidence that there is a strong public interest in

the United States in the outcome of this litigation.  (Suppl. Decl. Marshall B. Grossman Supp.

Pl.'s Suppl. Br. [15] Ex. B at 6-13 (May 31, 1992, letter signed by the entire Senate); *id.* Ex. B at

16-24 (February 24, 2005, letter signed by the entire Senate); *id.* Ex. B at 28-43 (May 5, 2005,

letter signed by members of Congress); *id.* Ex. B at 44 (July 11, 2005, letter from the State

Department)).

Chabad points out the irony in the defendants' claim that the Library is part of the

Russian Federation's cultural heritage, when the Russian Federation and its predecessor Soviet

Union kept the Library in poor conditions for decades.  (Pl.'s Suppl. Br. 42-43.)  *See also* Fuerth

Decl. ¶¶ 10-12 (noting that the U.S. government was not "persuaded by the alternative Russian

argument that the Library was a national treasure" in view of the fact that it was "completely

hidden from view for nearly a quarter of a century, and its existence only revealed when tracked

down by outsiders"; because this "treasure" was stored in the lower stacks of the Lenin Library without regard for the books' significance; and because of evidence of anti-Semitism in Russia). In addition, the Soviet Union long denied that it even had possession of the Archive.

As for the other public interest factors, this case represents more than just a localized dispute, so the preference for deciding localized controversies in a local forum is inapplicable. Because this is not a diversity case, but one predicated on questions of international law, either forum may have to deal with legal concepts "foreign to itself." *Gulf Oil*, 330 U.S. at 509. It is also important to note that there is no burden on potential jurors, as jury trials are not available in suits brought under the FSIA. (Pl.'s Suppl. Br. 42.)

Even had the defendants demonstrated the existence of an adequate available alternate forum, a balancing of the private and public interest factors does not "clearly point towards trial" in the Russian Federation. *Piper Aircraft*, 454 U.S. at 255. The private interests slightly favor the defendants, mostly due to the location of witnesses and costs associated with translating testimony and various relevant documents. The public interests favor Chabad—while the defendants can claim a natural interest in having the case decided in a domestic court, there is a greater public interest in having this dispute decided in the United States, which is also home to many followers of Chabad. Assuming *arguendo* the existence of an adequate alternate forum, the private and public factors viewed together do not overcome the strong presumption in favor of the plaintiff's choice of forum, *id.*, especially where the plaintiff is a United States citizen. In all, the principles underlying the doctrine of *forum non convenience* point to the District of Columbia as the more appropriate forum for this litigation.

### III. CONCLUSION

For the foregoing reasons, this Court concludes that it has jurisdiction over Chabad's claims relating to the Archive but not the Library.  The application of the act of state doctrine does not change this outcome, as it only bars this Court from adjudicating Chabad's claims relating to the Library, and this Court does not find it appropriate to dismiss the case under the doctrine of *forum non conveniens*.  Accordingly, and for the reasons stated herein, this Court shall grant in part the motion [Cal. 13] to dismiss as to Chabad's claims concerning the Library, and shall deny in part the motion to dismiss as to Chabad's claims concerning the Archive.

A separate Order accompanies this Memorandum Opinion.


Signed by Royce C. Lamberth, United States District Judge, December 4, 2006.