# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 17, 2008          Decided June 13, 2008

No. 07-7002

AGUDAS CHASIDEI CHABAD OF UNITED STATES,
APPELLEE/CROSS-APPELLANT

v.

RUSSIAN FEDERATION, RUSSIAN MINISTRY OF CULTURE AND
MASS COMMUNICATION, RUSSIAN STATE LIBRARY, AND
RUSSIAN STATE MILITARY ARCHIVE,
APPELLANTS/CROSS-APPELLEES

Consolidated with
07-7006

———

Appeals from the United States District Court
for the District of Columbia
(No. 05cv01548)

———

*James H. Broderick, Jr.* argued the cause for appellants/cross-appellees.  With him on the briefs was *Donald T. Bucklin.*

*Nathan Lewin* argued the cause for appellee/cross-appellant.  With him on the briefs were *Marshall B.*

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    JUN 1 3 2008

CLERK

2

*Grossman, Seth M. Gerber, Alyza D. Lewin,* and *William B. Reynolds.*

Before: HENDERSON, *Circuit Judge,* and EDWARDS and WILLIAMS, *Senior Circuit Judges.*

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Opinion concurring in the judgment filed by *Circuit Judge* HENDERSON.

WILLIAMS, *Senior Circuit Judge:*    Agudas Chasidei Chabad of United States is a non-profit Jewish organization incorporated in New York. It serves as the policy-making and umbrella organization for Chabad-Lubavitch—generally known as "Chabad"—a worldwide Chasidic spiritual movement, philosophy, and organization founded in Russia in the late 18th century. (Chabad's name is a Hebrew acronym standing for three kinds of intellectual faculties: *Chachmah, Binah,* and *Da'at,* meaning wisdom, comprehension, and knowledge.)  In every generation since the organization's founding, it has been led by a Rebbe—a rabbi recognized by the community for exceptional spiritual qualities.  Agudas Chasidei Chabad stakes claim to thousands of religious books, manuscripts, and documents (the "Collection") that were assembled by the Rebbes over the course of Chabad's history and comprise the textual basis for the group's core teachings and traditions.  The religious and historical importance of the Collection to Chabad, which is extensively reviewed in the district court opinion, can hardly be overstated.  See *Agudas Chasidei Chabad v. Russian Federation* ("District Court Decision"), 466 F. Supp. 2d 6, 10-14 (D.D.C. 2006).  Agudas Chasidei Chabad says that the Collection was taken by the Soviet Union—or its successor, the Russian Federation—in violation of international law.

3

According to the plaintiff's allegations (as amplified in some cases by later submissions), Russia's Bolshevik government seized one portion of the Collection (known as the "Library") during the October Revolution of 1917, taking it from a private warehouse in Moscow, where the Fifth Rebbe had sent it for safekeeping as he fled the German forces invading Russia.  Although the Soviet government initially acted with some hesitancy, by 1925 it appears to have finally rejected pleas for return of the Library by the Fifth Rebbe and the Sixth (who succeeded the Fifth in 1920).  The regime stored the materials at its Lenin Library, which later became the Russian State Library ("RSL," a term we use to include its predecessor).

After arresting the Sixth Rebbe for "counter revolutionary activities" (namely establishing Jewish schools), the Soviets beat him and sentenced him to death by firing squad, but then commuted the sentence to exile.  The Sixth Rebbe resettled in Latvia in 1927 and became a citizen there, bringing with him another set of religious manuscripts and books known as the "Archive."  In 1933 he moved to Poland, bringing the Archive along.  On September 1, 1939, Nazi German forces invaded Poland, forcing the Rebbe to flee yet again.  Nazi forces seized the Archive and transferred it to a Gestapo-controlled castle at Wölfelsdorf, a village about fourteen miles south of Glatz (now Klodzko) in Lower Silesia.  Soviet military forces commandeered the Archive in September 1945, calling its contents "trophy documents" and carrying them away to Moscow.  The Archive is now held by the Russian State Military Archive ("RSMA," again a term we use to include its predecessors).

With the assistance of the U.S. government, the Sixth Rebbe escaped Nazi Europe and came to New York, where Agudas Chasidei Chabad was incorporated in 1940.  The plaintiff and its predecessor made various efforts to recover

4

the Collection for nearly 70 years. It enjoyed brief successes regarding the Library in 1991-1992, amid a flurry of Soviet and then Russian judicial, executive, and legislative pronouncements, but various governmental actions ultimately thwarted the group's efforts to secure possession of the Library, actions that it describes as a further expropriation.

To regain possession of both the Library and the Archive, the plaintiff brought suit against the Russian Federation as well as its Ministry of Culture and Mass Communication, the RSL, and the RSMA (all collectively referred to as "Russia" except as needed to distinguish among them). Russia moved to dismiss the claims on grounds of foreign sovereign immunity, forum non conveniens, and the act of state doctrine. Before the district court,[1] Russia scored a partial victory; the court dismissed all claims as to the Library, finding for them no exception to Russia's sovereign immunity, but it denied Russia's motion as to the Archive. District Court Decision, 466 F. Supp. 2d at 31. Both sides appeal.

We affirm the district court's order in part and reverse it in part. First, on our reading of the expropriation exception of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(3), plaintiffs must demonstrate certain jurisdictional prerequisites by a preponderance of the evidence before the case goes forward, whereas they can satisfy others simply by presenting substantial and non-frivolous claims. On this reading, we hold that Agudas Chasidei Chabad satisfied the FSIA's jurisdictional requirements as to both the Library and

---

[1] The plaintiff initially filed suit in the Central District of California, but that court, in response to a Russian motion for change of venue, ordered the case transferred to the district court here.

the Archive.  Second, we conclude that the district court did not abuse its discretion in rejecting the application of forum non conveniens.  Finally, we affirm the district court's rejection of Russia's motion to dismiss as to the Archive on act of state grounds, and we vacate its apparent ruling that the act of state doctrine operates as an alternative ground for dismissal of Chabad's claims as to the Library.

## I.  FSIA:  Immunity and Jurisdiction

The district court held that Russia was immune under the FSIA with respect to the Library claims, but not with respect to the Archive.  466 F. Supp. 2d at 31.  Agudas Chasidei Chabad's appeal as to the Library is properly before us because the district court entered final judgment as to those claims under Fed. R. Civ. P. 54(b), expressly determining that there is "no just reason for delay" of appellate review.  Under the collateral order doctrine, we also have jurisdiction over Russia's appeal of the district court's assertion of jurisdiction over the Archive claim.  See *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004).

### A.  Background and General Principles

Section 1330(a) of Title 28 gives the district courts subject matter jurisdiction over cases against foreign states "as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title [parts of the FSIA] or under any applicable international agreement."  In its suit against Russia, Agudas Chasidei Chabad argues that the FSIA's expropriation exception, § 1605(a)(3), precludes the defendants' immunity. It states in relevant part:

6

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

> . . . .

> (3) in which [A] rights in property taken in violation of international law are in issue and [B][1] that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or [2] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States . . . .

28 U.S.C. § 1605(a)(3).

The provision appears to rest jurisdiction in part on the character of a plaintiff's claim (designated "A") and in part on the existence of one or the other of two possible "commercial activity" nexi between the United States and the defendants (designated "B"). Before exploring the statute's particular requirements, we pause to note the standards by which courts are to resolve questions of federal jurisdiction.

