UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AGUDAS CHASIDEI CHABAD OF UNITED STATES | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 05-cv-1548 (RCL) |
| RUSSIAN FEDERATION, *et al.*, | ) ) ) | |
| Defendants. | ) ) | |

**MEMORANDUM OPINION**

**I.     INTRODUCTION**

Plaintiff Agudas Chasidei Chabad of the United States is a New York-based, non-profit religious corporation holding a default judgment under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1602 *et seq.*, against the Russian Federation, a foreign state, the Russian Ministry of Culture and Mass Communication (the "Ministry"), the Russian State Library ("RSL"), and the Russian State Military Archive ("RSMA"). The default judgment entitles plaintiff to a collection of religious books and artifacts concerning the cultural heritage of its fore bearers. These items fell into defendants' hands in the early 20th century, and Russia has, to date, declined to return them. Further complicating matters, upon learning of the default judgment after withdrawing from this litigation, Russia announced that it will refuse to loan cultural artifacts and art to institutions in the United States for fear that plaintiff will attach such items in satisfaction of the default judgment. Before the Court are plaintiff's motions seeking permission to pursue execution of its judgment and imposition of sanctions on all defendants for failure to return the collections. The Court will grant the former and deny the latter at this time.

## II.     PROCEDURAL HISTORY

The full background underlying this action is set forth in this Court's prior opinion in *Agudas Chasidei Chabad v. Russian Fed'n*, 466 F. Supp. 2d 6, 10–14 (D.D.C. 2006). In short, plaintiff is the incorporated entity and successor to a worldwide organization of Jewish religious communities having origins in Eastern Europe and Russia. *Id*. at 11. These groups were part of the Chasidim movement and adhere to Chasidism, which teaches of the presence of God in all things, even the most mundane. *Id*. During the tumultuous periods of World War I and World War II, two sets of historical and religious records were lost to the Chasidim movement. In particular, the "Library," which includes books and manuscripts maintained by the leaders of the movement, was taken by the Soviet Department of Scientific Libraries following the Bolshevik Revolution, while the "Archive," which consists of more than 25,000 pages of materials handwritten by the movement's leaders, was left in Poland in 1939 by the leader of the movement when fleeing to America and subsequently seized by the Soviet Army from defeated German troops. *Id*. at 12–13. Though remaining in Soviet possession through much of the 20th century, in the early 1990s a series of rulings by Soviet tribunals determined that the Library and Archive were not the national property of the Soviet Union and ordered that the collections be returned to plaintiff. *Id*. at 13. Before the return could be accomplished, however, the Soviet Union was dissolved and the new Russian Federation nullified the prior orders. *Id*. As a result, both the Library and the Archive remained in Russian possession.

Plaintiff turned to the U.S. courts in 2004, bringing suit against Russia and various state agencies in the Central District of California. The action is brought under the FSIA, which codifies principles of sovereign immunity by barring the assertion of jurisdiction over foreign states by any state or federal court in the United States. 28 U.S.C. § 1604. At the same time, the

Act enumerates several specific exceptions to general principles of sovereign immunity, one of which is applicable here: "A foreign state shall not be immune . . . in any case in which rights in property taken in violation of international law are in issue." *Id*. § 1605(a)(3). Plaintiff's action was transferred to this Court in 2005, and shortly thereafter the Court granted in part and denied in part defendants' motion to dismiss on both jurisdiction and *forum non conveniens* grounds. *Agudas Chasidei Chabad*, 466 F. Supp. 2d at 31.[1] Following nearly four years of active litigation between the parties, all defendants withdrew from this matter, explaining that "[t]he Russian Federation views any continued defense before this Court and, indeed, any participation in this litigation as fundamentally incompatible with its rights as a sovereign nation." Statement of Defendants with Respect to Further Participation 2, Jun. 26, 2009 [71] ("Ds' Stmt"). A year later, the Court entered default judgment after finding that "[p]laintiff has met its burden of proving a *prima facie* case against defendants and has established its right to relief by evidence satisfactory to the Court." *Agudas Chasidei Chabad v. Russian Fed'n*, 729 F. Supp. 2d 141, 148 (D.D.C. 2010). The Court simultaneously ordered defendants "to surrender . . . the complete collection of religious books, manuscripts, documents and things that comprise the 'Library' and the 'Archive.'" Order & Judgment 2, July 30, 2010 [80].

