# EXHIBIT B

No. 12-842

In The

# Supreme Court of the United States

————— ◆ —————

REPUBLIC OF ARGENTINA,

*Petitioner,*

v.

NML CAPITAL, LTD.,

*Respondent.*

————— ◆ —————

**On Writ Of Certiorari To The
United States Court Of Appeals
For The Second Circuit**

————— ◆ —————

**BRIEF *AMICUS CURIAE* OF AGUDAS
CHASIDEI CHABAD OF UNITED STATES
IN SUPPORT OF RESPONDENT**

————— ◆ —————

*Of Counsel*
STEVEN LIEBERMAN
ROBERT P. PARKER
ROTHWELL, FIGG, ERNST
 & MANBECK, P.C.
607 14th Street, NW,
 Suite 800
Washington, DC 20005
(202) 783-6040

NATHAN LEWIN
 *Counsel of Record*
ALYZA D. LEWIN
LEWIN & LEWIN, LLP
1775 Eye Street NW,
 Suite 850
Washington, DC 20006
(202) 828-1000
nat@lewinlewin.com

*Attorneys for Amicus Curiae*

COCKLE LEGAL BRIEFS (800) 225-6964
WWW.COCKLELEGALBRIEFS.COM

i

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................... ii

INTEREST OF THE *AMICUS CURIAE* ................ 1

INTRODUCTION AND
SUMMARY OF ARGUMENT.................................. 4

ARGUMENT ............................................................ 7

I.   THE FSIA CONTEMPLATES THAT
     DISTRICT COURTS WILL ISSUE
     ENFORCEABLE INJUNCTIONS
     DIRECTING FOREIGN STATES TO
     RETURN PROPERTY TAKEN IN
     VIOLATION OF INTERNATIONAL
     LAW.................................................................. 7

II.  THE PROSPECT THAT A DAILY CIVIL
     PENALTY FOR CONTEMPT WILL BE
     COLLECTIBLE IS ESSENTIAL FOR
     MEANINGFUL ENFORCEMENT OF
     MANDATORY INJUNCTIONS ...................... 9

III. VICTIMS OF HOLOCAUST PROPERTY
     SEIZURES THAT VIOLATED
     INTERNATIONAL LAW WOULD BE
     DENIED JUDICIAL REMEDIES IF
     ARGENTINA'S CONTENTION IS
     SUSTAINED .................................................. 11

ii

# TABLE OF CONTENTS

Page

IV.  THE LANGUAGE OF THE FSIA DOES NOT
     SUPPORT ARGENTINA'S CONTENTION
     THAT DISCOVERY MAY NOT BE
     DIRECTED TO FINDING ASSETS
     LOCATED OUTSIDE THE UNITED
     STATES ........................................................ 13

CONCLUSION ...................................................... 15

# TABLE OF AUTHORITIES

**Cases**                                 Page

*Abelesz v. Magyar Nemzeti Bank*,
   692 F.3d 661 (7th Cir. 2012) ............................ 12

*Abelesz v. OTP Bank*,
   692 F.3d 638 (7th Cir. 2012) ............................ 12

*Agudas Chasidei Chabad of United States v.*
   *Russian Federation*, 466 F. Supp. 2d 6
   (D.D.C. 2006) .................................................... 2, 8

*Agudas Chasidei Chabad of United States v.*
   *Russian Federation*, 528 F.3d 934
   (D.C. Cir. 2008) ............................................... 3, 8

*Cassirer v. Kingdom of Spain*,
   616 F.3d 1019 (9th Cir. 2010) ........................... 11

*Cassirer v. Thyssen-Bornemisza Collection*
   *Foundation*, 737 F.3d 613 (9th Cir. 2013) ........ 11

iii

# TABLE OF AUTHORITIES

**Cases**                                              Page

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) ..... 10

*de Csepel v. Republic of Hungary*,
   714 F.3d 591 (D.C. Cir. 2013) ........................... 11

