**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AGUDAS CHASIDEI CHABAD** | ) |
| **OF UNITED STATES**, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:05-cv-01548-RCL |
| | ) |
| **RUSSIAN FEDERATION,** *et al.*, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## STATEMENT OF INTEREST OF THE UNITED STATES

Pursuant to 28 U.S.C. § 517,[1] the United States submits this Statement of Interest to set forth for the Court the United States' interest with respect to recent efforts by the Plaintiff, Aguda Chasidei Chabad of the United States ("Chabad"), to seek discovery about Russian assets from certain U.S. financial institutions via subpoena. The United States greatly appreciates the Court's consideration of its views in this matter.

The United States remains committed to its position that the collection of books and manuscripts at issue in this litigation (the "Collection") should be transferred to Chabad. *See* Statement of Interest of the United States, *Chabad v. Russian Federation*, Case No. 1:05-cv-01548-RCL (D.D.C.), ECF No. 111, at 1-2. To this end, the United States has engaged in extensive diplomatic efforts to resolve this dispute over the years, and it expects to continue such efforts.

---

[1] Section 517 provides that "[t]he Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

It is the United States' position that the recent actions taken by Chabad in this litigation, including third-party discovery seeking information about Russian assets, are contrary to the goal of resolving this dispute and will harm not only further diplomatic efforts to do so but also the foreign policy interests of the United States.  Nor are the discovery actions now being pursued by Chabad permitted by law.  As the Supreme Court recently observed in *Republic of Argentina v. NML Capital, Ltd.*, a subpoena seeking "information that could not lead to executable assets in the United States or abroad" would not lead to information that is relevant to execution and is therefore likely unenforceable.  134 S. Ct. 2250, 2257 (2014).  The subpoenas recently issued by Chabad fall squarely within this category.  As set forth further below, the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602-11, precludes attachment of Defendants' assets here in the United States as part of an effort to enforce a monetary sanctions judgment, and, moreover, any such attachment efforts abroad would not be permitted overseas.  Chabad therefore should not be permitted to take discovery into assets it cannot attach.  And allowing such discovery could cause significant harm to the foreign policy interests of the United States.  Accordingly, Chabad's recent efforts to obtain discovery about Russian assets in an effort to enforce its sanctions judgment should not be permitted.

## BACKGROUND

This case concerns Chabad's efforts to obtain the Collection from the Defendants, the Russian Federation, the Russian Ministry of Culture and Mass Communication, the Russian State Library, and the Russian State Military Archive (collectively "Russia").  The Collection consists of two sets of materials:  (1) a set of books and manuscripts

seized at the time of the Bolshevik Revolution and now held by the Russian State Library; and (2) a set of manuscripts of religious teachings seized by Nazi Germany during the 1941 invasion of Poland, which was subsequently taken by the Soviet Red Army, and is now held at the Russian State Military Archive.

After an initial appearance to contest the Court's jurisdiction, Russia withdrew from further participation in this litigation. *See* Mot. to Withdraw Appearance as Counsel of Record, ECF No. 72, Ex. 1. The Court then entered a default judgment against Russia and directed it to transfer the Collection to Chabad (the "specific performance order"). Order Grant. Pl.'s Mot. for Entry of Default J. Against All Ds., ECF No. 80. In an effort to compel Russia's compliance, Chabad asked the Court to find Russia in contempt and impose monetary contempt sanctions against it in the form of a "fine payable to the Plaintiff" until the Collection is transferred to Chabad. Pl.'s Mot. for Civil Contempt Sanctions, Proposed Order, ECF No. 92-2 at 2. At the Court's invitation, the United States submitted a Statement of Interest opposing the entry of a sanctions order against Russia, noting that the FSIA does not authorize the Court to seek to compel Russia's compliance with an order directing the transfer of property that it holds within its own borders. Statement of Interest of the United States, ECF No. 111. The United States also informed the Court of its view that civil contempt sanctions would "risk damage to significant foreign policy interests" while simultaneously undermining the possibility of an amicable diplomatic resolution to the dispute. *Id.* On January 16, 2013, the Court entered an order for civil contempt sanctions, fining Russia $50,000 per day until it complied with the Court's order to transfer the Collection to Chabad (the "sanctions order"). Mem. Op. on Contempt Sanctions, ECF No. 116.

