## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **AGUDAS CHASIDEI CHABAD OF UNITED STATES,** | |
| *Plaintiff,* | |
| **v.** | |
| **RUSSIAN FEDERATION; RUSSIAN MINISTRY OF CULTURE AND MASS COMMUNICATION; RUSSIAN STATE LIBRARY; and RUSSIAN STATE MILITARY ARCHIVE,** | **No. 1:05-cv-1548-RCL** |
| *Defendants.* | |

## MEMORANDUM OPINION

In 2010, plaintiff Agudas Chasidei Chabad of the United States ("Chabad") won a judgment against the defendants: the Russian Federation and three of its agencies and instrumentalities. This Court ordered the defendants to return a collection of religious and cultural materials that rightfully belong to Chabad. So far, the defendants have refused. In response, this Court imposed daily sanctions until they comply. And in 2015, it awarded Chabad an interim judgment on the accrued sanctions debt. Attempting to find assets of the Russian Federation to satisfy those sanctions, Chabad issued subpoenas on Tenex-USA Incorporated ("Tenam"), a Maryland corporation. Tenam is wholly but indirectly owned by Russia's state nuclear agency, Rosatom. Tenam filed a motion to quash those subpoenas, which this Court denied. Mem. Order, ECF No. 198. Though not a party to this case, Tenam then moved for partial vacatur of the underlying judgment under Federal Rule of Civil Procedure (FRCP) 60(b), which this Court also denied. Mem. Order, ECF No. 221. Tenam has appealed that decision to the D.C. Circuit. Not. of App., ECF No. 223. It now moves to stay discovery pending appeal. Mot., ECF No. 221. Chabad

1

filed a response to that motion, ECF No. 226, and Tenam a reply. ECF No. 227. With the briefing complete, the Court proceeds to the merits of Tenam's motion for stay. For the reasons discussed below, Tenam's request is **DENIED**.

## I.     BACKGROUND

The present discovery dispute stems from a lawsuit Chabad brought in 2004 against the Russian Federation, the Russian Ministry of Culture and Mass Communication (RMCMC), the Russian State Library (RSL), and the Russian State Military Archive (RSMA). Chabad, though now a non-profit corporation in New York, represents the longstanding Chabad Chasidic movement of Judaism. Chasidism emerged "in the mid-18th Century" in and around "the Russian Empire." *Agudas Chasidei Chabad of United States v. Russian Federation* (*Chabad I*), 466 F. Supp. 2d 6, 11 (D.D.C. 2006). "Chabad Chasidism," specifically, "was formed in 1775 by Rabbi Schneur Zalman." *Id.* Zalman, then residing in Lyubavichi, Russia, came to be known as "the first Lubavitcher Rebbe." *Id.* Rabbi Zalman was succeeded by five additional Rebbes. *Id.* These Rebbes produced and curated a body of religious materials central to Chabad Chasidism. *Id.* at 11–12.

"Two distinct sets" of those materials—the "Library" and the "Archive"—lay at the center of the original suit. *Id.* at 11. The Library, which "date[s] back to 1772, consists of more than 12,000 books and 381 manuscripts." *Id.* at 12. The Archive, by contrast, "is comprised of over 25,000 pages of [the] Chabad Rebbes' handwritten teachings, correspondence, and other records." *Id.* During World War I, the Fifth Rebbe, Rabbi Shalom Dov Baer, was forced to flee Lyubavichi "from the advancing German army." *Id.* He "took some books and manuscripts from the Library with him and sent the rest to be stored in a private warehouse in Moscow." *Id.* After the war, upheaval from the Bolshevik Revolution prevented the Fifth Rebbe from reclaiming the rest of the Library. *Id.* In 1920, the Soviet Department of Scientific Libraries (SDSL) then "moved the

2

Library to a state facility." *Id.* After the Fifth Rebbe died in 1920, "his son, Rabbi Joseph Isaac Schneersohn, succeeded him as the Sixth Rebbe." *Id.* Despite the Sixth Rebbe's efforts, the SDSL never returned the Library. Instead, it offered to sell the materials back, but the Rebbe "lacked the funds for its return." *Id.* Later, in 1927, "Soviet authorities arrested the Sixth Rebbe and sentenced him to death." *Id.* His sentence was commuted in response to "international pressure," at which point he fled to Latvia, and then to Poland. *Id.* Though he brought the Archive with him, the Library "remained behind" in the Soviet Union. *Id.*

In 1939, both Nazi Germany and the Soviet Union invaded Poland. The Sixth Rebbe again was forced to flee, this time to the United States. *Id.* He was unable to bring the Archive on his transatlantic journey. Though he "made numerous efforts to retrieve the contents . . . left behind in Poland," he could secure only their partial return. *Id.* at 13. The remainder was captured "by Nazis in Poland and moved to a Gestapo-controlled castle in Germany." *Id.* (internal quotation marks omitted). In 1945, the invading Soviet Army re-captured the materials "as German 'trophy documents' or 'war booty'" and transferred them "to the RSMA in Russia." *Id.* "A portion of the Archive found in Poland that was not taken by the Soviet Army was returned to Chabad by the Polish government in 1974." *Id.* Chabad's efforts to regain the entire Archive persisted.

In September 1991, "Soviet President Mikhail Gorbachev instructed the RSL to return the Library to Chabad." *Id.* The same month, Chabad petitioned "an arbitration court to order the RSL to return the Library," and the court placed a lien on the Library. *Id.* In October, "a State Arbitration Tribunal of the RSFSR held," first, that the Library was not a Soviet "National property," and second, that it was not "ownerless," given Chabad's repeated attempts to reclaim it. *Id.* The court, therefore, ordered the Library's return to Chabad. *Id.* Yet the Chief State Arbiter later reversed that decision, "holding that Chabad had failed to show that it, rather than the Rebbe, owned the

Library." *Id.* On December 25, 1991, the Soviet Union collapsed and was replaced, in relevant part, by the Russian Federation.

On January 29, 1992, "the Deputy Chairman of [the new] Russian Federation ordered the [RSL] to give the Library back to Chabad." *Id.* But when a Chabad delegation went to retrieve it, they "encountered a group of anti-Semitic hooligans incited by an RSL director" who blocked the delegation's ingress. *Id.* Then, in February 1992, "the Deputy Chief State Arbiter of the Russian Federation nullified the previous court orders that mandated the RSL's relinquishment of the Library and closed the case." *Id.* The Supreme Soviet of the Russian Federation next "abolished the January 29, 1992 order [mandating the Library's return] and decreed that" the Library's disposition instead would be dictated "solely on the basis of the legislation of the Russian Federation and the provisions of international law." *Id.* at 14. These measures by the Russian government foreclosed Chabad's attempt in the early 1990s to regain the Library.

In response to that stonewalling, Chabad filed a lawsuit against the above-named defendants in 2004.[1] Russia and its agencies and instrumentalities appeared and began to defend the action. Before this Court confronted the merits of Chabad's claims, it was obligated to address the threshold issue of subject-matter jurisdiction. Ordinarily, foreign sovereigns hailed into federal court are entitled to assert sovereign immunity from suit, which operates as a jurisdictional bar to adjudication of the case or controversy. *See* 28 U.S.C. § 1604 (providing "[i]mmunity of a foreign state from jurisdiction"). But the Foreign Sovereign Immunities Act (FSIA)—the federal statute that governs sovereign immunity in U.S. courts—provides certain exceptions. *Id.* at § 1605 (listing "[g]eneral exceptions to the jurisdictional immunity of a foreign state").

---

[1] Chabad filed the lawsuit in the District Court for the Central District of California. *Chabad I*, 466 F. Supp. 2d at 10. On July 14, 2005, that court transferred the case to this Court pursuant to 28 U.S.C. § 1406(a). *Id.*

Relevant to this dispute is the so-called "expropriation exception," contained at 28 U.S.C.

§ 1605(a)(3). The text of that provision is as follows:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case— [. . .]
>
>> (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

Chabad argued that for both the Library and the Archive, it had demonstrated (a) rights in the property, (b) that the property was taken in violation of international law, and (c) that the relevant commercial nexus with the United States existed for jurisdiction over the defendants. The Court summarizes its original analysis of those three elements, and the D.C. Circuit's treatment of those issues on review, in the following sections.

*(a) Rights in Property*

Russia conceded that Chabad's property rights were at issue for both the Archive and the Library, satisfying the first § 1605(a)(3) requirement. *Chabad I*, 466 F. Supp. 2d at 23 n.21. On review, the D.C. Circuit remarked that that "concession was obviously correct; the plaintiff's complaint indeed put in issue its property rights[.]" *Agudas Chasidei Chabad of United States v. Russian Federation* (*Chabad II*), 528 F.3d 934, 942 (D.C. Cir. 2008).

*(b) Property Taken in Violation of International Law*

As to whether the takings were "in violation of international law," § 1605(a)(3), this Court agreed with Chabad as to the Archive, but not as to the Library. Ordinarily, "[a] taking violates international law if: (1) it was not for a public purpose; (2) it was discriminatory; or (3) no just

compensation was provided for the property taken." *Chabad I*, 466 F. Supp. 2d at 15. This Court was of the view that Chabad had satisfied *those* elements regarding both the Library and the Archive. *Id.* at 16, 19–20. But Russia defended by invoking the countervailing principle that "international law does not govern disputes between a sovereign nation and its citizens." *Id.* at 16. That principle required this Court to analyze whether Russia had taken the property at issue when the Rebbes were citizens of the Russian Federation (or, earlier, of the Soviet Union), or whether the takings occurred when the Rebbes had become citizens of other nations.

Regarding the Library, the Court reasoned that its taking occurred "in or around 1920, when the Soviet government sealed it and moved it to a state facility, or, at the latest, in 1921, when, in unclear circumstances, the Sixth Rebbe had the opportunity to retrieve it but could not afford to." *Id.* at 19. At either time, the Sixth Rebbe was a Soviet citizen. Accordingly, this Court reasoned, "[t]he Library's possession and control by the Soviet authorities for over 70 years strongly support the finding that it was, indeed, expropriated in the 1920s, when its owner was a Soviet citizen, and its taking thus did not violate international law." *Id.*

Alternatively, this Court reasoned, the act of state doctrine posed an independent bar to this Court's adjudication of the disposition of the Library. *Id.* at 26. "The act of state doctrine directs courts in the United States to presume the validity of 'acts of foreign sovereigns taken within their own jurisdictions.'" *Id.* at 25 (citing *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990)). Specifically, Chabad "premise[d] its claims of the Library's taking in part on the alleged unlawfulness of the Russian Chief Arbiter's Final Decision" and of the "February 19, 1992 decree by the Supreme Soviet of the Russian Federation," both of which blocked Chabad from regaining the Library. *Chabad I*, 466 F. Supp. 2d at 26–27. This Court was of the view that

because those actions implicated the exercise of Russia's sovereign authority within its own territorial jurisdiction, the Court lacked authority to adjudicate those acts' validity. *Id.*

By contrast, this Court reasoned that the taking of the Archive *was* a violation of international law. Its taking might have occurred, first, when Nazi Germany illegally appropriated the Archive during World War II. *Id.* at 19. Because the defendant-state in *possession* of the property need not have been the state to originally have *taken* the property, Russia could be liable for its refusal to return the Archive. *Id.* Or, this Court reasoned, a second "taking" occurred with the Soviet Army's "illegal appropriation" of the Archive "in Poland in 1945" as "trophy documents" or "war booty." *Id.* at 19, 13. Last, the Court explained that because that Soviet appropriation "occurred in Poland and not in Soviet territory," Russia could not invoke the act of state doctrine as a defense to the taking of the Archive. *Id.* at 26.

On review, the D.C. Circuit affirmed these holdings as to the Archive but reversed as to the Library. *Chabad II*, 528 F.3d at 946, 955. Regarding the Archive's taking, the Court of Appeals agreed that Russia's act of state defense failed because Russia did not disprove Chabad's contention that Russia seized the Archive in Poland. *Id.* at 952. And so the Archive's "taking" would not have occurred in Russia's sovereign territory. The D.C. Circuit then turned to the Library. As to what constituted the relevant "taking" of the Library, the D.C. Circuit reasoned that Chabad had at least two plausible theories: that the taking occurred with the initial Soviet appropriation of the Library circa 1917–1925, *id.* at 943, or that Russia and the RSL took (or re-took) the Library in 1991–1992, when they frustrated Chabad's attempts "to secure the return of the Library." *Id.* at 946. Because the theory that Russia and the RSL took (or re-took) the Library in 1991–1992 was viable, the D.C. Circuit ruled that the act of state doctrine did not apply. That was so because, by its terms, the Second Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2), "bars

application of the act of state doctrine to seizures occurring after January 1, 1959." *Id.* at 953. Though it acknowledged that whether the doctrine applied to the putative 1917–1925 taking was a difficult question, the D.C. Circuit declined to resolve it. That was so, it noted, because if this Court determined on remand that a taking occurred in 1991–1992, the act of state doctrine would pose no bar to adjudication of the case. *Id.* at 953. For *that* "taking" would have occurred long after January 1, 1959.

