**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AGUDAS CHASIDEI CHABAD<br>OF UNITED STATES,<br><br>          *Plaintiff,*<br><br>v.<br><br>RUSSIAN FEDERATION; RUSSIAN<br>MINISTRY OF CULTURE AND MASS<br>COMMUNICATION; RUSSIAN STATE<br>LIBRARY; and RUSSIAN STATE<br>MILITARY ARCHIVE<br><br>          *Defendants,* | Case No. 1:05-cv-01548-RCL<br><br>**REDACTED PUBLIC VERSION** |

<u>**PLAINTIFF AGUDAS CHASIDEI CHABAD OF UNITED STATES'**</u>
<u>**MOTION TO ATTACH PROPERTY OR, IN THE ALTERNATIVE,**</u>
<u>**TO REGISTER JUDICIAL LIENS**</u>

**TABLE OF CONENTS**

TABLE OF AUTHORITIES ................................................................................................. iii
I. BACKGROUND ............................................................................................................. 1
    A.     The D.C. Circuit Has Issued Its Mandates ........................................................ 1
    B.     Current Status of VEB and Tenex .................................................................... 2
          1.    VEB ......................................................................................................... 2
          2.    Tenex ...................................................................................................... 3
II. ARGUMENT .................................................................................................................. 5
    A.  Requirements for Attachment Under the FSIA ................................................ 5
          1. Chabad has Satisfied the FSIA's Procedural Requirements .......................... 5
          2.    Russian Federation Property Is Subject to Attachment under
               the FSIA ................................................................................................. 5
               a.     Property "in the United States." .................................................. 6
               b.     Property used for a "commercial activity." .................................. 7
               c.     Property of a "foreign state." ...................................................... 7
    B.     VEB And Tenex Assets are Subject to Attachment .......................................... 13
          1. VEB ......................................................................................................... 13
          2. Request for Attachment of VEB Assets ................................................... 20
          3.    Tenex and Tenex-USA ........................................................................... 21
                a.     Rosatom .................................................................................... 23
                b.     Atomenergoprom ...................................................................... 26
               c.     Tenex ....................................................................................... 28
          4.    Request for Attachment of Tenex Assets ................................................. 34
III. CONCLUSION ............................................................................................................. 35

**TABLE OF AUTHORITIES**

**CASES**

*Agudas Chasidei Chabad of United States v. Russian Federation,*
   Slip op. No. 20-7078 (D.C. Cir. Dec. 3, 2021) ................................................................... 2

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
   462 U.S. 611 (1983) ......................................................................................................... passim

*McKesson Corp. v. Islamic Rep. of Iran,*
   52 F.3d 346 (D.C. Cir. 1995) ......................................................................................... passim

*Rep. of Argentina v. Weltover, Inc.,*
   504 U.S. 607 (1992) ................................................................................................................. 7

*TMR Energy, Ltd. v. State Property Fund of Ukraine,*
   411 F.3d 296 (D.C. Cir. 2005) ....................................................................................... passim

*Transamerica Leasing, Inc. v. La Republica de Venezuela,*
   200 F.3d 843 (D.C. Cir. 2000) ....................................................................................... passim

**STATUTES**

28 U.S.C. § 1603 ............................................................................................................. 7, 14

28 U.S.C. § 1610 ........................................................................................................... 1, 5, 6

**RULES**

Fed. R. Civ. P. 30 ................................................................................................................. 4

**REGULATIONS**

Amendment to the Agreement Suspending the Antidumping Investigation on
   Uranium from the Russian Federation, 73 Fed. Reg. 7705 (February 11, 2008) ................ 30

Pursuant to the  Foreign Sovereign Immunity Act ("FSIA"), 28 U.S.C. § 1610, Plaintiff Agudas Chasidei Chabad of United States ("Chabad") respectfully submits this motion to attach the property of the Russian Federation held or controlled by VEB.RF ("VEB") and JCS Techsnabexport (Tenex"), and to execute on that property in satisfaction of this Court's judgments.  In the alternative, if necessary to maintain access to the property, Chabad moves for authorization to assert and record judicial liens on that property.

As explained below, Chabad has satisfied the FSIA's procedural requirements for attachment of, and execution on, Russian Federation property pursuant to 28 U.S.C. § 1610(c), and the target property is subject to attachment and execution pursuant to 28 U.S.C. § 1610(a)(3).  Accordingly, Chabad requests that the Court grant this motion.[1]

## I.     BACKGROUND

### A.  The D.C. Circuit Has Issued Its Mandates

Chabad will not recount the long history of this case.  As this Court is aware, it has issued (1) a judgment holding the Defendants liable for the expropriation of Chabad's sacred Library and Archive (together referred to as the "Schneerson Collection" or "Collection") and ordering them to return the Collection; and (2) a judgment awarding Chabad $78.3 million in accrued sanctions against Defendants for failure to comply with this Court's judgment.  The total accrued sanctions now amount to $164,450,000.[2]

---

[1]   **A note on sources and confidential materials**:  All citations in the form "Ex. X" refer to exhibits attached to the accompanying Declaration of Robert P. Parker ("Parker Dec.").  *See* Parker Dec., ¶ 5.  As explained in that declaration, all of the exhibits were either (i) submitted by VEB or Tenex-USA in support of their respective motions to quash Chabad's subpoenas, (ii) taken from the website of the relevant entity, or (iii) filed with the U.S. Nuclear Regulatory Commission.  Pursuant to the protective order entered in this case, two exhibits have been designated as confidential.  Confidential material in this brief has been identified by double brackets ("[[  ]]").

[2]   By a separate motion, Chabad has asked the Court to increase the monetary judgment to the full amount of the accrued sanctions.

Following entry of the Court's second judgment, Chabad served subpoenas on a number of entities, including VEB.RF and Tenex-USA, Inc., Tenex's U.S. agent.[3]  VEB and Tenex-USA moved to quash the subpoenas, and the Court denied those motions.  VEB and Tenex-USA then appealed this Court's rulings to the D.C. Circuit by different routes.  That Court affirmed this Court's ruling as to Tenex-USA, and dismissed VEB's appeal for lack of jurisdiction.  *Agudas Chasidei Chabad of United States v. Russian Federation,* Slip op. No. 20-7078 (D.C. Cir. Dec. 3, 2021).

The D.C. Circuit's mandate with respect to Tenex-USA issued on January 11, 2022.  VEB petitioned for rehearing and rehearing *en banc*, and, after that motion was denied, moved to stay issuance of the mandate pending the filing of a petition for writ of *certiorari* (which it has not filed), and later moved separately for a stay pending the substitution of counsel (although VEB's counsel did not file a motion to withdraw).  By order dated March 21, 2022, the Court of Appeals denied VEB's motions, and the mandate with respect to VEB issued on March 28, 2022.  There are no appeals or motions pending in the D.C. Circuit or any other court.

**B.  Current Status of VEB and Tenex**

**1.  <u>VEB</u>**

Chabad seeks to attach VEB assets that may be found in (or that are subject to attachment from) the United States, including but not limited to real and personal property, securities, deposits, cash, or other assets that VEB owns or controls in the United States.  Because these assets have been frozen under the U.S. government's sanctions regime, Chabad also asks for permission to record a judicial lien on any assets that VEB has or may acquire in the United States, so that Chabad may execute on those assets in due course.

---

[3]  Previously, the parties referred to this entity as "Tenam."  The U.S. agent's name has been changed to "Tenex-USA."  *See*  https://www.tenam-usa.com/ (last visited April 4, 2022).  We will refer to the entity as Tenex-USA.

