**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **AGUDAS CHASIDEI CHABAD OF UNITED STATES**, | |
| *Plaintiff,* | |
| **v.** | |
| **RUSSIAN FEDERATION; RUSSIAN MINISTRY OF CULTURE AND MASS COMMUNICATION; RUSSIAN STATE LIBRARY; and RUSSIAN STATE MILITARY ARCHIVE**, | **No. 1:05-cv-1548-RCL** |
| *Defendants.* | |

<u>**MEMORANDUM OPINION**</u>

During the 20th century, amid civil unrest, revolution, and then world war, a collection of invaluable religious books and manuscripts were seized in violation of international law.  Plaintiff Agudas Chasidei Chabad of the United States ("Chabad") is the rightful owner of those books and manuscripts.  Nearly two decades ago, it sued the Russian Federation ("Russia"), Russian Ministry of Culture and Mass Communication, Russian State Library, and Russian State Military Archive (together, "defendants") and requested that this Court order a return of that property.  In 2010, after determining that the materials were indeed expropriated, the Court entered a default judgment against defendants and ordered them to return the texts to Chabad.  After they failed to comply with that directive, the Court imposed monetary sanctions to coerce compliance.  Since that time, defendants have failed to satisfy the Court's order and the accrued sanctions now approach $200 million.  To make good on that debt, Chabad moves now to attach and execute on Russian property held or controlled by third parties VEB.RF ("VEB") and Tenex (whether it be Tenex-USA or its

1

corporate parent entity).  Chabad alternatively seeks authorization to assert and record judicial liens.

Because the judgments that Chabad seeks to enforce were entered by default, and defendants have not received required notice, this Court will **DENY WITHOUT PREJUDICE** Chabad's motion.

## I.      BACKGROUND

The Court has comprehensively and repeatedly explained the factual and procedural history of this lawsuit, *see, e.g.*, *Agudas Chasidei Chabad of U.S. v. Russian Fed'n* ("*Stay Opinion*"), No. 1:05-cv-1548-RCL, 2020 WL 13611456, at *1–8 (D.D.C. Nov. 6, 2020), *aff'd, Agudas Chasidei Chabad of United States v. Russian Fed'n*, 19 F.4th 472 (D.C. Cir. 2021), and therefore the following will constitute a non-exhaustive summary of the pertinent information for the present motion.

The plaintiff here is Chabad, a non-profit corporation in New York representing the longstanding Chabad Chasidic movement of Judaism which started "in the mid-18th Century in and around the Russian Empire."  *Id.* at *1 (internal quotation marks omitted).  Over time, the organization "produced and curated a body of religious materials central to Chabad Chasidism."  *Id.*  At issue in this case are two sets of those materials: "the Library," which contains thousands of books and hundreds of manuscripts dating back to 1772, and "the Archive," which contains the "Chabad Rebbes' handwritten teachings, correspondence, and other records."  *Id.* (internal quotation marks omitted).

In 2004, Chabad sued defendants, alleged that they possessed the Library and Archive, and asked this Court to issue an order directing defendants to return them.  *Id.* at *1–2.  The defendants appeared and moved to dismiss the complaint, alleging that they were immune from suit.  *Id.* at *2.

2

Though Congress has established a general rule depriving courts of subject-matter jurisdiction over lawsuits against foreign states—an instruction located in the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604 *et seq.*—the statute provides an exception to that presumption when property is taken in violation of international law. *Id.* § 1605(a)(3). This Court held that, pursuant to Section 1605(a)(3), the Court maintained subject-matter jurisdiction over claims related to the Archive, but not claims related to the Library. *Agudas Chasidei Chabad of U.S. v. Russian Fed'n* ("*Chabad I*"), 466 F. Supp. 2d 6, 31 (D.D.C. 2006). The D.C. Circuit then affirmed in part, vacated in part, and reversed in part, concluding that, under Section 1605(a)(3), this Court had subject-matter jurisdiction over Chabad's claims related to both the Archive and the Library. *Agudas Chasidei Chabad of U.S. v. Russian Fed'n* ("*Chabad II*"), 528 F.3d 934, 939, 955 (D.C. Cir. 2008).

After the D.C. Circuit remanded the case, defendants withdrew from further participation in this action. ECF No. 71-1. Russia explained that it took issue with the Circuit's ruling depriving it of immunity from suit and it would therefore no longer participate. *Id.* This Court subsequently entered default judgment against all defendants. *Agudas Chasidei Chabad of U.S. v. Russian Fed'n* ("*Chabad III*"), 729 F. Supp. 2d 141, 148 (D.D.C. 2010). It then ordered defendants to ensure a "prompt and safe" return of Chabad's religious materials. Order Granting Pl.'s Mot. for Entry of Default Judgment, ECF No. 80. Specifically, the Court directed defendants to "surrender to the United States Embassy in Moscow or to the duly appointed representatives of . . . Chabad . . . the complete collection." *Id.*