First, to the extent that jurisdiction depends on particular factual propositions (at least those *independent* of the merits), the plaintiff must, on a challenge by the defendant, present adequate supporting evidence. Thus, a plaintiff must establish the facts of diversity for purposes of jurisdiction under 28 U.S.C. § 1332. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178 (1936). For purely factual matters under the FSIA, however, this is only a burden of production; the burden of persuasion rests with the foreign sovereign claiming

7

immunity, which must establish the absence of the factual basis by a preponderance of the evidence. See, e.g., *Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc.* 179 F.3d 1279, 1290 (11th Cir. 1999); *Cargill Int'l v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993); *Alberti v. Empresa Nicaraguense de la Carne*, 705 F.2d 250, 255-56 (7th Cir. 1983).

Second, to the extent that jurisdiction depends on the plaintiff's asserting a particular type of claim,[2] and it has made such a claim, there typically is jurisdiction unless the claim is "immaterial and made solely for the purpose of obtaining jurisdiction or . . . wholly insubstantial and frivolous," i.e., the general test for federal-question jurisdiction under *Bell v. Hood*, 327 U.S. 678, 682-83 (1946), and *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 513 & n.10 (2006). (Other circuit courts have applied this same standard when jurisdiction depends on factual propositions intertwined with the merits of the claim, but we need not express any opinion on this point. See *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1040 (9th Cir. 2004); cf. *Morrison v. Amway Corp.*, 323 F.3d 920, 925 (11th Cir. 2003) (finding no need for the independent ascertainment, for jurisdictional purposes, of merits-intertwined facts).) The *Bell v. Hood* standard to be applied is obviously far less demanding than what would be required for the plaintiff's case to survive a summary judgment motion under Fed. R. Civ. P. 56. Thus, for example, in *Clark v. Tarrant County*, 798 F.2d 736 (5th Cir. 1986), the court upheld jurisdiction on a finding that the plaintiffs' position on the disputed element of their claim "cannot be said [to be] wholly frivolous," *id.* at 742, saying

---

[2] We do not understand our concurring colleague's gerrymandering of this phrase to suggest that it refers to jurisdictional facts. See Henderson Op. at 2.

8

expressly that it did "not intimate whether" the plaintiffs in fact established the necessary element, *id.* at 743. See generally Harry T. Edwards & Linda A. Elliott, Federal Standards of Review ch. III.A (2007).

Section 1605(a)(3) presents both types of jurisdictional questions. The alternative "commercial activity" requirements ("B") are purely factual predicates independent of the plaintiff's claim, and must (unless waived—see below) be resolved in the plaintiff's favor before the suit can proceed. The remainder ("A") does not involve jurisdictional facts, but rather concerns what the plaintiff has put "in issue," effectively requiring that the plaintiff assert a certain type of claim: that the defendant (or its predecessor) has taken the plaintiff's rights in property (or those of its predecessor in title) in violation of international law.[3] It is undisputed that Agudas Chasidei Chabad has made such claims as to both parts of the Collection. The defendants assert various legal and factual inadequacies in the claims. It is rather unclear what standard the district court applied to those contentions, but *Bell* requires only that such potential inadequacies do not render the claims "wholly insubstantial" or "frivolous." See 327 U.S. at 682-83. As we shall show below, the claims plainly survive that test.

Russia has seemed to draw a distinction between the "rights in property" element of the plaintiff's claim and the "taken in violation of international law" element. In a motion to dismiss Russia conceded that "[h]ere, for the purposes of

---

[3] The District Court stated that under § 1605(a)(3) a plaintiff can put property "in issue" without making any claim of its own to rights in the property. 466 F. Supp. 2d at 21-22. This is incorrect; and, in any case, a plaintiff relying on § 1605(a)(3) would have an independent obligation to assert a basis for its own standing.

this motion only, the first prong [of the expropriation exception] (rights in property at issue) is not disputed, inasmuch as Plaintiff's claims of right to the Library and the Archive are placed in issue by Plaintiff's complaint." Def. Mot. Dismiss 10.  The motion then stated, "Obviously, the Defendants vigorously deny that Plaintiff has any right of ownership or possession of either the Library or the Archive." *Id.* at 10 n.7.  On that issue, therefore, Russia recognized that Agudas Chasidei Chabad's burden was only to put its rights in property in issue in a non-frivolous way.  Where a plaintiff has failed to do so, such as by making concessions logically inconsistent with a substantial claim to "'rights in property' of which he was deprived in derogation of international law," a court will not find jurisdiction.  *Peterson v. Kingdom of Saudi Arabia*, 416 F.3d 83, 88 (D.C. Cir. 2005).

When it came to whether rights had been "taken in violation of international law," however, Russia vigorously disputed the matter, seeming to regard this element as a jurisdictional fact that—like "commercial activity"—must be resolved definitively before the court could proceed to the merits.  On the contrary, for jurisdiction, non-frivolous contentions suffice under *Bell*.  Thus in *West v. Multibanco Comermex, S.A.*, 807 F.2d 820 (9th Cir. 1987), the Ninth Circuit found jurisdiction proper under § 1605(a)(3) when the plaintiff's claim of conversion was "substantial and non-frivolous" and "provide[d] a sufficient basis for the exercise of our jurisdiction, even though we ultimately rule against the plaintiffs on the merits"; indeed, the court found on the merits that the defendant's acts were not actually "takings in violation of international law."  *Id.* at 826, 831-33; see also *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 712-13 (9th Cir. 1992) (finding "no difficulty [in] concluding that the . . . complaint contains 'substantial and non-frivolous' allegations that [the disputed property] was taken in violation

10

of international law," subject to further fact finding on remand).

### B. Specific Application

We address first the "rights in property" element of the plaintiff's claim, then the "taken in violation of international law" element, and then the commercial activity nexus. Finally, we address Russia's related argument that the plaintiff failed to exhaust its remedies in Russia before proceeding in the United States.

1. *Agudas Chasidei Chabad's property rights.* The plaintiff maintains that the international Chabad organization held a property interest in the Collection as it accumulated, with a succession of Rebbes acting as custodians for the benefit of Chabad and its followers, and that on incorporation it automatically became vested under New York law with the property rights of its predecessor entity. See N.Y. Relig. Corp. Law § 4. As mentioned, Russia initially conceded that "[h]ere, for purposes of this motion only, the first prong [of the expropriation exception] (rights in property at issue) is not disputed, inasmuch as Plaintiff's claims of right to the Library and the Archive are placed in issue by Plaintiff's complaint." Def. Mot. Dismiss. 10. Before us, however, in its reply brief, Russia claims that it somehow rendered its waiver inoperative.[4]

---

[4] An FSIA defendant's waiver of immunity is effective to meet the FSIA's jurisdictional requirements because Congress, in deploying the FSIA to implement Article III's grant of subject matter jurisdiction over suits between citizens of a state and foreign states, limited that jurisdiction to cases in which a foreign state (or its agency or instrumentality) is not immune under the FSIA. Those immunities are entirely personal, as is shown by Congress's

11

Whether it did so or not is of no moment, however, as the concession was obviously correct; the plaintiff's complaint indeed put in issue its property rights, if any, in the Collection. Russia's sole basis for attacking the plaintiff's assertion of property rights rests on a notion that the Collection's ownership has been conclusively resolved against Agudas Chasidei Chabad in a prior litigation: *Agudas Chasidei Chabad of United States v. Gourary*, 650 F. Supp. 1463 (E.D.N.Y 1987), *aff'd*, 833 F.2d 431 (2d Cir. 1987).   As Russia was not a party to that litigation, any preclusive effect could only take the form of non-mutual collateral estoppel. And while the effectiveness of such an estoppel argument to render a claim "frivolous" is unclear, in any event the *Gourary* judgment affords Russia no basis for precluding the plaintiff here.