Following entry of default judgment, plaintiff sent by FedEx copies of the opinion and final judgment, in both English and Russian, to the address and contact for each defendant that was provided by defendants' former counsel at the time Russia and the Russian entities withdrew from this case. *Compare* Certificate of Service, Oct. 20, 2010 [84-1], *with* Ex. A to Reply in Support of Motion to Withdraw, Aug. 6, 2009 [75]. Two months later, the Court received a

---

[1] In particular, the Court dismissed all claims related to the Library and retained all claims related to the Archive. On appeal, the D.C. Circuit reversed this Court's holdings with respect to the Library and remanded the matter to proceed with claims related to both the Library and Archive. *Agudas Chasidei Chabad v. Russian Fed'n*, 528 F.3d 934, 955 (D.C. Cir. 2008).

3

letter from the U.S. Department of State indicating that the Russian Ministry of Foreign Affairs had returned these documents to the American Embassy in Moscow. Dec. 8th Letter, Dec. 10, 2010 [86]. In the intervening period, plaintiff had also sent copies and translations of these papers to the State Department for service through diplomatic channels. Notice of Service, Nov. 24, 2010 [85]. Not long thereafter, the Court received another letter indicating that service of these documents had been effected through diplomatic channels in late 2010. Affidavit of Service, Jan. 11, 2011 [87]. In January, the Court received yet another letter—this time from the Russian Ministry of Justice. Jan. 16th Letter, Jan. 21, 2011 [88]. A translation indicates that the Jan. 16th Letter declares as follows:

> The Ministry of Justice of the Russian Federation hereby returns without judicial review all court documents issued by the Columbia District Court along with the petition filed by the Chassidic Community of the United States, seeking return of the Chassidic religious library. The documents are being returned due to nonexistence of an international treaty between the United States and Russia which would regulate legal provisions pertaining to civil, family and trade matters.

Certified Translation, Feb. 24, 2011 [90-1]. A few months after receipt of the Jan. 16th Letter, plaintiff filed motions requesting a determination that notice of the default judgment has been provided to defendants—allowing plaintiff to pursue execution of the default judgment—and seeking imposition of sanctions against defendants. Motion to Enforce Judgment and Permit Attachment, Apr. 4, 2011 [91] ("Enforcement Mtn."); Motion for Sanctions, Apr. 4, 2011 [92] ("Sanctions Mtn.").

Before the Court could address these motions, two events relevant to their disposition occurred. First, Russia announced that it was suspending exchanges of Russian art and cultural artifacts with American institutions, such as museums and universities, until resolution of this case, and directed its State-run museums to cancel scheduled loans to their American

4

counterparts. Carol Vogel & Clifford J. Levy, *Dispute Derails Art Loans from Russia*, N.Y. Times, Feb. 2, 2011. According to one account, Russian officials are seeking legal assurances from the United States that any art and artifacts will be immune from attachment by plaintiff or others. *Id*. Second, in light of these developments, the United States appeared in this action and asked the Court for additional time to review plaintiff's motions before any ruling was issued. Notice of Potential Participation, Apr. 15, 2011 [93]. In an attempt to remedy any concerns, plaintiff sent a letter to the State Department in May promising that it "will not seek to enforce its default judgment by attaching or executing against any art or object of cultural significance loaned by the Russian Federation to American museums that is covered" by federal statutes. May 9th Letter, May 13, 2011 [94-1]. Plaintiff then submitted a copy of that letter to the Court, and separately declared that it "does not seek to disrupt in any manner the non-profit exchange of art and cultural objects between the Russian and American people." Statement of Plaintiff, May 13, 2011 [94]. A few days later, the United States requested another thirty days to respond in light of plaintiff's letter and statement. Second Notice of Potential Participation, May 16, 2011 [95]. Once again attempting to head-off any governmental involvement, plaintiff submitted a stipulation in which it agreed not to seek attachment of any objects from Russia declared by the State Department to be of "cultural significance" that were to be part of an upcoming exhibit. Stipulation Prohibiting Attachment of Certain Cultural Objects, May 18, 2011 [96].