*de Csepel v. Republic of Hungary*,
   808 F.Supp.2d 113 (D.C. Cir. 2011).................. 12

*Ex Parte Robinson,* 86 U.S. 505 (1873) .................. 9

*FG  Hemisphere Assocs., LLC v. Democratic*
   *Republic of Congo*, 637 F.3d 373
   (D.C. Cir. 2011) ................................................. 10

*Garb v. Republic of Poland*,
   440 F.3d 579 (2d Cir. 2006) .............................. 12

*Holocaust Victims of Bank Theft v.*
   *Magyar Nemzeti Bank*,
   807 F.Supp.2d 689 (N.D. Ill. 2011) ................... 12

*International Union, United Mine Workers of*
   *America v. Bagwell*, 512 U.S. 821 (1994) .......... 8

*Michaelson v. United States ex rel. Chicago*,
   266 U.S. 42 (1924) ............................................ 10

*Republic of Austria v. Altmann*,
   541 U.S. 677 (2004) .......................................... 11

iv

# TABLE OF AUTHORITIES

**Cases**                                    Page

*Rubin v. Islamic Republic of Iran*, 637 F.3d 783
(7th Cir. 2011), *cert. denied*, 133 S. Ct. 23 (2012) .... 12

*Securities and Exchange Comm'n v. Bilzerian*,
613 F. Supp. 2d 66 (D.D.C. 2009) ...................... 9

*Shillitani v. United States*, 384 U.S. 364 (1966) ... 10

*United States v. Hudson & Goodwin*,
7 Cranch 32 (1812) ............................................. 9

*United States v. United Mine Workers of America*,
330 U.S. 258 (1947) .......................................... 11

*Whiteman v. Dorotheum GMBH & CO KG*,
431 F.3d 57 (2d Cir. 2005) ................................ 12

## Statutes and Rules

28 U.S.C. § 1605 ..................................................... 8

28 U.S.C. § 1609 ................................................... 13

28 U.S.C. § 1610 ............................................ 13, 14

Fed. R. Civil P. 69 ................................................ 14

## Other Authorities

11A Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure*
§ 2960 (2d ed. 1995) ............................................. 9

No. 12-842

IN THE

# Supreme Court of the United States

REPUBLIC OF ARGENTINA,

*Petitioner,*

*v.*

NML CAPITAL, LTD.,

*Respondent.*

## BRIEF *AMICUS CURIAE* OF AGUDAS CHASIDEI CHABAD OF UNITED STATES IN SUPPORT OF RESPONDENT

### INTEREST OF THE AMICUS CURIAE[*]

Agudas Chasidei Chabad of United States (hereinafter "Chabad") is an American non-profit religious corporation that is the policy-making and umbrella organization for the world-wide Chabad-Lubavitch movement. The movement was founded in Russia in the Eighteenth Century and is an Orthodox Jewish spiritual movement that has been led by a succession of "Rebbes" – rabbis recognized

---

[*] Pursuant to Supreme Court Rule 37.6, *amicus* certifies that no counsel for a party authored this brief in whole or in part. No person or party other than the *amicus* has made a monetary contribution to this brief's preparation or submission. All parties have consented in writing to the filing of this *amicus* brief.

2

by their followers as possessing exceptional spiritual qualities.

In November 2004 Chabad instituted an action under the Foreign Sovereign Immunities Act ("FSIA") against the Russian Federation, the Russian Ministry of Culture and Mass Communication, the Russian State Library, and the Russian State Military Archive for the taking, in violation of international law, of Chabad's "Library" of more than 12,000 volumes that had been stored in a Moscow warehouse and was seized by the Bolsheviks during the October Revolution of 1917 and of an "Archive" of more than 25,000 Chabad-owned documents and books taken as "trophy documents" in September 1945 by the Red Army from a castle in Poland.