One year later, Chabad filed a motion for an interim judgment of accrued sanctions. Pls.' Mot. for Interim J. of Accrued Sanctions, ECF No. 127. The United States filed a Statement of Interest opposing entry of an interim judgment on the same grounds that it opposed entry of the sanctions order. Statement of Interest of the United States, ECF No. 134. The Court granted Chabad's motion on September 10, 2015 and entered an interim judgment, finding that $43.7 million had accrued in daily fines since the sanctions order was entered (the "sanctions judgment"). *See* Order Granting Mot. for Order for Interim J. of Accrued Sanctions, ECF No. 144.

Chabad has taken several steps in recent months to enforce the Court's sanctions order and judgment. In April 2015, it served a subpoena *duces tecum* and *ad testificandum* on Sberbank CIB, USA ("Sberbank USA").[2] ECF No. 140. On June 26, 2015, Sberbank USA filed a motion for a protective order seeking to preclude Chabad from taking the deposition of one of its officials. Non-Party Sberbank CIB USA Inc.'s Mot. for Protective Order, *Chabad v. Russian Federation*, Misc. Case No. 15-01153-RCL (D.D.C.), ECF No. 1. That motion was originally filed in the Southern District of New York, which subsequently transferred the matter to this Court. *See* Order Granting Mot. to Transfer Case, ECF No. 18. The Court stayed its consideration of that motion upon receiving notice that Chabad and Sberbank USA had agreed to a deposition of a Sberbank USA official pursuant to Federal Rule of Civil Procedure 30(b)(6). *See* Order Staying a Decision on the Pending Mot. for Protective Order, ECF No. 36.

---

[2] Chabad also served a subpoena on a public relations agency called Ketchum, Inc., *see* Mots. Hr'g Tr. 12:8-14, Aug. 20, 2015 (attached as Exhibit C), and, in response to a request made pursuant to the Freedom of Information Act, has received documents from the Office of Foreign Asset Control within the Department of Treasury, *see* Hr'g Tr. 12:15-24, presumably to assist its efforts to locate and attach Russian property located in the United States.

In September 2015, Chabad filed a Proposed Protective Order purporting to govern the dissemination of any information it receives from third parties from its discovery efforts.  *See* Proposed Protective Order, *Chabad v. Russian Federation*, Case No. 1:05-cv-01548-RCL (D.D.C.), ECF No. 146.  The United States filed a Statement of Interest raising several objections to Chabad's proposed protective order, *see* Statement of Interest of the United States, ECF No. 149, and Chabad has since filed a revised proposed protective order, *see* Pl.'s Mot. for a Protective Order and Resp. to the Government's Statement of Interest, ECF No. 150.

Most recently, on December 4, 2015, Chabad issued subpoenas *duces tecum* and *ad testificandum* on five financial institutions.[3]  *See* Subpoenas *Duces Tecum* and *Ad Testificandum* served on JPMorgan Chase, Citigroup, Goldman Sachs, Deutsche Bank, and Computershare (attached as Exhibit A).  The subpoenas seek information about accounts held by these entities both in the United States and worldwide on behalf of the Russian Federation as well as various Russian governmental entities, government-connected entities, and individuals, including Russian President Vladimir Putin.  *Id*. at 6.  In addition, the subpoenas request documents concerning accounts and assets of entities and individuals that have been sanctioned under the United States' Russian/Ukrainian sanctions program.  *Id*.  The subpoenas also request deposition testimony about these same issues.  *Id*. at 7-8.  Although the subpoenas state that the deadline to produce documents was December 22, 2015 and set the depositions for January 14, 2016, the United States' understanding is that, to date, no documents have been produced and no

---

[3] Consistent with this Court's order, *see* Order Directing Pl. to Give Notice to the U.S. Department of Justice, ECF No. 145, Chabad provided the United States with same-day notice that the subpoenas had been issued.

depositions have taken place.

Finally, on January 27, 2016, Chabad registered its sanctions judgment in the

Southern District of New York. *See Agudas Chasidei Chabad of the United States v.*

*Russian Federation, et al.*, 1:16-mc-00040-Pl (S.D.N.Y.), ECF No. 1.

## DISCUSSION

The discovery now being sought by Chabad about Russian assets is improper

because it would not lead to the identification of any executable assets and thus is

irrelevant as a matter of law.  Moreover, efforts toward enforcement of monetary

contempt sanctions, such as the restraint of funds, even temporarily, could cause

significant harm to the foreign policy interests of the United States.

**A.** **Discovery about Russian assets would not lead to the identification of any executable assets and is therefore improper**

Discovery about Russian assets for purposes of enforcing the sanctions judgment

is impermissible because Chabad is unable to attach any Russian assets held in the United

States or abroad to satisfy that judgment, thereby rendering information about those

assets irrelevant to post-judgment proceedings.  A party is permitted to obtain through

discovery only information that is "relevant" to its claim or defense.[4]  Fed. R. Civ. P.