On remand, this Court held that, indeed, there were "three distinct 'takings' at issue." Mem. Op. at 7, ECF No. 81. First was the illegal seizure of the Library between 1917 and 1925, which the defendants "did not substantively refute." *Id.* Second, just as the D.C. Circuit suggested, this Court found a second taking to have occurred when the Soviet government promised in 1991 to return the Library but failed to do so. *Id.* at 7 (citing *Chabad II*, 528 F.3d at 945–46). Last, again following the D.C. Circuit's holding, this Court found a third taking of the Library in 1992 when Russia, "faced with an order transferring the Library back to [the] plaintiff . . . decided by official decree to close to [the] plaintiff all executive and judicial avenues of possible retrieval of the Library." *Id.* And so Chabad's property was, indeed, "taken in violation of international law." § 1605(a)(3).

### (c) The Relevant Commercial Nexus with the United States Existed for Jurisdiction

Last, before exercising jurisdiction, this Court was required to determine whether a sufficient commercial nexus existed between the defendants and the United States. That determination is governed by the latter, italicized clauses of § 1605(a)(3):

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case— [. . .]

(3) in which rights in property taken in violation of international law are in issue and *that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the*

> *foreign state*; **or** *that property or any property exchanged for*
> *such property is owned or operated by an agency or*
> *instrumentality of the foreign state and that agency or*
> *instrumentality is engaged in a commercial activity in the United*
> *States*[.] (emphasis added).

Those italicized clauses are disjunctive, as indicated by the bolded "or." Thus, this Court read the

provision as establishing a three-element test—containing two alternative versions of the third

element—for deciding when "a foreign state shall not be immune from the jurisdiction of courts

of the United States." § 1605(a)(3); *Chabad I*, 466 F. Supp. 2d at 15. If satisfied, that test would

grant subject-matter jurisdiction over all the defendants in *Chabad*—both the Russian Federation

itself as the "foreign state" plainly mentioned at § 1605(a) as well as its agencies and

instrumentalities. *See* 28 U.S.C. § 1603(a) ("A 'foreign state,' except as used in section 1608 of

this title, includes a political subdivision of a foreign state or an agency or instrumentality of a

foreign state."). To put it even more simply, this Court's conception of the test established by

§ 1605(a)(3) was as follows:

> A foreign state shall not be immune from the jurisdiction of courts of the United
> States or of the States in any case:
>
>> (1) In which rights in property are in issue, *and*
>> (2) The property was taken in violation of international law, *and*
>> (3)(a) That property, or any property exchanged for such property, is present
>> in the United States in connection with a commercial activity carried on in
>> the United States by the foreign state, *or*
>> (3)(b) That property, or any property exchanged for such property, is owned
>> or operated by an agency or instrumentality of the foreign state and that
>> agency or instrumentality is engaged in a commercial activity in the United
>> States.

This Court determined that of the alternative means to satisfy element (3), only the latter, (3)(b),

was relevant. That was so because neither the Library nor the Archive (the relevant "property"),

nor "any property exchanged for [the Library or the Archive]," was "present in the United States."

*Chabad I*, 466 F. Supp. 2d at 15 n.10. Thus, the Court proceeded to analyze whether Chabad could satisfy elements (1), (2), and (3)(b). And this Court concluded that it could. *Id.* at 25.

The D.C. Circuit affirmed that conclusion. Regarding the statutory framework, the D.C. Circuit endorsed this Court's interpretation of § 1605(a)(3). Though the D.C. Circuit grouped what this Court thought of as elements (1) and (2) into a single element it labeled [A], the D.C. Circuit agreed with the substance of this Court's view of § 1605(a)(3). The panel depicted its understanding of § 1605(a)(3)'s jurisdictional test as follows:

> (a)  A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case— [. . .]
>
> > (3) in which **[A]** rights in property taken in violation of international law are in issue and **[B][1]** that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or **[2]** that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

*Chabad II*, 528 F.3d at 939–40 (emphasis added). As this excerpt shows, the panel treated what it labeled [A], that is, "rights in property taken in violation of international law," as a single threshold element about what it called "the character of a plaintiff's claim." *Id.* at 940. Then, the panel explained that § 1605(a)(3) was satisfied insofar as, after having shown [A], a plaintiff could also show either [B][1] or [B][2]. In the panel's view, so long as a plaintiff could show either [A] + [B][1] or [A] + [B][2], that showing sufficed to establish the trial court's subject-matter jurisdiction over a foreign sovereign and its agencies or instrumentalities. *Id.* at 940, 939. That is to say, the majority understood both [A] + [B][1] and [A] + [B][2] as answering the same question: how a

federal court may gain subject-matter jurisdiction over a foreign state for its unlawful expropriation. *Id.*[2]

When it applied that understanding to this case's facts, the D.C. Circuit was unequivocal that jurisdiction existed as to both the Library and the Archive. *Id.* at 948. As it pointed out, "[b]oth the RSMA and the RSL"—the instrumentalities holding the Archive and the Library, respectively—"have entered transactions for joint publishing and sales in the United States[,] easily satisfying these standards." *Id.* "At the time of the filing of the suit in November 2004, the RSMA had entered contracts with two American corporations for the reproduction and worldwide sale of RSMA materials, including in the United States." *Id.* Similarly, "[t]he RSL ha[d] also contracted for cooperative commercial activities in the United States. For example, it entered into agreements with Norman Ross Publishing (later succeeded by ProQuest), arranging for that firm to sell an encyclopedia and to produce and distribute 'microcopies' of various RSL materials (in exchange for a 10% royalty payment to the RSL)." *Id.* "Thus," the D.C. Circuit concluded, "§ 1605(a)(3)'s second alternative commercial activity requirement is plainly satisfied." *Id.*

On remand, this Court faithfully applied those instructions as it rendered judgment against the Russian Federation and its agencies and instrumentalities. Mem. Op., ECF No. 81. It found, first, that Chabad had shown that property rights were at issue. *Id.* at 5. Second, it found that the defendants had taken both the Archive and the Library in violation of international law. *Id.* at 6. Third, it found that said property was owned or operated by the Russian Federation's agencies or instrumentalities. *Id.* at 7. And last, the Court found that those agencies and instrumentalities were

---

[2] Judge Henderson, concurring in the judgment for other reasons, agreed with the majority's interpretation that [B][1] and [B][2] were simply alternative mechanisms to gain jurisdiction over a foreign state defendant. 528 F.3d at 956 (Henderson, J., concurring in the judgment). Footnote 2 of her separate opinion stated, "'B' sets forth two alternatives of the 'commercial activity' tie between the United States and the defendants also needed to establish jurisdiction, the second of which the plaintiff relies on." *Id.*

engaged in commercial activities in the United States. *Id.* at 10. This Court, therefore, ordered the defendants to effect a "prompt and safe" return of Chabad's religious materials. Order, ECF No. 80.

Instead of so doing, the defendants decided to flout this Court's Order. Having withdrawn from the case after losing on the jurisdictional issue, the defendants explained that they had no intention of complying with the judgment. Statement of Def. at 2, ECF No. 71. In response, this Court held the defendants in contempt. Mem. Op. at 1, ECF No. 116. Concomitantly, it entered civil contempt sanctions against the defendants in the amount of $50,000 per day until the defendants comply. *Id.*; Order, ECF No. 115. So far, they have not. And because of the defendants' contumacy, this Court awarded Chabad an interim judgment on the accrued sanctions in 2015. Order, ECF No. 144.

Several years later, as was discussed above, Chabad served subpoenas on Tenam to probe whether Tenam holds assets that may be used to satisfy the sanctions debt. This Court denied Tenam's motion to quash those subpoenas. Mem. Op., ECF No. 198. Though not a party to this action, Tenam then moved for partial vacatur of the Court's judgment under Rule 60(b). Mot., ECF No. 203. Specifically, Tenam asserted that this Court lacked subject-matter jurisdiction over the Russian Federation in the underlying suit and that it lacked authority to impose sanctions for the defendants' non-compliance. *Id.* From those premises, it argued that Chabad could not subpoena Tenam—which is owned indirectly by the Russian Federation—to discover assets to satisfy the sanctions debt. *Id.* at 2–3. Again, this Court denied Tenam's Rule 60(b) motion, finding that Tenam had no standing as a non-party to make such a request. Mem. Order, ECF No. 221. Tenam appealed that decision to the D.C. Circuit, ECF No. 223, and it now asks this Court to stay discovery pending appeal. For the reasons discussed below, that request is hereby **DENIED**.

## II.     LEGAL STANDARD

A stay is an extraordinary remedy. *Cuomo v. U.S. Nuclear Reg. Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985). As such, it is the movant's burden to show that the "exercise of the court's extraordinary injunctive powers is warranted." *Id.* at 974. The "legal principles" governing whether to grant a stay "have been distilled into consideration of four factors." *Nken v. Holder*, 556 U.S. 418, 434 (2009). These are, "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* "The first two factors" of this standard "are the most critical." *Id.* If the movant fails to make the requisite "strong showing that he is likely to succeed on the merits," *id.*, that defect is "an arguably fatal flaw for a stay application." *Citizens for Resp. & Ethics in Wash. v. FEC*, 904 F.3d 1014, 1019 (D.C. Cir. 2018). And regarding the second factor, the "irreparable harm" asserted must be both "certain and great" to warrant a stay. *Id.* (internal quotation marks omitted).

## III.     ANALYSIS

In support of its motion for a stay, Tenam argues that it has satisfied all four of the above factors. Mot. at 2–7, ECF No. 225. Chabad claims Tenam has satisfied none. Opp'n at 1, ECF No. 226. On review, the Court agrees with Chabad. As to factor (1), Tenam has failed to make a "strong showing" that it will likely succeed on any of the issues it plans to raise on appeal. Tenam has also failed to show, under factor (2), that it would suffer "certain and great" harm without a stay or, under factor (4), that a stay would serve the public interest. As to factor (3), issuance of a stay would be unlikely to substantially injure Chabad. But that lone factor cannot save Tenam's

application for a stay. Tenam's arguments regarding the other, more important factors are much

too weak to justify the extraordinary remedy it seeks.

    *A.  Factor (1): Tenam Has Not Made a Strong Showing It Is Likely to Succeed on the Merits.*

    According to the Statement of Issues Tenam submitted to the D.C. Circuit, Tenam

apparently seeks to raise five issues on appeal:

1. Whether [the D.C. Circuit's] consistent interpretation of the 'expropriation' exception under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(3)—that 'a foreign state <u>itself</u> does not lose immunity . . . unless the allegedly expropriated property is located in the United States'—requires partial vacatur of the District Court's judgments for lack of subject-matter jurisdiction as to Defendant Russian Federation?
2. Whether the FSIA prohibits—and thereby deprives U.S. courts of subject-matter jurisdiction to order—remedies of specific performance against a foreign sovereign and its agencies or instrumentalities, as the United States has consistently argued?
3. Whether monetary sanctions may be imposed against a foreign sovereign to enforce an extraterritorial order of specific performance to return allegedly expropriated property in the foreign territory?
4. Whether Movant-Appellant Tenex-USA must have 'standing' for the Court to consider whether there is subject-matter jurisdiction under the FSIA as to Defendant Russian Federation itself, pursuant to Movant-Appellant Tenex-USA's motion for partial vacatur under Rule 60(b) of the Federal Rules of Civil Procedure?
5. Whether Movant-Appellant Tenex-USA (whose assets allegedly may be subject to seizure to satisfy sanctions against the Russian Federation) possesses standing to seek partial vacatur of the District Court's judgments pursuant to Rule 60(b) of the Federal Rules of Civil Procedure? [3]

Stripped of their verbosity and placed in the correct order (that is, flowing from threshold to merits

questions), these issues are as follows:

1. May Tenam, a non-party, move for vacatur of the underlying judgment against the defendants under Rule 60(b)? [4]

---

[3] Statement of Issues [1864231], *Agudas Chasidei Chabad of United States v. Russian Federation*, 20-7080 (D.C. Cir., Sept. 30, 2020). All of these arguments also may be found in Tenam's motion and reply before this Court, though scattered throughout its briefing rather than as discrete issue statements. *See* Mot., ECF No. 225; Reply, ECF No. 227.
[4] This Court has combined the fourth and fifth "issues" Tenam submitted to the D.C. Circuit into a single issue, since Tenam's fourth and fifth "issues" are not truly distinct, but concern the same inquiry—whether Tenam properly may invoke Rule 60(b) to move this Court for partial vacatur of the underlying judgment.