Nominally, VEB is the Russian Federation agency that finances that country's international investment projects.  It also serves as the Russian Federation's agent for the management and settlement of Russian sovereign debt around the world.  Senior U.S. government officials have correctly referred to VEB as the Kremlin's "piggy-bank."  Ex. A.  The U.S. government has frozen VEB's assets in two separate orders, first as a sanction for Russia's invasion of Crimea in 2014, and more recently as a sanction for Russia's invasion of Ukraine earlier this year.  Ex. B.

As a result of VEB's delays in this case, and then the U.S. government's latest sanctions, VEB's counsel has represented that is no longer in a position to appear on VEB's behalf, although it did not file a motion for leave to withdraw either in the D.C. Circuit or before this Court. [4]  VEB still has not responded to Chabad's subpoena, and given the U.S. government's freeze on VEB's assets, Chabad no longer has access to information from VEB directly. However, as demonstrated below in Sections II.B(1) and (2), publicly available information, including important information that VEB produced in connection with its motion to quash Chabad's subpoena, confirms that VEB's assets meet the FSIA's requirements for attachment and for execution in satisfaction of this Court's judgments.

### 2.  Tenex

Chabad seeks to attach uranium products and other materials owned or controlled by Tenex, and to execute on those materials in satisfaction of the Court's judgments.  In the alternative, so as to avoid disruption in the supply of uranium to U.S. utilities and other users, Chabad asks the Court to allow Chabad to attach the proceeds of payments for that uranium from

---

[4]    On February 25, 2022, VEB's counsel contacted Chabad's counsel to report that he and his firm were no longer able to represent VEB in light of the U.S. government's sanctions regime.  *See* Declaration of Robert Parker ("Parker Decl."), ¶ 4.  Soon thereafter, VEB filed in the D.C. Circuit its motion for a stay pending substitution of counsel.  As noted above, the D.C. Circuit denied that motion, and VEB's counsel has not filed a motion to withdraw.

the utilities and other customers to Tenex and/or to Tenex's agent in the United States, Tenex-USA.

Tenex is the successor to a World War II-era Soviet agency engaged in the development of nuclear materials and related activities, and Tenex plays an important role in Russia's management of its nuclear-industrial complex to this day.  In 2007, Tenex was placed under the control of Rosatom, the Russian Federation agency responsible for that country's military and civilian nuclear activities.  Tenex established Tenex-USA as its U.S. agent, and Tenex-USA has produced documents and provided a deposition witness pursuant to this Court's subpoena and Fed. R. Civ. P. 30(b)(6).  As explained in Sections II.B(3) and (4) below, the information that Tenex-USA produced, the testimony of Tenex-USA's Rule 30(b)(6) witness, and publicly available information (including information filed with the U.S. Nuclear Regulatory Commission) confirm that Tenex is Rosatom's agent, and the agent of the Russian Federation, with respect to Russia's sale of nuclear materials to the United States.  Its assets are therefore subject to attachment.

To summarize, no appellate proceedings are pending in this case, and there are no other barriers to this Court's resumption of jurisdiction. Having exhausted legal remedies in Russia (only to have a victory snatched away by the Russian government), and having waited patiently for diplomatic efforts to run their course, Chabad now looks to this Court's judgments to secure the return of its sacred property.   To that end, Chabad is prepared to proceed with the next phase of the litigation – attachment of, and execution on, Russian Federation property.  However, Chabad repeats a point it has emphasized throughout this case: the seizure of Russia's property is a step towards Chabad's sole objective, which is the return of Chabad's sacred Collection.

## II.    ARGUMENT

### A.  Requirements for Attachment Under the FSIA

#### 1.  Chabad has Satisfied the FSIA's Procedural Requirements

The FSIA specifies the procedures to be followed with respect to the attachment of

sovereign property.  Pursuant to 28 U.S.C. § 1610(c):

> No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

These requirements were satisfied more than a decade ago.  As this Court held then:

> 1. [E]ach defendant in this action has been served with a copy and translation of the Court's Memorandum Opinion, July 30, 2010 [81] and Order & Judgment, July 30, 2010 [80] in a manner consistent with the procedures set forth in 28 § U.S.C. 1608(a)–(b), as required by 28 U.S.C. § 1608(e); and

> 2. a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under § 1608(e), and thus defendants have had an adequate opportunity to respond to the entry of judgment.  Accordingly, it is hereby

> ORDERED that plaintiff may enforce their judgment against defendants in any manner consistent with 28 U.S.C. § 1610 through a Writ of Attachment or Execution pursuant to Fed. R. Civ. P. 70, except that plaintiff may not attempt to attach or execute upon any property or interest belonging to defendants that constitutes art, artifacts, or other cultural objects subject to immunity under 22 U.S.C. § 2459.

Order Granting Motion to Enforce Judgment and Permit Attachment, July 26, 2011.  ECF 101.

Since the Court entered that order, Chabad has continued to serve Defendants with copies

of Chabad's filings and with the Court's orders, so nothing about the Court's previous order is

"stale."  Accordingly, the requirements of § 1610(c) have been met.

#### 2.  Russian Federation Property Is Subject to Attachment under the FSIA

The FSIA identifies the foreign sovereign property that is subject to attachment or

execution in satisfaction of a judgment.  As relevant to this case, 28 U.S.C. § 1610(a) provides:

> The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from

5

attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

\*\*\*

(3)  the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law[.]

In its order denying Tenex-USA's motion to quash Chabad's subpoena, this Court held that the

judgments in this case qualify for attachment under § 1610(a)(3):

[Tenex-USA] urges the Court to read "relates to" [in § 1610(a)(3)] narrowly.  While it does not dispute that property has been taken in violation of international law, [Tenex-USA] refutes that either the Default Judgment . . . or the Interim Judgment . . . establishes a valid right in that property.  The Court cannot agree – both judgments are clearly predicated on Chabad's rights to the stolen collection.  In the absence of controlling or on-point precedent, the Court will read "relates to" under its plain meaning.  *Chabad is not yet seeking execution against [Tenex-USA].  If it ever does, such execution would not relate to a spontaneous and unilateral declaration of entitlement by Chabad.  Rather, it would relate directly to these judgments and the rights they establish.  Section 1610(a)(3) is not a roadblock to Chabad's theory of execution.*

ECF 198 at 7 (emphasis added).  *See also* Order Denying Tenex-USA's Motion for a Stay

Pending Appeal, ECF 228 at 46 (§ 1610(a)(3) permits execution of a sovereign's property "so

long as the underlying cause of action was predicated upon an exception to jurisdictional

immunity").

The statute has three additional requirements that are directed to the specific property

subject to attachment or execution: (i) the property must be located "in the United States," (ii)

the property must be used for a "commercial activity," and (iii) the property must be "of a

foreign state."  We turn to these elements in order.

a.  Property "in the United States."

On numerous occasions, Chabad has stated its intention to identify, attach, and execute

on Russian Federation property <u>located in the United States</u>.  This Court has recognized

Chabad's position on this issue: "All Chabad has thus far suggested it *may* seek to execute upon

[] the Russian Federation's assets held *in the United States,* which Chabad proposes could satisfy the sanctions debt."  ECF 228 at 45 (italics in original).  Chabad reiterates the point here, and all of the property Chabad seeks to attach pursuant to this motion is located in the United States.

b.  Property used for a "commercial activity."

The FSIA defines "commercial activity" to include "either a regular course of commercial conduct or a particular commercial transaction or act."  28 U.S.C. § 1603(d). For these purposes, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  *Id.*

The Supreme Court supplemented this definition in *Rep. of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614 (1992): "[T]he issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages is 'trade and traffic or commerce[.],'" (citations omitted, italic in original).