In 2011, after determining that Russia had received adequate notice of the Court's default judgment, and "that plaintiff ha[d] demonstrated defendants' non-compliance to a reasonable certainty," this Court instructed defendants to show cause why they should not be held in civil

contempt.  *Agudas Chasidei Chabad of U.S. v. Russian Fed'n* ("*Chabad IV*"), 798 F. Supp. 2d 260, 273 (D.D.C. 2011) (internal quotation marks omitted).  The Court then "direct[ed] plaintiff to serve a copies of its motion for sanctions and t[he] order to show cause on defendants via mail using the addresses defendants' former counsel provided, and [] g[a]ve defendants the same 60 days they are generally entitled in responding to service of papers initiating suit under the FSIA." *Id.* at 273–74.

In 2013, after defendants failed to respond, Chabad moved for civil monetary contempt sanctions against defendants.  *Chabad v. Russian Fed'n* ("*Sanctions Opinion*"), 915 F. Supp. 2d 148, 149–51 (D.D.C. 2013).  This request came after "multiple meetings at the Russian Embassy in Washington, D.C.," during which "the parties were unable to reach a settlement."  *Id.* at 150–51 (internal quotation marks and citation omitted).  After determining that civil monetary sanctions were both within the Court's authority and appropriate for the situation, the Court issued sanctions in the amount of $50,000 per day until defendants comply with the Court's 2010 order to return the materials.  *Id.* at 154–55; Order ("Sanctions Order"), ECF No. 115.  That day has yet to arrive.

Following the imposition of sanctions, this Court has thrice issued interim judgments of accrued sanctions.  Interim Judgment, ECF No. 144; Order and Judgment ("Second Interim Judgment"), ECF No. 201; Revised Interim Judgment, ECF No. 263.  Chabad also subpoenaed various entities, including VEB and Tenex-USA, to discover Russian property that might satisfy the accrued sanctions debt.  *See* Mem. Order 1 ("Motion to Quash Order"), ECF No. 198; *Stay Opinion*, 2020 WL 13611456 at *7.

Following that discovery, Chabad moved to attach and execute to satisfy the sanctions debt, or alternatively to assert and record judicial liens.  Pl.'s Mot., ECF No. 235.  Chabad also filed a sealed memorandum in support.  Pl.'s Mem., ECF No. 236-2.  VEB opposed, VEB's Opp'n, ECF

No. 241-1, and Chabad replied, Pl.'s Reply to VEB, ECF No. 254.  Tenex-USA also opposed, Tenex-USA's Opp'n, ECF No. 248-2, and Chabad replied, Pl.'s Reply to Tenex-USA, ECF No. 253.  Tenex-USA moved to file a sur-reply, Tenex-USA's Mot. Sur-Reply ECF No. 256-2, Chabad opposed, Pl.'s Opp'n to Sur-Reply, ECF No. 258, and Tenex-USA replied, Tenex-USA's Reply Sur-Reply, ECF No. 259.[1]

Upon consideration of the parties briefing, the applicable law, and the whole record, the Court will **DENY WITHOUT PREJUDICE** Chabad's motion because defendants have not been provided sufficient notice of the monetary sanctions judgments that Chabad seeks to enforce.

## II.  LEGAL STANDARDS

The FSIA provides the governing legal standards in this dispute.  Under that statute, "Congress established . . . a comprehensive framework for resolving any claim of sovereign immunity." *Republic of Argentina v. NML Cap., Ltd.*, 573 U.S. 134, 141 (2014) (quoting *Republic of Austria v. Altmann*, 541 U.S. 677 (2004)).  "Thus, any sort of immunity defense made by a foreign sovereign in an American court must stand on the Act's text. Or it must fall." *Id.* at 141–42.  The framework includes two kinds of immunity: jurisdictional immunity and execution immunity. *TIG Ins. Co. v. Republic of Argentina*, 967 F.3d 778, 781 (D.C. Cir. 2020).  "To enforce an award against a foreign state in the United States, a party must therefore establish both that the foreign state is not immune from suit and that the property to be attached or executed against is not immune." *Id.*  Because Chabad seeks attachment of Russia's property, both immunities must be defeated for it to succeed.

---

[1] The Court concludes that Tenex-USA's sur-reply is appropriate and grants its motion to file. *See Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 85–86 (D.D.C. 2014).  However, Tenex-USA's argument that there is a due process or service issue for Tenex, raised for the first time in its sur-reply despite being previously available to it, will not be considered. *See* Proposed Sur-Reply 4–5, ECF No. 256-3; *Connecticut v. Dep't of the Interior*, 344 F. Supp. 3d 279, 317 n.36 (D.D.C. 2018) ("[T]he Court declines to entertain an argument raised for the first time in a sur-reply.").

**A. Jurisdictional Immunity**

As this Court and the D.C. Circuit have already determined, an exception to the FSIA's default rule of sovereign immunity applies. That exception reads as follows:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States.