In *Gourary*, Agudas Chasidei Chabad sued the Sixth Rebbe's heirs over the ownership of certain religious books and manuscripts that the Sixth Rebbe possessed in New York at the time of his death (obviously *not* the Library or the Archive, which were in Russia). The plaintiff claimed that the Rebbe held them on behalf of the Chabad community and that they therefore belonged to Agudas Chasidei Chabad; the Rebbe's heirs claimed them to be his personally and therefore part of his estate. The books and papers at issue were ones collected after 1925 that had made their way from Poland to America during World War II and thereafter.

The reasons not to apply non-mutual collateral estoppel here seem to be legion, but let us simply address one fatal

---

specification in § 1605(a)(1) that there is no immunity in any case in which the foreign state has waived immunity.  See generally Caleb Nelson, *Sovereign Immunity as a Doctrine of Personal Jurisdiction*, 115 Harv. L. Rev. 1559 (2002).

12

problem. Issue preclusion can be applied only as to an issue resolved against the party sought to be estopped and necessary to the judgment. *Consol. Edison Co. of N.Y. v. Bodman*, 449 F.3d 1254, 1258 (D.C. Cir. 2006) (citing Restatement (Second) of Judgments § 27). In *Gourary*, Agudas Chasidei Chabad had pressed two alternative theories. The broad one was that it (or its predecessor) had owned the materials from the start of the collection, the successive Rebbes acting at all times on behalf of the religious community. The narrow one was that the Sixth Rebbe had owned them and then subsequently transferred them to Agudas Chasidei Chabad. In ruling *in favor of* Agudas Chasidei Chabad, the *Gourary* court appeared to rely on the narrow theory, 650 F. Supp. at 1474 & n.9, 1476, but to the extent that it rejected the broad theory, that rejection was completely unnecessary to the court's unqualified judgment in Agudas Chasidei Chabad's favor.

At oral argument Russia tried to save its theory by a claim that the *Gourary* court decided in part against Agudas Chasidei Chabad, because on the narrow theory Agudas Chasidei Chabad would be holding the documents for the benefit of the worldwide religious community, of which the Sixth Rebbe's heirs were members. Tr. of Oral Arg. at 12-13. Even assuming *arguendo* that some difference in community members' rights might turn on whether the community's ownership rested on one historical theory as opposed to another, the Rebbe's heirs were not seeking access to the materials as members of the community; they were seeking outright ownership. They lost. Completely.

2. *A taking in violation of international law.* Under this prong, Russia challenges both Agudas Chasidei Chabad's Library claims—the taking in 1917-1925 and the taking (or retaking) in 1991-1992. (It does not challenge the district court's holding on the Archive claim under this prong except with respect to exhaustion, as discussed below.) As to the

13

Library's taking in 1917-1925, Russia's sole challenge rests on its contention that at the relevant times, the Library and the Archive were the personal property of the Fifth or the Sixth Rebbe (who were Soviet citizens in the 1917-1925 period), not of Chabad, so that any taking by the Soviet government could not have violated international law. But again Russia rests entirely on its proposed misapplication of the *Gourary* case, and thus fails to show the plaintiff's claim to be insubstantial or frivolous.    (Apparently relying only on *Gourary*, the district court adopted Russia's view as to the ownership of the Library and its proposed conclusion as to the absence of any violation of international law. But the plaintiff's contention is that the worldwide Chabad organization, not any Soviet citizen, owned the Library, creating at least a substantial and non-frivolous claim of a taking in violation of international law. Cf. *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1396-97 & n.17 (5th Cir. 1985); Restatement (Third) of the Foreign Relations Law of the United States § 712 (1987).)

This leaves the alleged taking of the Library in 1991-1992. To the extent that Russia again relies on *Gourary*, its reliance is no better grounded than before. But here the defendants have a stronger theory, namely that the events of 1991-1992 were not a taking at all. In view of the plaintiff's contention that the Library had been taken in 1917-1925, this obviously has some traction. We emphasize yet again, however, that the jurisdictional question is only whether the plaintiff's claim is wholly insubstantial or frivolous. It is not.

To simplify matters, we look first at Agudas Chasidei Chabad's theory. It casts the events of 1991-1992 as a "renewal" of the earlier illegal takings. Chabad Br. 41. The facts of *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1203 (C.D. Cal. 2001), *aff'd*, 317 F.3d 954, 968 n.4 (9th Cir. 2002), *aff'd* 541 U.S. 677 (2004), provide a possible template.

14

There a plaintiff's predecessors in title *recovered* Klimt paintings that the Nazis had seized, but then, in exchange for export licenses, "donated" them to a government art gallery. They claimed that the forced donation was a taking. Here, Agudas Chasidei Chabad never recovered *possession* of the Library, but we should think that a final court decree in its favor, subject to no *lawful* appeal, might be considered a recovery, such that government frustration of the decree's enforcement could qualify as a renewal of the earlier taking. In this country, certainly, if a property owner secured a judgment invalidating a prior taking, affirmed by the highest court having jurisdiction, we would likely see executive officials' later assertion of ownership, and their frustration of the owner's efforts at physical recovery, as very much like a retaking of the property.

The procedural history surrounding the Library, however, is far more complex. In 1990, as *perestroika* unfolded, the Seventh Rebbe dispatched a delegation to the Soviet Union to undertake further efforts to obtain the Library. Various institutions, first of the Soviet Union and then of the Russian Federation, proceeded to issue a welter of confusing orders and decrees. On September 6, 1991 Alexander Yakovlev, a special adviser to General Secretary Mikhail Gorbachev, assured the Chabad delegation that Gorbachev would that day issue an order to the RSL to return the Library to Chabad. The delegation followed this up with a petition to a Soviet court, the State Arbitration Tribunal, to direct the RSL to return the Library. That court issued such a direction on October 8, 1991, giving the RSL one month to comply and placing a lien on the Library. State Arbitration Tribunal, Russian Socialist Federative Soviet Republic, Case #350/13 (Oct. 8, 1991). The court also found that the Library was "the communal property of the entire Agudas Chasidei Chabad movement" and that the Soviet government had failed to prove that the Library "acquir[ed] a status of National

15

property." *Id.*; see also District Court Decision, 466 F. Supp. 2d at 13.