     Notwithstanding plaintiff's commendable attempts to minimize any interference with the exchange of art and cultural artifacts between the United States and Russia, the United States eventually submitted a Statement of Interest, June 15, 2011 [97] ("U.S. Stmt."). That statement explains that the United States government has an interest in ensuring proper enforcement of 22 U.S.C. § 2459(a), which immunizes from "any judicial process" art and other objects of "cultural

5

significance" imported into the United States from any foreign country under an agreement between "cultural or educational institutions" in both countries. U.S. Stmt. at 3. The United States goes on to explain that, if issued, plaintiff's "proposed order would fail to alert other courts or enforcement authorities to the potential immunities applicable to Defendants' property," and thus could risk undermining the effectiveness of § 2459(a). *Id*. at 5. In response, plaintiff submitted a new proposed order that includes the following text:

> (3) Plaintiff may enforce the judgment against defendants . . . through attachment and execution of defendants' property which falls within the immunity exceptions under 28 U.S.C. §§ 1610(a)(3), (b)(2) and is not protected by 22 U.S.C. § 2459. Any application by Plaintiff for a Writ of Attachment . . . shall identify the specific property that is the subject of application. . . . Pursuant to its agreement, Plaintiff shall not enforce the default judgment in this action by seeking to attach or execute against any art or object of cultural significance which has been granted protection under 22 U.S.C. § 2459.

Proposed Order 1–2, June 21, 2011 [98-1]. With the entirety of this background in mind, the Court now turns to the merits of plaintiff's motions.

### III. ANALYSIS

Plaintiff asserts, based on the above record, that it has fulfilled its obligations to give defendants notice of the default judgment entered against them sufficient to permit plaintiff to attempt to execute its judgment as permitted under the FSIA, and that the extensive delay caused by defendants throughout their participation and non-participation in these proceedings, as well as their refusal to comply with the Court's order directing turnover of the Library and Archive, warrants the imposition of sanctions. The Court discusses each issue in turn.

#### A. Plaintiff's Motion for a 1610(c) Order

Having obtained a judgment against the Russian entities, plaintiff now pursues the enforcement of that judgment and return of the Library and Archive. In its present motion,

6

plaintiff requests a court order "finding that a reasonable period of time has elapsed following entry of judgment . . . and that the notice required . . . has been given to defendants." Enforcement Mtn. at 1. This request stems directly from paragraph (c) of § 1610 of the FSIA, which governs attachment of property and execution of judgments. That provision states:

> No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

28 U.S.C. § 1610(c). In response to plaintiff's motion, the United States expresses unease "that a broad, unqualified attachment order in this or any other proceeding could be used in an attempt to seize immune property, including cultural objects protected by § 2459." U.S. Stmt. at 4–5. The Court first discusses whether plaintiff has satisfied the requirements of § 1610(c), and then turns to the government's concern.

### 1. Plaintiff Has Complied with Section 1610(c)'s Requirements

Section 1610(c) of the FSIA imposes two basic requirements on a plaintiff seeking to enforce a judgment against a foreign state or its agencies and instrumentalities: first, each defendant must receive notice that judgment has been entered against it; and second, each defendant must be given an adequate opportunity to respond. *Murphy v. Islamic Republic of Iran*, No. 06 Civ. 596, 2011 U.S. Dist. LEXIS 43363, at *5–6. The record in this case shows that plaintiff has served defendants using two distinct methods, and that several months have passed since both entry of judgment and transmittal of copies of that default judgment. For the reasons set forth below, the Court finds that plaintiff has satisfied the requisites and a 1610(c) order should issue.

Before permitting enforcement of a FSIA judgment, a court must ensure that all foreign entities involved receive notice of the exposure of their property and other interests to attachment

7

and execution. Where, as here, that foreign state or agency is not participating or has withdrawn from the ligation, the entry of a default judgment will not, in and of itself, give sufficient warning that the defendant's interests and assets are exposed. Accordingly, § 1610(c) requires that "notice required under section 1608(e)" be given. 28 U.S.C. § 1610(c). Section 1608(e), in turn, requires that "[a] copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section." *Id*. § 1608(e). Such service must be made on each and every defendant. *Murphy*, 2011 U.S. Dist. LEXIS at *6. Plaintiff is therefore required to have served a copy of the default judgment on Russia and each of the Ministry, RSL and RSMA.