Russia initially participated actively in the litigation through United States counsel in the District Court and in the United States Court of Appeals for the District of Columbia Circuit. The district court rejected Russia's motion under the FSIA to dismiss Chabad's claim to recover the "Archive" seized by the Red Army. It sustained Russia's motion under the FSIA to dismiss Chabad's claim to the "Library." *Agudas Chasidei Chabad of United States v. Russian Federation*, 466 F. Supp. 2d 6 (D.D.C. 2006). Russia appealed the denial of its motion regarding the "Archive" to the District of Columbia Circuit, and Chabad cross-appealed from the dismissal of its claim for the "Library."

3

The court of appeals ruled in favor of Chabad with regard to both the "Archive" and the "Library." *Agudas Chasidei Chabad of United States v. Russian Federation*, 528 F.3d 934 (D.C. Cir. 2008). Following remand of the case to the district court, Russia withdrew from the litigation, claiming that the court in which had theretofore litigated vigorously lacked jurisdiction.

Chabad then proceeded to present evidence to sustain entry of a default judgment. On July 30, 2010, the district court concluded that Chabad had "met its burden of proving a *prima facie* case against defendants" and entered a default judgment. The district court thereafter directed that an Order To Show Cause why they should not be held in contempt be served on the defendants. On January 16, 2013, the district court held the defendants in contempt of court and entered "civil contempt sanctions against the defendants in the amount of $50,000 per day until defendants comply" with the court's order.

The accumulated total due to date for Russia's disobedience and contempt of the district court's order exceeds 15 million dollars ($15,000,000). Chabad intends to seek enforcement of the contempt sanction against assets that are subject to attachment and execution in the United States or abroad. Chabad intends to discover assets that might be subject to attachment and execution by standard discovery procedures in United States courts.

4

This Court's decision on the legal issue presented in this case could affect Chabad's ability to find assets that might be attached in order to coerce compliance with the district court's order in *Chabad v. Russian Federation*.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Chabad's case differs from the case that is now before the Court in two major respects that are relevant in determining both the outcome and scope of any decision issued in this case.

*First*, Chabad and many other past, current and potential plaintiffs in lawsuits against foreign states lack the resources that have enabled the respondent in this case to pursue enforcement of judgments against petitioner Argentina. Individual plaintiffs or entities like Chabad that are non-profit and are dependent upon voluntary charitable contributions will only be able to enforce judgments against foreign sovereigns that can litigate exhaustively if the plaintiffs can use efficient discovery procedures to find a foreign state's assets that are accessible under the FSIA. Limiting discovery as petitioner Argentina requests and as the Seventh Circuit has held would severely impair successful plaintiffs' efforts to enforce district court judgments.

*Second*, unlike the respondent NML, Chabad is not seeking to enforce a money judgment for damages. Chabad and similarly situated plaintiffs –

5

including individuals who have filed FSIA lawsuits to recover artworks and other property seized during the Holocaust – are attempting to enforce judicial injunctions that direct a foreign state to return property that was taken in violation of international law. The traditional means of securing compliance with judicial commands is to impose civil contempt fines for continued deliberate non-compliance. Finding a foreign state's assets that might be attached and executed upon in order to coerce compliance with an injunctive order is essential to upholding the dignity and efficacy of the judiciary and its orders. Restricting discovery that would enable a plaintiff to implement the command in a court order is, we submit, damaging not only to the particular plaintiff but also to the respect that should be accorded to the judicial process.

We note in this *amicus* brief that if petitioner Argentina's legal position is approved by this Court and the decision of the Court of Appeals for the Second Circuit is reversed, district court injunctive orders against foreign states are likely to become dead letters. Foreign states will be able to disobey and disregard considered judgments of American courts. The provisions of the FSIA that authorize the entry of orders restoring ownership of property taken in violation of international law will effectively become nugatory if full traditional discovery is restricted and a plaintiff cannot use discovery procedures to find a foreign state's assets, including property that the foreign state is holding outside the United States.