---

[4] Chabad also bears the burden of showing that the non-defendant Russian entities and individuals about which it seeks information are the alter egos of the four Russian Defendants, or of showing that the assets of the non-defendants could otherwise be used to satisfy the sanctions judgment. *See First Nat'l City Bank v. Banco para el Comercio Exterior de Cuba*, 462 U.S. 611, 626-28 (1983) (holding that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such" and that the FSIA does "not permit execution against the property of one agency or instrumentality to satisfy a judgment against another" unless the plaintiff overcomes that presumption).  This presumption of execution immunity afforded to distinct government agencies and instrumentalities flows from "[d]ue respect for the actions taken by foreign sovereigns and for principles of comity between nations." *Id.* at 626-27; *see also SerVaas v. Iraq*, No. 14-385 (2d Cir.),

26(b)(1); *see also* Fed. R. Civ. P. 69(a)(2) (allowing a judgment creditor to seek discovery "[i]n aid of the judgment or execution" but only "as provided in these rules or by the procedures of the state where the court is located").  As the Supreme Court has recognized, "information that could not possibly lead to executable assets is simply not 'relevant' to execution in the first place."  *NML Capital*, 134 S. Ct. at 2257 (2014). Subpoenas seeking information about a foreign sovereign's assets that are immune from attachment should therefore not be enforced.  *See id.*

Here, Chabad cannot execute against any Russian assets because (1) U.S. law precludes the enforcement of monetary contempt sanctions against a foreign state and (2) such contempt sanctions cannot be enforced outside of the United States. Accordingly, Chabad should not be permitted to seek discovery into Russian assets which, as a categorical matter, it is unable to attach.

1.   U.S. law does not authorize enforcement of monetary contempt sanctions against a foreign state

Chabad should not be permitted to take discovery about Russian assets located in the United States because the FSIA does not authorize attachment of those assets for purposes of satisfying the sanctions judgment.  The FSIA provides the sole and exclusive framework for obtaining and enforcing judgments against a foreign state in United States courts.  *See Arg. Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434-435 (1989).  "After the enactment of the FSIA, the Act—and not the pre-existing common law—indisputably governs the determination of whether a foreign state is entitled to

---

U.S. Amicus Br., Sept. 9, 2014, at 13-14 (explaining that, in the absence of any threshold showing that this presumption should be disregarded, discovery into the assets of separate foreign government entities offends ordinary relevance principles, and is particularly problematic in light of the comity, reciprocity, and foreign policy concerns implicated in this context).

sovereign immunity." *NML Capital*, 134 S. Ct. at 2256 (quoting *Samantar v. Yousuf*, 560 U.S. 305, 313 (2010)).

A foreign state's property located in the United States is immune from attachment, arrest, or execution unless one of the narrow exceptions enumerated in the FSIA apply. *See* 28 U.S.C. § 1609; §§ 1610-11 (listing exceptions). The FSIA "explicitly contemplates that a court may have jurisdiction over an action against a foreign state and yet be unable to enforce its judgment unless the foreign state holds certain kinds of property subject to execution," *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, 637 F.3d 373, 377 (D.C. Cir. 2011). Indeed, this Court previously has noted that there is a distinction between the imposition of a sanctions order and a court's ability to *enforce* such an order, observing that the latter "is carefully restricted by the FSIA." *See* Mem. Op. on Contempt Sanctions, ECF No. 116 at 6; *see also FG Hemisphere*, 637 F.3d at 377 ("[I]t is not anomalous to divide . . . the question of a court's power to impose sanctions from the question of a court's ability to enforce that judgment through execution.").

The limited nature of execution immunity under the FSIA reflects a deliberate policy choice on the part of Congress, which in enacting the FSIA "was primarily codifying pre-existing international and federal common law." *See Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1234 (2d Cir. 1995). "Prior to the enactment of the FSIA, the United States gave absolute immunity to foreign sovereigns from the execution of judgments. This rule required plaintiffs who successfully obtained a judgment against a foreign sovereign to rely on voluntary repayment by that State." *Autotech Tech. LP v. Integral Research & Dev. Corp.*, 499 F.3d 737, 749 (7th Cir. 2007);

*see also De Letelier v. Republic of Chile*, 748 F.2d 790, 799 (2d Cir. 1984) (noting that

pre-FSIA practice "left the availability of execution totally up to the debtor state").  The

narrow exceptions to execution immunity further reflect Congress' awareness that, "at the

time the FSIA was passed, the international community viewed execution against a

foreign state's property as a greater affront to its sovereignty than merely permitting

jurisdiction over the merits of an action."  *Conn. Bank of Commerce v. Republic of