2. If so, did this Court have subject-matter jurisdiction under 28 U.S.C. § 1605(a)(3) as to those parts of the suit against defendant Russian Federation?

3. If this Court indeed had subject-matter jurisdiction, was an order to return extraterritorial assets ("specific performance")[5] a permissible remedy?

4. If "specific performance" was a permissible remedy, when the Russian Federation refused to comply with that order, was this Court's imposition of sanctions permissible?

Addressing these issues in turn, the Court explains why none of Tenam's arguments regarding these four issues is likely to succeed on appeal.

### A(1). Tenam, a Non-Party, May Not Move for Vacatur Under Rule 60(b)

Federal Rule of Civil Procedure 60 provides mechanisms by which courts may grant "relief from a judgment or order." Fed. R. Civ. P. 60. FRCP 60(a) deals with clerical mistakes and is not relevant to this litigation. Instead, Tenam asserts that it is entitled to move for relief under Rule 60(b). That rule's text is reproduced below:

> (b) GROUNDS FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR PROCEEDING. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

Tenam's theory is that this Court's underlying judgment is void specifically as against the Russian Federation, because though this Court may have had subject-matter jurisdiction over Russia's *agencies and instrumentalities* under § 1605(a)(3), it lacked subject-matter jurisdiction to impose liability against the Russian Federation *itself*. Thus, Tenam seeks partial vacatur of the judgment under Rule 60(b)(4), which deals with relief from void judgments.

---

[5] This term is a misnomer, as the Court discusses below. *See infra* at section (A)(3).

Tenam's arguments about subject-matter jurisdiction are clearly wrong, as discussed below. But more fundamentally, Tenam does not even have standing to deploy those arguments via a Rule 60(b) motion. Rule 60(b) states that "on motion . . . the court may relieve a party or its legal representative from a final judgment." Fed. R. Civ. P. 60(b). So may anyone in the world make such a motion to secure relief for a party or its legal representative? No. Leading authorities have long explained that only "parties" or their "legal representatives" are entitled to move for relief. As the preeminent treatise on the subject states, "Rule 60(b) . . . restricts the right to reopen a judgment to 'a party or its legal representative.' The reference to the party's legal representative has been construed to refer solely to persons who effectively stand in the shoes of a party, such as a trustee or guardian[.]" Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 11 *Federal Practice and Procedure* § 2852 (2012).

And that construction is undoubtedly correct, as is revealed by dictionaries and usage of the term "legal representative" contemporaneous with the Federal Rules' promulgation. As *Webster's Second* explains, the term "legal representative" refers to "[o]ne who represents, or stands in the place of, another, as the heir under some systems of law, an executor, administrator, etc." *Legal Representative*, Webster's New International Dictionary, Second Edition (1934). That definition was also the term's ordinary usage circa 1938. For instance, when a California woman was killed by a driver for the Civilian Conservation Corps, Congress passed a private bill in 1939 for the relief of her "legal representative." S. Rep. No. 410, at 1 (1939). That happened to be her mother, who, as administrator of the deceased's estate, effectively stood in place of her late daughter. *Id.* Given these terms' plain meaning, courts have recognized that only parties and their "legal representatives"—those standing directly in the parties' stead—may invoke 60(b). *Ericsson Inc. v. InterDigital Comm'n Corp.*, 418 F.3d 1217, 1224 (Fed. Cir. 2005); *see also Bridgeport*

*Music, Inc. v. Smith*, 714 F.3d 932, 940 (6th Cir. 2013) ("In short, Tilmon-Jones, as a nonparty, does not qualify for relief under the plain language of Fed. R. Civ. P. 60(b)."); *Smith v. Missouri Pac. R. Co.*, 615 F.2d 683, 685 (5th Cir. 1980) (noting that it would "defeat . . . the aim of finality" if any non-party "who felt aggrieved enough to file a Rule 60(b) motion for post-judgment relief" was allowed to do so).

These facts are fatal to Tenam's claim that it may invoke Rule 60(b). By its own admission, Tenam is not a party to this litigation. Mot. at 1, ECF No. 225 ("Non-Party Tenex-USA's Motion to Stay Discovery Pending Appeal."). And Tenam is not the Russian Federation's "legal representative" either. There is no serious argument that Tenam—a Maryland corporation with two employees who work from home, *id.* at 5—is the successor-in-interest, administrator, executor, guardian, or trustee of, or otherwise "stand[s] in the shoes" of, the Russian Federation. Wright, Miller & Kane, *supra*, at § 2852. Indeed, in a later part of its brief, Tenam seeks to wriggle out of discovery by arguing that its "connection to this case is highly attenuated."[6] Mot. at 6, ECF No. 225. But if Tenam's statement means what it says, then Tenam has no basis to invoke Rule 60(b). For that provision plainly does not allow non-parties with "highly attenuated . . . connection[s]," *id.*, to a case to disturb the finality of its judgment upon a 60(b) motion.

Probably in tacit recognition that its request for vacatur has no valid basis in Rule 60 itself, Tenam instead asked this Court to tailor an *ad hoc* exception to that Rule's plain text. Tenam argued in its failed Rule 60(b) motion, Mot., ECF No. 203, and now renews said argument in its motion for stay, that it may invoke 60(b) because of its status as a "'third party [which] [sic] is strongly affected by the judgment[s]' at issue." Mot. at 1, ECF No. 203 (quoting *Grace v. Bank*

---

[6] As the Court later explains, though Tenam cannot invoke Rule 60(b) because of this self-described attenuation, that attenuation does not invalidate Chabad's attempt to gain discovery into Tenam. Tenam conflates two different standards—that governing Rule 60(b) (standing as a party or its legal representative) and that governing discovery (relevance)—throughout its motion for stay.

*Leumi Tr. Co.*, 443 F.3d 180, 188 (2d Cir. 2006)). Though some Circuits have recognized an atextual third category of entities that may invoke Rule 60(b)—namely, those "strongly affected by the judgment"—that embellishment's propriety remains an open question in our Circuit. In response to Tenam's original 60(b) motion, this Court declined to recognize such an innovation. And Tenam is unlikely to succeed on appeal in obtaining that novel relief for the reasons discussed below.

First, as the Court has already pointed out, the plain text of Rule 60(b) has no provision that would allow those "strongly affected by the judgment" to move for vacatur. Only "parties" and their "legal representative[s]" may so move. Fed. R. Civ. P. 60(b). That the Rule specifically enumerates these entities indicates that *other* entities are not entitled to invoke its provisions. The basic interpretive principle of *expressio unius est exclusio alterius*—the expression of one thing implies the exclusion of others—dispels the notion that there is a mysterious third category of entities *outside* the parties and their legal representatives permitted to move for vacatur. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 107 (2012).

Second, as the D.C. Circuit has recently explained, courts have "no authority" to craft *ad hoc* exceptions to federal rules of procedure merely because they perceive such exceptions to be "good public policy." *McKeever v. Barr*, 920 F.3d 842, 844–45 (D.C. Cir. 2019). When a rule "makes quite clear" its scope and content, and "sets forth in precise terms" the ways in which it operates, judges may not "supplement[]" the Rule "by unwritten additions." *Id.* at 844, 847. That is so because federal rules of procedure emerge "as the product of a carefully considered policy judgment by the Supreme Court in its rulemaking capacity, and by the Congress" that approves those rules. *Id.* at 845. Given that fresh and clear instruction, it is unlikely the D.C. Circuit will bend the plain text of Rule 60(b) to indulge Tenam's motion for vacatur.

Last, even if the D.C. Circuit were to adopt the Second Circuit's "strongly affected by the judgment" exception, that exception has nothing to do with Tenam's Rule 60(b) motion. The case Tenam cited in its Rule 60(b) motion and cites again in its motion for stay, *Grace v. Bank Leumi Trust Co.*, involved a fraud perpetrated upon the court to saddle a third party with a judgment debt. *Grace*, 443 F.3d at 189. Specifically, the plaintiff colluded with a judgment-proof defendant to manufacture a lawsuit that resulted in serious liability to the non-party movant. *Id.* When the non-party moved for vacatur under Rule 60(b), the Second Circuit permitted the motion to proceed. But it did so only by "carv[ing] out an exceedingly narrow exception to the well-established rule that litigants, who [a]re neither a party, nor a party's legal representative to a judgment, lack standing to question a judgment under Rule 60(b)." *Id.*

Tenam presented to this Court no persuasive argument as to why, even if this Court recognized that "exceedingly narrow exception," Tenam would fall within the exception's ambit. Tenam does not allege that Chabad and the Russian Federation somehow colluded with the intent of gaining discovery into Tenam fifteen years after filing this lawsuit. And the purported inconvenience of discovery is the only way in which Tenam asserts that it has been "strongly affected." Mot. at 4–5, ECF No. 225. If Tenam could invoke Rule 60(b), then the Rule's reference to a motion for relief by a "party or its legal representative" would be rendered meaningless. Indeed, if Tenam is correct, then *any* entity—including other non-parties with "highly attenuated . . . connection[s]" to the litigation—would enjoy the opportunity to vacate an entire judgment simply because they could not countenance what Tenam acknowledges is just a "discovery dispute." Mot. at 1, ECF No. 225. Because the D.C. Circuit is not likely to embrace Tenam's threadbare argument that this result makes any sense, much less that it has a basis in the text of

Rule 60(b), Tenam has not established the requisite "strong showing" that it is "likely" to prevail

on this issue. *Nken*, 556 U.S. at 434.

> *(A)(2) This Court Had Subject-Matter Jurisdiction Under § 1605(a)(3) Over Those*
> *Parts of the Lawsuit Against the Russian Federation, as the D.C. Circuit Confirmed*

As was discussed in the Background section above, the D.C. Circuit squarely held in 2008

that this Court had subject-matter jurisdiction over those portions of the lawsuit that dealt with

defendant Russian Federation. *Chabad II*, 528 F.3d at 939 ("[W]e hold that Agudas Chasidei

Chabad satisfied the FSIA's jurisdictional requirements as to both the Library and the Archive.").

Despite that holding, Tenam now argues that subsequent "precedents[7] [so-called] favor Tenam's

position and require vacatur of the judgments against the Russian Federation." Mot. at 3, ECF No.

225. Tenam points to four cases, listed here in chronological order, that allegedly support that

contention: *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016); *de Csepel v. Republic*

*of Hungary*, 859 F.3d 1094 (D.C. Cir. 2017); *Schubarth v. Federal Republic of Germany*, 891 F.3d

392 (D.C. Cir. 2018); and *Philipp v. Federal Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018).

Tenam is correct that each case is irreconcilable with the D.C. Circuit's decision in *Chabad*. But

Chabad is correct that none of these four cases controls. Opp'n at 1, ECF No. 226. Because the

D.C. Circuit has never followed the correct procedure to overrule *Chabad*, *Chabad* remains the

law. Moreover, even if the D.C. Circuit were to reconsider *Chabad*'s holdings in the forum capable

of overruling them—an *en banc* sitting—it is unlikely the full court would overrule *Chabad*. That

is so because, as is shown below, *Chabad* was rightly decided.

---

[7] Despite Tenam conclusorily labeling these cases "precedents," they do not have precedential effect under the D.C. Circuit's own law of the circuit doctrine. Because *Chabad* was the earlier-in-time decision, was never withdrawn by the panel, has never been overruled *en banc*, and has never been overruled by the Supreme Court, it remains controlling law. *See Maxwell v. Snow*, 409 F.3d 354, 358 (D.C. Cir. 2005) ("[T]his Court is bound to follow circuit precedent until it is overruled either by an *en banc* court or the Supreme Court.") (citing *Brewster v. C.I.R.*, 607 F.2d 1369, 1373 (D.C. Cir. 1979) ("In its intra-circuit application, Stare decisis demands that we abide by a recent decision of one panel of this court unless the panel has withdrawn the opinion or the court En banc has overruled it.")).