Both VEB and Tenex are commercial enterprises engaged in commercial activities.  VEB engages in banking activities and other commercial transactions.  Tenex and Tenex-USA sell uranium and other nuclear materials to entities in the United States.  These entities thus engage in "commercial activity" for FSIA purposes.

c.   Property of a "foreign state."

Foreign governments often do not own property outright – rather, government property is assigned to government agencies, departments, ministries, instrumentalities, government-owned corporations, and other entities that the sovereign establishes or acquires for a particular purpose. When a foreign sovereign assigns assets to a government corporation or similar entity, attachment of the assets raises questions as to whether a U.S. court must respect the entity's form – that is, whether the form insulates those assets from attachment under the FSIA.  Supreme

Court and D.C. Circuit decisions set the guidelines for making that determination, and highlight the extent to which "piercing the sovereign-corporate veil" is different from "piercing the private-corporate veil" under American state-law principles.

In *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611 (1983) (*"Bancec"*), the Supreme Court recognized "the presumption that a foreign government's determination that its instrumentality is to be accorded separate legal status" will be respected in U.S. courts. *Id.* at 628. However, the Supreme Court also expressed concern that a foreign sovereign not be allowed to "escape liability for acts in violation of international law simply by retransferring the assets to separate juridical entities. To hold otherwise would permit governments to avoid the requirements of international law simply by creating juridical entitles whenever the need arises." *Id.* at 633.

The Supreme Court therefore declined to announce a "mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded." *Id.* Instead, the Court called for the application of "internationally recognized equitable principles to avoid the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law." *Id.* at 633-34.

Consistent with these principles, the D.C. Circuit has applied *Bancec* in several cases involving government-owned entities. In *McKesson Corp. v. Islamic Rep. of Iran,* 52 F.3d 346 (D.C. Cir. 1995), the Court considered McKesson's claim against the Iranian government with respect to McKesson's minority interest in an enterprise, "Pak Dairy," in which the Iranian government held a majority stake. The D.C. Circuit applied the *Bancec* presumption that entities such as Pak Dairy are separate from the sovereign, *id.* at 351, but upheld the district court's ruling that Iran could not hide behind Pak Dairy's corporate form.

The Court in *McKesson* held that corporate formalities did not protect the Iranian government from McKesson's claims.  At the outset, "organizations of the Iranian government" (such as the National Investment Company, the Bank of Industry and Mine, etc.) owned a majority of Pak Dairy's stock, and controlled six of seven seats on its board.  The shareholders and the board "forced the dairy to disregard its commercial mission and its duties to McKesson as a [minority] shareholder."  Instead, Pak Dairy was operated for "the profit of the people and the Government," and the company's main objective was "to protect the interests of the country."  *Id.* at 351-52.

The Court then applied the relevant rule of decision:  "In the international context, jurists and scholars recognize that when a state-controlled corporation implements state policies, its separate corporate existence does not shield the state from liability."  *Id.* at 352 (citations omitted).  Finding Iran's involvement in Pak Dairy to be a far cry from a case in which "a government corporation is simply carrying out a state commercial policy as a normal part of the corporation's mission," the Court rejected Iran's efforts to hide behind Pak Dairy's corporate form.  *Id.*

Whereas *McKesson* involved a commercial entity engaged in a governmental mission, *Transamerica Leasing, Inc. v. La Republica de Venezuela,* 200 F.3d 843 (D.C. Cir. 2000), concerned a true commercial enterprise that happened to be government-owned.  Plaintiff in *Transamerica* asked the Court to hold Venezuela liable for a judgment against a government-owned shipping company ("CAVN").  The Court considered whether CAVN was subject to a sufficient level of governmental control to warrant setting aside the corporate form.  Specifically, the Court asked whether the government's oversight "significantly exceed[ed] the normal supervisory control exercised by any corporate parent over its subsidiary" – *e.g.*, the entities are operated as a "single enterprise";  one corporation is "operated as a division of another";  the

entities "may be so intermingled that no distinct corporate lines are maintained"; or the corporation is a "shell, inadequately financed."  *Id.* at 848-49.  Separately, the Court considered whether "the sovereign exercises its control in such a way as to make the instrumentality its agent[.]"  *Id.* at 849.

Applying these concepts, the Court concluded that the Venezuelan government's ownership of CAVN's stock, and its appointment of CAVN's board, were "relevant," but insufficient in themselves to ignore CAVN's corporate status.  *Id.* at 851.  Looking further, the Court found little else "[b]eyond the features inherent in a state-owned corporation, namely the government's ownership of stock and control of the Board of directors[.]"  *Id.* at 853.  The Court highlighted the different circumstances in *McKesson,* and observed that the Pak Dairy in *McKesson* had not "simply carr[ied] out a state commercial policy as a normal part of the corporation's mission, without any state involvement but instead had <u>acted to effectuate governmental policy . . . through a corporate policy guided by government representatives</u>."  *Id.* at 853 (emphasis added, citation and internal quotation marks omitted).

A third case, *TMR Energy, Ltd. v. State Property Fund of Ukraine,* 411 F.3d 296 (D.C. Cir. 2005), concerned TMR's enforcement of an arbitration award against an oil company, Linos.  Ukraine owned 67% of Linos through defendant State Property Fund of Ukraine ("SPF"), the Ukraine-government entity established as part of the country's privatization program following the Soviet Union's collapse.  SPF moved to dismiss TMR's claim under the Due Process Clause, arguing that it was a "person" separate from the Ukrainian government.  The D.C. Circuit considered (i) whether SPF was "an integral part of a foreign state's political structure," in which case it would "be treated as the foreign state itself," or (ii) whether SPF's "structure and core function" were commercial, in which case it would be treated as a separate instrumentality.  *Id.* at 300 (internal quotation marks omitted).

Although the issue raised in *TMR* did not concern a sovereign's liability for a judgment, the Court applied *Bancec*:  "[T]he same analysis must govern whether the SPF is a 'person' within the meaning of the due process clause," *viz.,* whether "the State of Ukraine exerted sufficient control over the SPF to make it an agent of the State[.]"  *TMR,* 411 F.3d at 301.  Citing Ukranian laws and regulations, the Court answered in the affirmative, finding that "the State of Ukraine had plenary control over the SPF."  *Id.*  Under Ukranian law, SPF was responsible for the implementation of national policy in the area of privatization, and was subject to the control of a central Ukraine government authority.  *Id.* at 302.  SPF's senior official was appointed and discharged by Ukraine's president, and members of SPF's board were approved by the highest counsel of Ukraine's government.  "From these structural features it is apparent that the SPF is an agent of the State, barely distinguishable from an executive department of the government, and should not be treated as an independent juridical entity."  *Id.*

*Bancec, McKesson, Transamerica,* and *TMR* establish the general guideposts that are relevant to this Court's consideration of this motion.

*First*, *Bancec* and D.C. Circuit cases set out "no mechanical formula for determining the circumstances under which the normally separate juridical status of a government instrumentality is to be disregarded," but rather apply "recognized equitable principles" to avoid injustice.  *Bancec,* 462 U.S. at 633.  The question of whether a sovereign entity's assets should be treated as the assets of the sovereign itself is not subject to precise calculation.  Instead, courts must engage in a fact-based inquiry leading to a decision applying equitable principles.

*Second,* the fact that the sovereign is a majority shareholder with the right to appoint the corporate board is significant, but not dispositive.  However, additional facts demonstrating sovereign control of the entity above and beyond that of a majority shareholder, or a demonstration that the entity is an agent of the state, will suffice to hold a sovereign liable for the

entity's judgment.  In *McKesson,* those facts concerned the Iranian government's deployment of Pak Dairy to achieve governmental purposes separate and apart from the dairy's own commercial interests.  In *TMR,* the Court found that SPF was under the government's control in light of Ukranian regulations and the involvement of the country's senior government officials. In *Transamerica*, the lack of these indicators warranted respect for the corporation's separate identity.