*Id.* § 1605(a)(3). The Court will refer to Section 1605(a)(3) as the "expropriation jurisdiction exception."

When jurisdictional immunity has been overcome, the scope of the Court's power is broad. For "any claim for relief with respect to which a foreign state is not entitled to immunity . . . the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." *Id.* § 1606; *see Republic of Argentina*, 573 U.S. at 142.

**B. Attachment and Execution Immunity**

Attachment and execution immunity "is not itself jurisdictional." *TIG Ins. Co.*, 967 F.3d at 781. Instead, there is a default presumption against "attachment of a foreign sovereign's property." *Id.* Specifically, "the property in the United States of a foreign state shall be immune from attachment arrest and execution," 28 U.S.C. § 1609, unless the judgment creditor demonstrates the applicability of a statutory "[e]xception[] to the immunity from attachment or execution," *id.* § 1610. *See TIG Ins. Co.*, 967 F.3d at 781.

The attachment exception at issue in this case reads as follows:

(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law.

28 U.S.C. § 1610(a)(3). The Court will refer to the requirements of (a) and (3) together as the "expropriation attachment exception."

As the statutory text lays out, the exception requires a judgment creditor to establish that "the execution relates to a judgment establishing rights in property" of the type described in the statute. *Id.* If that element is satisfied, the creditor "must satisfy the two general requirements outlined in the opening language of [Section 1610(a)]" which relates to the specific property that it seeks to attach or execute on. *TIG Ins. Co.*, 967 F.3d at 781; *see Chabad IV*, 798 F. Supp. 2d at 271.

In sum, the judgment creditor must demonstrate first that "the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law" and then identify (a) "property in the United States of a foreign state" that is (b) "used for a commercial activity in the United States." 28 U.S.C. § 1610(a)(3); *see TIG Ins. Co.*, 967 F.3d at 781. For the latter requirement, a court must consider the property's use at the time of the filing of the lawsuit and do so under the totality of the circumstances. *TIG Ins. Co.*, 967 F.3d at 782, 785.

Finally, before the Court orders attachment or execution, it must have "determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under [28 U.S.C. § 1608(e)]." 28 U.S.C. § 1610(c). Section 1608(e) reads as follows:

No <u>judgment by default</u> shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. <u>A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.</u>

*Id.* § 1608(e) (emphases added).

## III. DISCUSSION

Chabad seeks to attach and execute on "the property of the Russian Federation held or controlled by" VEB and Tenex.  Chabad's Mot. 1.  VEB and Tenex-USA oppose on several grounds, including that (1) the Court does not have subject-matter jurisdiction; (2) attachment immunity applies to any Russian property because the relevant judgments do not satisfy the first element of the expropriation attachment exception; (3) defendants have not received proper notice of the monetary sanctions judgments that Chabad seeks to enforce; and (4) Chabad has not identified specific Russian property used for a commercial activity in the United States.[2]

The Court will take those arguments in the order identified, rejecting the first two but agreeing with the third.  Accordingly, this Court will dismiss Chabad's current motion without prejudice.  However, this is only a temporary reprieve.  Once defendants have proper notice, and the reasonable period of time following notice has passed, Chabad may again file for attachment and execution.  At that point the remaining question will simply be whether particular Russian property in the United States has been identified and whether the property was used for a commercial activity in the United States.

---

[2] The fourth argument raised by VEB and Tenex-USA is premised in part on the assertion that VEB and Tenex-USA are not Russian agencies or instrumentalities.  Relatedly, Tenex-USA argues that assets of its corporate parent cannot be attached.  Because the Court holds that defendants have not received proper notice of this Court's sanctions, it would be inappropriate to reach the merits of whether there is property that can be attached and executed on, or for which judicial liens may be recorded.

The Court will accordingly deny Chabad's motion without prejudice and direct plaintiff to provide proper notice of the sanctions judgments it seeks to enforce.

**A. Subject-Matter Jurisdiction Over Russia is Appropriate Under the Expropriation Jurisdiction Exception**

VEB and Tenex-USA first bring back the now oft-defeated argument that this Court does not have subject-matter jurisdiction. VEB's Opp'n 13–14; Tenex-USA's Opp'n 9–12. Specifically, they contest the application of the expropriation jurisdiction exception to abrogate Russia's immunity to suit.  This Court and the Circuit have addressed the issue of jurisdiction under the expropriation jurisdiction exception five separate times.  *See Chabad I*, 466 F. Supp. 2d at 14–20; *Chabad II*, 528 F.3d at 939, 955; *Chabad III*, 729 F. Supp. 2d at 144–48; Mem. Order ("Interlocutory Appeal Order"), ECF No. 220 at 3–4; *Stay Opinion*, 2020 WL 13611456 at *11–25.  Nevertheless, because VEB and Tenex-USA raise the argument now to oppose a motion that threatens assets held or controlled by them, rather than through an ancillary motion for interlocutory appeal or a motion for stay, the Court will briefly summarize why the argument against subject-matter jurisdiction fails again.