On November 18, 1991, the Chief State Arbiter affirmed in part and reversed in part. Chief State Arbiter, State Arbitration Court of the Russian Soviet Federative Socialist Republic, Decree Regarding Reconsideration of Ruling, No. 350/13H (Nov. 18. 1991) ("11/18/91 Decree"). He stated that "the Arbitration Court is not obligated to consider the matter of legal ownership of the . . . Library by either the Community or the State (represented by [the RSL]), since evidence on file in this case does not contain any basis upon which assumption can be made that the aforementioned collection belongs to anyone *other than* the Lubavitcher Rebbe." *Id.* The district court characterized this as a finding that "the Rebbe, *rather than Chabad*, was the rightful owner of the Library," 466 F. Supp. 2d at 18 (emphasis added), and thus as a rejection of the lower tribunal's conclusion that the Library was the "communal property of the entire Agudas Chasidei Chabad movement." That characterization is questionable, however.

The higher court's *action* was to grant the Chabad community precisely the relief it sought. After noting that the "Community [had] appealed to the State Arbitration Court, requesting that the . . . Library be transferred to the newly established Jewish National Library," 11/18/91 Decree at 4, the Chief State Arbiter ordered the transfer of the Library— starting the day of the decision's issuance—to precisely that institution. *Id.* The Jewish National Library was Chabad's co-petitioner in the lawsuit, and the plaintiff's expert, Professor Veronika R. Irina-Kogan, declared under oath that the Jewish National Library participated in the suit "on behalf of the Chabad Community." Declaration of Veronika R. Irina-Kogan ¶ 11.

16

Thus there appears a substantial and non-frivolous factual basis for the view that the November 18, 1991 decision of the Chief State Arbiter represented a legal recovery of the property by Agudas Chasidei Chabad, possibly subject to limitations on its removal from Russia. See 11/18/91 Decree at 3 (stating that the materials were "part of Russia's national treasure").

But the delegation's efforts to have the order carried out were frustrated—a frustration that arguably constituted a new taking. According to a declaration submitted by the plaintiff, RSL staff members responded to their efforts to take possession by taunting them with anti-Semitic slurs and threats of violence. "[A]pproximately 30 baton-wielding" RSL police officers allegedly attacked the delegation and its supporters. Declaration of Rabbi Boruch Shlomo Eliyahu Cunin ¶ 10.

In December 1991 the Soviet Union dissolved, to be replaced by various successor states, including the Russian Federation. On January 29, 1992, Deputy Chairman of the Russian Federation Aleksandr Shokhin ordered the RSL to relinquish the Library. The executive order stated that the Russian government "accept[s] a request from officials of the movement of Lubavich Chassids (Agudas Chasidei Chabad) for the delivery of [Library] holdings available to the [RSL] to the [Maimonides] State Jewish Academy," which houses the Jewish National Library. By directing the latter to duplicate the documents and deliver the copies to the RSL "before the end of 1992," the order by implication required delivery of the originals *to* the Jewish National Library well before that date. Government of the Russian Federation Regulation No. 157-r (Jan. 29, 1992), Declaration of Tatiana K. Kovaleva, Ex. D. An affidavit submitted by the plaintiff characterizes the resolution as "ordering the RSL to return the Library to Chabad's representatives." Cunin Decl. ¶ 11. That reading

17

appears plausible, given that the resolution is framed as the executive's "accept[ing]" a request from Agudas Chasidei Chabad officials.

Thus, while the November 11, 1991 Decree may have represented a *judicial* judgment transferring the Library into the hands of Chabad's allies, the Shokhin decree of January 1992 appears to have constituted parallel relief from the *executive* branch.

But this executive relief was no more easily realized than that provided by the Chief State Arbiter. The Chabad delegation approached the RSL, but the plaintiff reports that once again it was confronted by an anti-Semitic mob, which thwarted its efforts to secure the Library, this time incited by the director of the manuscript department at the RSL, who "shout[ed] death threats through a bullhorn." Cunin Decl. ¶ 11.

Further, Chabad's original success before State Arbitration Tribunal and the Chief State Arbiter encountered not only practical but also juridical frustration. On February 14, 1992, the Deputy Chief State Arbiter of the Russian Federation purported to reverse the prior court orders that had required that the RSL transfer the Library, and ordered that "all further action" in the case "cease." Agudas Chasidei Chabad's expert maintains that the deputy made the ruling "unilaterally and secretly" and says that the deputy lacked authority under Russian law to nullify the order of the Chief State Arbiter, and that his ruling "lacked any legal or binding effect under Russian law." Irina-Kogan Decl. ¶¶ 12-14. Given the decider's title as "*Deputy* Chief State Arbiter," the assertion is hardly implausible.

Finally, a legislative action purported to reverse Shokhin's January 29, 1992 decree ordering transfer of the

18

Library to Chabad's representative.  On February 19, 1992, the Russian Federation's Supreme Soviet (despite its title, a body vested with legislative authority only between sessions of the Congress of Soviets, a/k/a Congress of People's Deputies) issued an order purporting to nullify that decree and stating that "the safety, movement and use of the holdings available to the Russian State Library [be effectuated] solely on the basis of the legislation of the Russian Federation and the provisions of international law."  Supreme Soviet of the Russian Federation, Decree No. 2377-1 (Feb. 19, 1992). Agudas Chasidei Chabad's later attempts to secure the return of the Library have all failed.

To the extent that Shokhin's decree or the Chief State Arbiter's order effected a recovery of the Library (within the meaning of *Altmann*), the actions of the Deputy Chief State Arbiter and the Supreme Soviet, coupled with RSL action on the ground, would appear to have effected a retaking.  To return to our earlier variation on the facts of *Altmann*:  if the victim of a property seizure secured a judgment from the highest available judicial authority that papers seized by the government should be turned over to its ally, and a *lower* court then abruptly "reversed" that decision, authorizing the government to keep the papers, we would have little difficulty viewing the latter order as a purported retaking of the property.  It would enhance the retaking case if high executive officials issued orders paralleling those of the highest court, followed by countermanding legislative action and accompanied by government officials' physical action.  We cannot say that the analogy is perfect.  Here, the lines of authority among the various judicial, executive, and legislative bodies appear to defy comprehension by outsiders (indeed, they may be inconsistent with the concept of lines of authority altogether).  But neither can we declare insubstantial or frivolous the plaintiff's claim that the 1991-1992 actions of Russia and the Russian State Library constituted a retaking of

19

the property; thus we reverse the district court's decision on the point.

3. *Commercial activity.* Contrary to Russia's claims, we find that both the RSMA and the RSL engaged in sufficient commercial activity in the United States to satisfy that element of 28 U.S.C. § 1605(a)(3). (The district court so found for the RSMA, but did not reach the issue as to the RSL because, focusing exclusively on the events of 1991-1992, it concluded that the plaintiff had failed to show a taking of the Library in violation of international law. 466 F. Supp. 2d at 23, 24 & n.22.)

The argument over the RSL's and RSMA's commercial activities rests on the relationship between the two clauses specifying alternative commercial activity requirements, which bear repeating here:

> (3) in which [A] rights in property taken in violation of international law are in issue and [B] [1] that property or any property exchanged for such property is present in the United States in connection with a commercial activity *carried on* in the United States by the foreign state; or [2] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is *engaged in* a commercial activity in the United States . . . .

§ 1605(a)(3) (emphasis added).

Section 1603(d) offers a rather broad definition of commercial activity for purposes of the FSIA:

> (d)   A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act.   The commercial character of an

20

activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

§ 1603(d). The phrase "commercial activity *carried on* in the United States," by contrast, is defined as "commercial activity carried on by such state and having substantial contact with the United States." § 1603(e) (emphasis added).