Section 1608 divides the methods for serving foreign entities under FSIA into two sections: procedures governing service "upon a foreign state or political subdivision" and procedures governing service "upon an agency or instrumentality of a foreign state." 28 U.S.C. § 1608(a)–(b). Service on a foreign state or political subdivision is governed by § 1608(a), which "prescribes four methods of service, in descending order of preference. Plaintiffs must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." *Ben-Rafael v. Islamic Republic of Iran*, 540 F. Supp. 2d 39, 52 (D.D.C. 2008). These methods are service (1) "in accordance with any special arrangement . . . between the plaintiff and the foreign state," (2) "by delivery . . . in accordance with an applicable international convention," (3) "by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt," and (4) "by sending two copies" to the U.S. Department of State, which "shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating

when the papers were transmitted." 28 U.S.C. § 1608(a)(1)–(4). In § 1608(a), Congress intended to "set[] forth the exclusive procedures for service on a foreign state." *Transaero v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 154 (D.C. Cir. 1994). Thus, plaintiff "must strictly comply with the statutory service of process provisions" when serving Russia and the Ministry. *Magness v. Russian Fed'n*, 247 F.3d 609, 616 (D.C. Cir. 2001).

Service on RSL and RSMA is governed by § 1608(b), *see Agudas Chasidei Chabad*, 729 F. Supp. 2d at 146–47 (finding that RSL and RSMA are "agencies or instrumentalities of the Russian Federation"), which permits service (1) "in accordance with any special arrangement", (2) "by delivery . . . either to an officer, a managing or general agent, or to any other agency authorized . . . to receive service of process in the United States [or] in accordance with an applicable international convention on service of judicial documents," (3) or, "if reasonably calculated to give actual notice, by delivery . . . as [either (a)] directed by an authority of the foreign state[, or (b)] any form of mailing requiring a signed receipt, to be addressed and dispatched by the clerk of the court[, or (c)] as directed by order of the court consistent with the law of the place where service is to be made." 28 U.S.C. § 1608(b)(1)–(3). In § 1608(b), Congress was "concerned with substance rather than form." *Transaero*, 30 F.3d at 154. Thus, unlike service against a foreign state or political subdivision, "section 1608(b) may be satisfied by technically faulty service that gives adequate notice." *Id.* (concurring with Third, Sixth, Ninth and Eleventh Circuits). Incorporating these observations into a workable framework, the D.C. Circuit has explained that "substantial compliance with the provisions of service upon an agency or instrumentality of a foreign state—that is, service that gives actual notice . . . to the proper individuals within the agency or instrumentality—is sufficient to effectuate service under section 1608(b)." *Magness*, 247 F.3d at 616.

9

The first two options for service against all defendants under either § 1608(a) or § 1608(b)—by special arrangement or under an international agreement—are unavailable to plaintiff in this case. Plaintiff argues that the provision of mailing addresses for each individual defendant constitutes a "special arrangement" between the parties. Enforcement Mtn. at 1–2. But the record is clear that defendants determined not to participate in this litigation at least a month before their former counsel submitted these addresses, Ds' Stmt. at 1, and that this subsequent submission was merely counsel's attempt to comply with local rules, which require that an attorney withdrawing without his or her client's consent must submit such information to the Court. Local Civ. R. 83.6(c). In these circumstances, the Court will not transform the provision of addresses by counsel upon withdrawing from representation *after* the parties notified the Court of their intention to longer participate into a "special arrangement" between plaintiff and the Russian defendants for the continued service of legal papers. *Cf. G.E. Trans. S.p.A. v. Republic of Alb.*, 693 F. Supp. 2d 132, 137 (D.D.C. 2010) (finding existence of special arrangement only in contract between parties). Nor can plaintiff have served defendants through any international agreement. Though Russia is a member of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, art. 3, 20 U.S.T. 361, 658 U.N.T.S. 163, Status Table, April 8, 2011, *available at* http://www.hcch.net/ index_en.php?act=conventions.status&cid=17, in 2003 Russia "unilaterally suspended all judicial cooperation with the United States in civil and commercial matters." U.S. Dep't of State, Russia Judicial Assistance, http://travel.state.gov/law/judicial/judicial_3831.html (last visited July 20, 2011). As a result of Russia's unilateral action, no method to deliver the default judgment to defendants "in accordance with an applicable international convention on service of judicial documents" exists. 28 U.S.C. § 1608(a)(2).

Moving on to the remaining options for service on Russia and the Ministry under § 1608(a), plaintiff's attempted mailing also fails to meet the standard for service "by any form of mailing requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. § 1608(a)(3). In light of the necessity of strict adherence to the form of service, *supra*, plaintiff's (1) failure to submit signed receipts of service, (2) choice to send the mailing itself rather than through the clerk of the court, and (3) decision to send the packages to individual Russian entities rather than the "head of the ministry of foreign affairs," are all fatal. *See Nikbin v. Islamic Republic of Iran*, 471 F. Supp. 2d 53, 68 (D.D.C. 2007) (rejecting adequacy of service against foreign state under § 1608(a)(3) where package was mailed by plaintiff rather than court clerk and where shipping company did not return signed receipt). That said, plaintiff's decision to turn to the State Department for service upon Russia and the Ministry through diplomatic channels, as contemplated in § 1608(a)(4), was a wise one—in early January, the State Department informed the Court that service through this method had been completed. In light of this evidence, the Court finds that defendants Russia and the Ministry have been properly served with the default judgment as required by § 1608(a).