6

The Russian Federation has been a paradigmatic contemnor in the litigation initiated by Chabad. It retained highly qualified American counsel to argue that Chabad's claims in United States courts should be dismissed under the FSIA. When it was unsuccessful in its attempt to end the lawsuit under American law, it thumbed its nose at the American judicial system and walked off the playing field with the spurious claim that American courts never had any jurisdiction to consider Chabad's claims that Russia is illegally holding Chabad's property.

After proceedings that amply established the factual validity of Chabad's claims to both its "Archive" and its "Library," the district court entered an injunction ordering Russia to return Chabad's property that had been taken in violation of international law. It is undisputed that Russia deliberately disobeyed that order. The district court properly took the steps that any American court would routinely take if a party to litigation refused contumaciously to comply with a judicial command. The court entered an order imposing a monetary daily fine for future noncompliance.

Russia has continued for more than one year deliberately to disobey the district court's order. Chabad must now take meaningful steps to enforce the order and demonstrate to Russia that the American court process cannot be blithely ignored. The rule of law that petitioner Argentina is seeking from this Court would effectively close off Chabad's most realistic and promising avenue for

7

securing compliance with the district court's order. After it terminated its participation in litigation with Chabad, Russia and the Russian governmentally controlled agencies that Chabad has sued may well have concealed assets that they held in the United States and removed from within the borders of the United States any property "used for a commercial activity in the United States." If – as petitioner Argentina contends in this Court – the FSIA bars plaintiffs who hold valid FSIA judgments from invoking traditional acceptable discovery procedures to find hitherto unidentified assets of a foreign state in the United States or in foreign countries, foreign sovereigns can readily evade orders to return property validly issued by district courts under the FSIA.

## ARGUMENT

## I.

### THE FSIA CONTEMPLATES THAT DISTRICT COURTS WILL ISSUE ENFORCEABLE INJUNCTIONS DIRECTING FOREIGN STATES TO RETURN PROPERTY TAKEN IN VIOLATION OF INTERNATIONAL LAW

The FSIA authorizes lawsuits against foreign sovereigns by plaintiffs claiming "rights in property taken in violation of international law" if the property is located in the United States and, if the property is not "present in the United States," whenever "such property is owned or operated by an

8

agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3). Chabad established the statutory preconditions to the district court's jurisdiction over Chabad's claims to property that Russia is now holding within its own borders. See *Agudas Chasidei Chabad of United States v. Russian Federation*, 466 F. Supp. 2d 6 (D.D.C. 2006), *aff'd in relevant part*, 528 F.3d 934 (D.C. Cir. 2008).

A district court judgment enforcing a plaintiff's right to property held by a foreign state and located in that foreign state will, of necessity, include an order to the foreign state to return the property to the plaintiff. That was the form of the order sought and obtained by Chabad against Russia with regard to the Chabad "Library" and "Archive." Such an order against a non-governmental defendant is customarily enforced, if the defendant refuses to comply, with a contempt sanction imposing a financial penalty for future disobedience.

This Court held in *International Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 829 (1994), that "a per diem fine imposed for each day a contemnor fails to comply with an affirmative court order" is analogous to "coercive imprisonment" for contempt. The same principle applies to a contempt sanction imposed against a foreign state. If a district court order is to have "teeth" and if the dignity of the court issuing such an order is to be upheld, a fine for continued failure to comply with

9

the court order must be realistically collectible. See *Securities and Exchange Comm'n v. Bilzerian*, 613 F. Supp. 2d 66, 70 (D.D.C. 2009) ("Civil contempt, unlike the punitive remedy of criminal contempt, is designed to coerce compliance with a court order or to compensate a complainant for losses sustained.")

## II.

## THE PROSPECT THAT A DAILY CIVIL PENALTY FOR CONTEMPT WILL BE COLLECTIBLE IS ESSENTIAL FOR MEANINGFUL ENFORCEMENT OF MANDATORY INJUNCTIONS

The leading treatise on Federal Civil Procedure notes that "[a] court's ability to punish contempt is thought to be an inherent and integral element of its power and has deep historical roots." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2960 (2d ed. 1995). An early observation by this Court in *United States v. Hudson & Goodwin*, 7 Cranch 32, 34 (1812), was the following: "Certain implied powers must necessarily result to our Courts of justice from the nature of their institution . . . . To fine for contempt – imprison for contumacy – enforce the observance of order, &c., are powers which cannot be dispensed with in a Court, because they are necessary to the exercise of all others."