Congo*, 309 F.3d 240, 255-56 (5th Cir. 2002).[5]

      None of the exceptions to execution immunity set forth in the FSIA permit

execution against Russian assets for purposes of satisfying the sanctions judgment;

indeed, absent a specific waiver of immunity by a foreign state, it is doubtful that *any*

order of monetary contempt sanctions could fall within any of the exceptions.  Russia has

not waived the immunity of its property from execution to allow enforcement of a

---

[5] The legislative history of the FSIA echoes this same point.  According to a House
Report accompanying the legislation, a court could, with respect to a foreign state subject
to jurisdiction under the statute,

> order an injunction or specific performance.  But this is not determinative
> of the power of the court to enforce such an order.  For example, a foreign
> diplomat or official could not be imprisoned for contempt because of his
> government's violation of an injunction.  *See* 22 U.S.C. § 252.  *Also a fine
> for violation of an injunction may be unenforceable if immunity exists
> under sections 1609-1610.*

H.R. Rep. No. 94-1487, at 6622 (1976) (emphasis added).

    Moreover, the legislative history reinforces the conclusion that exceptions to
execution immunity are limited and exclusive in nature.  In 1988, Congress ultimately
rejected proposed amendments to the statute that would have allowed for significantly
greater enforcement rights against foreign state property due to concerns about causing
friction in U.S. foreign affairs, causing foreign investments in the United States to
decline, and foreign states taking reciprocal actions against U.S. property held abroad.
*See* Foreign Sovereign Immunities Act Amendments, Hearing on H.R. 3763, Before the
Senate Judiciary Committee, S. Hr'g. 100-1061, 100th Cong., 2d Sess. 17, 39, 47, 52,
105-06, 108 (Oct. 5, 1988).

sanctions judgment, rendering the exception at 28 U.S.C. § 1610(a)(1) inapplicable.

Likewise, the sanctions judgment did not result from a claim based on commercial

activity, *see* § 1610(a)(2), is not an order confirming an arbitral award, *see* § 1610(a)(6),

did not relate to a claim brought pursuant to the statute's terrorism exception to

jurisdictional immunity, *see* § 1610(a)(7), and enforcement does not involve efforts to

recover under an insurance policy, *see* § 1610(a)(5).  Nor do the exceptions found at

§ 1610(a)(3)-(4) apply:  those concern only execution of judgments establishing rights in

certain types of property.  The sanctions judgment at issue here, as to which Chabad

seeks discovery in aid of execution, while resulting from Russia's non-compliance with a

default judgment ordering it to return certain property to Chabad, does not in and of itself

grant any property rights to Chabad.  Instead, it simply sanctions Russia for its non-

compliance with the Court's specific performance order.

Accordingly, none of the FSIA exceptions to execution immunity permit

attachment of Russian assets in the United States.  *See Af-Cap, Inc. v. Republic of Congo*,

462 F.3d 417, 428 (5th Cir. 2006), *cert. dismissed*, 549 U.S. 1275 (2007) (noting that

§§ 1610-11 "do not present a situation in which the order [for monetary sanctions] could

stand").[6]  And because the FSIA precludes Chabad from being able to attach any Russian

assets located in the United States, discovery into these assets should not be permitted.

*See NML Capital*, 134 S. Ct. at 2257; *id.* at 2259 (Ginsburg, J., dissenting) (summarizing

---

[6] The D.C. Circuit's decision in *FG Hemisphere* does not counsel otherwise.  Although
the court in that case upheld an order of monetary contempt sanctions against a foreign
state, its holding was narrow and focused on the limited question of whether the inherent
authority of a federal court to *impose* contempt sanctions had been entirely displaced by
the FSIA.  *See FG Hemisphere*, 637 F.3d at 377-80 ("We hold today only that the FSIA
does not abrogate a court's inherent power to impose contempt sanctions on a foreign
sovereign, and that the district court did not abuse its discretion in doing so here.").

the majority's holding as prohibiting " inquiry into a foreign sovereign's property in the United States" where no immunity exception applies because such an inquiry does not satisfy the Rule 26(b)(1) relevancy requirement).