Before dissecting these four cases, an introductory word must be said about how an earlier panel decision may be overruled by the D.C. Circuit.[8] As a general matter, courts in the United States observe the principle of stare decisis—that a later court should not disturb its earlier decision unless a compelling reason has arisen in the interim that casts the earlier precedent into significant doubt. Proponents of the Constitution considered stare decisis a bulwark against judicial caprice. *See* Federalist No. 78, at 470 (Alexander Hamilton) (Clinton Rossiter, ed., 1961) ("To avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents[.]"). To preserve that bulwark, every circuit court of appeals observes some variation of the law of the circuit doctrine. Henry J. Dickman, Note, *Conflicts of Precedent*, 106 Va. L. Rev. 1345, 1350 (2020). "The law of the circuit doctrine requires three-judge panels in the federal courts of appeals to give stare decisis effect to past decisions of the circuit[.]" *Id.* at 1345; *see also* Bryan Garner et al., *The Law of Judicial Precedent* 37 (2016) (noting that panels are "strictly bound by the decisions of prior panels under the 'law-of-the-circuit' rule.").

The D.C. Circuit, like its sister-circuits, adheres to this doctrine. *Maxwell v. Snow*, 409 F.3d 354, 358 (D.C. Cir. 2005). Under it, the D.C. Circuit can overrule the earlier decision of one of its panels only through two specific actions: either through an *en banc* sitting or, more rarely, through a procedure called an *Irons* footnote. *See Irons v. Diamond*, 670 F.2d 265, 268 n.11 (D.C. Cir. 1981). Under the latter mechanism, a panel may circulate a draft of its opinion that is irreconcilable with prior circuit precedent. If a majority of the Circuit's active judges agree that the earlier panel decision should be overruled, the later panel will indicate the full court's approval by dropping an

---

[8] And an introductory word must also be said about the nature of the analysis that follows. This Court recognizes how unusual it is for a mere district court to present such a lengthy discussion of internal divisions within the D.C. Circuit. Nevertheless, it seems that this Court, to adequately explain why it denies the requested stay, must explain how it reached that determination. It is, though, an uncomfortable posture for a mere district court to air such obvious internal disagreements within the court of appeals.

*Irons* footnote. *See, e.g.*, *SecurityPoint Holdings, Inc. v. TSA*, 836 F.3d 32, 35 n.1 (D.C. Cir. 2016) (showing an *Irons* footnote in action). This procedure is appropriate only where the prior panel's decision is clearly invalid, as when an intervening Supreme Court decision has rendered the panel opinion obsolete. *See* Aaron L. Nielson, *D.C. Circuit Review—Reviewed: The* Irons *Footnote*, Yale J. on Regulation: Notice and Comment (June 8, 2018), https://www.yalejreg.com/nc/d-c-circuit-review-reviewed-the-irons-footnote/ (explaining that the *Irons* footnote is "rarely used"). Crucially, though, either of these procedures requires the consideration of the *full* D.C. Circuit—not merely a second-in-time panel—to abrogate an earlier panel decision. And without employing either of those procedures, an ordinary panel of the D.C. Circuit has no authority to overrule an earlier panel decision.

With that framework established, the Court proceeds to explain why none of the four cases cited by Tenam represents a strong showing that Tenam is likely to prevail on appeal.

### (A)(2)(1). *Simon v. Republic of Hungary*, 812 F.3d 127 (D.C. Cir. 2016)

In *Simon*, "fourteen Jewish survivors of the Hungarian Holocaust [brought] various causes of action against the Republic of Hungary and the Hungarian state-owned railway [abbreviated MÁV] arising from the defendants' participation in—and perpetration of—the Holocaust." *Simon*, 812 F.3d at 132. Certain of these claims involved expropriation of the survivors' property. *Id.* Thus, the panel was required to assess whether it had subject-matter jurisdiction over the controversy. And that question required an analysis of § 1605(a)(3)—the very same analysis undertaken by the D.C. Circuit in the *Chabad* case a few years before.

Under *Chabad*, that analysis would have been as follows: recall how the *Chabad* panel divided § 1605(a)(3):

(a) A foreign state shall not be immune from the jurisdiction of courts of
the United States or of the States in any case— [. . .]

> (3) in which **[A]** rights in property taken in violation of international law are in issue and **[B][1]** that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or **[2]** that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States[.]

*Chabad II*, 528 F.3d at 939–40 (emphasis added). Thus, to assess subject-matter jurisdiction over the "foreign state" (that is, both the sovereign itself and its agencies and instrumentalities), the panel should have asked the following questions: First, are there rights in property taken in violation of international law at issue in the case? Second, is that property or property exchanged for that property present in the United States in connection with a commercial activity carried on in the United States by the foreign state? Or, alternatively, is that property or property exchanged for such property owned by the sovereign's agency or instrumentality that is engaged in a commercial activity in the United States? Under *Chabad*, if the first question and either iteration of the second were answered affirmatively, then the court would have had subject-matter jurisdiction over a controversy involving both the foreign sovereign itself and its agencies or instrumentalities.

But the *Simon* panel—for reasons it left unclear—framed the inquiry as follows: "The [commercial] nexus requirement," it said, "differs somewhat for claims against the foreign state itself (e.g., Hungary) as compared with claims against an agency or instrumentality of the foreign state (e.g., MÁV)." *Simon*, 812 F.3d at 146 (citing *Chabad II*, 528 F.3d at 947). Thus, said *Simon*, subject-matter jurisdiction over *the sovereign* exists when "property [in issue] or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state." *Simon*, 812 F.3d at 146. By contrast,

*Simon* continued, "[a]s to the claims *against MÁV* [the agency or instrumentality], the question is whether the 'property [in issue] or property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States." *Id.* (emphasis added). The *Simon* panel cited for that novel chopping up of § 1605(a)(3)—remarkably—the *Chabad* decision. *Id.* (citing *Chabad II*, 528 F.3d at 947).

Yet *Simon* advanced an interpretation that differed radically from *Chabad*'s. *Chabad* understood the second and third clauses of (a)(3)—what it labeled [B][1] and [B][2]—as alternative mechanisms to gain jurisdiction over both a sovereign itself *and* its agencies and instrumentalities. *Chabad II*, 528 F.3d at 939–40. *Simon*, without any apparent reason for doing so, instead broke (a)(3)'s second and third clauses into *two distinct tests* about how to gain jurisdiction over *different* defendants. *Simon*, 812 F.3d at 146. The third clause was thus transmogrified into a test for *agencies and instrumentalities* of the sovereign, while the second clause became a test about sovereigns *themselves*.

This construction has no basis in the text or history of the FSIA, and it certainly had no basis in *Chabad*. As one member of the Circuit has noted, "[t]he only reasonable explanation for *Simon*'s treatment of *Chabad* is that it made a mistake." *De Csepel v. Republic of Hungary*, 859 F.3d 1094, 1114 (D.C. Cir. 2017) (Randolph, J., dissenting). *Simon* apparently mistook *Chabad*'s plain reading of § 1605(a)(3) as having established two distinct tests for different defendants. And because of that misunderstanding—which created both an intra-circuit conflict *and* a circuit split[9]—*Simon* undertook *no* analysis to explain why its view was consistent with *Chabad*. Though

---

[9] The Ninth Circuit—the first circuit to weigh in on this issue—adopted what would also later become the D.C. Circuit's interpretation in *Chabad. See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 712–13 (9th Cir. 1992) (permitting claims against Argentina to proceed where plaintiffs demonstrated, under § 1605(a)(3), that an Argentinian agency or instrumentality had the requisite commercial nexus with the United States). It was once thought

*Simon* itself mentioned nothing about its new construction's irreconcilability with *Chabad*, other district courts of this jurisdiction flagged it immediately. *See, e.g.*, *Philipp v. Federal Republic of Germany*, 248 F. Supp. 3d 59, 73–74 (D.D.C. 2017) (noting *Chabad* and *Simon*'s irreconcilability and electing, correctly, to apply *Chabad*); *see also de Csepel*, 859 F.3d at 1110 (Randolph, J., dissenting) ("*Chabad* and *Simon* cannot be reconciled, at 'first glance' and every later glance.").

More importantly, under the D.C. Circuit's own law of the circuit doctrine, *Simon*'s view of § 1605(a)(3) has no precedential weight. *Simon* was not endorsed by the *en banc* D.C. Circuit, nor did it deploy an *Irons* footnote to signal the full Circuit's endorsement of abandoning *Chabad*. (Nor would an *Irons* footnote even have been an appropriate vehicle to overrule *Chabad*, itself a straightforward application of § 1605(a)(3) that has never been impeached by the Supreme Court). As was explained above, an ordinary panel of the D.C. Circuit is not entitled to overrule the recent and valid holding of a prior panel—much less unintentionally.

> *(A)(2)(2). De Csepel v. Republic of Hungary*, 859 F.3d 1094 (D.C. Cir. 2017)

Upon discovery of *Simon*'s irreconcilability with *Chabad*, the D.C. Circuit had three options. First, the panel could re-hear *Simon*, withdraw the initial opinion, and re-write it to correctly apply *Chabad*. Second, the *en banc* D.C. Circuit could re-hear *Simon* and, if so desiring, overrule *Chabad* through the correct mechanism. Third, it could attempt in later cases to supply a rationale—one "missing from the *Simon* opinion itself"—as to why *Simon* validly could contradict *Chabad*. *De Csepel*, 859 F.3d at 1110 (Randolph, J., dissenting). Unfortunately, it chose that third option in the second case Tenam invokes: *de Csepel v. Republic of Hungary*.

---

that the Second Circuit had earlier endorsed the *Simon/de Csepel* reading in its 2006 decision *Garb v. Republic of Poland*, 440 F.3d 579, 589 (2d Cir. 2006). But courts of that circuit have since explained that they do not regard *Garb*'s commentary on the second prong as binding, because it concerned facts not actually before the court, and thus constituted a genuine *dictum*. *Freund v. Republic of France*, 592 F. Supp. 2d 540, 561 n.10 (S.D.N.Y. 2008).

*De Csepel*, like *Simon*, involved facts squarely analogous to *Chabad*. Therein, a Jewish family sued Hungary itself, along with its museums and a Hungarian state university, in an attempt to recoup property the defendants had stolen from the family during the Holocaust. *De Csepel*, 859 F.3d at 345. That alleged expropriation required an analysis under § 1605(a)(3) as to whether the court had subject-matter jurisdiction over the suit. And that, in turn, should have involved a straightforward inquiry under *Chabad*: whether the plaintiffs had satisfied § 1605(a)(3)'s "rights in property taken in violation of international law" clause and either of its two commercial nexus clauses. *Chabad II*, 528 F.3d at 939–40.

Yet instead of engaging in *that* inquiry, *de Csepel* framed its task as determining whether it was "bound by *Chabad* or *Simon*." *De Csepel*, 859 F.3d at 1105. The answer was, of course, *Chabad*. But curiously, *de Csepel* endeavored to explain why *Chabad* was not really the law. The central thrust of that explanation was that *Chabad*'s interpretation of § 1605(a)(3) was not actually a *holding*, and thus was not binding. *Id.* at 1105–06. (Though the implication was that *Chabad*'s reasoning was thus, somehow, all mere dicta, the *de Csepel* majority, oddly, never actually employed the terms "dictum" or "dicta" anywhere in its opinion). From the premise that *Chabad* did not represent a binding holding—a premise disproven below—the *de Csepel* majority then reasoned that it was "bound by *Simon*" rather than by *Chabad*. *Id.* at 1107.

As an initial matter, *Chabad* clearly relied on a genuine holding that § 1605(a)(3) establishes two avenues—what it called [B][1] and [B][2]—by which a court may establish subject-matter jurisdiction over a foreign sovereign under (a)(3). *Chabad II*, 528 F.3d at 939–40. It is an elementary principle that what binds a later court is an earlier court's *ratio decidendi*—that is, the rationale employed by an earlier court that was "necessary for the decision of [that] particular case." John Chipman Gray, *The Nature and Sources of the Law* 261 (2d ed. 1921); *see*

*also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996) (noting that what is binding are

"those portions of the opinion necessary to th[e] result"); Garner et al., *supra*, at 44–47. The *ratio*

*decidendi* stands in opposition to mere *obiter dicta*—propositions stated in passing that were not

actually necessary to the earlier court's decision. Garner et al., *supra*, at 46 ("[A] *dictum* is a

statement in a judicial opinion that is unnecessary to the case's resolution."). *Chabad*'s reasoning

falls squarely into the former category. Its interpretation that the "agencies and instrumentalities"

prong of (a)(3) also sufficed for jurisdiction over sovereigns themselves was the only possible way

it could have concluded that this Court had subject-matter jurisdiction over the Russian Federation.

Indeed, the first prong—which requires that the expropriated property actually be in the United

States—was not even litigated in *Chabad*, since the Library and the Archive remain in Russia.

*Chabad I*, 466 F. Supp. 2d at 15 n.10. (Indeed, that was the whole reason Chabad filed the lawsuit.)

And that interpretation of § 1605(a)(3), therefore, was necessary to the judgment, and thus a

binding *ratio decidendi*.