*Third*, courts look to whether the entities are focused on commercial objectives (as in *Transamerica*), or whether they operate pursuant to other state policies and goals (as in *McKesson*).  Under *McKesson*, "when a state-controlled corporation implements state policies, its separate corporate existence does not shield the state from liability."  *McKesson,* 52 F.3d at 352.  As rephrased in *TMR*, "[A]n entity that is an integral part of a foreign state's political structure is to be treated as the foreign state itself, whereas an entity the structure and core function of which are commercial is to be treated as an agency or instrumentality of the state." *TMR,* 411 F.3d at 300 (citation and internal quotation marks omitted).

*Fourth,* the circumstances of the underlying judgment matters.  Courts distinguish between (i) a situation in which a judgment is against a sovereign entity and the judgment creditor is seeking to attach assets in the hands of the sovereign (*Transamerica*), and (ii) the judgment is against the sovereign itself and the plaintiff is seeking attachable assets that the sovereign has chosen to place in the hands of government entities (*McKesson*).  The latter situation touches directly on the Supreme Court's concern that sovereigns not be able to avoid the consequences for their unlawful acts (like the expropriation of property), by claiming that their assets in the United States are protected by a corporate or other juridical form.  *Bancec,* 462 U.S. at 633.

In sum, a government's ownership of an entity, including the ownership of stock and the appointment of directors, is a starting point.  From there, courts consider the entity's structure and governance, as reflected in its enabling statute and other laws and regulations, to determine whether the government exercises sufficient control over the entity, or whether the entity operates as the government's agent.  If either condition holds, then *Bancec* and D.C. Circuit precedent provide a path to attachment and execution on the entity's assets, notwithstanding its corporate form.

We apply these principles to VEB and Tenex, and demonstrate that each should be held to be indistinguishable from the Russian Federation itself.

### B.  VEB And Tenex Assets are Subject to Attachment

#### 1.  VEB

Earlier this year, the U.S. government imposed sanctions on VEB in order to "begin the process of dismantling the Kremlin's financial network and its ability to fund destabilizing activity in Ukraine and around the world."  To emphasize the point, a senior U.S. government official quoted on the White House website described VEB as "a glorified piggy bank for the Kremlin."  *See* Exs. A and B.

This is not hyperbole.  As discussed below, VEB was established for two purposes: to serve as the Russian Federation's designated agent in connection with the country's foreign debt, and otherwise to fund Russian-government activities according to the whim of the Russian Federation's president and prime minister.  As the U.S. government's sanctions orders confirm, VEB's "corporate status" is virtually irrelevant, and VEB's assets are in fact the assets of the Russian Federation itself.

The starting point is VEB's enabling law, Law No. 82-FZ, "On State Development Corporation 'VEB.RF'."  The statute sets out VEB's "legal status, organisational principles, incorporation and business purposes, reorganisation and liquidation procedures."  *See* Ex. C.

Under the enabling statute, VEB is a "state corporation," not a private joint stock company.  *Id.*  A White Paper published on VEB's website explains this point in greater detail:

> VEB.RF is not a commercial bank.  Rather, VEB.RF is a non-profit state development corporation established by Russian federal law for the public good.
>
> ***
>
> VEB.RF is a Russian "state corporation," which is a specific form of legal entity under Russian law.  As a state corporation, VEB.RF is a non-profit, non-commercial organization.
>
> State corporations are established to pursue defined objectives for the public good and are assigned specific functions that determine the scope of their business activities and powers.  Accordingly, state corporations are permitted to engage in commercial activity only to the extent that such activity is consistent with their purpose and contributes to the accomplishment of their specific goals.  Moreover, as a state corporation, VEB.RF is not governed by standard Russian commercial banking laws and regulations and is instead subject to laws and regulations specific to it. . . .  Importantly, VEB.RF is not licensed by the Central Bank of Russia and is not subject to regulatory oversigh by the CBR.

Ex. D at pp. 1, 3-4 (emphasis added).

In FSIA parlance, VEB is "an organ of a foreign state."  28 U.S.C. § 1603(b)(2).  In common parlance, VEB is an agency of the Russian government.  *Id.*

VEB's enabling statute, Russian Federation Law 82-FZ, elaborates on VEB's activities, structure, and governance.  As indicated in the White Paper, under Russian law, VEB "is a state corporation established by the Russian Federation with the status, business purposes, functions and powers governed by this Federal Law, other federal laws and associated regulations of the Russian Federation."  Ex. C, Art. 2(1).  Art. 3(1) of Law 82-FZ sets out VEB's business purposes and functions, including its goal "to facilitate the long-term socio-economic development of the Russian Federation, create the conditions for sustained economic growth, improve investment

14

efficiency and expand investment in the Russian economy," etc.  *Id.* Art. 3(1).  These objectives are not a hortatory ambition, they are a statutory limitation: under Art. 3, any "entrepreneurial activities" must "serve and fulfil the purposes specified in Art. 3(1)."  *Id.* Art. 3(2).

Art. 3 of the statute sets out 32 "principal functions" and "other functions" in which VEB may engage, such as issuing debt, financing, leasing, investing, receiving deposits, etc. Importantly, the list does <u>not</u> authorize VEB to sue or be sued in its own right.  *Id.* Art. 3(3), 3(4).  In other words, VEB is not directly responsible for its actions, separate and apart from whatever steps are available to holding a Russian-government agency accountable under Russian law.  *See Bancec,* 462 U.S. at 624 (government entities established as "separately constituted legal entities" are usually authorized to "sue and be sued").

By law, VEB acts as the Russian Federation's designated agent in international sovereign debt markets.  Under Law 82-FZ, VEB "perform[s] the functions of the agent of the Government of the Russian Federation, including acting for and on behalf of the Russian Federation in court" in connection with, *inter alia*; (i) Russian Federation government guarantees, and obligations under those guarantees; (ii) settlement of Russian government debts; and (iii) safekeeping of Russian government securities.  Ex. C, Art. 21(1).  Separate and apart from whether VEB's nominal assets as a development bank are attributable to the Russian Federation, therefore, VEB is directly involved in the management and settlement of Russian Federation debt, the handling of Russian Federation securities, and similar activities in which it holds or manages assets belonging to the Russian Federation itself.

In addition to its statutory role as agent for the Russian Federation, VEB is required to provide financing and financial guarantees for other institutions "[b]ased on the decision[s] of the Government of the Russian Federation."  Ex. C, Art. 3(5.3).  This provision is not limited to legislative or administrative constraints.  On the contrary, VEB is at the beck and call of Russia's

president and prime minister.  It must "participate in the implementation" of projects of national significance "[a]s instructed by" by Russia's two senior political officials, "even if they [the instructions] are not consistent with the principal areas, targets, limitations or principles applicable to VEB.RF's investment and financial activities in accordance with the procedure specified in this Federal Law."  *Id.,* Art. 3(5).  In other words, VEB is required to engage in *ultra vires* activities on the say so of Russia's head of state or head of government.  Piggy bank indeed.

To the extent that an independent board might have insulated VEB from political interference, the statute actually ensures that Russia's senior political officials retain control. VEB's "supreme governing body" is its nine-member "supervisory board," which is chaired by the Russian Federation's prime minister – who, as noted above, is one of the individuals with plenary authority to direct VEB's activities notwithstanding other legal constraints.  Ex. C,  Art. 10(2).  As of 2019, the members of the supervisory board included Russia's prime minister, five deputy prime ministers, a minister of the Russian Federation, and the chair of VEB's management committee (*ex officio*).  Ex. E (Kremlin report of conversation between Vladmir Putin and Igor Shuvalov on the latter's appointment as VEB's chair).  Lest the Court be misled into thinking that the chair of the management committee might offer some independent oversight, the Russian prime minister nominates a candidate for that position, and the chair is then appointed by, and serves at the pleasure of, Russia's president.  Ex. C, Art. 15(2).