In 2006, this Court was first faced with the question of whether the expropriation jurisdiction exception applies in this case.  At that time, the Court held that the expropriation jurisdiction exception applied to claims regarding the taking of the Archive, but not to the taking of the Library.  *Chabad I*, 466 F. Supp. 2d at 14–20.  Because subject-matter jurisdiction does not lie over a foreign state without an FSIA exception, the Court held that it had subject-matter jurisdiction over Russia only for claims related to the Archive.  *Id.* at 31.

A panel of the D.C. Circuit, reviewing this Court's decision, "affirm[ed] the judgment of the district court finding jurisdiction over Agudas Chasidei Chabad's claims concerning the Archive; [while] revers[ing] its finding of Russia's immunity as to the Library claims." *Chabad*

*II*, 528 F.3d at 955.    That is, the D.C. Circuit concluded that the Court had subject-matter jurisdiction over Russia for both of Chabad's claims.    *Id.* at 939–40, 942–50, 955.    The Circuit explained that a foreign state like Russia is not immune from suit when the two elements of the expropriation jurisdiction exception are met.    The first element can only be satisfied a single way, by establishing "[A] rights in property taken in violation of international law are in issue."    *Id.* at 946–47 (alteration in original) (quoting 28 U.S.C. § 1605(a)(3)).    The second element may be satisfied with either of two "alternative commercial activity requirements"—either "[B][1] that property or any property exchanged for such property is present in the United States in connection with a commercial activity *carried on* in the United States by the foreign state; or [2] that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is *engaged in* a commercial activity in the United States."    *Id.* (alterations and emphases in original) (quoting 28 U.S.C. § 1605(a)(3)).    In holding that subject-matter jurisdiction over Russia was proper, the panel explained that "§ 1605(a)(3)'s second alternative commercial activity requirement is plainly satisfied."    *Id.* at 948.

Over a decade later, after Tenex-USA was brought into the case as a third party, it raised the issue of subject-matter jurisdiction afresh.    Interlocutory Appeal Order 3–4.    It asserted that D.C. Circuit opinions in other cases, issued several years after the *Chabad II* panel's judgment, effectively ousted this Court of its previously established jurisdiction.    *Id.*    Tenex-USA brought this argument to bear through the procedural vehicle of seeking a certification of interlocutory appeal to the D.C. Circuit.    *Id.* at 1.    This Court rejected that argument and denied certification.    *Id.* at 3–4.    When Tenex-USA moved for a stay of this case pending appeal, this Court once again tackled the challenge to subject-matter jurisdiction under the expropriation jurisdiction exception

and explained in comprehensive fashion why the D.C. Circuit's latter cases fail to deprive this Court of jurisdiction. *Stay Opinion*, 2020 WL 13611456 at \*11–25. Now VEB and Tenex-USA raise the issue again. VEB's Opp'n 13–14; Tenex-USA's Opp'n 9–12.

At the risk of belaboring the point, this Court still has subject-matter jurisdiction because a 2008 panel of the D.C. Circuit held as much in *Chabad II* and the Circuit has never overruled that holding. *See Stay Opinion*, 2020 WL 13611456 at \*11–25 (explaining the Court's continuing subject-matter jurisdiction in detail). Tenex-USA was correct before, and is correct now, that several D.C. Circuit panel opinions, issued starting in 2016, conflict with the reasoning of the *Chabad II* panel. Specifically, the panel held that the second alternative commercial activity requirement contained in the expropriation jurisdiction exception did not distinguish between, and therefore equally abrogated the sovereign immunity of, foreign sovereigns and their agencies or instrumentalities. *Chabad II*, 528 F.3d at 955. Later panels held that the *second* alternative commercial activity requirement defeats immunity only for *agencies and instrumentalities*, while the *first* alternative commercial activity requirement must be satisfied when subject-matter jurisdiction is asserted over *foreign states*. *Simon v. Republic of Hungary*, 812 F.3d 127, 146 (D.C. Cir. 2016) (citing *Chabad II*, 528 F.3d at 947), *abrogated on other grounds by Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703 (2021); *De Csepel v. Republic of Hungary*, 859 F.3d 1094 (D.C. Cir. 2017) (relying on *Simon*); *Schubarth v. Federal Republic of Germany*, 891 F.3d 392 (D.C. Cir. 2018) (same); *Philipp v. Fed. Republic of Germany*, 894 F.3d 406 (D.C. Cir. 2018) (same), *vacated and remanded on other grounds*, 141 S. Ct. 703 (2021).