In the face of § 1603(d)'s hospitable language, Russia offers a rather subtle argument for a more demanding test. It suggests that since the first nexus clause in § 1605(a)(3) requires that the property be present in the United States in connection with a commercial activity carried on in the United States, it would be quite anomalous if the second clause, requiring neither physical presence in the United States nor such a link (between property physically present and the commercial activity), could be satisfied unless the level of commercial activity was at least "a level of activity equal to the standard established by the phrase 'carried on' of the first prong and, accordingly, require 'substantial contact' with the United States." Russia Br. 42.

To support this conclusion Russia stresses the language in § 1603(e) quoted above, which requires that for commercial activity to qualify as "*carried on* in the United States" it must have "*substantial contact* with the United States." Then, noting that among Webster's Third International's examples of "engaged" is to "begin and carry on an enterprise," Russia sprints to the conclusion that "engage in" in the second prong must mean "carry on"; thus, abracadabra, the second prong includes the first prong's cross-referenced substantiality requirement.

We need not decide whether Agudas Chasidei Chabad can satisfy this more demanding standard, for Russia's

21

argument plainly cannot work. Congress took the trouble to use different verbs in the separate prongs, and to define the phrase in the first prong. Russia wants us to turn that upside down and obliterate the distinction Congress drew. Moreover, we see no anomaly in applying the "commercial activity" definition set forth in § 1603(d). While the first clause of § 1605(a)(3) and the definition in § 1603(e) are quite demanding in some respects, the clause applies to activities "carried on *by the foreign state*," whereas the second clause involves the commercial activities of the foreign state's agencies and instrumentalities. Congress might well have thought such entities' greater detachment from the state itself justified application of § 1603(d)'s broad definition. (Russia concedes that both the RSL and the RSMA are "agencies or instrumentalities" of the Russian Federation for this purpose. Russia Reply Br. 38 n.8.) The substantiality requirement of § 1603(e) is thus inapplicable.

Section 1603(d)'s first sentence seems to set a low quantitative threshold and its second sentence a low qualitative one. As the Court said in *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992), the qualitative criterion asks "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce,'" for "when a foreign government acts ... in the manner of a private player within [a market], the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Id.* at 614. Thus "a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party." *Id.*

Both the RSMA and the RSL have entered transactions for joint publishing and sales in the United States easily satisfying these standards. At the time of the filing of the suit

22

in November 2004, the RSMA had entered contracts with two American corporations for the reproduction and worldwide sale of RSMA materials, including in the United States. District Court Decision, 466 F. Supp. 2d at 21. One set of contracts was with Primary Source Media and allowed the American firm to publish, among other items, papers of Leon Trotsky and other documents relating to the Russian Civil War. The contracts include provisions waiving sovereign immunity, specifying that the activities described in the contract are "commercial in nature." Agreement on the Granting of Rights to Publish Archival Documents art. 14. By the year 2000 the RSMA had received $60,000 in advance royalties. See Declaration of Joseph Bucci ¶ 8; see also Royalty Advance Statements, Primary Source Microfilm. Another contract with Yale University Press provides for the "joint preparation and publication of a volume of documents entitled *The Spanish Civil War*" and garnered RSMA a $10,000 royalty advance in the year of the contract.

The RSL has also contracted for cooperative commercial activities in the United States. For example, it entered into agreements with Norman Ross Publishing (later succeeded by ProQuest), arranging for that firm to sell an encyclopedia and to produce and distribute "microcopies" of various RSL materials (in exchange for a 10% royalty payment to the RSL). One such contract has already yielded RSL over $20,000 and another over $5000.

Thus § 1605(a)(3)'s second alternative commercial activity requirement is plainly satisfied.

4. *Exhaustion.* Russia contends that Agudas Chasidei Chabad's "taking claim as to the Archive must [] fail for the reason that Chabad has failed to pursue and exhaust remedies it has in the Russian Federation to recover the Archive." Russia Br. 34. (No such claim is made as to the Library,

23

presumably in view of Agudas Chasidei Chabad's heroic—but ultimately frustrated—legal efforts with respect to those materials.)   The district court held that Agudas Chasidei Chabad was not required to exhaust Russian remedies before litigating in the United States.  466 F. Supp. 2d at 21.  We believe this is likely correct, but that in any event the remedy Russia identifies is plainly inadequate.

As a preliminary matter, nothing in § 1605(a)(3) suggests that plaintiff must exhaust foreign remedies before bringing suit in the United States.   Indeed, the FSIA previously contained one exception with a local exhaustion requirement, § 1605(a)(7), which for certain suits required that the foreign state be granted "a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration."  Congress repealed that exception this year.  See National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, div. A, § 1083(b)(1)(A)(iii), 122 Stat. 3, 341 (2008) (repealing 28 U.S.C. § 1605(a)(7)).   Obviously before deletion of subsection (7) it would have been quite plausible to apply the standard notion that Congress's inclusion of a provision in one section strengthens the inference that its omission from a closely related section must have been intentional, see *United Mine Workers v. Mine Safety & Health Admin.*, 823 F.2d 608, 618 (D.C. Cir. 1987); we do not see that the inference is any weaker just because Congress has, for independent reasons, removed the entire exhaustion-requiring provision.

Russia invokes *Restatement (Third) of Foreign Relations Law of the United States*, which notes:

> *Exhaustion of remedies.* Under international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies, unless such remedies

24

are clearly sham or inadequate, or their application is unreasonably prolonged.

Restatement § 713, cmt. *f.*

But this provision addresses claims of one state against another. Its logic appears to be that before a country moves to a procedure as full of potential tension as nation vs. nation litigation, the person on whose behalf the plaintiff country seeks relief should first attempt to resolve his dispute in the domestic courts of the putative defendant country (if they provide an adequate remedy). But § 1605(a)(3) involves a suit that necessarily pits an individual of one state against another state, in a court that by definition cannot be in *both* the interested states. Here there is no apparent reason for systematically preferring the courts of the defendant state.

Russia advances a more compelling theory based upon Justice Breyer's concurrence in *Republic of Austria v. Altmann*, 541 U.S. 677 (2004), which noted that a plaintiff seeking relief under § 1605(a)(3) "may have to show an absence of remedies in the foreign country sufficient to compensate for any taking" and that a "plaintiff who chooses to litigate in this country in disregard of the postdeprivation remedies in the 'expropriating' state may have trouble showing a 'tak[ing] in violation of international law.'" *Id.* at 714 (alteration in original). Thus Justice Breyer draws on a substantive constitutional theory—that there simply is no unlawful taking if a state's courts provide adequate postdeprivation remedies. *Id.* (citing *City of Monterey v. Del Monte Dunes*, 526 U.S. 687, 721 (1999); and alluding to cases applying that doctrine).

The substantive theory would seem to moot the argument from the language of the FSIA and is independent of Restatement § 713. Nonetheless, one may question whether it

makes sense to extend such a requirement from the domestic context, in which state courts are already bound by the U.S. Constitution, to the foreign context, in which the courts that a plaintiff would be required to try may observe no such limit.