With respect to RSL and RSMA, § 1608(b) does not specify additional methods for service, but instead permits service by delivery either "as directed by an authority of the foreign state," "by any form of mailing requiring a signed receipt [and] dispatched by the clerk of the court," or "as directed by order . . . consistent with the law of the place where service is to be made." 28 U.S.C. § 1608(b)(3). In this instance, plaintiff's two methods of serving RSL and RSMA do not fall cleanly within any of these subcategories. The Court, however, remains mindful that the "substantial compliance" test applicable to § 1608(b) service "is devoted to

11

common sense realism: a party can give 'technically faulty' service under section 1608(b), as long as the intended party for service in fact received actual notice of the lawsuit. The test rejects formalism." *In re English High Court Proceedings*, No. 06 Civ. 2935, 2006 U.S. Dist. LEXIS 96140, at *9 (E.D. La. Nov. 2, 2006). Here, there can be no dispute that both methods relied upon by plaintiff were calculated to provide notice to RSL and RSMA. And more importantly, the subsequent actions by the Russian defendants—which include returning all documents served by mail on every defendant to the U.S. Embassy in Moscow and later submitting a letter, after diplomatic service, indicating that none of the defendants would accept service—demonstrate that those entities are well-aware of the import of the papers served upon them. Thus, based on the record before it, the Court holds that plaintiff has provided adequate notice of the default judgment to both RSL and RSMA. *See Doe v. State of Israel*, 400 F. Supp. 2d 86, 102 (D.D.C. 2005) ("[The] requirements of § 1608(b) are less stringent than those of § 1608(a), and can be satisfied by 'technically faulty service' as long as the defendants receive adequate notice of the suit and are not prejudiced.") (citing *Transaero*, 30 F.3d at 154).

Having concluded that all defendants were served consistent with the strictures of § 1608(e), the Court now turns to whether sufficient time has passed between final judgment, subsequent service of the default judgment, and the present—as required by § 1610(c)—and concludes that there has in fact been an adequate passage of time. As an initial matter, default judgment was entered almost a year ago, and notice of that judgment was provided by diplomatic note nearly eight months ago. The Court finds no basis in the FSIA to suggest that any longer period is needed, particularly in comparison to the period of time—60 days, 28 U.S.C. § 1608(d)—that a foreign sovereign is given to respond to service of a complaint and summons. Additionally, a period of a few months—a shorter period than in this case—has been repeatedly

found sufficient under the Act. *See Ned Chartering & Trading, Inc. v. Republic of Pak.*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001) (collecting cases to conclude "that other courts have found periods such as two or three months sufficient to satisfy section 1610(c)'s requirements" and separately determining that six weeks was acceptable). Finally, in the eight months since Russia, the Ministry, RSL and RSMA were provided notice, defendants have informed the Ministry of Justice of the Russian Federation of the default judgment, and that Russian agency—which is not otherwise a party to these proceedings—has transmitted a letter to the Court stating it that it "hereby returns without judicial review all court documents issued by the Columbia District Court along with the petition filed by the Chassidic Community of the United States, seeking return of the Chassidic religious library." Certified Translation. If defendants had sufficient time to undertake these acts, they certainly had sufficient time to evaluate and consider responses to the Court's entry of default judgment. *See Ned Chartering*, 130 F. Supp. 2d at 67 (explaining that "a court's determination of 'reasonable time' should be informed by an examination of" several factors, including "evidence that the foreign state is attempting to evade payment of the judgment"). The Court therefore finds that an order announcing that plaintiff has satisfied requirements under § 1610(c) should issue.