This was reaffirmed in *Ex Parte Robinson*, 86 U.S. 505, 510 (1873), with the observation that "[t]he

10

power to punish for contempt is inherent in all courts." The Court added, "The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power." *Id.* See also *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991); *Shillitani v. United States*, 384 U.S. 364, 370 (1966).

Enforceability of injunctions by means of contempt was deemed in *Michaelson v. United States ex rel. Chicago*, 266 U.S. 42, 65 (1924), to be so "essential to the administration of justice" that it can be neither "abrogated nor rendered practically inoperative." The Court's opinion in *Michaelson* implied that Congress lacked power to limit a court's authority in "cases of failure or refusal to comply affirmatively with a decree – that is to do something which a decree commands – ***which may be enforced by coercive means*** or remedied by purely compensatory relief." 266 U.S. at 66 (emphasis added).

Congress has, to be sure, enacted procedural safeguards for contempt proceedings (*e.g.*, 18 U.S.C. § 401), but it has never sought to prevent the enforceability of judicially entered injunctions. The Court of Appeals for the District of Columbia Circuit has noted that "there is not a smidgen of indication in the text of the FSIA that Congress intended to limit a federal court's inherent contempt power." *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 637 F.3d 373, 377 (D.C. Cir. 2011). And this Court has ensured that court orders, even if

11

ultimately vacated on plenary consideration, would be respected and obeyed. See *United States v. United Mine Workers of America*, 330 U.S. 258, 293-294 (1947).

It is highly improbable that Congress enacted provisions in the FSIA that granted enforceable rights to plaintiffs with claims to property held in foreign countries but deliberately withheld or restricted procedures and means by which judicial orders vindicating such claims could be enforced. Restricting ordinary discovery and barring disclosure of property of a foreign state that could potentially be attached in aid of execution would frequently have the effect of eviscerating a court order directing return of unlawfully held property.

## III.

## VICTIMS OF HOLOCAUST PROPERTY SEIZURES THAT VIOLATED INTERNATIONAL LAW WOULD BE DENIED JUDICIAL REMEDIES IF ARGENTINA'S CONTENTION IS SUSTAINED

Families of Jewish victims of the Holocaust whose valuable property, including artworks, was taken in violation of international law have pursued, and are currently pursuing, claims for return of such illegally seized property. See, *e.g.*, *Republic of Austria v. Altmann*, 541 U.S. 677 (2004); *Cassirer v. Thyssen-Bornemisza Collection Foundation*, 737 F.3d 613 (9th Cir. 2013); *de Csepel v. Republic of Hungary*, 714 F.3d 591 (D.C. Cir. 2013); *Cassirer v.*

12

*Kingdom of Spain*, 616 F.3d 1019 (9th Cir. 2010);
*Garb v. Republic of Poland*, 440 F.3d 579 (2d Cir.
2006); *Whiteman v. Dorotheum GMBH & CO KG*,
431 F.3d 57 (2d Cir. 2005); *Abelesz v. Magyar
Nemzeti Bank*, 692 F.3d 661 (7th Cir. 2012); *Abelesz
v. OTP Bank*, 692 F.3d 638 (7th Cir. 2012); *de Csepel
v. Republic of Hungary*, 808 F.Supp.2d 113 (D.C. Cir.
2011); *Holocaust Victims of Bank Theft v. Magyar
Nemzeti Bank*, 807 F.Supp.2d 689 (N.D. Ill. 2011).