      2.     The enforcement of monetary sanctions against Russia would not be permitted overseas

Even assuming that it is appropriate for a litigant to use the U.S. legal system's discovery tools to locate extraterritorial assets of a foreign government to satisfy a judgment that is unenforceable in the United States, such discovery would be unwarranted in this case. Chabad should not be allowed to seek discovery through U.S. courts about Russian assets located abroad because attachment of those assets would be inconsistent with international practice. As the party seeking discovery, Chabad bears the burden of demonstrating that the information it seeks is relevant. *See Haynes v. Navy Fed. Credit Union*, 286 F.R.D. 33, 36 (D.D.C. 2012) ("Once a relevancy objection has been raised, the party seeking discovery must demonstrate that the information sought to be compelled is discoverable."). Chabad therefore must show that it would be permitted to execute on Russian assets located in other countries. International law and practice, however, do not support the imposition of penalties on foreign states for noncompliance with a court order, let alone permit litigants to take measures to enforce such penalties. Any effort by Chabad to attach Russian assets held abroad would be inconsistent with this widespread practice.

To the United States' knowledge, no foreign state has permitted enforcement of a sanctions judgment against property of another foreign state within the first state's territory. On the contrary, several countries have entered into international agreements affording foreign states broad grants of immunity or have enacted sovereign immunity

laws on their own which bar the imposition of civil contempt sanctions.  For example,

thirty-four states—including Russia—have signed or ratified the United Nations

Convention on Jurisdictional Immunities of States and Their Property.[7]  That Convention

states that "[a]ny failure or refusal by a State to comply with an order of a court of

another State enjoining it to perform or refrain from performing a specific act . . . shall

entail no consequences other than those which may result from such conduct in relation

to the merits of the case.  In particular, *no fine or penalty shall be imposed on the State* by

reason of such failure or refusal."  U.N. Convention on Jurisdictional Immunities of

States and Their Property, art. 24(1), G.A. res. 59/38, annex, Dec. 2, 2004, 44 I.L.M. 803

(2005) (emphasis added).  Although the Convention has not yet entered into force, many

of its immunity provisions, including Article 24, reflect current international norms and

practice, and Article 24 was uniformly supported by the member states that helped

negotiate the Convention.  *See* Int'l Law Comm'n, *Jurisdictional Immunities of States*

*and Their Property, Comments and observations received from Governments*, U.N.

GAOR Supp. No. 10, U.N. Doc. A/CN.4/410 (Feb. 17, 1988), *available at*

http://legal.un.org/ilc/documentation/english/a_cn4_410.pdf.  Similarly, the European

Convention on State Immunity prohibits all execution against the property of a

contracting state within the territory of another contracting state except where the former

has "expressly consented thereto in writing in any particular case."  European Convention

on State Immunity, Article 23 (E.T.S. No. 074) (entered into force on June 11, 1976).

---

[7] The thirty-four states are Austria, Belgium, China, the Czech Republic, Denmark,
Estonia, Finland, France, Iceland, India, Iran, Italy, Japan, Kazakhstan, Latvia, Lebanon,
Liechtenstein, Madagascar, Mexico, Morocco, Norway, Paraguay, Portugal, Romania,
the Russian Federation, Saudi Arabia, Senegal, Sierra Leone, Slovakia, Spain, Sweden,
Switzerland, Timor-Leste, and the United Kingdom.

Nine states have ratified this Convention.[8]  *Id.*

In addition to these multi-lateral immunity agreements, some foreign states have codified laws placing restrictions on the execution of property of a foreign state[9] and/or have enacted specific prohibitions on imposing sanctions on foreign sovereigns for failure to comply with an injunctive order.[10]  In total, more than forty states have

---

[8] Those states are Austria, Belgium, Cyprus, Germany, Luxembourg, Netherlands, Portugal, Switzerland, and the United Kingdom.

[9] Foreign states enacting such laws include Australia, *see* Foreign States Immunity Act 1985, § 30, *available at* http://www5.austlii.edu.au/au/legis/cth/consol_act/fsia1985288/s30.html; Canada, *see* State Immunity Act, R.S.C. 1985, c. S-18, § 11(1), *available at* http://laws-lois.justice.gc.ca/eng/acts/S-18/page-5.html#docCont; Israel, *see* Foreign States Immunity Law, 5769-2008, § 15(a), SH No. 2189, *available at* http://www.coe.int/t/dlapil/cahdi/Source/state_immunities/Israel%20Immunities%20January%202009.pdf; Singapore, *see* Singapore State Immunity Act 1979, § 15(2), *available at* http://statutes.agc.gov.sg/aol/search/display/view.w3p;ident=c8b9f6b1-19dc-4413-a9f2-3884421e71ed;page=0;query=DocId%3A1be1a8f7-0968-4fcc-ac26-39d3a51b7b70%20Depth%3A0%20Status%3Ainforce;rec=0#pr15-he-.; South Africa, *see* South African Foreign States Immunities Act 1981, § 14(1)(a), *available at* http://www.dfa.gov.za/chiefstatelawadvicer/documents/acts/foreignstatesimmunitiesact.pdf; and the United Kingdom, *see* State Immunity Act, 1978, c. 33, § 13(2), *available at* http://www.legislation.gov.uk/ukpga/1978/33.