Moreover, the *Chabad* panel *reversed* this Court's conclusion that even if it had subject-

matter jurisdiction over the Russian Federation under (a)(3), the act of state doctrine posed an

independent bar to the Russian Federation's liability. *Chabad II*, 528 F.3d at 953. The act of state

doctrine *only* applies when courts *must* adjudge the actions of a foreign sovereign. *W.S. Kirkpatrick*

*& Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 406 (1990) (explaining that "[a]ct of state issues

only arise when a court *must decide*—that is, when the outcome of the case turns upon—the effect

of official action by a foreign sovereign. When that question is not in the case, neither is the act of

state doctrine."). So by concluding that not only did this Court have subject-matter jurisdiction as

to the Russian Federation, but also that the act of state doctrine did not bar the Russian Federation's

liability, *Chabad* necessarily held that the second prong of § 1605(a)(3) creates jurisdiction over a foreign sovereign itself.

That analysis plainly dispels the *de Csepel* majority's contention that "the Russian state's immunity was completely unaddressed" by either this Court or by the *Chabad* panel. *De Csepel*, 859 F.3d at 1105. Indeed, that issue was addressed *twice*—first as a matter of the proper interpretation of § 1605(a)(3), and then again regarding whether the Russian Federation was entitled to assert the act of state defense. *Chabad II*, 528 F.3d at 939–40, 953. And *de Csepel*'s assertion that it was never explained why the Russian Federation was in the *Chabad* case defies logic. The *Chabad* panel plainly held that it was the Russian Federation's—and specifically, the Deputy Chief State Arbiter's and the Supreme Soviet's—refusal to return Chabad's materials in 1991–1992 that could constitute a "taking in violation of international law." *Id.* at 945–46. That determination was necessary to the *Chabad* panel's holding that Chabad's claims relating to the Library could proceed against the Russian Federation under § 1605(a)(3). Once again, that was how the *Chabad* panel circumvented the act of state doctrine—it was only for *that* taking that the Second Hickenlooper Amendment prevented the doctrine's application. *Id.* at 953.

Further, the *de Csepel* majority never explained why, even if *Chabad*'s relevant provisions were somehow only dicta, the panel was then "bound by *Simon*."[10] *Simon* merely purported to be *an application of Chabad itself. Simon*, 812 F.3d at 146 (citing *Chabad II*). So if *Simon* thought *Chabad* was binding, and the *de Csepel* majority thought itself "bound by *Simon*," *de Csepel*, 859 F.3d at 1107, then the *de Csepel* majority should have followed *Simon*'s decision to apply *Chabad*. *Simon*, 812 F.3d at 146 (citing *Chabad II*). Relatedly, *Simon*'s mis-application of *Chabad* could

---

[10] The *de Csepel* majority also pointed to the fact that the *Simon* panel denied a discretionary petition for rehearing. *De Csepel*, 859 F.3d at 1107. But discretionary denials of review "have no effect" on the relevant opinion's precedential weight. Garner et al., *supra*, at 261. Thus, *Simon* had only the precedential weight its original opinion had, which is to say none at all, since it inexplicably contradicted *Chabad* and violated the law of the circuit doctrine.

not have formed an independent *ratio decidendi* by which the *de Csepel* panel was then bound. Aside from violating the law of the circuit doctrine, *Simon* merely asserted without any apparent reason that *Chabad* stood for something it plainly did not. *Simon* propounded *no* underlying rationale why that *ipse dixit* was faithful to *Chabad*, and thus it propounded no binding *ratio decidendi*. Garner et al., *supra*, at 46 (explaining that the *ratio decidendi* is, literally, the "reason for deciding"). Indeed, that *Simon* lacked any apparent reason for its unintentional revision of *Chabad* is what necessitated the *de Csepel* majority's post hoc rationalization of *Simon*.

Perhaps realizing that *Simon* presented no principled basis for its departure from *Chabad*, the *de Csepel* majority closed by falling back on the good old belt-and-suspenders approach. "[E]ven were we not bound by *Simon*," the majority said, "we would hold that a foreign state retains its immunity unless the first clause of the commercial-activity nexus is met." *De Csepel*, 859 F.3d at 1107. That was an odd move, of course, because if the majority really was "bound by *Simon*," *id.*, then it was bound by *Simon*. And if *Simon* said what the *de Csepel* majority claimed it did, there would have been no need for the *de Csepel* majority's subsequent four-paragraph analysis in which it assembled rationales found nowhere in *Simon* as to why its reading of § 1605(a)(3) was correct.

Ironically, by so couching that analysis as a set of reasons for which the majority would have independently arrived at its construction of § 1605(a)(3) "even were [it] not bound by *Simon*," *id.*, the majority rendered that independent analysis paradigmatic *obiter dicta*. Again, *obiter dicta* consists of those statements not actually necessary to arrive at a case's disposition, as when the court describes how it would have handled a hypothetical, different case. Garner et al., *supra*, at 46–47. That is just the speculation the *de Csepel* majority undertook: "Although [*Simon*] is sufficient to resolve the question," it said, "even were we not bound by *Simon*, we would hold that

a foreign state retains its immunity unless the first clause of the commercial-activity nexus requirement is met." *De Csepel*, 859 F.3d at 1107. By the majority's own admission, then, all that was necessary to *de Csepel*'s disposition was the alleged bindingness of *Simon*. The majority's independent analysis could have been deleted from the opinion, and *de Csepel*'s outcome would have been the same—a fact plainly making that independent analysis mere *dicta*. Garner et al., *supra*, at 46 (noting that "a *dictum* is a statement in a judicial opinion that is unnecessary to the case's resolution"). So because that speculation about how the majority *would have decided* a different case involving hypothetical facts was logically unnecessary to its decision, that independent analysis was not a *ratio decidendi*, and thus is not binding on future courts. Edward Jenks, *The New Jurisprudence* 105 (1933) ("[J]udges may have uttered what are known as *dicta* or *obiter dicta*, i.e. opinions as to what views they *would have taken* had the material facts in their case been otherwise . . . Such *dicta* are not binding on later tribunals[.]") (emphasis added).

And not only is the *de Csepel* majority's independent rationalization of its view of § 1605(a)(3) not binding, but it is not even persuasive. As is universally understood, it is the *text* of a statute that establishes the law for which the statute stands. *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1737 (2020) ("When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law[.]"); Scalia & Garner, *supra*, at 56 ("The words of a governing text are of paramount concern, and what they convey, in their context, is what the text means."). Once again, the relevant text of § 1605(a)(3) is as follows:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case— [. . .]
>
>> (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the

> foreign state; or that property or any property exchanged for
> such property is owned or operated by an agency or
> instrumentality of the foreign state and that agency or
> instrumentality is engaged in a commercial activity in the United
> States[.]

Like most other statutes, § 1605(a)(3) follows "a hierarchical scheme in subdividing statutory

sections." *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004). In drafting parlance,

the (a) in § 1605(a)(3) is a "subsection," and the (3) in § 1605(a)(3) a "paragraph." *Id.* Within this

nested set, the subsection—that is, (a)—is like an umbrella, under which are gathered the

subsequent paragraphs, such as paragraph (3). And those paragraphs, in turn, refer back to and

explicate their overarching subsection—in this case, (a).

 With that basic understanding in place, it is easy to see why both this Court's and the

*Chabad* panel's reading of § 1605(a)(3) was correct. Paragraph (3) has three distinct clauses. The

first, "in which rights in property taken in violation of international law are in issue," is separated

from the latter two clauses by a conjunctive "and." § 1605(a)(3). The latter two clauses, in turn,

are separated from each other by a semicolon and a disjunctive "or." *Id.* ("[T]hat property or any

property exchanged for such property is present in the United States in connection with a

commercial activity carried on in the United States by the foreign state**; or** that property or any

property exchanged for such property is owned or operated by an agency or instrumentality of the

foreign state and that agency or instrumentality is engaged in a commercial activity in the United

States[.]") (emphasis added). Thus, for jurisdiction over a sovereign and its agencies or

instrumentalities, the plaintiff must establish either of the two latter clauses and, in all cases, must

satisfy the first clause. And when the plaintiff makes that showing, what question has she

answered? The question posed by subsection (a), and to which all portions of paragraph (3) refer

back: when it is that "[a] *foreign state* shall not be immune from the jurisdiction of the courts of

the United States." § 1605(a). And again, the FSIA defines a "foreign state" as both the sovereign's

agencies and instrumentalities and the foreign sovereign *itself*. 28 U.S.C. § 1603(a).

In contrast to that exposition of the plain text, the *de Csepel* majority manufactured a new

jurisdictional qualification and then implanted that embellishment into § 1605(a)(3) to rationalize

*Simon*. According to the *de Csepel* majority, what (a)(3) *really* says—plain text notwithstanding—

is this:

> (a) A foreign state shall not be immune from the jurisdiction of courts of
> the United States or of the States in any case— [. . .]
>
>> (3) in which rights in property taken in violation of international
>> law are in issue and that property or any property exchanged for
>> such property is present in the United States in connection with
>> a commercial activity carried on in the United States by the
>> foreign state; or, **when the defendant is an agency or
>> instrumentality,** that property or any property exchanged for
>> such property is owned or operated by an agency or
>> instrumentality of the foreign state and that agency or
>> instrumentality is engaged in a commercial activity in the United
>> States[.]

But that bolded embellishment is, of course, not actually present in the statute. Because it has *no*

textual warrant and thus contradicts *Chabad*'s (correct) interpretation, it therefore cannot be the

law established by § 1605(a)(3).

Why did the *de Csepel* majority so revise the statute? Its opinion leaves the answer

mysterious. That reading certainly did not accord with the plain text, and the opinion did not even

suggest that its revision somehow better effectuated congressional "intent." The justification

proffered by the majority, instead, was the supposed need to avoid "odd results" engendered by

the statute's actual text. *De Csepel*, 859 F.3d at 1108. The majority pointed to two such "odd

results" it hoped to avoid by re-writing the statute. *Id.* But the first "result" the majority envisioned

was predicated on a nonsensical argument, and the second is not an "odd" result of § 1605(a)(3),

but instead a result that flows directly from the statute's design.

32

Taking these supposedly "odd results" in turn, the *de Csepel* majority said, first, that reading (a)(3)'s second prong to establish jurisdiction over a foreign state itself would mean, paradoxically, that the second prong could never establish jurisdiction over a foreign state's agencies or instrumentalities. *Id.* at 1107. The *de Csepel* majority reasoned as follows: The FSIA, it said, "generally allows for 'an agency or instrumentality of a foreign state' to count as a foreign state." *Id.* True enough. *See* 28 U.S.C. § 1603(a). But then, said the majority, if "foreign state" were read to mean "foreign sovereign or its agency or instrumentality" throughout (a)(3), then, bizarrely, the court would have no jurisdiction over the Hungarian museums and university that possessed the expropriated property in *de Csepel*. 859 F.3d at 1107. That was so, it reasoned, because the second prong of (a)(3) would effectively read "or that property or any property exchanged for such property is owned or operated by an agency or instrumentality **of the agency or instrumentality** and that agency or instrumentality is engaged in a commercial activity in the United States." *Id.* Thus, because the property at issue in *de Csepel* was possessed by an agency or instrumentality of the sovereign (state museums and a university), rather than an agency or instrumentality of an agency or instrumentality, the majority reasoned that *Chabad*'s view of (a)(3) would paradoxically deprive the *de Csepel* panel of jurisdiction. *Id.*

But as was said above, this reading of § 1605(a)(3) makes no sense on its own terms. As the *de Csepel* majority correctly recognized, for purposes of (a)(3), the FSIA here treats the definition of "foreign state" as a foreign sovereign and its agency or instrumentality. *Id.* So with that definition in place, replacing "foreign state" with "foreign sovereign and its agency or instrumentality" causes § 1605(a)(3) to read as follows:

> (a) A **[foreign sovereign or its agency or instrumentality]** shall not be immune from the jurisdiction of courts of the United States or of the States in any case— [. . .]

33

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the **[foreign sovereign or its agency or instrumentality]**; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the **[foreign sovereign or its agency or instrumentality]** and that agency or instrumentality is engaged in a commercial activity in the United States[.]

So even on the *de Csepel* majority's reasoning, what the second prong actually establishes is that its terms are satisfied when the expropriated property is possessed *either* by an agency or instrumentality of the agency or instrumentality (essentially, a sub-agency) *or* by an agency or instrumentality of the foreign sovereign itself. Keeping the definition consistent throughout (a)(3), then, would have provided jurisdiction over the agencies (the state museums and university) in *de Csepel* itself—a fact the *de Csepel* majority plainly failed to realize.