Given this backdrop, it is not surprising that the U.S. government and financial analysts have identified VEB as a tool of the Russian government.  In 2014, following Russia's invasion of Crimea, the U.S. government imposed an initial set of sanctions on VEB, which it described as "a development bank and payment agent for the Russian government."  Among other things, the government pointed to VEB's role as "an agent for the Russian Government for the purposes

of accounting, servicing, and repaying the sovereign debts of the former USSR and Russia; accounting, servicing, and repaying government loans issued by the former USSR and Russia to foreign borrowers; . . . [and] providing and executing state guarantees of Russia and monitoring projects implemented by Rissian with involvement of international financial institutions." Ex. F.

The U.S. government was more explicit about VEB's connections to the Russian government when it imposed additional sanctions following Russia's invasion of Ukraine earlier this year. "Today Treasury is targeting Russia's ability to finance aggression against its neighbors by sanctioning the Corporation Bank for Development and Foreign Economic Affairs Vnesheconombank (VEB) and [another bank], along with 42 of their subsidiaries. VEB is crucial to Russia's ability to raise funds. . . ." Ex. B. The Treasury Department identified VEB as one of two banks

> that play specific roles to prop up Russia's defense capability and its economy. . . VEB occupies a unique role in Russia's financial system as the servicer of Russia's sovereign debt, financier for exports, and a funding source for investment projects with a loan portfolio of over $20 billion. VEB finances Russia's national economic development, including large-scale projects to develop domestic infrastructure and other industries that are critical to Russia's generation of revenue."

*Id.* It was unnecessary for the U.S. government's purposes to point out that all of these activities are under the direct control of the president and prime minister.

To summarize, VEB is an important financial arm of the Russian government. As a formal matter, it is the Russian government's agent with respect to sovereign debt and related matters. Beyond that formal agency role, VEB implements Russian government policy, regardless of statutory constraints. VEB's structure is noteworthy for the absence of any indicia of independent authority. VEB's supervisory board is not just *appointed* by the Russian government, but actually *comprises* the head of Russia's government and his minions, and its senior manager serves at the Russian president's pleasure. *See* Ex. E.

Under *Bancec* and D.C. Circuit precedent, allowing Chabad to attach and execute on VEB's assets in the United States is therefore appropriate for a number of independent reasons.

*First*, such a course follows from equitable principles. This Court's judgments were directed to the Russian Federation on account of its unlawful expropriation of Chabad's property. As demonstrated above, VEB's assets are either assets of the Russian government over which VEB formally acts as agent (*e.g.,* with respect to Russian sovereign debt), or they are assets VEB holds for use as the most senior political officials of the Russian Federation dictate. Compared to VEB, the Ukranian entity in *TMR* (SPF) was a model of independent corporate governance and probity.

*Second,* insofar as the *Bancec* equitable principles require consideration of third-party interests, no one who has dealt with VEB can be under any illusions as to its status. Given the lack of statutory constraints on the Russian government's right to deploy VEB assets at will, and the lack of a "sue and be sued" provision in VEB's enabling statute, no reasonably diligent third party that has dealt with VEB could claim surprise or prejudice when those assets are directed to the satisfaction of the Russian Federation's legal obligations.

*Third*, the circumstances of this case exceed the standards set out in *Transamerica,* and even exceed those recognized in *McKesson* and *TMR*. In *Transamerica,* the Court noted that the government's appointment of a corporate board and senior manager was relevant, but not sufficient. In VEB's case, the head of state and head of government have *de jure* control of the institution by virtue of their statutory right to issue orders directly to the institution, even if those orders would have VEB engage in *ultra vires* activities. Moreover, the Russian president and prime minister exercise *de facto* control over VEB by their direct representation on the VEB supervisory board and control over the senior manager. In short, there is no semblance of

independent governance that separates VEB from the Russian Federation's highest political apparatus.

*Fourth,* insofar as VEB is the Russian Federation's designated agent for management of sovereign debt and similar matters, the assets VEB holds are actually those of the Russian Federation. The situation is similar to a commercial bank deposit in the U.S.; the funds may be held by the bank, but the funds belong to the depositor. Insofar as VEB holds Russian Federation funds or other financial instruments as the Russian Federation's agent, then to that extent VEB's corporate status is irrelevant to the attachment of VEB assets.

*Fifth,* to the extent there are gaps in the record, the presumption should weigh heavily in Chabad's favor. VEB has had every opportunity to comply with the Court's subpoena and provide relevant information, but it refused. Even after the D.C. Circuit dismissed VEB's appeal because VEB had not filed a timely notice, VEB asked for a stay on the frivolous ground that dismissal for failure to lodge a timely appeal raised an issue likely to attract Supreme Court review. But then Russia invaded Ukraine, the U.S. government imposed a second round of sanctions, and VEB took one last shot – a motion asking the D.C. Circuit for a stay on the ground that it could no longer be represented by counsel (even though counsel never moved to withdraw). VEB, and the Russian Federation itself, should not be allowed to use their own bad acts – in this Court, and more importantly on the world stage – as a barrier to enforcement of the Court's orders.

In sum, VEB is not a commercial enterprise that is operated for commercial purposes, but happens to be owned by the Russian government. VEB operates as an integral part of the Russian government's financial operation, subject to direct control and oversight of the most senior Russian government officials. VEB is "an agent of the State, barely distinguishable from

an executive department of the government, and should not be treated as an independent juridical entity." *TMR*, 411 F.3d at 302.

### 2. Request for Attachment of VEB Assets

As explained above, VEB has not responded to Chabad's subpoenas, and its assets are now frozen as a result of the Russian Federation's invasion of Ukraine. Given the U.S. government's sanctions order, VEB's counsel says that it may not represent VEB. However, because VEB's counsel has not moved to withdraw or to substitute counsel, Chabad's counsel is prohibited from seeking information from VEB directly.

This does not mean that Chabad needs to sit by idly. VEB's White Paper states that "VEB.RF's current activities substantially touch on U.S. interests. VEB.RF services the foreign public debt of the Russian Federation (approximately USD 41.07 billion as of October 1, 2019), of which U.S. investors hold approximately 41%." Ex. D at 2 (footnote omitted). VEB also has interests in Boeing aircraft, having invested over $2 billion to finance the acquisition of Boeing 777 and Boeing 737 MAX planes. *Id.* As a result of the U.S. government's sanctions, VEB assets in the United States are currently under Treasury Department control. Chabad therefore seeks an order from the Court authorizing Chabad to attach, or in the alternative to record a judicial lien, on the following VEB assets:

1. Any real or personal property owned or controlled by VEB in the United States; any property in or associated with VEB's office(s) in the United States; and any vehicles, fixtures, electronics, communications, or other equipment owned or controlled by VEB in the United States.

2. Any currency, deposits, accounts receivable, securities of any kind (including but not limited to Russian Federation securities or debt instruments), accrued or payable

interest or dividends, and similar assets or instruments either located in the United States or available for attachment in the United States.[5]

3. Any property in which VEB has an interest by contract, lien, security interest, or otherwise.

4.  Any interest held by VEB in an entity in the United States, including but not limited to any VEB investment in a U.S. entity, and shares held by VEB in a U.S. entity, and any joint venture interest between VEB and an entity in the United States.