Each later panel's interpretation of the second alternative commercial activity requirement "is irreconcilable with the D.C. Circuit's decision in *Chabad*." *Stay Opinion*, 2020 WL 13611456 at \*11. Yet, under the law of the circuit doctrine, a prior panel's decision is binding on a latter

panel unless that opinion is overruled by the procedures of the D.C. Circuit or by the Supreme Court. *Maxwell v. Snow*, 409 F.3d 354, 358 (D.C. Cir. 2005). Under the D.C. Circuit's procedures, "the D.C. Circuit can overrule the earlier decision of one of its panels only through two specific actions: either through an *en banc* sitting or, more rarely, through a procedure called an *Irons* footnote." *Stay Opinion*, 2020 WL 13611456 at *12 (citing *Irons v. Diamond*, 670 F.2d 265, 268 n.11 (D.C. Cir. 1981)). *Irons* requires that a special footnote appear in the panel opinion explaining that the prior panel's decision has been overruled by consideration of the full D.C. Circuit. *Id.*

Here, none of the methods by which a prior panel opinion may be overruled have been undertaken. *Id.* at *11–25. There is no claim that the Supreme Court has overturned the relevant portion of the *Chabad II* panel's opinion. *Id.* No *en banc* sitting has concluded that the proper interpretation of the expropriation jurisdiction exception is the one endorsed by the *Simon* panel and its progeny, or alternatively that the *Chabad II* panel's reasoning was incorrect. *Id.* And no *Irons* footnote has been employed to overrule the decision. *Id.*

That puts this Court in an awkward position. It must choose a panel opinion to follow. The question is which.

The law of the case doctrine provides the answer. Under that doctrine, a decision on FSIA immunity made by a higher court "may be revisited [by the lower court] only if there is an intervening change in the law or if the previous decision was clearly erroneous and would work a manifest injustice." *Simon v. Republic of Hungary*, 443 F. Supp. 3d 88, 111 (D.D.C. 2020) (quoting *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999)) (internal quotation marks omitted)).[3] The exceptions do not apply here, so the Court must follow the panel opinion in this

---

[3] That means, for example, that a decision on immunity made prior to trial, but upset by the factual record developed later, need not be "calcif[ied]" by the law of the case doctrine. *Wye Oak Tech., Inc. v. Republic of Iraq*, 24 F.4th 686, 698–700 (D.C. Cir. 2022). But no new facts have emerged that undermine application of the expropriation jurisdiction exception here.

case.  As discussed above, the D.C. Circuit has not changed the law because it has not followed its procedure for doing so.  The previous decision was not clearly erroneous, nor would following it work a manifest injustice, both because it is binding under the law of the circuit doctrine and, if that were not enough, the interpretation appears correct on the merits.  *See Stay Opinion*, 2020 WL 13611456 at *11–25.

Unless and until the Court receives a mandate from the D.C. Circuit stating otherwise, or the Circuit overrules the *Chabad II* panel opinion through its procedures for doing so, this Court will continue to assert subject-matter jurisdiction in accordance with the 2008 mandate issued by the Circuit.  In short, of the panel opinions to choose from, the earliest one, directed at this Court for this very case, is most appropriate.

For those reasons, and the expansive explanation in its prior opinion, *id.*, the Court maintains subject-matter jurisdiction over Russia under the expropriation jurisdiction exception.

## B.  The "Relates To" Element of the Expropriation Attachment Exception is Satisfied

VEB and Tenex-USA next challenge whether the first element of the expropriation attachment exception applies here.  VEB's Opp'n 3–8; Tenex-USA's Opp'n 14–17.  As a reminder, that element requires that "the execution *relates to a judgment* establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law."  28 U.S.C. § 1610(a)(3) (emphasis added).  The question then is whether the execution that Chabad seeks relates to a qualifying judgment.  When it previously authorized discovery, this Court suggested why the answer to that question is yes.  Motion to Quash Order 7.  It now so holds for the purpose of Chabad's present motion.

Stepping back for a moment, it is important to recognize that nearly anytime a judgment creditor seeks to execute a judgment predicated on the expropriation jurisdiction exception, the creditor will also be able to satisfy this first element of the expropriation attachment exception.

That is inevitable because the language of the expropriation attachment exception closely mirrors the language of the expropriation jurisdiction exception. *Compare* 28 U.S.C. § 1605(a)(3) ("[I]n which rights in property taken in violation of international law are in issue."), *with* 28 U.S.C. § 1610(a)(3) ("[R]elates to a judgment establishing rights in property which has been taken in violation of international law."). It is difficult to imagine a situation where a plaintiff would be able to establish the applicability of the jurisdictional exception, and obtain a judgment based on that exception, but subsequently fail at the "relates to" portion of the attachment exception for that same judgment. Indeed, VEB and Tenex-USA do not point to any such case where that has occurred.[4]

This case does not break the mold. Here, the Court entered a default judgment in 2010 "clearly predicated on Chabad's rights to the stolen collection." Motion to Quash Order 7. Specifically, the Court concluded that "plaintiff has shown that rights in property are at issue" and "defendants expropriated both the Archive and Library from plaintiff in violation of international law." *Chabad III*, 729 F. Supp. 2d at 145–46. The result of those findings was "a judgment establishing rights in property which has been taken in violation of international law." *See* 28 U.S.C. § 1610(a)(3); Order Granting Pl.'s Mot. for Entry of Default Judgment.