Assuming that an exhaustion requirement exists, however, the only remedy Russia has identified is on its face inadequate. Russia points to a law entitled "Federal Law on Cultural Valuables Displaced to the U.S.S.R. as a Result of World War II and Located on the Territory of the Russian Federation," Federal Law N 64-FZ of April 15, 1998 ("Valuables Law"), *available at* http://docproj.loyola.edu/rlaw/r2.html, particularly Articles 12 and 16. But, even assuming the other prerequisites of relief were met, Article 19(2) of the statute authorizes return of property only on the claimant's "payment of its value as well as reimbursement of the costs of its identification, expert examination, storage, restoration, and transfer (transportation, etc.)," without specifying rules for calculating value. Whatever the valuation method, and assuming *arguendo* that Russia's *payment* of compensation would satisfy the requirements of international law, obviously Russia's mere willingness to *sell* the plaintiff's property back to it could not remedy the alleged wrong.

## II. Russia's Defenses of Forum Non Conveniens and Act of State

Russia moved to dismiss the claims as to the Library and Archive on grounds of forum non conveniens, which the district court denied. Russia also moved to dismiss on the act of state doctrine, which the district court denied as to the Archive but accepted as an alternative grounds for dismissal as to the Library. The parties appeal the judgments adverse to them. As above, we have jurisdiction over Agudas Chasidei

26

Chabad's appeal because the district court entered final judgment on the Library claims under Fed. R. Civ. P. 54(b). Russia properly asserts pendent appellate jurisdiction as to the Archive under *Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675, 679-80 (D.C. Cir. 1996), which allows a court with jurisdiction over one appeal also to exercise jurisdiction over issues "inextricably intertwined" with those raised by that appeal. We (and the plaintiff) agree that there is such intertwining here.

### A. Forum Non Conveniens

Russia claims that the district court abused its discretion in denying its motion to dismiss the claims to the Library and Archive on grounds of forum non conveniens. We disagree and uphold the district court's decision, which applies to the entire Collection.

In deciding forum non conveniens claims, a court must decide (1) whether an adequate alternative forum for the dispute is available and, if so, (2) whether a balancing of private and public interest factors strongly favors dismissal. See *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981). There is a substantial presumption in favor of a plaintiff's choice of forum. See *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947); *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296, 303 (D.C. Cir. 2005). We review the district court's determination to see if it was a "clear abuse of discretion." *TMR Energy Ltd.*, 411 F.3d at 303.

The district court found that Russia had failed to meet its burden of demonstrating the adequacy of the Russian forum. 466 F. Supp. 2d at 28; see also *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 677 (D.C. Cir. 1996). Our conclusion

above that Russia's Valuables Law did not provide an adequate remedy with reference to any hypothetical exhaustion requirement for the Archive might seem to compel automatic affirmance of the forum non conveniens ruling solely on that ground. But in this context a foreign forum "is not inadequate merely because it has less favorable substantive law," *El-Fadl*, 75 F.3d at 678, so that the adequacy issue would be more complicated. In any event, the district court went on to resolve the balance of conveniences in favor of the plaintiff, and we find no abuse of discretion in that balance; we can affirm on that basis without addressing the adequacy of the Russian forum in this context.

We need not rehearse the factors considered. We do note two areas where Russia particularly finds fault with the district court's reasoning. First, it says that while the court relied on the plaintiff's agreement to pay the airfare and hotel expenses of Russian witnesses needed for depositions here, 466 F. Supp. 2d at 29, in fact that agreement related solely to the jurisdictional discovery process. Russia's reading of the stipulation appears correct, see Parties' Stipulation Extending Time to Respond to the Complaint, Setting a Briefing Schedule, and Providing for Expedited Discovery of Elderly Witnesses, Apr. 13, 2005, and the plaintiff does not answer the objection. But the district court in the preceding sentence referred to practical cooperation on other aspects of jurisdictional discovery, and, when mentioning the witness agreement, referred to it as contained in an "earlier stipulation," *id.*; thus the context of the court's reference suggests its full awareness of the agreement's limits. Accordingly, it seems reasonable to suppose that the court simply regarded the witness agreement as a fact portending similar cooperation in the future.

Second, Russia argues that the district court "will likely be unable to afford Chabad the relief it seeks, possession of

28

the Archive (and the Library)."  Russia Br. 53.  The district
court saw the argument as a contention that a Russian court
would not heed an American court's judgment in the
plaintiff's favor, and called it an "affront" to the court.  466 F.
Supp. 2d at 29.  Some district courts have treated a United
States forum's inability to provide relief directly as an
argument for granting a defendant's forum non conveniens
motion, see *McDonald's Corp. v. Bukele*, 960 F. Supp. 1311,
1319 (N.D. Ill. 1997); *Fluoroware, Inc. v. Dainichi Shoji
K.K.*, 999 F. Supp. 1265, 1271-73 (D. Minn. 1997), though
one might have thought that was simply the plaintiff's
problem.  In any event, Agudas Chasidei Chabad points to the
FSIA provisions that allow attachment of certain Russian
government property in the United States, 28 U.S.C.
§ 1610(a)(3), (b)(2), evidently believing that attachment of
such property would give it significant leverage over the
defendants, enhancing the likelihood that Russia or its courts
would respect the judgment of a U.S. court.  Russia does not
reply to the point, and it seems plausible.

In short, we find no abuse of discretion.


B.  Act of State

Russia invokes the act of state doctrine, under which "the
Judicial Branch will not examine the validity of a taking of
property within its own territory by a foreign sovereign
government, extant and recognized by this country at the time
of suit, in the absence of a treaty or other unambiguous
agreement regarding controlling legal principles, even if the
complaint alleges that the taking violates customary
international law."  *Banco Nacional de Cuba v. Sabbatino*,
376 U.S. 398, 428 (1964).  The doctrine rests on a view that
such judgments might hinder the conduct of foreign relations
by the branches of government empowered to make and

execute foreign policy. *Id.* at 423-25; see also *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 404-05 (1990). The burden of proving an act of state rests on the party asserting the defense. See *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 691 (1976).

1. *The Archive.* Russia invoked the act of state doctrine by a motion under Fed. R. Civ. P. 12(b)(6), as the defendant had in *W.S. Kirkpatrick*, a procedure that would be correct if its absence is part of the plaintiff's case but wrong if it is a defense. In any event, the district court reviewed the parties' extensive factual presentations before it ruled that "that the act of state doctrine does not apply to the taking of the Archive." 466 F. Supp. 2d at 26. The district court did not expressly convert Russia's Rule 12(b)(6) motion into a motion for summary judgment, see Fed. R. Civ. P. 12(d), but because Russia initially raised the matter and the disposition was to deny its motion, it seems appropriate to treat the ruling as the denial of a Russian motion for summary judgment. We affirm the district court's order; Russia has failed to show that it was entitled to judgment as a matter of law.

The act of state doctrine applies only when a seizure occurs within the expropriator's sovereign territory. *Sabbatino*, 376 U.S. at 428; *Riggs Nat'l Corp. & Subsidiaries v. Comm'r*, 163 F.3d 1363, 1367 (D.C. Cir. 1999). As to the Archive, Russia's theory is that it seized the Archive in German territory occupied by the Soviet Union, and that such occupation would be sovereignty enough. We need not consider the substantive validity of that theory, however, because Russia fails to demonstrate that it seized the Archive in occupied Germany rather than in Poland.