### 2. The Effects of a 1610(c) Order

Turning to the United States' concern with plaintiff's proposed 1610(c) order, any such objection turns on the continuing effectiveness of the federal Mutual Educational and Cultural Exchange Program, which declares, in relevant part:

> Whenever any work of art or other object of cultural significance is imported into the United States from any foreign country, pursuant to an agreement entered into between the foreign owner or custodian thereof and the United States or one or more cultural or educational institutions within the United States providing for the temporary exhibition or display thereof within the United States at

> any cultural exhibition, assembly, activity or festival . . . no court of the United States, any State, the District of Columbia, or any territory or possession of the United States may issue or enforce any judicial process . . . for the purpose or having the effect of depriving such institution . . . of custody or control of such object.

22 U.S.C. § 2459(a). This provision "fulfills an important role in fostering the exchange of art and cultural works between this country and other nations." *Malewicz v. Amsterdam*, 362 F. Supp. 2d 298, 310 (D.D.C. 2005). According to the United States, the "proposed order would fail to alert other courts or enforcement authorities to the potential immunities applicable to Defendants' property" and risks undermining the effectiveness of § 2459. U.S. Stmt. at 4–5.

The Court concludes that the government's concerns are based on a misconception about the scope of a 1610(c) order and are therefore unfounded. A 1610(c) order, in the context of this case, *does not* authorize the attachment or execution of particular property—or any property at all. The proposed order is clear on this point, asking the Court to rule *only* that (1) a "reasonable period of time has elapsed following entry of judgment," (2) plaintiff "has given the proper notice to defendants that is required under 28 U.S.C. § 1608(e)," and (3) plaintiff "may enforce the judgment against defendants." Proposed Order, Apr. 4, 2011 [91-1]. Thus, to the extent the United States is concerned that such an order might authorize the attachment of property potentially immune under other statutes—such as art and cultural artifacts, 22 U.S.C. § 2459— that worry is unfounded. Any court, whether this or another, would be required to evaluate a proposed attachment of specific property in this case by reviewing the jurisdictional provisions of § 1610(a)–(b), as well as any other immunities that might apply. *See, e.g.*, *Magness v. Russian Fed'n*, 84 F. Supp. 2d 1357, 1360 (S.D. Ala. 2000) (denying attachment of objects included in exhibit related to Russian Tsars under § 2459 without discussion of § 1610(c)).[2]

---

[2] The United States also notes that "the proposed order . . . does not specify any particular property that would be subject to attachment and execution," asserting that a "writ of attachment or execution against a foreign

14

The purpose of the order sought by plaintiff is a practical one. Section 1610(c) is designed to ensure that a foreign power is always given an opportunity to evaluate and respond to any court judgment entered against it which could subject its property and interests in the United States to attachment or execution. As the legislative history of the FSIA makes clear, Congress was very concerned that the normal procedures for attachment and execution of judgments—which often lack formal legal process—might fail to give foreign defendants adequate notice. H.R. Rep. No. 94-1487, at 30 (1976). Section 1610(c) was therefore written into the statute as a way to ensure, through judicial review, that property and interests of foreign entities are not only *not* immune—which is accomplished by review of a proposed writ's consistency with §§ 1610(a)–(b)—but also that each foreign power has a fair and adequate opportunity to appear and contest any attachment or execution—which is accomplished by § 1610(c)'s notice requirement. The purpose of obtaining an order finding compliance with § 1610(c), then, is to permit a FSIA plaintiff to establish that one of the prerequisites is satisfied so that the plaintiff may pursue specific attachments without worry over any lingering § 1610(c) requirements. In light of the severe hurdles to enforcement of judgments that often face FSIA plaintiffs, a 1610(c) order makes practical sense. But such orders say nothing about the remaining jurisdictional immunities that must be overcome before an order granting the attachment or execution of particular property may issue. *See Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 800 (7th Cir. 2011) ("[E]ven when the foreign state fails to appear in the execution proceeding, the court must determine that the property sought to be attached is excepted from immunity under § 1610(a) or (b) before it can order attachment or execution.").

---

sovereign . . . should identify specific property to which it relates." U.S. Stmt. at 5 n.3 (citing *Rubin v. Islamic Republic of Iran*, 637 F.3d 783, 796 (D.C. Cir. 2011)). This argument misses the mark. The order sought by plaintiff is not a writ of attachment or execution; nor does the order authorize the attachment of, or execution upon, any property—either generally or with respect to specific interests. The order merely—and only—finds that the requirements of § 1610(c) have been satisfied.