District courts with jurisdiction under the FSIA
may direct that these properties be returned. The
plaintiffs will have to rely on the availability of civil
contempt remedies to coerce compliance by
recalcitrant foreign states or their agencies. The
plaintiffs in such cases do not have the resources
available to NML, the respondent in the case
presently before this Court. They will have to
discover assets held in the United States or abroad
through comparatively less expensive available
discovery. If, as petitioner Argentina contends and
as the Seventh Circuit held in *Rubin v. Islamic
Republic of Iran*, 637 F.3d 783, 799 (7th Cir. 2011),
*cert. denied*, 133 S. Ct. 23 (2012), discovery may only
be utilized to assist in execution on previously
identified assets, there is little realistic prospect that
court orders resisted by foreign states will ever be
implemented.

13

## IV.

## THE LANGUAGE OF THE FSIA DOES NOT SUPPORT ARGENTINA'S CONTENTION THAT DISCOVERY MAY NOT BE DIRECTED TO FINDING ASSETS LOCATED OUTSIDE THE UNITED STATES

In Argentina's Petition for Certiorari (pp. i, 22-26), and in its Brief on the Merits (pp. 32-39), as well as in the Government's *Amicus Curiae* Brief on the Merits (pp. 12-15), much emphasis is placed on the possibility that broad discovery will seek to find property owned by a foreign state that is located outside the United States. Argentina and the Government contend that the FSIA bars attachment and execution on a foreign state's property located abroad.

The "plain language" of the FSIA does not, however, support the broad immunity from discovery of foreign-located property that petitioner Argentina advocates.

*First*, no provision of the FSIA entitles individuals or entities located in the United States to refuse to comply with lawful subpoenas seeking discovery of information needed to enforce a court's judgment under the FSIA.

*Second*, Sections 1609, 1610(a), and 1610(b) define "property in the United States" that is "immune" and that "shall not be immune . . . from

14

attachment in aid of execution." By the well-established principle of *inclusio unius est exclusio alterius*, these provisions do not apply to property that is **not** "in the United States." Such property is beyond the scope of the FSIA. Whether a plaintiff with a judgment from a United States court may execute on property located outside the United States belonging to a foreign state will depend on the law of the jurisdiction where execution is sought. Hence discovery of property located in that jurisdiction is permissible under the discovery standards of Rule 69(a)(2) of the Federal Rules of Civil Procedure.

Section 1610(a)(3) also presupposes that a plaintiff seeking return of property located outside the United States may obtain execution of a judicial decree directing the return of such illegally seized property. That subsection authorizes execution of "a judgment establishing rights in property which has been taken in violation of international law" with no limitation relating to the current location of such property. Unlike the introductory language of Section 1610 – which declares that certain property "in the United States" is not immune from attachment in aid of execution – subsection (3) does not state that the property which is the subject of the judgment must be "in the United States."

Since subsection (3) authorizes execution of a "judgment establishing rights in property which has been taken in violation of international law" even if the taken property is located within the geographical

15

borders of the foreign state that is the defendant in the action, there must be some meaningful realistic means of achieving execution of such a judgment. A plaintiff holding a civil contempt judgment that imposes a penalty on a foreign state for its contumacious refusal to comply with a mandatory injunction should surely be permitted to seek, through routine discovery, assets that might be seized to coerce compliance with the court's order.

## CONCLUSION

For the foregoing reasons, this Court should affirm the decision and judgment of the United States Court of Appeals for the Second Circuit.

|  |  |
|---|---|
| | Respectfully submitted, |
| *Of Counsel* | NATHAN LEWIN |
| STEVEN LIEBERMAN | *Counsel of Record* |
| ROBERT P. PARKER | ALYZA D. LEWIN |
| ROTHWELL, FIGG, | LEWIN & LEWIN, LLP |
| ERNST & MANBECK, PC | 1775 Eye Street, NW |
| 607 14th Street, NW, | Suite 850 |
| Suite 800 | Washington, DC 20006 |
| Washington, DC 20005 | (202) 828-1000 |
| (202) 783-6040 | nat@lewinlewin.com |
| | |
| April 2, 2014 | *Attorneys for Amicus Curiae* |