[10] These foreign states include Australia, *see* Foreign States Immunities Act 1985, § 34, *available at* http://www5.austlii.edu.au/au/legis/cth/consol_act/fsia1985288/s34.html; Israel, *see* Foreign States Immunity Law, 5769-2008, § 15(b), SH No. 2189, p. 76, *available at* http://www.coe.int/t/dlapil/cahdi/Source/state_immunities/Israel%20Immunities%20January%202009.pdf; and Pakistan, *see* Pakistan State Immunity Ordinance, § 14, *available at* http://pakistancode.gov.pk/UY2FqaJw2-apaUY2Fqa-bZuY-sg-jjjjjjjjjjjj-con-7181. China, moreover, adheres to the theory of absolute immunity and thus does not permit any non-consensual lawsuits against a foreign sovereign regardless of the nature of the claim.  *See, e.g.*, Restatement (Fourth) of Foreign Relations Law of the United States, Sovereign Immunity, Council Draft No. 1 (Sept. 29, 2014) § 454 at 20 ("Some major trading states such as China, explicitly adhere to the absolute approach."), 25 ("China has recently reiterated that it adheres to the absolute approach, explaining its signature on the U.N. Convention as an effort to support international coordination."), *available at* https://www.ali.org/media/filer_public/dd/4c/dd4c26d1-2742-4beb-b4e43aaf854d73a4/sovereign_immunity_cd1.pdf.

affirmatively expressed support for a general prohibition on monetary contempt sanctions or non-consensual execution against property of foreign states, whereas no state has ever supported such an action, let alone permitted execution of monetary contempt sanctions to proceed.  Given this uniformity in international practice, any effort by Chabad to identify and attach Russian assets located in foreign states on the basis of this Court's sanctions judgment would find no support in international practice.  Consequently, Chabad should not be permitted to use discovery in this case—including the five subpoenas it issued in December 2015—to obtain information about any assets that Russia may hold abroad.

**B.     Attempts to enforce monetary contempt sanctions could have significant adverse consequences for U.S. foreign policy interests**

Not only would the discovery sought by Chabad be legally improper and irrelevant, but such enforcement efforts could have significant adverse consequences for the foreign policy interests of the United States.  These efforts implicate "particular question[s] of foreign policy," to which deference is owed to "the considered judgment of the Executive."  *See Republic of Austria v. Altman*, 541 U.S. 677, 702 (2004); *Sosa v. Alvarez-Machain*, 542 U.S. 692, 733 n.21 (2004) (noting that "there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy").  Indeed, this Court recently acknowledged "the serious impact which the outcome of this case could have on the foreign policy interests of the United States," *see* Order Soliciting Views of the United States, *Chabad v. Russian Federation*, Misc. Case No. 15-01153-RCL (D.D.C.), ECF No. 27, and the discovery sought by Chabad, as well as any other enforcement efforts, could have significant adverse consequences for the foreign policy interests of the United States.

14

Judicial seizure of a foreign state's property "may be regarded as 'an affront to its dignity and may affect our relations with it.'" *Republic of Phil. v. Pimentel*, 553 U.S. 851, 866 (2008) (quoting *Republic of Mex. v. Hoffman*, 324 U.S. 30, 35-36 (1945)). Indeed, the international community views "execution against a foreign state's property as a greater affront to its sovereignty than merely permitting jurisdiction over the merits of an action." *Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d at 255-56. Any restraint of the assets of a foreign state, its agencies or instrumentalities, or its officials, in and of itself, can reasonably be expected to cause disruption to the activities of the entities whose assets are at issue and result in immediate and significant interference in U.S. relations with that foreign state.

Permitting Chabad to proceed with its present discovery efforts, or any other effort to enforce this Court's judgments, would also result in other more specific harms. Such efforts are antithetical to the goal of securing the return of the Collection to Chabad, open the doors to reciprocal measures being taken against the United States by Russia, and would be out of step with international practice such that they could cause considerable friction with other foreign governments.