The second, supposedly "odd result" the *de Csepel* majority perceived from the operation of § 1605(a)(3)'s plain text was framed as follows:

Because a foreign state could be amenable to suit whenever its agency or instrumentality is not immune, a plaintiff would be able to sue a foreign state with no commercial activity in the United States so long as the agency or instrumentality owning the property in issue is engaged in a commercial activity in the United States. In other words—and counterintuitively—a plaintiff . . . could more easily obtain jurisdiction over a foreign state if the expropriated property is possessed not by it, but by one of its agencies or instrumentalities[.]

*Id.* at 1108. That first sentence, though couched hypothetically, is simply a recitation of how the plain text of § 1605(a)(3) operates. Where the foreign agency or instrumentality possesses expropriated property and has commercial contacts in the United States, the foreign sovereign itself may be sued. The *de Csepel* majority considered that result "counterintuitive[]," though, and thus apparently not the law, because it would allow plaintiffs to "more easily obtain jurisdiction

over a foreign state if the property is possessed not by it, but by one of its agencies or instrumentalities." *Id.*

But that was precisely the aim of § 1605(a)(3)'s drafters: to provide an alternative and broader mechanism to gain jurisdiction over a foreign sovereign when the expropriated property was outside the United States. As Professor Mark Feldman, himself a drafter of the original FSIA, has explained,

> In drafting the expropriation exception, State and Justice[11] recognized that foreign states confiscating American investments in natural resources (including petroleum and mining properties) would likely transfer the resources to separate legal entities that might want to do business in the United States. As an element of U.S. expropriation policy, the second prong of Section 1605(a)(3) was created to allow actions against a *foreign state (including its agencies and instrumentalities)* when a government agency or instrumentality that owns or operates property taken in violation of international law is engaged in a commercial activity in the United States. Under that prong, no nexus is required between the expropriated property (presumably held abroad) and the commercial activity in the United States.

Mark B. Feldman, *Cultural Property Litigation and the Foreign Sovereign Immunities Act of 1976: The Expropriation Exception to Immunity*, 3 ABA Sec. of Int'l L. 9, 11 (2011).

(emphasis added). Therefore, Professor Feldman explains,

> Section 1605(a)(3) expressly provides, as the Executive drafters and the Congress clearly intended, that a foreign state, such as [the Russian Federation], shall not be immune from the jurisdiction of the U.S. courts in any case in which the specified property is 'owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.'

Expert Witness Report and Opinion of Mark B. Feldman, ECF No. 90-2, *Mezerhane v. Republica Bolivariana de Venezuela* (S.D. Fla. June 3, 2013) (Case No. 1:11-cv-23983-MGC). So what the

---

[11] Tenam claims that "because of the role of the State Department and the Department of Justice in drafting the FSIA, the views of the United States on such issues are afforded 'special attention.'" Mot. at 4, ECF No. 225. The United States's views *now* as to the interpretation of the statute "merit no special deference." *Republic of Austria v. Altmann*, 541 U.S. 677, 701 (2004). And unfortunately for Tenam, the views of the FSIA's *drafters* at those departments directly refute its interpretation of § 1605(a)(3). *See* Expert Witness Report and Opinion of Mark B. Feldman, ECF No. 90-2, *Mezerhane v. Republica Bolivariana de Venezuela* (S.D. Fla. June 3, 2013) (Case No. 1:11-cv-23983-MGC).

*de Csepel* majority thought "counterintuitive" was, in fact, the precise intuition of the FSIA's drafters,[12] and one they codified into § 1605(a)(3)'s plain text. The second prong is supposed "to allow actions against" both a foreign state's agencies and instrumentalities *and* "against a foreign state" *itself* when the former possess expropriated property and do business in the United States. Feldman, *Cultural Property Litigation*, *supra*, at 11.

There is nothing "odd" or "anomalous" about that result. The FSIA was born of an era when "[c]onfiscatory takings of American investments were widespread," having recently occurred "in Cuba, Peru, Chile, Jamaica[,] and in Africa." *Id.* at 9. Because "[r]emedies in foreign courts were illusory," "there was a strong U.S. policy interest in providing a domestic judicial remedy for takings of foreign investment in violation of international law." *Id.* at 9–10. But that interest in a domestic remedy also stood in tension with international norms, which considered expropriation a "sovereign" rather than a commercial act. *Id.* at 10. That was a problem, because under the prevailing "restrictive" theory of sovereign immunity, only foreign states' commercial acts were stripped of their immunity. *Id.* The solution the FSIA's drafters reached was to create two immunity exceptions for expropriations they thought sufficiently commercial. *Id.* The first— (a)(3)'s first prong—was intended to be "extraordinarily narrow" with its requirement that the expropriated property actually be in the United States in connection with commercial activity. *Id.* But the drafters realized few sovereigns would be so brazen. *Id.* So the second prong—at issue here—was made deliberately broader. *Id.* It construed expropriations to be sufficiently "commercial" to permit suit against the sovereign itself under the restrictive theory when the

---

[12] For whatever it is worth, the legislative history also supports the *Chabad* panel's interpretation of the statute. The House Report states that "Section 1605 sets forth the general circumstances in which a claim of sovereign immunity by a foreign state, as defined in section 1603(a), would not be recognized in a Federal or State court in the United States." H. Rep. 94-1487, 94th Cong. 2nd Sess., September 9, 1976, p. 18. In its later explication of "[e]xpropriation claims" under Section 1605(a)(3), it draws no distinction between the liability of a foreign sovereign under prong one and the liability of a foreign sovereign's agency or instrumentality under prong two. *Id.* at 19.

sovereign transferred property to an agency or instrumentality that had commercial contacts on our soil. *Id.* The drafters realized that that broad a definition stretched the limits of the restrictive theory. But they balanced that fact against the strong desire for a "domestic remedy" for then-prevalent expropriations. *Id.* It was by careful design, then, that the second prong encompassed subjection of foreign sovereigns to liability. And it was a frustration of that design for the *de Csepel* majority to limit the second prong with its atextual embellishment.

In closing, the Court would note that this Opinion is not the first time that *de Csepel*'s majority opinion has been refuted, but the second. Senior Judge Randolph, dissenting in *de Csepel*, systematically explained the majority's missteps. He pointed out that the majority erroneously contended that "§ 1605(a)(3) should be treated as if it means the opposite of what it actually provides[.]" *De Csepel*, 859 F.3d at 1111 (Randolph, J., dissenting). Even more importantly, he pointed out that the majority opinion violated the law of the circuit doctrine. *Id.* at 1113. ("[T]he majority's failure to follow *Chabad* is clear error.").

That diagnosis was exactly right. And for that reason, on review of this Court's denial of Tenam's Rule 60(b) motion, the D.C. Circuit is under no obligation to follow *de Csepel*'s majority opinion. Rather, the law of the circuit doctrine requires it to follow *Chabad*. Tenam, therefore, has not made a "strong showing" that *de Csepel* makes Tenam's appeal "likely to succeed on the merits." *Nken*, 556 U.S. at 434.

> *(A)(2)(3). Schubarth v. Federal Republic of Germany,* 891 F.3d 392 (D.C. Cir. 2018)

Third, Tenam points to *Schubarth v. Federal Republic of Germany* as evidence that it is likely to succeed on appeal. *Schubarth* is simply a conclusory recitation of the D.C. Circuit's "holding [so-called] in *de Csepel* [that] a foreign state is immune to claims for the expropriation of property not present in the United States." *Schubarth*, 891 F.3d at 394–95. Indeed, the opinion

contains only four sentences of "analysis" regarding the German government's sovereign immunity. (And one of those is just a string cite to *de Csepel*). *Id.* at 401. *Schubarth* makes no attempt to explain how either *Simon* or *de Csepel*—itself a purported application of *Simon*, which was itself a purported application of *Chabad*—are at all consistent with *Chabad*. And thus it makes no attempt to explain why its conclusions are consistent with the law of the circuit doctrine. Citation to *Schubarth*, then, is not a "strong showing" that Tenam is likely to succeed on appeal, because the D.C. Circuit remains bound by *Chabad*—a fact undisturbed by *Schubarth*.

> *(A)(2)(4). Philipp v. Federal Republic of Germany*, 894 F.3d 406, 414 (D.C. Cir. 2018)

Fourth and last, Tenam invokes *Philipp v. Federal Republic of Germany*. 894 F.3d 406 (D.C. Cir. 2018). *Philipp* is as conclusory as is *Schubarth*. *Philipp*, 894 F.3d at 414. The *Philipp* panel simply remarked that "[i]n *Simon* we held [sic] that, with respect to foreign states (but not their instrumentalities), the expropriation exception's second requirement—'an adequate commercial nexus between the United States and the defendant[ ], *de Csepel*, 859 F.3d at 1101— is satisfied only when the property is present in the United States." *Philipp*, 894 F.3d at 414 (quoting *Simon*, 812 F.3d at 146). (Note how *Philipp* had to embed a citation to *de Csepel* into the middle of a purported citation to *Simon*, since *Simon* itself contains no rationale for its so-called "holding."). Like *Schubarth*, *Philipp* simply applied *Simon* and *de Csepel*'s spurious reading of § 1605(a)(3) while ignoring the comedy of errors that had produced it. And also like *Schubarth*, *Philipp* made no attempt to explain how application of *Simon* (again, itself a purported application of *Chabad*) is consistent with *Chabad* itself. It failed to do so because *Simon* cannot be squared with *Chabad*. Because *Simon* is irreconcilable with *Chabad*, *Simon* is irreconcilable with the law of the circuit doctrine. And because, under that doctrine, *Chabad* controls, Tenam's invocation of *Philipp* is not a strong showing it is likely to succeed on appeal.

*(A)(3). Ordering the Return of the Archive and Library ("Specific Performance")*
*As Against the Russian Federation Was A Permissible Remedy*

Tenam next claims that it has made a "strong showing" it is "likely to succeed" in persuading the D.C. Circuit that this Court had no "jurisdiction to order specific performance against a foreign sovereign State (concerning property held in its territory and not within the United States)." Mot. at 4, ECF No. 225. This argument is flawed for several reasons. The scope of liability under the FSIA is not a "jurisdictional" question, but a question of the remedies permitted by the FSIA once the Court determines that it has jurisdiction over the controversy. The FSIA itself draws this distinction at 28 U.S.C. § 1606, which governs the "[e]xtent of liability" of foreign sovereigns. It states, in relevant part,

> As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages[.]

28 U.S.C. § 1606. Thus, § 1606 governs remedies, not jurisdiction. By its terms, it presumes that the subject-matter jurisdictional determination has already been made under §§ 1605 or 1607 by the time the court assesses the scope of the foreign sovereign's liability. That § 1605—not § 1606—governs threshold jurisdictional issues, furthermore, accords with the plain text of § 1605. 28 U.S.C. § 1605 (providing "exceptions to the *jurisdictional* immunity of a foreign state") (emphasis added).

Tenam mislabels not only the nature of the § 1606 inquiry (it is remedial, not jurisdictional), but the disputed remedy itself. It characterizes this Court's Order directing the defendants to return Chabad's materials as one requiring "specific performance." Order, ECF No. 80. But specific performance "is a form of injunctive relief that compels the defendant to perform [a] contract with the plaintiff." Edward D. Re, *Remedies: Cases and Materials* 281 (2d ed. 1987).

It is a contractual remedy, and more specifically, a contractual remedy in equity. *Id.* There is no contract at issue that Chabad seeks to enforce, so it is unclear why Tenam constantly refers to "specific performance." What Chabad sought in its complaint was, essentially, equitable replevin[13]—an injunction ordering that the defendants return Chabad's "fragile and irreplaceable" holy texts. Complaint at 21–22, ECF No. 1. Background principles of equity supplied such a cause of action. 1 *Pomeroy's Equity Jurisprudence* § 177a (Spencer W. Symons ed., 5th ed. 1941) (noting that "where the chattel has a certain special, extraordinary, and unique value impossible to be compensated for by damages," equitable replevin is available); *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (noting that equitable remedies persist even where the statute itself does not contain an implied right of action). And because the Russian Federation had no sovereign immunity regarding that claim, as discussed above, this Court had original jurisdiction over the controversy under the FSIA. 28 U.S.C. § 1330.

And not only did this Court have jurisdiction to entertain the controversy, but it was permitted to order the return of Chabad's materials as well. As the plain text of § 1606 states, "[a]s to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, *the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances*." (emphasis added). So, because the Russian Federation does not enjoy immunity as to Chabad's claim, it may be liable to the same extent as would private converters wrongfully detaining Chabad's chattel. It is unquestionable that this Court lawfully could compel a private converter to return wrongfully detained property. For that reason, and under the plain text of the FSIA, it also may so compel the Russian Federation.