5. Any other asset or property that the U.S. Treasury has included within its sanctions order and that is owned or controlled by VEB in the United States, or that is attributable to VEB's operations in the United States.

6. Any intangible assets owned or controlled by VEB, including trademarks, tradenames, trade secrets, contact lists, databases, licenses, and existing customer or investment accounts.

By entering an order authorizing Chabad to proceed with the attachment of these properties, either immediately or by recordation of a judicial lien, the Court will allow Chabad to work with Treasury Department officials to identify property within the scope of the Court's order, and to secure that property for attachment and execution in satisfaction of the Court's judgments, either now or in the future.

### 3.  Tenex and Tenex-USA

As a political and economic matter, uranium is different from any other element on earth. Given uranium's unique qualities, the Russian Federation and other countries have established a domestic industrial complex to implement the nation's nuclear policies in the military and

---

[5]   Securities, deposits, and other instruments may be owned or controlled by VEB's U.S. affiliate, but nominally held in an account outside of the country.  Chabad respectfully submits that these VEB assets are also "in the United States" for purposes of the FSIA.

civilian spheres.  Two entities at the center of Russia's nuclear complex are Tenex, a Russian government entity with its roots in the Soviet Union's earliest ventures into nuclear technology, and Tenex-USA, Tenex's designated agent in the United States.  Within the Russian Federation's nuclear-industrial complex as currently constituted, these entities are responsible for the Russian government's overseas trade in uranium and other nuclear materials.

To understand Tenex's and Tenex-USA's role, it is important to understand the overall structure of the Russian government's nuclear operation, which can be shown graphically as follows:



As explained in more detail below, Rosatom is Russia's nuclear agency, and it oversees two holding companies, Atomenergoprom and Tenex. The sales division of the Tenex holding company is Rosatom's designated agent in connection with Russia's export of nuclear materials, including to the United States. Tenex-USA is Tenex's U.S. sales agent, and it works directly with Tenex's sales division in connection with Tenex's U.S. transactions in nuclear materials.

      a.  <u>Rosatom</u>

Russia's nuclear complex has its origins in a World War II decree adopted by the Soviet Union's Special Defense Committee on the Organization of Work in Uranium. The Soviet

nuclear apparatus established by that decree evolved into the post-Soviet Federal Agency on Atomic Energy.  In 2007, that agency's powers were assigned to the State Atomic Energy Corporation Rosatom ("Rosatom").  Ex. G, at 8-9 ("State Atomic Energy Corporation Rosatom. Performance in 2019").  Pursuant to two enabling statutes, Rosatom consolidated the entire Russian military and civilian nuclear complex under its umbrella.

The first enabling statute, Law 13-FZ, is entitled "On the Specifics of Managing, Disposing of, the Property and Stock of Organisations Engaged in the Activity of Using Atomic Energy [etc.]."  Ex. H.  Law 13-FZ established the structure of the Russian nuclear complex generally.  The second enabling statute, Law 317-FZ, is entitled "On the State Atomic Energy Corporation Rosatom," and established Rosatom itself.  Ex. I.

Although Rosatom is a "corporation" in name, by statute it is the Russian Federation's "authorized agency in charge of atomic energy use[.]"  *Id.* Art. 2(1).  It has "the organisational and legal form of a state-run corporation," *id.* Art. 3(1), but like VEB, it is not a private joint stock company, or a corporation in the common sense of the term.  Also like VEB, for FSIA purposes, Rosatom is an agency of the Russian government.

Law 13-FZ authorized the transfer of all Russian nuclear operations in the civilian and military spheres to "the public administration body in charge of atomic energy use," *i.e.,* Rosatom, except those military operations excluded by the Russian President.  Ex. H, Art. 1(2), (3).  Within this sphere, Rosatom's obligation is to "ensur[e] the exercise of governmental control over organisations engaged in the activity of atomic energy use."  *Id.* Art. 2(3) (emphasis added).

The second enabling act, Law 317-FZ, "specif[ies] the legal status, organisational principles, aims of establishment and activities," applicable to Rosatom and its subordinate entities.  *See* Ex. I, Art. 1 (scope of the law), Art. 2(3)-(4).  The law vests in Rosatom "the

authority to effect on behalf of the Russian Federation public administration of atomic energy use …, public administration in the exercise of the activities connected with development, production, utilization of nuclear weapon and nuclear power plants of military purpose, as well as normative legal regulation in respect of atomic energy use." *Id.* Art. 2(1).  Under the statute, Rosatom's primary goal is charged with the "pursuance of the state policy, normative legal regulation, rendering of state services and state property management in the area of atomic energy use, development and safe functioning of organisations pertaining to the nuclear industrial complex and the nuclear arms complex, [etc.]" *Id.* Art.4.1.

Insofar as its commercial operations are concerned, Rosatom "is only entitled to exercise profitable activities insofar <u>as they serve the purposes of its establishment and comply with these purposes</u>. The Corporation's profit derived from its activities shall be solely used for the purposes established in this Federal Law." *Id.* Art. 3(8) (emphasis added).  The law expressly includes the export and import of nuclear materials as a Rosatom activity subject to the statute's restrictions and requirements, including the requirement that all of Rosatom's activities be pursuant to Russian Federation nuclear policy and objectives. *Id.,* Art. 15(1) (Rosatom "is entitled to exercise for the purpose of accomplishing the tasks established by this Federal Law the following kinds of activities: . . . (12) export and import of commodities (works and services) connected with atomic energy use[.]" ).

Rosatom ranks its performance against the Russian Federation's policy objections.  In 2019, for example, Rosatom stated that its "[o]verall performance against the targets set in the government programme of the Russian Federation 'Development of the Nuclear Power and Industry Complex' in 2019 was assessed at 99.73%." Ex. G at 155.  Rosatom's achievement of Russian military objectives was perfect: "[A]ll targets set as part of the state defense order were achieved." *Id.*

Rosatom's most senior body is its supervisory board.  The board has nine members, "eight of them being representatives of the President of the Russian Federation and the Government of the Russian Federation, as well as the Corporation's director general," serving *ex officio*.  Ex. I, Art. 23(2).  As of December 31, 2019, Rosatom's supervisory board comprised the following senior officials of the Russian government:

> S. Kirienko –   First Deputy Chief of the Presidential Executive Office
> I. Burovkov – Chief of Staff of the Military Industrial Commission,
>                  Deputy Chief of Staff of the Russian Government
> L. Brychyova – Assistant to the President of the Russian Federation
> A. Klepach –   Deputy Chairman of State Development Corporation VEB (!)
> S. Korolev –    Head of the Economic Security Service of the Federal Security Service
> A. Likhachev – Director General of Rosatom
> A. Novak – Minister of Energy of the Russian Federation
> Y. Trutnev – Deputy Chairman of the Russian Federation
> Y. Ushakov -- Assistant to the President of the Russian Federation

Ex. G at 135.

In sum, Rosatom is the successor to the Soviet Union's nuclear ministries and the post-Soviet Russian atomic energy agency.  As of 2007, it is the Russian government agency that oversees the country's civilian and military nuclear complex.  Its purposes are limited to the implementation of Russian Federation policy, and its commercial activities – including the export and import of nuclear materials – must be consistent with those policies and directed to meeting Russian Federation ends.  To ensure success, Rosatom's representatives of the Russian president's office and other Russian agencies (including the Russian intelligence service) make up its board.