Furthermore, the execution that Chabad seeks relates to that qualifying judgment. As the Court has previously explained, it "will read 'relates to' under its plain meaning." Motion to Quash Order 7. Generally, that phrase means "to connect (something) with (something else)" "to be connected with (someone or something)" or "to be about (someone or something)." *Relate to*, Merriam–Webster Dictionary Online, https://www.merriam-webster.com/dictionary/relate%20to (last visited Jan. 20, 2023); *see also Relate*, Webster's Third New Int'l Dictionary 1916 (1965)

---

[4] Of course, a judgment creditor could still fail at the second requirement, identifying "property in the United States of a foreign state used for a commercial activity in the United States." 28 U.S.C. § 1610(a).

(providing a similar definition).  For the expropriation attachment exception to apply, executing on property to satisfy the monetary sanctions must be connected with, or otherwise about, the 2010 default judgment establishing Chabad's rights in the collection.

The "relates to" requirement is plainly satisfied because the Court's sanctions order, and the associated interim judgments, are based entirely on the default judgment establishing Chabad's rights in the property.  Specifically, the monetary sanctions were "calibrated to coerce compliance with the 2010 [default judgment]." *Sanctions Opinion*, 915 F. Supp. 2d at 154 (internal quotation marks omitted).  The Court "issue[d] civil contempt sanctions against defendants in the amount of $50,000 per day," not for their own sake, but rather to compel "defendants [to] comply with this Court's [default judgment and order to return the property]." *Id.* at 154–55; Sanctions Order. Execution premised on the monetary sanctions is therefore directly connected with, and based on, the judgment establishing Chabad's rights in property taken in violation of international law. Accordingly, the sanctions judgments, calculating the total sanctions that have accrued by a given date thereby providing a specific sum to collect, "are clearly predicated on Chabad's rights to the stolen collection" and therefore satisfy the "relates to" element of the expropriation attachment exception.  *See* Motion to Quash Order 7.

## C.  Section 1610(c)'s Notice Requirement Has Not Been Satisfied

Despite fending off the first two arguments against attachment, Chabad stumbles when faced with the FSIA's notice requirement for a judgment by default.  The question here is novel: whether the sanctions judgments entered following the 2010 default judgment are themselves "judgment[s] by default" and therefore must be served in compliance with Sections 1608(e).  The Court concludes that the answer is yes.  Because the monetary sanctions Chabad seeks to enforce are based on judgments entered by default that have not been properly served on defendants, the Court is barred from ordering attachment and execution.

15

The relevant requirement states that "[n]o attachment or execution . . . shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e)."  28 U.S.C. § 1610(c).  Under the referenced Section 1608(e):

> No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

*Id.* § 1608(e) (emphases added).  The "manner prescribed for service" is detailed in Section 1608(a) for foreign states or political subdivisions and in Section 1608(b) for agencies or instrumentalities of a foreign state.  *Chabad IV*, 798 F. Supp. 2d at 267–68.

This notice requirement is no mere technicality.  Rather, it is an "important procedural protection[] for foreign states and their instrumentalities built into the FSIA."  *Haim v. Islamic Republic of Iran*, 902 F. Supp. 2d 71, 74 (D.D.C. 2012).  The notice portion was "designed [in part] to . . . preserve foreign property interests by insisting upon prompt notification of any entry of judgment that might put such interests at risk."  *Murphy v. Islamic Republic of Iran*, 778 F. Supp. 2d 70, 72 (D.D.C. 2011).  In short, the requirement cannot be given short shrift.

When notice is mandated, service must be satisfied pursuant to the directives in Sections 1608(a) and Section 1608(b).  For service on foreign states or political subdivisions, a plaintiff must strictly comply with the four methods of service listed in Section 1608(a).  *Chabad IV*, 798 F. Supp. 2d at 267.  Indeed, even "actual notice" is insufficient to bypass the requirement.  *Barot v. Embassy of the Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015).  For agencies or instrumentalities, "[S]ection 1608(b) may be satisfied by technically faulty service that gives

adequate notice" and substantial compliance may be sufficient. *Chabad IV*, 798 F. Supp. 2d at 268–69 (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994)).

Because Chabad seeks to rely on the sanctions judgments to attach and execute on property, Tenex-USA argues that defendants must receive the notice required for judgments by default. Tenex-USA's Opp'n 12–14.  Tenex-USA is correct only if (1) proper notice has not already been given by the 2010 default judgment; (2) the sanctions judgments are indeed entries of judgment; and (3) the judgments were "any such default judgment," meaning "judgment[s] by default."  After considering the text of the statute and the broader principles underlying notice in this context, the Court concludes that the notice requirement does apply and therefore the sanctions judgments must be served on defendants before attachment and execution premised on those judgments is ordered.