Far from placing the factual issue beyond dispute, Russia merely asserts that there is uncertainty as to the exact location of the Russian seizure. But even that claimed uncertainty

appears trivial to non-existent.   Records of the RSMA submitted in the course of discovery state that the Archive was received by the RSMA in September 1945 at "Welfelsdorf," in "Germany."[5]   Russia does not deny that "Welfelsdorf" is at most a misspelling of Wölfelsdorf,[6] nor does it claim that the scribe's reference to "Germany" undermines the fact that by September 1945 Wölfelsdorf was part of Poland as defined by the Potsdam Protocol.  Jointly issued on August 1, 1945 by the United States, United Kingdom, and Soviet Union, that Protocol announced a tentative western border for Poland at the Oder-Neisse line, a border which has never since been disturbed.  It is undisputed that Wölfelsdorf lies within Poland, as so defined.

Russia points to two items of evidence that it claims raise doubt.  First, it refers to a statement in the district court's recitation of facts to the effect that the Archive had been taken to a "Gestapo-controlled castle in Germany."  466 F. Supp. 2d at 13 (quoting Pl.'s Opp'n to Defs.' Mot. to Dismiss at 7). Given that Wölfelsdorf was part of pre-World-War-II Germany, the statement is altogether consistent with RSMA records showing that the Russian acquisition occurred in post-war Poland.

_____

[5]   See Joint Appendix 4:3086 (referring to a July 6, 2005 delivery of documents bearing Bates Nos. DEF00168-218); *id.* at 4:3099-3103 (listing origins of certain RSMA materials and bearing Bates numbers encompassed in the prior reference); *id.* at 3:2253, :2255, :2265-67 (deposition testimony of Vladimir N. Kouzelenkov, director of the RSMA, referring to RSMA's book listing incoming materials).

[6]   In fact, the Russian "e" is in many contexts pronounced "yo," so it is far from clear that there is even a misspelling.

31

Second, Russia points to a letter from the plaintiff to President Vladimir Putin, stating that the Archive was "seized by the Nazis and subsequently loaded on boxcars as they were losing the war, to be taken deep into Germany and evade the oncoming Russian liberators." As with the contention that the Nazis removed the Archive to a "Gestapo-controlled castle in Germany," the statement is not inconsistent with its later capture by the Russians at Wölfelsdorf. Moreover, the letter precedes the delivery to Agudas Chasidei Chabad of documents showing the RSMA's receipt of the materials at Wölfelsdorf in September 1945.

In any event, the burden of providing a factual basis for acts of state rests on Russia, see *Riggs*, 163 F.3d at 1367 n.5, and it has not met its burden with respect to the Archive.

2. *The Library.* We have two taking scenarios regarding the Library: the events of 1917-1925 and those of 1991-1992. Having mistakenly found itself without jurisdiction over the Library claim (a mistake in which it focused entirely on the 1991-1992 events), the district court said in a throwaway line that "even were [the court] to have jurisdiction [over the Library claims], these claims would be barred by the act of state doctrine." 466 F. Supp. 2d at 27.

The district court seemed to suggest that the 1991-1992 claims were barred because they challenged the decision of the Deputy Chief State Arbiter and the decree of the Supreme Soviet. *Id.* at 26-27. But the Second Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), normally bars application of the act of state doctrine to seizures occurring after January 1, 1959. Thus the doctrine poses no apparent barrier to the plaintiff's claim that the 1991-1992 events effected an unlawful taking.

As to the district court's apparent ruling that the doctrine bars any recovery of the Library based on the 1917-1925 events, we vacate the district court's order. The plaintiff argues that *Sabbatino* itself would except the 1917-1925 seizure from the doctrine. As we shall explain, the argument poses both sensitive foreign policy and jurisprudential issues. If on remand the court finds that the 1991-1992 actions of Russia and the RSL constituted an actionable retaking of the property, it will be unnecessary to resolve those issues, which in any event have not yet been the subject of either factual development or thorough briefing. While of course the court might (as a matter of insurance) resolve the plaintiff's claimed exception even if it accepts the latter's theory as to 1991-1992, and is free to address non-jurisdictional issues in any order it chooses, we refrain from any final ruling and discuss the complications of the claimed exception merely to highlight the questions that the parties must address.

As the district court recognized, the events of 1917-1925 all occurred within Russia, and thus were official acts of a sovereign nation regarding property within its borders. We could not grant the requested relief without invalidating those acts. See 466 F. Supp. 2d at 27; see also *W.S. Kirkpatrick*, 493 U.S. at 405.

Agudas Chasidei Chabad contends that the *Sabbatino* decision allows relaxation of the doctrine in response to certain countervailing factors. It points to the following passage:

> It should be apparent that the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed principle to circumstances of fact rather than on the sensitive task of

33

establishing a principle not inconsistent with the national interest or with international justice. It is also evident that some aspects of international law touch much more sharply on national nerves than do others; the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches. The balance of relevant considerations may also be shifted if the government which perpetrated the challenged act of state is no longer in existence, . . . for the political interest of this country may, as a result, be measurably altered. Therefore, rather than laying down or reaffirming an inflexible and all-encompassing rule in this case, we decide only that the Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government, extant and recognized by this country at the time of suit, in the absence of a treaty or other unambiguous agreement regarding controlling legal principles, even if the complaint alleges that the taking violates customary international law.

376 U.S. at 428. The passage mentions a number of factors that might militate against application of the doctrine here. Most significant are the phrase requiring that the taking have been by a "sovereign government, extant and recognized by this country at the time of suit," and the earlier sentence saying that the relevant considerations may shift when the perpetrating government is no longer in existence. These suggest that whatever flexibility *Sabbatino* preserves is at its apex where the taking government has been succeeded by a radically different regime.

Other circuits have on occasion declined to apply the doctrine, or have directed consideration of countervailing factors, in reliance on a change in regime. Two decisions involve suits *by* the government of the Philippines against its

34

former President Ferdinand Marcos, seeking to recover property acquired by him in office. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988) (en banc) (declining to apply the act of state doctrine); *Republic of the Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir. 1986) (ordering the district court to weigh *Sabbatino*'s qualifying considerations). In a third, *Bigio v. Coca-Cola Co.*, 239 F.3d 440 (2d Cir. 2000), the court found the doctrine inapplicable to a suit by former Egyptian nationals against a foreign corporation for its possession of property nationalized by the defunct Nasser government; the sole expression of the current Egyptian government on the matter was a letter from the Minister of Finance *directing* the holder of the property to return it to the plaintiffs. *Id.* at 452-53; cf. *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 130 (E.D.N.Y. 2000) (holding the doctrine inapplicable to claims against banks that had taken assets in the accounts of Jewish victims and survivors of the Holocaust under the laws of Vichy France).

Here, of course, Russia and its agencies or instrumentalities are the defendants, not private corporations or defenestrated rulers. Plaintiff has pointed to statements in its favor by Russian officials as high as former President Boris Yeltsin; but the current Russian government, by its energetic defense of this lawsuit, appears unwilling to relinquish the Collection to Chabad. Thus, while no one doubts that the collapse of the Soviet Union has entailed radical political and economic changes in the territory of what is now the Russian Federation, application of *Sabbatino*'s invitation to flexibility would here embroil the court in a seemingly rather political evaluation of the character of the regime change itself—in comparison, for example, to de-Nazification and other aspects of Germany's postwar history. It is hard to imagine that we are qualified to make such judgments. Moreover, our plunging into the process would seem likely, at least in the absence of an authoritative lead from the political branches, to

35

entail just the implications for foreign affairs that the doctrine is designed to avert.