Though the Court ultimately concludes that entry of a 1610(c) order creates no risk to Russian art or artifacts on loan to American institutions that otherwise would not exist, plaintiff, in light of the United States' concerns, has made several concessions in an attempt to resolve imagined problems. Included among these concessions is a new proposed order that adds a specific exemption for property covered by 22 U.S.C. § 2459. While superfluous, the Court sees no prejudice in the inclusion of such text in a 1610(c) order, given the plaintiffs' consent, and will therefore incorporate similar language into the order accompanying today's opinion.

### B. Plaintiff's Request for Sanctions

In its second motion, plaintiff asks the Court to sanction the Russian defendants for two basic reasons: first, defendants have failed to return the Library and Archive to plaintiff in accordance with the Court's order accompanying the default judgment, Sanctions Mtn. at 11–13; and second, defendants are also "actively making the return" of the Library and Archive "more difficult," in contravention of this Court's prior order barring any party from any action that would cause unreasonable delay to these proceedings. *Id*. at 12–14. Plaintiff points the Court to sanctions issued in other cases—ranging from $25,000 to $500,000 per-day—and requests that the Court enter similar levies against defendants in this case. *Id*. at 15–16.

Federal courts enjoy inherent contempt power, *FG Hemisphere Assocs., LLC v. Dem. Rep. of Congo*, 637 F.3d 373, 377 (D.C. Cir. 2011), and the D.C. Circuit recently reaffirmed that this inherent power to sanction persists in the FSIA context. *See id*. at 378 ("[T]here is not a smidgen of indication in the text of the FSIA that Congress intended to limit a federal court's inherent contempt power."). "Civil contempt, unlike the punitive remedy of criminal contempt, is designed to coerce compliance with a court order or to compensate a complainant for losses sustained." *SEC v. Bilzerian*, 613 F. Supp. 2d 66, 70 (D.D.C. 2009). To determine whether civil

contempt is appropriate in a particular case, the Court must evaluate whether "the putative contemnor has violated an order that is clear and unambiguous," and whether such a violation has been "proved by clear and convincing evidence."  *Broderick v. Donaldson*, 437 F.3d 1226, 1234 (D.C. Cir. 2006).

Without reaching a conclusion concerning defendants' effect on the pace with which this matter is resolved,[3] the record is clear that defendants have not—to date—complied with the Court's order directing them to return the Library and Archive to plaintiff.  That order unequivocally instructs defendants to "surrender to the United States Embassy in Moscow or to the duly appointed representatives of Plaintiff . . . the 'Library' and the 'Archive,'" and to "assist and authorize the transfer of the 'Library' and the 'Archive.'"  Order & Judgment at 2.  It is clear that the Library and Archive remain in Russian possession, and the record provides no hint that defendants have taken any steps necessary towards compliance with the Court's order.  Indeed, defendants' prior statement that they view "any continued defense before this Court and, indeed, any participation in this litigation as fundamentally incompatible with [their] rights as a sovereign state," Ds' Stmt. at 2, along with their letter—sent after receipt of the default judgment—returning documents "without judicial review," Certified Translation, make clear that they have no intention of complying with the Court's prior order.  Moreover, the United States does not, at least in its latest statements, object to the imposition of sanctions or otherwise

---

[3] Though the Court finds that nothing in plaintiff's proposed 1610(c) order puts any Russian art or artifacts in any greater peril from attachment than would otherwise exist, as such an order does not eliminate the immunity provided by 22 U.S.C. § 2459, *supra*, the Court is unwilling to conclude that Russia's concerns about the safety of its own cultural objects is entirely unfounded, given prior—albeit unsuccessful—attempts to attach such objects in at least one other case in satisfaction of a FSIA judgment. *See, e.g.*, *Magness*, 84 F. Supp. 2d at 1359–60.  While the Court is eager to provide whatever assurances to Moscow are necessary to encourage full future exchanges of art and artifacts between the United States and Russia, as an Article III tribunal the Court is not imbued with the authority to pre-judge any potential attachment that might occur.  *Nw. Airlines, Inc. v. FAA*, 795 F.3d 195, 205 (D.C. Cir. 1986).  What the Court can do at this time, however, is frankly acknowledge that absolutely nothing in today's opinion or accompanying order calls into question the immunity granted to cultural objects by § 2459, and thus—to the extent Russia has been previously satisfied with the protection of its art and artifacts provided by that provision of federal law—no events in this case should give the Russian Federation any additional pause when deciding whether to share cultural objects with U.S. institutions under that provision.

suggest that negotiations for the return of the Library and Archive have made any progress, or are even ongoing. *See generally* U.S. Stmt. at 6–7. Based on available evidence, the Court finds that plaintiff has demonstrated defendants' non-compliance "to a reasonable certainty," as required to warrant the entry of civil contempt sanctions. *Bilzerian*, 613 F. Supp. 2d at 70.