This Court previously has noted the difference between the entering of a sanctions order against a foreign state and enforcement of such an order. Mem. Op. on Contempt Sanctions, ECF No. 116 (observing that "the latter is carefully restricted by the FSIA"); *see also* Mem. Op. on Pl.'s Mot. for Interim J., ECF No. 143, at 3-5. Absent any restriction placed on Chabad, the enforcement stage of this proceeding is imminent. As noted above, on January 27, 2016, Chabad registered its interim judgment for $43.7 million in sanctions accrued in the Southern District of New York, which positions

Chabad to take immediate steps in that jurisdiction to enforce the sanctions order, including steps that do not require any further involvement of this Court.  Under New York law, a judgment creditor such as Chabad is able to issue a restraining notice to a judgment debtor that prevents the debtor from transferring up to twice the judgment amount for as long as one year.  *See* N.Y. Civ. Practice Law and R. § 5222(a)-(b).  The process for issuing a restraining notice is similar to that for issuing a subpoena and does not require further litigation.  *Id*.  Thus, if Chabad were to obtain information about accounts held in the United States by any of the entities or individuals listed in the subpoenas, it may attempt to issue unilaterally a retraining notice temporarily freezing the transfer of money from such accounts.  Given the broad sweep of the subpoenas, it appears Chabad could seek to restrain accounts belonging not only to the Defendants but also to a wide array of Russian government instrumentalities, government officials, non-governmental entities, and Russian individuals that have no involvement in this litigation.[11]

---

[11]To be sure, an account holder in receipt of a restraining notice would have grounds to seek to have the restraint invalidated.  For instance, the FSIA requires a court to make a determination—*sua sponte*, if necessary—that foreign state property is not immune before any attachment or enforcement can take place.  *See* 28 U.S.C. §§ 1609, 1610(a), (c) (creating presumption of immunity of foreign state property and requiring judicial review before permitting an order of attachment or execution); H.R. Rep. 94-1487, at 8, 27, 30 (explaining that allowing a judgment creditor to attach or execute on a foreign state's property simply by applying to the clerk or local sheriff "would not afford sufficient protection to a foreign state").  Any restraints unilaterally placed on a Russian account by Chabad, even if just temporary, would be improper without any prior judicial review as to whether such assets are not immune.  Depending on the circumstances, an account holder could also challenge a restraining notice issued by Chabad on the grounds that the account holder is not an "alter ego" of any of the Defendants in this case.  *See supra*, at 6, n.4.  Nevertheless, because a restraining notice may, as a practical matter, be issued without a court order, there is a risk that a Russian account holder's funds will have already been frozen temporarily—and the harm to U.S. foreign policy interests will have already been incurred—before the restraint could be vacated.

Several potential harms could flow from the restraint of Russian accounts or from Chabad taking any other type of enforcement action.  As an initial matter, discovery into assets of Russian entities and individuals, as well as other enforcement steps, will significantly hinder the ability of the United States to facilitate a negotiated transfer of the Collection to Chabad.  The United States has invested significant resources in diplomatic efforts over many years to resolve this dispute, and it continues to believe that out-of-court dialogue with Russia, rather than litigation, presents the best opportunity for ultimate resolution.  *See* Letter dated February 2, 2016, from Katherine D. McManus, Deputy Legal Adviser, United States Department of State, to Benjamin C. Mizer, Principal Deputy Assistant Attorney General, United States Department of Justice (Attached as Exhibit B).  Resolution of a long-standing dispute such as this, in which both sides have entrenched positions, typically takes an extended period of time, with small steps leading to larger breakthroughs and eventually resolution of the dispute.  *Id.* at 2.  By contrast, blunt coercive instruments, such as restraining Russian assets located in the United States, have the potential to delay resolution for years.  *Id.*  Indeed, Russian officials regularly have raised the instant litigation with their U.S. counterparts for several years, and they have done so with greater frequency, and at higher levels of the government, since this Court issued the sanctions order in 2013.  *Id.* at 3.  Russian officials have indicated in these discussions that they considered the sanctions to be a violation of Russian sovereignty and that Russia will not be pressured by such sanctions to enter into negotiations.  *Id.*  Rather than compelling Russia to return the Collection, enforcement actions are more likely to cause Russia to harden its position against transfer as well as lead to the further deterioration of U.S.-Russian relations overall.  *Id.*

Further enforcement efforts, including disclosure of Russian assets in the United

States, are likely to prompt Russia to take reciprocal measures against U.S. property and

to justify such measures by asserting that U.S. courts violated international law first.  As

the United States advised the Court during the hearing on Chabad's Motion for Interim

Judgment of Accrued Sanctions, *see* Mots. Hr'g Tr. 16:14-23, Aug. 20, 2015 (attached as

Exhibit C), the Russian Ministry of Culture and the Russian State Library filed a civil

lawsuit in Moscow against the United States and the Library of Congress seeking the

return of seven books from the Collection that were lent to the Library of Congress in