---

[13] Replevin was classically a remedy at law. Dan B. Dobbs, *The Law of Torts* § 67 (2000). But it was also available in equity where the chattel was "special, extraordinary, and unique." 1 *Pomeroy's Equity Jurisprudence*, *supra*, at § 177a; *see also* M.T. Van Hecke, *Equitable Replevin*, 33 N.C. L. Rev. 57 (1954). Chabad's holy texts obviously fit that description.

Tenam's only remaining objection is that the materials subject to this Court's Order are held outside the United States. Mot. at 4, ECF No. 225. Though its brief is opaque on this point, Tenam apparently disagrees that this Court was authorized to enjoin the return of property held abroad. But the lawfulness of this Court's Order follows from both the FSIA's plain text and basic principles in the law of judgments. To understand why that is so requires an appreciation of the difference between an *in personam* equitable decree (the situation at issue in this case) and pre-judgment attachment.

In the law of judgments, "attachment" includes two distinct concepts, neither of which is relevant to this litigation. In its first sense, "attachment" refers to a court's pre-judgment levy or seizure of property to guard against the possibility the defendant might remove the property from the jurisdiction during the litigation. *Restatement (Second) of the Law of Judgments* § 8 (Am. Law Inst. 1980) (distinguishing "attachment jurisdiction" from pre-judgment attachment); *see also* Jack H. Friedenthal, Mary Kay Kane & Arthur R. Miller, *Civil Procedure* § 3.2 (4th ed. 2005). Attachment temporarily transfers possession and control of the property to the state during the suit. And if the plaintiff prevails, the attached property may then be used to satisfy the judgment. Pre-judgment attachment requires, indeed, that the attached property reside within the attaching court's geographic jurisdiction. *Restatement (Second) of the Law of Judgments* § 8 (Am. Law Inst. 1980) (noting that property attached pre-judgment must be "local property" within the court's geographic jurisdiction); *see also* Friedenthal, Kane & Miller, *supra*, at § 3.2.

In its other sense, attachment is also a mechanism to establish a court's jurisdiction over the controversy. Jurisdictional attachment may be either *in rem* or *quasi in rem*. When the plaintiff wishes to determine title to a piece of property and bind all the world, she may sue the property itself. So long as the property actually resides within the court's geographic jurisdiction, that

physical presence endows the court with *in rem* jurisdiction to adjudicate the property's title. *Restatement (First) of the Law of Judgments* § 32 (Am. Law Inst. 1942); *see also* Friedenthal, Kane & Miller, *supra*, at § 3.2. *Quasi in rem* jurisdiction, by contrast, was formerly a doctrine through which courts could gain jurisdiction over a defendant's *person* as a result of her *property* being physically present within the court's geographic jurisdiction. *Restatement (First) of the Law of Judgments* § 34 (Am. Law Inst. 1942); *see also* Friedenthal, Kane & Miller, *supra*, at § 3.2. *Quasi in rem* jurisdiction has been functionally abolished by modern personal jurisdiction doctrine, which requires that suits satisfy the Due Process minimum contacts test. *See Shaffer v. Heitner*, 433 U.S. 186 (1977). The key point, though, is that both *in rem* and *quasi in rem* jurisdiction require the relevant property to reside within the court's geographic jurisdiction.

*In personam* jurisdiction, however, is fundamentally different. In contrast to judgments *in rem*, judgments *in personam* create "a personal liability or obligation" against the defendant herself in her personal capacity. *Restatement (First) of the Law of Judgments* p. 5 (Am. Law Inst. 1942). Particularly in equity, "[t]he effect of such a judgment is to impose a duty upon the defendant to do or refrain from doing [a] designated act." *Id.* at 6; 2 *Pomeroy's Equity Jurisprudence* § 428 (Spencer W. Symonds ed., 5th ed. 1941) ("Equity acts *in personam*, not *in rem*."). And because an *in personam* judgment runs against the defendant's *person*, rather than against her property, what matters in determining whether the court had valid jurisdiction to render the judgment is whether the court had jurisdiction over the defendant's *person*. *Restatement (First) of the Law of Judgments* p. 5 (Am. Law Inst. 1941) ("Such a judgment may be rendered where the jurisdiction of the court which renders it is based on the court's power over the *persons* upon whom . . . the liabilities are imposed.") (emphasis added).

And if the court had valid *in personam* jurisdiction over the defendant to compel the defendant to dispose of his property in a certain way, then it does not matter that the property *itself* resides outside the court's geographic jurisdiction. That is so because even though the property itself resides extraterritorially, the judgment runs against the defendant's *person*. So insofar as the judgment-rendering court had valid personal jurisdiction over the defendant's *person*, the defendant himself is bound to dispose of his property in the manner directed by the court. That is a basic doctrine of equity jurisprudence. 5 *Pomeroy's Equity Jurisprudence* § 1318 (Spencer W. Symons ed., 5th ed. 1941) ("The jurisdiction to grant such remedies is well-settled. Where the subject-matter is situated within another state or country, but the parties are within the jurisdiction of the court, any suit may be maintained and remedy granted which *directly* affect and operate upon the person of the defendant, and not upon the subject-matter, although the subject-matter is referred to in the decree, and the defendant is ordered to do or to refrain from certain acts toward it[.]"); *see also Bispham's Principles of Equity* 27 (Joseph D. McCoy ed., 11th ed. 1931) ("[W]hen the *parties* are within the jurisdiction of a court of chancery, it will not, ordinarily, hesistate to grant relief, although the property to be ultimately affected by the decree may lie in another forum."); *Fall v. Eastin*, 215 U.S. 1, 8 (1909) ("A court of equity, having authority to act upon the person, may indirectly act upon real estate in another state[.]"); *French v. Hay*, 89 U.S. 250, 252–53 (1874) ("The court having jurisdiction *in personam* had power to require the defendant to do or refrain from doing anything beyond the limits of its territorial jurisdiction which it might have required to be done or omitted within the limits of such territory."). And if the defendant refuses to comply with such an *in personam* judgment, the plaintiff may enforce the judgment by having the defendant's property seized in either the court's own jurisdiction or in a foreign jurisdiction—

with the aid of that jurisdiction's local sheriff—or by having the defendant held in contempt. *Restatement (First) of the Law of Judgments* p. 6 (Am. Law Inst. 1941).

The only remaining question, then, is whether this Court's Order represented an *in personam* judgment that ran against the Russian Federation itself. And that it did. Chabad did not sue its own texts *in rem* to quiet their title. Rather, it sued the Russian Federation and its agencies and instrumentalities to compel them to return Chabad's materials. Such a suit under the FSIA obviously is *in personam*, as the statute itself explains. 28 U.S.C. § 1330(a) ("The district courts shall have original jurisdiction . . . as to any claim for relief *in personam* with respect to which the foreign state is not entitled to immunity . . . under sections 1605–1607 of this title[.]"). And again, the statute provides that sovereigns "shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. So because courts of equity may compel a defendant *in personam* to act or refrain from acting as to property outside the court's geographic jurisdiction, so too may this Court compel the Russian Federation to return Chabad's extraterritorial holy texts.

The cases cited over and over to the effect that the Russian Federation somehow enjoys "execution immunity" from this Court's Order are irrelevant. *S & S Machinery Co. v. Masinexportimport*, for example, has once again been dusted off for the proposition that in the FSIA context, "courts . . . may not grant, by injunction, relief which [sic] they may not provide by attachment." 706 F.2d 411, 418 (2d Cir. 1983). That case involved a New York court's pre-judgment attachment of a Romanian instrumentality's assets in the United States at the initiation of a garden-variety breach of contract case. *Id.* at 412–13. The underlying cause of action had no relationship to one of the exceptions to jurisdictional immunity provided in the FSIA, *id.* at 416, such as § 1605(a)(3). Thus, attachment would have required the instrumentality's waiver, which

had not occurred. *Id.* at 416–17. When the case was removed to federal court, however, the district court not only continued the state attachment order, but it entered a further injunction against the instrumentality's negotiation of letters of credit. *Id.* at 413. When the district court realized that the instrumentality remained immune under the FSIA, it vacated the attachment order and dissolved its own injunction. *Id.* On review, the Second Circuit concluded that the injunction's dissolution was correct. *Id.* at 418. Because the instrumentality enjoyed an underlying immunity from attachment, the district court could "not grant, by injunction, relief which [sic] [it] may not provide by attachment." *Id.*

Despite its frequent-flyer status in this case's briefing, *S & S Machinery Co.* self-evidently has nothing to do with the situation in *Chabad*. The plaintiff in *S & S Machinery Co.* had identified *no* exception to jurisdictional immunity in the FSIA, and it thus sought pre-judgment attachment plainly unauthorized by the FSIA's text. As the Second Circuit correctly pointed out, the district court could not, then, enjoin property protected by statute. *Id.*; *see also* 11 *Bispham's Principles of Equity*, *supra*, at 27 ("Equity will not give a remedy in direct contravention of a positive rule of law."). Chabad, by contrast, has litigated this entire case via an exception to jurisdictional immunity—§ 1605(a)(3). And it has not even sought execution upon assets held extraterritorially to the United States, such as the Library and Archive. All Chabad has thus far suggested it *may* seek to execute upon are the Russian Federation's assets held *in the United States*, which Chabad proposes could satisfy the sanctions debt.

Neither equity nor the FSIA bars such execution. It is well-established in equity jurisprudence that the winner of the decree may execute upon the defendant's assets *within* the court's territorial jurisdiction if the defendant flouts a decree about how he must dispose of his assets *outside* the court's territorial jurisdiction. *Restatement (First) of the Law of Judgments* p. 6

(Am. Law Inst. 1941). And it is equally well-settled that in the context of foreign sovereign immunity, the sovereign's assets *within* the United States are not immune from execution, so long as the underlying cause of action was predicated upon an exception to jurisdictional immunity. 28 U.S.C. § 1610(a)(3) ("The property in the United States of a foreign state . . . used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States . . . if the execution relates to a judgment establishing rights in property which has been taken in violation of international law[.]"). Because Tenam has offered no compelling argument as to why any of the above analysis is wrong, it has not made the requisite strong showing that it is likely to succeed in persuading the D.C. Circuit that ordering the Collection's return was an impermissible remedy.

*(A)(4). This Court's Imposition of Sanctions Upon the Russian Federation Was Permissible*

This Court's Memorandum Opinions of July 26, 2011, ECF No. 100, and September 10, 2015, ECF No. 143, comprehensively explained why this Court was authorized to impose sanctions upon the Russian Federation: the Russian Federation declared that it had no intention of complying with this Court's Order. *Id.* Accordingly, this Court held the Russian Federation and the associated defendants in contempt. And it therefore imposed civil contempt sanctions against the defendants designed to coerce them to comply. *Id.* When the defendants' contumacy continued, this Court awarded Chabad an interim judgment of accrued sanctions. Mem. Op., ECF No. 143. Tenam's briefing barely discusses this Court's authority to enter those sanctions, Mot. at 7, ECF No. 225, much less presents a "strong showing" it is likely to persuade the D.C. Circuit they were impermissible. Indeed, the D.C. Circuit has plainly instructed that such sanctions are permitted under the FSIA. *FG Hemisphere Assocs., LLC v. Dem. Rep. Congo*, 637 F.3d 373, 378 (D.C. Cir. 2011) (upholding contempt sanctions against a foreign sovereign since "there is not a smidgen of

indication in the text of the FSIA that Congress intended to limit a federal court's inherent contempt power.").

*(B) Factor Two: Tenam Will Not Be Irreparably Injured Absent a Stay*

Tenam's arguments about irreparable injury fare no better. Tenam seeks to portray Chabad's discovery requests as expensive, time-consuming, "invasive[,] and burdensome." Mot. at 2, 4–5, ECF No. 225. And it fears that "confidential and sensitive information relating to [its] trade secrets, corporate relationships, nuclear fuel contacts in a small industry, and utility clients in the United States" could be forever unleashed into the public domain. *Id.* Thus, it says, it would be "irreparably harmed . . . if discovery is not stayed." *Id.*

That rhetoric aside, Tenam acknowledges that what's really going on is just a "discovery dispute." Mot. at 1, ECF No. 225. The Russian Federation lost in court—several times now—and Tenam wants to avoid the logical consequence of those losses: that Chabad may conduct discovery to determine if Tenam holds Russian assets that might satisfy the sanctions debt. That's a problem for Tenam, because "[t]he rules governing discovery in postjudgment execution proceedings are quite permissive." *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 138 (2014); *see also* Fed. R. Civ. P. 69(a)(2). Indeed, in this very context—foreign sovereign immunity—the Supreme Court has explained that the FSIA and the FRCP permit broad post-judgment discovery, even into those assets that might themselves be protected from execution by sovereign immunity. *Id.* at 138, 144–45. That is so, the Supreme Court has explained, because judgment creditors "do[] not yet know" the nature and immunity status of such assets *until* they obtain discovery into them. *Id.* at 144. And thus, even where those assets are not ultimately executable, the judgment creditor still has a right to determine that fact through discovery.