### b.  Atomenergoprom

JSC Atomic Power & Industrial Complex ("Atomenergoprom") is a joint stock company wholly-owned by Rosatom and the Russian Federation.  According to information that Rosatom supplied to the U.S. Nuclear Regulatory Commission, Atomenergoprom was established to oversee and implement the civilian aspects of Rosatom's operations and activities relating to

nuclear energy.  Specifically, under the Rosatom umbrella, Atomenergoprom "heads Russia's Atomic Energy Complex and unites under its umbrella all of the civilian assets of the Russian Nuclear Industry."  Ex. J at 11.  Rosatom owns about 94.5% of Atomenergoprom's stock, and the Russian Federation holds the remainder.[6]

According to a report on which Tenex-USA relied in support of its motion to quash Chabad's subpoena, Atomenergoprom is just a corporate shell, and Rosatom would just as soon get rid of it:

> So, already in 2009 actually all the functions pertinent to management of enterprises incorporated into JSC Atomenergoprom holding have been delegated to SC Rosatom. JSC Atomenergoprom at present executes the functions of a certain 'corporate shell' without performing actually any managerial functions.  SC Rosatom management would be interested in JSC "Atomenergoprom" [*sic.*] closing.  However, the fact that JSC "Atomenergoprom" [was] created under federal law, and its closure will be necessary to adopt a new federal law and make changes to dozens of other laws and regulations, can inhibit the SC Rosatom against such a radical step.

Ex. K, IBR Report at 25.

Atomenergoprom's own published reports confirm that it is an arm of, and under the direct control of, Rosatom.  According to Atomenergoprom's 2018 annual report, the most recent report available on the company's website,[7]

> JSC Atomenergoprom is an organization of State Atomic Energy Corporation Rosatom (ROSATOM). ROSATOM pursues the governmental policy and ensures unity of management of the nuclear industry and sustainability of the nuclear power generation complex; it develops Russia's innovative potential in the nuclear industry, oversees the nuclear-powered icebreaker fleet and ensures nuclear and radiation safety. ROSATOM is tasked with fulfilling Russia's international commitments related to the peaceful use of nuclear energy and maintaining the non-proliferation regime. ROSATOM aims to contribute to the federal target programmes promoting the development of the nuclear industry, fostering the development of nuclear power and strengthening Russia's competitive position on the global market for nuclear technologies.

---

[6]   Some documents indicate that Rosatom owns 100% of Atomenergoprom, and portions of the record suggest that the Russian Federation itself owns 5.5%.

[7]   https://www.report.rosatom.ru/go_eng/atomenergoprom/go_aep_2018/go_aep_2018.pdf (last visited March 28, 2022).

Ex. L at 10.

To the extent that Atomenergoprom is the shareholder of its subsidiary organizations, including Tenex, its shareholder rights are limited by Article 3 of Law 13-FZ.  Under Article 3(1.14), "The statutes of the principal joint-stock company have to comply with the basic principles of state policy in the field of management and disposal of the property and stocks of organisations pertaining to the atomic energy industrial complex."  Ex. H, Art. 3(1.14).  As a practical matter, this means that Atomenergoprom does what Rosatom tells it to do.  Indeed, Antomenergoprom makes no bones of the fact:

> JSC Atomenergoprom exercises its shareholder powers with regard to organizations in the nuclear industry in accordance with applicable Russian corporate legislation.  <u>Since it holds 100% of JCS Atomenergoprom's voting shares, ROSATOM influences all of the shareholder decisions.</u>  Thus, JCS Atomenergoprom's main goal with regard to organizations in the nuclear industry is to improve their performance in order to help to achieve the strategic objectives of ROSATOM.

Ex. L at 86.  Notably, Rosatom instructs Atomenergoprom regarding Atomenergoprom's exercise of its shareholder right with respect to Tenex, discussed below.

In short, Atomenergoprom is a corporate shell that does little more than:  (1) hold shares in subsidiary entities; and (2) exercise its rights as a shareholder of Tenex in accordance with instructions from the Russian Federation's nuclear agency, Rosatom.

c.  <u>Tenex</u>

JSC Techsnabexport ("Tenex") is Rosatom's overseas trading arm, engaged in the export of nuclear materials from Russia to the United States and other countries.  Tenex is a joint stock company, and Atomenergoprom holds 100% of Tenex's shares as part of its holding-company portfolio.  As noted above, Atomenergoprom exercises its shareholder rights in Tenex pursuant to Rosatom's instructions.  Moreover, a majority of Tenex's board are members of Rosatom's

management.  Ex. M.[8]  Rosatom therefore controls all of the relevant levers in Tenex's corporate governance.

Tenex's articles of incorporation confirm that Tenex's conducts its operations in pursuit of Russian Federation policy goals.  Art. 4.4 of the articles states that Tenex "shall be guided in its activities by the basic principles of government policy in the area of managing and administering property and assets of organizations of the atomic energy complex of the Russian Federation."  Ex. N.  REDACTED

REDACTED

REDACTED

REDACTED

Tenex itself is a holding company, and its operating entity is actually one of its divisions.  Rosatom's website refers to Tenex (and other Atomenergoprom subsidiaries) as "divisions," and with respect to Tenex, Rosatom explains:

> The Sales and Trading Division is one of the world's largest suppliers of uranium products meeting a major share of demand of foreign-design reactors for uranium enrichment services since the early 1970s.
>
> The holding company of the Division, TENEX JSC, is ROSATOM's main organization promoting nuclear fuel cycle front-end products manufactured by nuclear enterprises, as well as Russian-designed solutions and technologies for spent nuclear fuel and radioactive waste management and decommissioning of facilities posing nuclear and radiation hazards on the global market.

Ex. P.  Tenex's top executive is also head of the company's sales and trading division.  Ex. Q, at 7 ("Performance of the Sales and Trading Division in 2019").  Tenex has no independent directors, as all of its directors are representatives of Rosatom or Rosatom's affiliated organizations.  *Id.* at 13 n.6.

---

[8]   Three of Tenex's five directors are senior Rosatom official, one is the president of another Rosatom entity, TVEL, and the fifth is Tenex's director general.  *See* Ex. R at 15.

Tenex operates as Rosatom's agent with respect to overseas trade in nuclear materials. This is evident from two important sources. *First*, Tenex holds itself out as "the leading organization of ROSATOM in promotion of NFC products and services in the global market[.]" Ex. R at 16.  To that end, Tenex "operates in the interests of the Russian nuclear industry while making the best possible use of its export potential and competitive advantages in compliance with applicable legislation[.]" *Id.*  "To implement decisions adopted by ROSATOM at the end of 2017," Tenex has taken steps "to concentrate the strategic marketing of all types of uranium products in the Company." *Id.*

*Second*, by the terms of a government-to-government agreement between Rosatom and the U.S. Commerce Department, Tenex has been officially designated as Rosatom's agent in connection with the sale of Russian nuclear materials in the United States.  The agreement, which addresses aspects of Russian sales of uranium under U.S. international trade laws, predates Rosatom, and was updated following the Russian Federation's establishment of Rosatom in 2007.  The amendments to the agreement, signed in 2008, state:

> The Department and ROSATOM acknowledge that, for purposes of the Agreement, as amended (the ''Agreement''), the successor in interest to MINATOM is the Federal Atomic Energy Agency (''ROSATOM''). All references to MINATOM in this Agreement shall be understood to indicate ROSATOM. <u>All exports of Russian Uranium Products are executed through the Russian Government-Owned entity Techsnabexport (''TENEX''). All references to TENEX include its successors and its affiliated companies.</u>

Ex. S, at 7706 (Amendment to the Agreement Suspending the Antidumping Investigation on Uranium from the Russian Federation, 73 Fed. Reg. 7705 (February 11, 2008) (emphasis added)).  The Commerce-Rosatom agreement allowed Tenex to "immediately enter into contracts for the sale of Russian Uranium Products in the United States, directly to U.S. utilities or otherwise." *Id.*

The record Chabad compiled during discovery confirms that the uranium imported into the United States from Russia REDACTED           Pursuant to subpoena, Chabad took the deposition of Tenex-USA's president, Fletcher Newton. REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

Moreover, the uranium that Tenex exports to the United States is shipped to one of three qualified U.S. facilities. REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

31

***

The upshot is this:  In 2007, Rosatom, an agency of the Russian Federation, absorbed the Russian civilian and military nuclear complex under its umbrella.  By statute, Rosatom is required to conduct all of its operations, including commercial operations, in pursuit of Russian national policies and goals.  To ensure that Rosatom acts in accordance with Russian Federation policy, Rosatom's supervisory board is controlled by senior Russian political figures, including the Russian Federation's Minister of Energy, the chair of VEB, a top Russian intelligence official, and others who are themselves Russia's top political figures or who serve at the pleasure of Russia's top political figures.