First, it is important to address why the previous notice for the 2010 default judgment, which was properly served, is not enough. *See* Chabad's Reply to Tenex-USA 9; *Chabad IV*, 798 F. Supp. 2d at 270.  The answer is simple—defendants were served at that time with a judgment that said nothing about monetary sanctions, imposed no obligation on defendants to pay such sanctions, and granted Chabad no right to collect such sanctions. *See* Order Granting Pl.'s Mot. for Entry of Default Judgment.  Indeed, when the Court first considered issuing sanctions in 2011, it noted that while "defendants ha[d] certainly received notice directing them to return the Library and Archive to plaintiff they ha[d] received no notice that failure to comply with that order may subject them to additional monetary penalties."  *Chabad IV*, 798 F. Supp. 2d at 273 (internal citation omitted).  It was a few years later that the Court adjudged and decreed that defendants were in civil contempt, ordered sanctions of $50,000 per day, and later still when the Court issued three interim judgments of accrued sanctions.  Sanctions Order; Interim Judgment; Second Interim

Judgment; Revised Interim Judgment.  And it is the sanctions judgments, not the 2010 default judgment, that Chabad seeks to enforce.  "A copy of any such default judgment" must be served under Section 1608(e) and therefore notice of the 2010 default judgment cannot also provide notice for the later judgments.

Second, the sanctions judgments are plainly judgments within the standard definition. Black's Law Dictionary defines judgment as "[a] court's final determination of the rights and obligations of the parties." *Judgment*, Black's Law Dictionary (10th ed. 2014).  The Court did exactly that when it ordered and adjudged that Chabad may recover from defendants each sum certain.  The fact that Chabad seeks to act on those awards—representing final determinations of its right to monetary relief and defendants' corresponding final obligation to pay—makes the applicability of that definition even clearer.

Moreover, Chabad, when filing motions for interim sanctions judgments, and the Court, when granting them, understood the Court to have been entering judgment.  The first interim sanctions judgment stated that the "Motion for an Interim Judgment of Accrued Sanctions . . . is GRANTED" that "plaintiff requests the Court enter interim judgment in the amount of $43,700,000" and explained that "the Clerk of Court may, upon application of plaintiff, *enter an additional judgment* pursuant [to a schedule of amounts]."  Interim Judgment (emphasis added). The next interim judgment was titled "Order and Judgment" and it stated that "the Court hereby: ORDERS AND AJUDGES that plaintiff recover from defendants, jointly and severally, an additional $78,300,300."  Second Interim Judgment.  The latest interim judgment, from this year, was titled "Revised Interim Judgment" and stated that "the Court hereby . . . ORDERS AND ADJUDGES that Plaintiff recover from Defendants, jointly and severally, $178,800,000.00." Revised Interim Judgment.

This Court's understanding that entry of the accrued amount of sanctions against a defendant in the FSIA context is the entry of judgment comports with the actions of other courts, both inside and outside of this District.  *See, e.g.*, *Sistem Muhendislik Insaat Sanayi Ve Ticaret, A.S. v. Kyrgyz Republic*, No. 12-cv-4502 (ALC), 2022 WL 5246422, at *1 (S.D.N.Y. Oct. 6, 2022) ("[Plaintiff] moved this court to enter a second interim judgment in the amount of total outstanding sanctions. . . . [T]he Court [will] grant [plaintiff's] motion and enter a second interim judgment against Defendant in the amount of $8,560,000."); *Micula v. Gov't of Romania*, No. 17-cv-02332 (APM), 2021 WL 5178852, at *3 (D.D.C. Nov. 8, 2021) ("The court will enter a judgment in the amount of $1,500,000, representing approximately 50% of the accrued sanctions."), *motion for relief from judgment denied,* 2022 WL 18356669 (D.D.C. Dec. 22, 2022).

Finally, each sanctions judgment is also a "judgment by default" and is accordingly "any such default judgment," therefore triggering the notice requirement.  *See* 28 U.S.C. § 1608(e). That result flows from a plain reading of the statute and the overall principles of notice for default judgments under the FSIA.

First, the language "judgment by default" facially covers the sanctions judgments here. After all, defendants were undoubtably in default at the time of each judgment.  The clerk's entry of default came in 2010 following the defendants' noisy withdrawal.  *See* ECF No. 71-1; ECF No. 82.  The order imposing monetary sanctions was after this entry.  *Chabad IV*, 798 F. Supp. 2d at 274; *Sanctions Opinion*, 915 F. Supp. 2d at 149–51.  And then each of the sanctions judgments were entered later, without the participation of defendants, who never reentered this lawsuit to defend themselves.  Crucially, not every imposition of monetary contempt sanctions occurs without such participation.  *See, e.g.*, *Micula v. Gov't of Romania*, No. 17-cv-02332 (APM), 2020 WL 6822695, at *5 (D.D.C. Nov. 20, 2020) (involving participation by Romania in contesting the

imposition of sanctions), *aff'd,* No. 20-7116, 2022 WL 2281645 (D.C. Cir. June 24, 2022).  But, in this novel situation, where sanctions judgments came after entry of default, and without participation or defense by defendants, those judgments are naturally "judgment[s] by default."