Agudas Chasidei Chabad also points to *Sabbatino*'s suggestion that "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it." 376 U.S. at 428. It asserts that the seizure of the Library occurred "in a campaign to suppress the practice of Judaism, not for any *bona fide* economic, academic, or other recognized governmental purpose. Hence the takings were plainly violations of *jus cogens* norms, just as is racial discrimination, and no less the subject of 'consensus' condemnation in the international community." Chabad Br. 63.

The argument is intuitively appealing. But it would require us to embark on a path of ranking violations of international law on a spectrum, dispensing with the act of state doctrine for the vilest. Further, as the *Sabbatino* Court refused to countenance an exception for violations of international law simpliciter, *id.* at 429-31, we are unsure what it intended in its references to different degrees of "consensus." While it would be heartening to believe that there is a nearly universal consensus against religious prejudice in general or anti-Semitism in particular, a glance around the world exposes glaring examples to the contrary in areas containing a large fraction of the human population.

Not only are the purely legal questions posed by Agudas Chasidei Chabad's argument difficult, but there are factual issues that might bear on the ultimate outcome. Agudas Chasidei Chabad argues that the 1917-1925 confiscation was driven by hostility to Judaism, and it maintained at oral argument that discovery would yield further evidence. Indeed, it is widely recognized that the Soviet government

36

suppressed Jewish religious practice and persecuted Jews for their religious beliefs. But to the extent that the Soviet Union had embarked on a course of eradicating private property, religion, and civil society generally, the role of *selective* persecution in the Library's seizure in 1917-1925 is unclear on the current record. (On the other hand, perhaps there is a stronger consensus against non-selective than selective crushing of private property and civil society.) Without suggesting that plaintiff's proposed exception is necessarily valid in any circumstances, we defer ultimate resolution and simply vacate the ruling.

\* \* \*

We therefore affirm the judgment of the district court finding jurisdiction over Agudas Chasidei Chabad's claims concerning the Archive; we reverse its finding of Russia's immunity as to the Library claims based on the events of 1917-1925 and 1991-1992; we affirm the court's rejection of Russia's forum non conveniens defense; we affirm its rejection of Russia's act of state defense to the Archive claims; and we vacate its application of the act of state doctrine to the Library claims.

*So ordered.*

KAREN LECRAFT HENDERSON, *Circuit Judge*, concurring in the judgment:

Although I concur in the judgment, I do not agree with the analysis of the jurisdictional issue contained in Part I.A of the majority opinion. The majority analyzes section 1605(a)(3),[1] the provision of the FSIA that allows the plaintiff's claims to survive dismissal, by dividing the section into two parts that, in its view, impose different burdens on the plaintiff. The portion of section 1605(a)(3) involving "rights in property taken in violation of international law" (labeled "A" by the majority) requires only that the plaintiff "assert a certain type of claim: that the defendant . . . has taken the plaintiff's rights in property . . . in violation of international law," which claim—to suffice—must not be " 'wholly insubstantial' or 'frivolous.' " Maj. Op. 8 (citing *Bell v. Hood*, 327 U.S. 678, 682–83 (1946)). On the other hand, the majority posits, the remainder of section 1605(a)(3) (labeled "B" by the majority) requires the plaintiff to "present adequate supporting evidence," which "[f]or purely factual matters under the FSIA . . . is only a burden of production," *id.*

---

[1] Section 1605(a)(3) provides:

A foreign state shall not be immune from the jurisdiction of the courts of the United States or of the States in any case— . . .

> (3) in which rights in property taken in violation of international law are in issue and . . .; [] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States . . . .

28 U.S.C. § 1605(a)(3).

2

at 6.[2] The majority differentiates the burdens based on whether the jurisdictional facts track "the plaintiff's . . . claim," *id.* at 7, that is, "A," or are instead "particular factual propositions . . . *independent* of the merits[]," *id.* at 6 (emphasis in original), that is, "B."

While all of this may be only dicta—after all, we all agree the plaintiff's claims to both the Library and the Archive survive dismissal—our court has yet to recognize such a construct (as is manifested by the majority's reliance on other circuits' precedent, Maj. Op. 7–10)[3] and I do not join in its adoption

---

[2]"B" sets forth two alternatives of the "commercial activity" tie between the United States and the defendants also needed to establish jurisdiction, the second of which the plaintiff relies on. *See* note 1 *supra.*

[3]I reject the majority's reliance on *Bell v. Hood,* 327 U.S. 678, 682–83 (1946), and *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 513 & n.10 (2006), insofar as it suggests the High Court has embraced any similar bifurcation of subject-matter jurisdiction in those cases. *See* Maj. Op. 7. The focus of the cited discussion in *Bell v. Hood* is on the difference between a dismissal for "want of jurisdiction"—a Rule 12(b)(1) dismissal—and a dismissal "on the merits"—a Rule 12(b)(6) dismissal. 327 U.S. at 683; *see also Land v. Dollar,* 330 U.S. 731, 735 n.4 (1947). Indeed, the "immaterial," "wholly insubstantial" and "frivolous" exceptions the majority opinion takes from *Bell v. Hood* as the template for "A" jurisdictional facts were themselves problematic to the Court. *Id.* ("The accuracy of calling these dismissals jurisdictional has been questioned."). As for *Arbaugh,* in concluding that Title VII's 15-employee "prerequisite" is non-jurisdictional, the Court differentiated between jurisdictional and *non*-jurisdictional facts, not two types of jurisdictional facts as the majority opinion

3

today. *Any* jurisdictional fact, once challenged, may require the district court to satisfy itself of its jurisdiction. How it does so should not be the subject of an elaborate proof scheme imposed on appellate review. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1131 (D.C. Cir. 2004) (district court "retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction" (quotations omitted)); *cf. Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 537 (1995). In my view, the plaintiff survives a Rule 12(b)(1) dismissal because it alleges that (1) it owns the Library and the Archive, (2) both of which were taken by the defendants or their predecessors in office based on the latters' intent " 'to suppress the practice of Judaism, not for any *bona fide* economic, academic, or other recognized governmental purpose,' " Maj. Op. 35 (quoting Chabad Br. 63); and, further, (3) each defendant asserts ownership of either the Library or the Archive and they both engage in commercial activity in the United States. While all of these jurisdictional facts were traversed by the defendants, the district court correctly, and without distinguishing between those jurisdictional facts "*independent* of the merits" of the plaintiff's claim and those "intertwined with the merits of the claim," Maj. Op. 6–7 (emphasis in original), assured itself of their existence—with the exceptions of the ownership of the Library and defendant RSL's commercial activity in the U.S. *vel non*, jurisdictional facts that it either did not reach and/or we today reverse—primarily *via* both parties' submissions supporting/opposing dismissal. *Agudas Chasidei Chabad of United States v. Russian Federation*, 466 F. Supp. 2d 6, 24–25 (D.D.C. 2006). "There is no need or justification, then, for imposing an additional . . . hurdle in the name of jurisdiction." *Grubart*, 513 U.S. at 538.

---

maintains with its "A" and "B" split.