In contemplating the entry of sanctions, however, the Court must remain cognizant that a fundamental requirement of civil contempt proceedings "is that the accused party has notice and an opportunity to be heard." *SEC v. Bilzerian*, 729 F. Supp. 2d 1, 7 (D.D.C. 2010) (citing *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826 (1994)). As the D.C. Circuit has cautioned, "a contemnor cannot be expected to purge civil contempt through reduction or avoidance . . . without having clear and unambiguous notice of the proscribed conduct." *Salazar v. Dist. of Columbia*, 602 F.3d 431, 442 (D.C. Cir. 2010). Though defendants have certainly received notice directing them to return the Library and Archive to plaintiff, *supra*, they have received no notice that failure to comply with that order may subject them to additional monetary penalties. Entry of a civil contempt order at this time is therefore premature, *see Majhor v. Kempthorne*, 518 F. Supp. 2d 221, 257 n.18 (D.D.C. 2007) (denying motion for sanctions absent prior opportunity to respond or correct conduct); but in light of the evidence in the record concerning defendants' non-compliance, the Court will direct defendants to show cause why they should not be held in civil contempt. *Int'l Painters & Allied Trades Indus. Pension Fund v. Zak Architectural Metal & Glass, LLC*, 736 F. Supp. 2d 35, 40 (D.D.C. 2010).

The determination that a show cause order should issue prompts the question of how such an order will give defendants sufficient notice. Because defendants are not active participants in this litigation, the Court is not comforted that the mere entry of an order on the docket will alert them of exposure to potentially significant monetary sanctions. And these concerns are only

heightened given the involvement of foreign powers and the "coercive" nature of civil contempt. *Ashford v. E. Coast Express Eviction*, No. 06 Civ. 1561, 2011 U.S. Dist. LEXIS 35810, at *4 (D.D.C. Mar. 31, 2011). At the same time, nothing in the FSIA requires special service to foreign defendants of any documents other than the initial papers and any default judgment, *see generally* 28 U.S.C. § 1608, and thus nothing warrants placing upon plaintiff the often-costly burden of achieving full compliance with 28 U.S.C. § 1608. *See Murphy*, 2011 U.S. Dist. LEXIS 43363 at 6–7 (describing significant costs of diplomatic service). To resolve these competing concerns, the Court will direct plaintiff to serve a copies of its motion for sanctions and today's order to show cause on defendants via mail using the addresses defendants' former counsel provided, and will give defendants the same 60 days they are generally entitled in responding to service of papers initiating suit under the FSIA. 28 U.S.C. § 1608(d). Because defendants' earlier copies of the default judgment were received via mail to these same addresses (and later returned), *supra*, the Court is satisfied that such service will provide sufficient notice.

## IV.  CONCLUSION

The Court is sympathetic to plaintiff, aware of the long road it has traveled and all-too familiar with the difficult trail that lies ahead in attempting to enforce a FSIA judgment. *See FG Hemisphere*, 637 F.3d at 377 (noting that often "a plaintiff must rely on the government's diplomatic efforts, or a foreign sovereign's generosity, to satisfy a [FSIA] judgment"). At the same time, defendants' ongoing failure to comply with the Court's order to turn over the Library and Archive cannot eliminate the requirement that they be given notice and an opportunity to respond before entry of civil contempt. And with respect to any art or artifacts belonging to Russia and currently in the United States, the Court reaffirms what should have been obvious beforehand: absolutely nothing in today's order has the effect of removing or altering any

protection for cultural objects subject to immunity under 22 U.S.C. § 2459. The Court hopes that today's opinion will help facilitate a return to business as usual in the sharing of artifacts and history between nations that is crucial to the promotion of cross-cultural understanding in a global world, that the ability to attach and execute property not otherwise subject to immunity under FSIA or any other federal statute may aid plaintiff in its pursuit of the return of the lost Library and Archive containing the cultural heritage and history of the Chasidim movement, and that the show cause order may prompt Russia to rethink its decision to retain items of immense historical and religious significance, seized during times of great crisis and in violation of international law, in warehouses rather than return them to their rightful owners.

      Separate Orders consistent with these findings shall issue this date.

      Signed by Royce C. Lamberth, Chief Judge, on July 26, 2011.