1994.  In May 2014, the Moscow court entered a judgment ordering the United States and

the Library of Congress to return the books and imposing a $50,000 fee for each day of

noncompliance.  *See* Decision, Case No. A40-82596/13, slip op. at 11 (Comm'l Ct. of

Moscow May 29, 2014) (Russ.) (attached as Exhibit D).  Furthermore, following this

Court's entry of the interim judgment in September 2015, the Russian government sent a

diplomatic note protesting that judgment and warning that any attempts to enforce it

would lead to reciprocal countermeasures.  *See* Ex. B at 3.  It is possible that Russia

might rely on recent legislation to take such steps.  In November 2015, Russian President

Vladimir Putin signed into law a bill concerning the jurisdictional immunity of foreign

states and their property in Russia.  Although the bill is generally consistent with the

restrictive view of sovereign immunity, as reflected in the FSIA and the U.N. Convention

on Jurisdictional Immunities of States and their Property, it contains a provision that

permits Russian courts to limit the immunities of a foreign state and that state's property

on the basis of reciprocity, depending on the treatment of Russia and Russian property in

that foreign state.  *See* Russian Federation Federal Law On the Jurisdictional Immunities

of Foreign States and the Property of Foreign States in the Russian Federation, art. 4 (attached as Exhibit E).

Finally, were the Court to permit the sweeping discovery into Russian property being sought by Chabad as part of its effort to enforce the sanctions judgment, it likely would cause friction with other foreign governments and could open the door to reciprocal orders being entered against the United States in foreign courts.  Any constraint placed on property of the Russian entities named in the subpoenas in the context of this case would isolate the United States in the international community and raise doubts about the United States' respect for other foreign sovereigns.  *See* Ex. B at 3. This friction could in turn embolden foreign courts to permit similar actions against the United States in foreign litigation.  *Id.*  The United States has a significant presence abroad, is frequently subject to litigation in foreign courts, and may on occasion decline to comply with orders entered by foreign courts for a variety of reasons.[12]  *Id.*  For example, the United States recently declined to produce post-judgment discovery about its assets after a default judgment was entered by a trial court in Spain.[13]  *Id.*  Because of this conduct, the Spanish court imposed monetary contempt sanctions and recommended that U.S. officials be subject to criminal proceedings.  *See Montasa-Montajes e Instalaciones v. Gobierno Estados Unido de America*, No. 177/1997, slip op. at 2, S. Juz.

---

[12] Examples of such occasions include where the United States deems the initial service of process to have been ineffective, where a particular U.S. law bans satisfaction of a judgment, and where the United States views the form of relief being sought as inappropriate against a sovereign, such as a request for an order seeking reinstatement of an employee at a diplomatic mission.  *See* Ex. B at 3.

[13] The United States did not receive service of the complaint in the action in a manner that complied with the requirements of customary international law and thus has taken the position that it is not subject to the court's jurisdiction in the case.

Prim. (Rota), May 24, 2014 (Spain) (attached as Exhibit F).  Although the trial court's

decision was reversed on appeal upon a finding that the United States enjoys immunity

from such sanctions,[14] *see Montasa-Montajes e Instalaciones v. Gobierno Estados*

*Unidos de America*, No. 177/1997, slip op. at 3, I Instancia n° 1 Rota, Jan. 22, 2015

(Spain) (attached as Exhibit G), other foreign courts might be less willing to extend

immunity if United State courts do not treat foreign states in like fashion.  Consequently,

allowing discovery here for the purpose of enforcing the monetary contempt sanctions for

Russia's non-compliance with the specific performance order risks creating an adverse

precedent that could subject the United States to similar adverse treatment abroad.  *See*

Ex. B at 3.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court

foreclose Chabad's recent efforts to obtain discovery about Russian assets via subpoena.


Dated: February 3, 2016                     Respectfully submitted,

                                            BENJAMIN C. MIZER
                                            Principal Deputy Assistant Attorney General

                                            ANTHONY J. COPPOLINO
                                            Deputy Branch Director
                                            Federal Programs Branch

                                             *s/ Nathan M. Swinton*
                                            NATHAN M. SWINTON (NY Bar)
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch

---

[14] The appellate court held that the United States was immune based on the prohibition on imposing fines contained in Article 24 of the U.N. Convention on Immunities from Jurisdiction.  *See* Ex. G.

20 Massachusetts Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 305-7667
Fax: (202) 616-8470
Email: Nathan.M.Swinton@usdoj.gov

*Counsel for the United States*