*NML*'s holding not only makes sense intuitively, but it also accords with the plain text of the Federal Rules of Civil Procedure. Rule 26 provides that, subject to this Court's discretion, "[p]arties may obtain discovery regarding *any* nonprivileged matter that is *relevant* to any party's claim or defense[.]" Fed. R. Civ. P. 26(b)(1) (emphasis added); *see also NML Capital, Ltd.*, 573 U.S. at 139. And the scope of such discovery is not limited to just parties. Rather, "[a] judgment creditor may obtain discovery from *any person*, including the judgment debtor, in aid of the judgment or execution." Wright and Miller, *supra*, at § 3014 (emphasis added). That includes third parties like Tenam, which can be required to disclose information about the assets of the judgment debtor (the Russian Federation) and to answer "probing questioning" as to its relationship with the same. *Id.*

So as is clear, both the Federal Rules themselves and the Supreme Court's binding interpretations evince a preference for broad and effective discovery. Whatever injury Tenam asserts from that necessary consequence of litigation, it is not of the "certain" and "great" variety that would justify this Court's grant of the extraordinary remedy of a stay. Chabad seeks discovery "relevant" to enforcement of this Court's Order, to which it is plainly entitled. Fed. R. Civ. P. 26(b)(1). Moreover, Tenam has done nothing to help itself avert the harms it alleges. Tenam's reply complains that no protective order exists in this case. Reply at 3, ECF No. 227. Yet Tenam has never bothered to move this Court for a protective order, which would have been the logical mechanism to defuse virtually all the consequences of discovery Tenam now complains about. *See* Fed. R. Civ. P. 26(c). Tenam cannot, at the eleventh hour, request an extraordinary remedy to achieve that which it should have sought months ago. 5 *Pomeroy's Equity Jurisprudence* § 418 (Spencer W. Symons ed., 1941) ("Equity aids the vigilant, not those who slumber on their rights.").

Last, Tenam argues that discovery should be stayed because of the ongoing COVID-19 pandemic. Mot. at 5, ECF No. 225. Discovery, it says, would confound its "critically important business of ensuring the delivery of nuclear fuel to U.S. utilities." *Id.* The Court does not put much stock in that representation. Tenam is simply the marketing arm of its parent company, Tenex. Decl. of Fletcher Newton ¶ 6, ECF No. 176-2. Tenam has no business dealings with any other entities besides Tenex. *Id.* at ¶ 9. And Tenex is the entity that actually manufactures the relevant nuclear fuel products. *Id.* at ¶ 6. Tenam, by contrast, is just the pass-through to U.S. purchasers. *Id.* Tellingly, according to Tenam's own brief, Tenam has just two full-time employees, and even they work from home. Mot. at 5, ECF No. 225. Despite Tenam's grandiose depiction of itself, Chabad has not exactly stumbled across the Manhattan Project. There is no serious evidence that discovery would somehow disrupt the United States's nuclear fuel industry.

Moreover, the vast majority of the discovery Chabad seeks is documentary rather than testimonial. Subpoena, ECF No. 176-3. Those documents can be exchanged electronically and remotely, so their exchange does not pose any elevated health risk. Chabad's brief in response also pointed out that "the parties have continued to litigate in a way that minimizes health risks and can do so with respect to the present discovery requests." Opp'n at 5, ECF No. 226. The Court understands that comment to mean that documentary discovery shall be undertaken first, and that any testimonial discovery shall follow only when consistent with applicable local and national guidelines. On those facts, COVID-19 is not a persuasive reason to grant Tenam's requested stay.

*(C) Factor Three: A Stay is Unlikely to Substantially Injure Chabad*

Chabad claims that it would be injured by a stay because discovery "is an important step in achieving" Chabad's goal of regaining its holy texts. Opp'n at 6, ECF No. 226. Tenam counters that the "grant of a stay would not harm others," including Chabad. Mot. at 6, ECF No. 225. Tenam

also points out that it "does not actually possess any of the property" Chabad seeks; that is, the Archive and the Library. *Id.* Accordingly, Tenam argues that "whether or not discovery proceeds . . . Tenam thus has no ability to make [Chabad] whole." *Id.*

The Court agrees with Chabad that Chabad probably would be injured if this Court were to issue a stay. Chabad is entitled to discovery because the information it may learn from Tenam— namely, whether Tenam holds executable assets of the Russian Federation—is "relevant to [Chabad's] claim" against the Russian Federation. Fed. R. Civ. P. 26(b)(1). That standard— relevance—does not require Chabad to demonstrate that discovery into Tenam could single-handedly secure the return of all Chabad's property. Rather, Chabad must only propound an inferential chain through which discovery makes the recovery of its property more likely than that recovery would be in discovery's absence. *See* Michael H. Graham, 2 *Handbook of Federal Evidence* § 401:1 (8th ed. 2016) (explaining relevance). And Chabad has done so: if Tenam possesses assets of the Russian Federation with which it could satisfy the sanctions debt, the coercive effects of that execution may make it more likely that the Russian Federation would return the texts than if the execution had never occurred. That is, after all, the very point of a coercive sanction.

But the third factor, by its terms, calls for an inquiry into whether Chabad would be *substantially* injured. *Nken*, 556 U.S. at 434. It is not clear to this Court that Chabad's injury upon the issuance of a stay would be "substantial." That is so simply because it is unknown what assets of the Russian Federation Tenam possesses. It may possess few or none, such that discovery would fail to reveal any significant, executable assets that could satisfy the sanctions debt. And thus the coercive effect discovery may facilitate is too uncertain to label discovery's delay, *ex ante*, a "substantial" injury.

In any event, though, Chabad's failure to sufficiently satisfy factor three does not entitle Tenam to a stay. If Tenam were otherwise entitled to a stay under factors one, two, and four, a convincing showing from Chabad on factor three might counsel hesitation to award that remedy. But Tenam has not made the requisite showings as to factors one and two. And its arguments under the fourth factor also fail for the reasons explained below.

### (D) Factor Four: The Public Interest Favors Discovery

The movant's—in this case, Tenam's—burden under the public interest factor is the subject of some dispute across the circuits, and the standard even within the D.C. Circuit in the analogous context of a preliminary injunction is not entirely clear. M. Devon Moore, Note, *The Preliminary Injunction Standard: Understanding the Public Interest Factor*, 117 Mich. L. Rev. 939, 940 (2019). One view is that the remedy must simply "not harm" the public interest. *Id.* at 951. Another is that the remedy must affirmatively further it. *Id.* at 949. And a leading D.C. Circuit case on the subject, *League of Women Voters*, can be read to support either view. *League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016). That decision states at one point that the remedy must "*accord with* the public interest." *Id.* at 6 (emphasis added). One thing can "accord with" another merely if they are "consistent with" each other. *Accord With*, New Oxford American Dictionary (3d ed. 2010). So it seems that a remedy that does no harm is at least "consistent with" the public interest. By contrast, the same decision later says that the remedy must "*serve* the public interest," *League of Women Voters*, 838 F.3d at 12 (emphasis added), which connotes affirmative furtherance rather than merely non-harm. *Serve*, New Oxford American Dictionary (3d ed. 2010) ("[B]e of use in achieving or satisfying.").

Whatever the correct view between those two options, however, it is not outcome-determinative in this case. Tenam has not shown that a stay would affirmatively further the public

interest, or even that a stay would do no harm. Instead, the public interest aligns with the enforcement of this Court's Order, the integrity of this country's judicial process, and the return of Chabad's Collection. A stay, then, would cut affirmatively *against* the public interest. That is so for three reasons.

First, it is plainly evident that the American public desires the return of Chabad's materials. In 1992, every sitting United States Senator signed an appeal to then-President of the Russian Federation Boris Yeltsin imploring him to "secure the return of the Lubavitch texts." Senate Letter to Pres. Yeltsin (May 31, 1992), ECF No. 15-3. It was their "hope and expectation" that those materials soon would be returned. *Id.* In 1993, they wrote again to "request that [he] do everything possible to ensure the release of the Schneersohn-Agudas Chabad Library collection." Senate Letter to Pres. Yeltsin (Mar. 16, 1993), ECF No. 15-3. But of course, those requests were not honored. Again in 2005, every sitting United States Senator wrote to now-President of the Russian Federation Vladimir Putin, again imploring him to "return these sacred religious texts, archives, and manuscripts to Chabad." Senate Letter to Pres. Putin (Feb. 22, 2005), ECF No. 15-3. That same year, 273 members of the House of Representatives sent President Putin a similar letter that "urge[d him] to return the entire Schneersohn collection to its rightful owners in the United States." House Letter to Pres. Putin (May 5, 2005), ECF No. 15-3. Indeed, as this Court has previously pointed out, the United States is "home to many followers of Chabad." *Chabad I*, 466 F. Supp. 2d at 30. So it is in *their* interest, to be sure, that their materials are returned, but their return would also serve the universal interests of "justice, human rights, and religious tolerance." House Letter to Pres. Putin (May 5, 2005), ECF No. 15-3. Tenam's requested stay, by contrast, would harm that interest by placing yet another obstacle in Chabad's path to the enforcement of this Court's judgment.

Second, the public, which through their tax dollars supports this nation's court system, has an interest in the integrity of the judicial process. At the outset of this litigation, the Russian Federation appeared and began to defend the action. *See, e.g.*, Supp. Mem., ECF No. 14. Had it won, it undoubtedly would have waived the judgment at Chabad as conclusive proof of the Russian Federation's right to the Collection. But when it lost on jurisdiction, it picked up its things and left. Notice, ECF No. 71. The Russian Federation made clear its intent never to comply with this Court's judgment. *Id.* It is often said that a judgment is just a piece of paper. Literally speaking, that may be true. But a judgment is supposed to represent much more: a binding declaration of the parties' rights and liabilities that enables the winner to satisfy those liabilities through the legal process. In this case, though, the Russian Federation has endeavored to make this Court's judgment worth less than the paper it was written on. The Russian Federation has refused to respect that judgment, and accordingly, it was held in contempt. Its entities now seek to escape the consequences of that decision by blocking Chabad's efforts to execute upon the contempt sanctions. But such flouting of the judicial process contravenes the rule of law, and it therefore harms the public interest.

Last, the Court is not persuaded that the foreign policy consequences that Tenam alleges might flow from Chabad's discovery show that a stay would be in the public interest. Mot. at 7, ECF No. 225. Since this case's inception, the executive branch has said that it wants the return of Chabad's materials. *See, e.g.*, Statement of Interest at 6, ECF No. 97. But it also has opposed virtually everything Chabad has done to get them back. It maintains that "dialogue" with the Russian Federation is the appropriate mechanism to pursue the Collection's return. *See e.g.*, Statement of Interest at 2, ECF No. 190. But the details of whatever "dialogue" it has undertaken

are always vague, and to the extent any has occurred to this point, it obviously has been unsuccessful. *See* Mem. Order at 6, ECF No. 198; Mem. Op. at 7–11, ECF No. 143.

The executive's views are appreciated. But that branch is one of three. When Congress passed the FSIA in 1976, it deliberately inaugurated a new system of foreign sovereign immunity in the United States. Gone were the days in which the judiciary gave the executive near-automatic deference to its views in suits that concerned foreign sovereigns. Instead, those suits were now governed by a new system of positive law—the FSIA. And the FSIA's passage announced to the world, too, that it sometimes would have to take the bitter with the sweet. Foreign sovereigns were free to avail themselves of our markets. But to the extent they did so, they might also be held liable on our soil for their violations of international law. That a carefully drafted piece of legislation passed by a democratically elected Congress permits such a "domestic remedy" itself indicates that attainment of that remedy was democratically adjudged to be in the public interest. Feldman, *Cultural Property Litigation*, *supra*, at 10. To the extent the executive disagrees with a straightforward application of the FSIA, those "apprehensions are better directed to that branch of government with authority to amend [it.]" *NML Capital*, 573 U.S. at 146.

## IV.    CONCLUSION

For the above-stated reasons, Tenam's motion for stay is hereby **DENIED**. A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed on this ___6th___ day of November, 2020.


_____
ROYCE C. LAMBERTH
SENIOR U.S. DISTRICT JUDGE


54