The civilian portion of the Rosatom nuclear complex was consolidated under Atomenergoprom, a "shell" holding company that is controlled by Rosatom.  By statute and according to its own reports (as discussed above), Atomenergoprom manages its subsidiaries in accordance with Rosatom's instructions. Tenex is also a holding company whose sales division is responsible for the export of Russian uranium to the United States.  Tenex is also controlled by Rosatom at the board level.  By statute and according to its by-laws, Tenex follows Russian Federation policy as dictated by Rosatom, and by international agreement, Tenex is Rosatom's agent in connection with Russian-U.S. trade in uranium.  REDACTED

Application of the *Bancec* factors to Tenex yields the same result as it did for VEB.  The only difference between the VEB and Tenex is that the Russian Federation operates its nuclear operations through holding companies, but they are nothing more than corporate shells.

Rosatom tells Atomenergoprom what to do, and according to Atomenergoprom's own published reports discussed above, it faithfully carries out Rosatom's instructions – including specifically with respect to Atomenergoprom's exercise of shareholder rights over Tenex.  Tenex is itself a holding company that is bound by law and by its own by-laws to follow Russian-government policy as handed down from Rosatom through Atomenergoprom.  Tenex's sales division operates as Rosatom's designated agent – *de jure* and *de facto* – for the same of nuclear products in the United States.

Several additional points relevant to the *Bancec* analysis confirm that Tenex should be treated as an agent of the Russian Federation.

*First,* the entities that deal with Tenex can or should be under no illusion that they are dealing with anything other than a Russian-government entity.  As the U.S.-Russia uranium agreement makes clear, trade in uranium is conducted under the auspices of a government-to-government arrangement between the U.S. Commerce Department and Rosatom, in which they designated Tenex as Russia's agent.  Any diligent entity involved in the transaction of uranium with Tenex must be aware of Tenex's role and status as a Russian Federation agent.

*Second,* Tenex's has no independent governance.  Tenex's supervisory board is controlled by Rosatom officials, and Tenex's sole shareholder does what Rosatom tells it to do.  Rosatom is controlled by senior Kremlin officials, all of whom are directly or indirectly answerable to the Russian president.  This is not a situation in which the government appoints the board of a government-owned entity – this is a situation (as with VEB) in which the government officials themselves serve on the board and control the entity directly.

*Third,* the evidence shows that Russia's export of uranium is a matter of national policy, not commercial considerations.  The relevant enabling statutes consolidate all of Russia's nuclear operations, civilian and military, under one entity, Rosatom.  The statutes require that any

commercial activity Rosatom conducts must be pursuant to Russian Federation policy goals.

REDACTED

### 4.    Request for Attachment of Tenex Assets

For the reasons set out above, the Court should allow Chabad to attached assets in the

United States owned or controlled by Tenex.  Specifically, Chabad asks the Court to enter an

order authorizing Chabad's attachment of, and execute on, any uranium or other products in the

United States,

1.  To which Tenex holds title, now or in the future;

2.  To which Tenex has transferred title to its U.S. agent, Tenex-USA, following

     importation into the United States.

In the event that the uranium is held to satisfy a contract with a U.S. customer, Chabad asks the

Court to authorize attachment of, and execution on, any proceeds from the sale of uranium in the

United States to which Tenex or Tenex-USA has held title.

///

## III.    CONCLUSION

For the foregoing reasons, Chabad respectfully requests that the Court approve the

attachment of VEB and Tenex assets as set forth above.  A proposed order accompanies this

motion.

Dated:  April 8, 2022                              Respectfully submitted,

                              By:  */s/ Robert P. Parker*
                                   Robert P. Parker (D.C. Bar No. 404066)
                                   Steven Lieberman (D.C. Bar No. 439783)
                                   Rothwell, Figg, Ernst & Manbeck, P.C.
                                   607 14th Street, N.W., Suite 800
                                   Washington, DC 20005
                                   Phone:  (202) 783-6040
                                   Facsimile:  (202) 783-6031
                                   E-mail:  slieberman@rfem.com
                                   E-mail:  rparker@rfem.com

                                   *Counsel for Agudas Chasidei Chabad*
                                   *of United States*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of April, 2022, a true and correct copy of the

foregoing **PLAINTIFF AGUDAS CHASIDEI CHABAD OF UNITED STATES' MOTION**

**TO ATTACH PROPERTY OR, IN THE ALTERNATIVE, TO REGISTER JUDICIAL**

**LIENS, DECLARATION OF ROBERT PARKER, and PROPOSED ORDER** were served,

in the format indicated (sealed or redacted), by electronic mail on the following counsel of

record:

Benjamin Thomas Takemoto
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Ben Franklin Station
Washington, DC 20044
Email: benjamin.takemoto@usdoj.gov

*Counsel for the United States of America – Served Redacted Version*


Carolyn Beth Lamm
Nicolle E. Kownacki
WHITE & CASE LLP
701 Thirteenth Street, N.W., 11th Floor
Washington, DC 20005
Emails: clamm@whitecase.com
nkownacki@whitecase.com

*Counsel for Tenex-USA, Inc. – Served Sealed Version*


David Y. Livshiz
Timothy P. Harkness
FRESHFIELDS BRUCKHAUS DERINGER US LLP
601 Lexington Avenue, 31st Floor
New York, NY 10022
Emails: david.livshiz@freshfields.com
timothy.harkness@freshfields.com

*Counsel for State Development Bank VEB.RF – Served Redacted Version*

1

I further certify that on this 8th day of April, 2022, a true and correct copy of the

foregoing **PLAINTIFF AGUDAS CHASIDEI CHABAD OF UNITED STATES' MOTION**

**TO ATTACH PROPERTY OR, IN THE ALTERNATIVE, TO REGISTER JUDICIAL**

**LIENS, DECLARATION OF ROBERT P. PARKER, and PROPOSED ORDER** were

served, in the format indicated (sealed or redacted), by First-Class International Mail, through the

U.S. Postal Service, on the following parties:

Ministry of Justice of the Russian Federation
Attn: Hon. Alexander Konovalov, Minister
14 Zhitnaya Street
GSP-1 Moscow, Russia 119991
*Served Redacted Version*

Ministry of Culture of the Russian Federation
Attn: Hon. Olga Lyubimova, Minister
7/6 Bldg. 1/2, Malyy Gnezdnikovsky Pereulok
Moscow, Russia 125993
*Served Redacted Version*

Russian State Military Archive
Attn: Vladimir N. Kyzelenkov, General Director
29 Admiral Makarov Street
Moscow, Russia 12512
*Served Redacted Version*

Russian State Library
Attn: Vadim Valerievich Duda, General Director
3/5, Vozdivhenka Street
Moscow, Russia 119019
*Served Redacted Version*

*/s/ Nasri V. Hage*
Nasri V. Hage
Rothwell, Figg, Ernst & Manbeck, P.C.