Second, the Court's plain reading is reinforced by the broader principles embedded in the notice requirement.  Preservation of foreign property interests and notice of any threats thereto are the core value at the heart of the postjudgment notice requirement.  *See Murphy*, 778 F. Supp. 2d at 72.  It is why a plaintiff is directed to serve the relevant judgment by default in compliance with the onerous requirements of foreign service and why courts are directed to wait until a reasonable period of time has elapsed before allowing attachment and execution based on such a judgment. *See id.*

The last time that defendants were given statutorily required notice of a judgment by default under Section 1610(c), they were directed to return the Library and the Archive.  Order Granting Pl.'s Mot. for Entry of Default Judgment; *see Chabad IV*, 798 F. Supp. 2d at 273.  Today, Chabad has the right to more than $178 million and defendants have a final corresponding obligation to pay that sanctions debt.  The 2010 default judgment "[gave] no notice that failure to comply with that order may subject them to additional monetary penalties."  *Id.*  The sanctions judgments threaten the absent defendants' property interests in a starkly different manner than the 2010 judgment ordering the return of the Library and the Archive.  The lack of notice as to those new final obligations reinforces this Court's conclusion that the FSIA's notice requirement applies.

Finally, Chabad's alternative contention that, even if notice is required, it was satisfied through regular mailing, is baseless.  *See* Chabad's Reply to Tenex-USA 10.  Chabad must strictly follow the requirements of Section 1608(a) for notice on a foreign state or political subdivision, and at least substantially comply with 1608(b) for Russian agencies or instrumentalities.  *Chabad*

*IV*, 798 F. Supp. 2d at 267–68.  Therefore, mailings sent by Chabad itself, as well as Tenex-USA's use of commercial mail service to send documents to Russia during the recent appeal to the D.C. Circuit, *see* ECF No. 254-2, were definitionally not in compliance with Section 1608(a).  For agencies or instrumentalities, Chabad would have to at least demonstrate substantial compliance with Section 1608(b) for the judgments that it seeks to rely on.  *Chabad IV*, 798 F. Supp. 2d at 268–69.  It has not presented such evidence.

Similarly, notice of the possibility of sanctions through the Court's original order to show cause served on defendants' former counsel, as well as evidence of actual notice on Russian representatives, cannot substitute for Chabad's notice obligations to serve the *judgments* in compliance with Section 1608.  *Id.* at 274; *Sanctions Opinion*, 915 F. Supp. 2d at 150–51; *Barot*, 785 F.3d at 27.

\*      \*      \*

In sum, because "judgment by default" naturally applies to these sanctions judgments, and given the broader principles embedded in the notice requirement, the Court concludes that the sanctions judgments must be served on defendants before attachment and execution can be ordered.  To conclude otherwise, allowing Chabad to rely on notice of a different judgment for a different kind of relief, would be to betray Section 1610(c)'s core premise.  And the Court will not undermine the "important procedural protection[] for foreign states and their instrumentalities" in such a manner.  *See Haim*, 902 F. Supp. 2d at 74.

The Court will therefore direct Chabad to serve each defendant in compliance with the manner prescribed for service in Section 1608.  *See Chabad IV*, 798 F. Supp. 2d at 267–68; *Murphy*, 778 F. Supp. 2d at 72.  After a reasonable period of time has elapsed—six weeks would be sufficient—Chabad may file its motion again.  *See Chabad IV*, 798 F. Supp. 2d at 270 (citing *Ned Chartering & Trading, Inc. v. Republic of Pak.*, 130 F. Supp. 2d 64, 67 (D.D.C. 2001)).

Indeed, Chabad suggests that a direction by this Court to provide defendants such notice can be done "without significant delay." Pl.'s Reply to Tenex-USA 11 n.3.

For now, then, the Court does not resolve whether Chabad has identified particular Russian property in the United States used for a commercial activity in the United States. And in the meantime, it is possible, however unlikely, that notice to defendants will spur a final reversal of Russia's shameful withholding of Chabad's treasured texts. It is feasible that Russia will now comply with this Court's decade-old order and Chabad will be reunited with what it has lost. If not, Russia's sanctions debt will keep accruing. And if Russia fails to act, Chabad will soon have the opportunity and authority to collect upon a renewed motion.

## IV.    CONCLUSION

For the above-stated reasons, Chabad's motion will be **DENIED WITHOUT PREJUDICE**. The Court will **DIRECT** Chabad to provide service on all defendants of the sanctions judgments. For purposes of completeness, the Court will also direct service of the sanctions order and accompanying opinion. A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed on this 2ᵗʰ day of February, 2023.

ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE