**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| AGUDAS CHASIDEI CHABAD OF UNITED STATES,  ) ) ) | |
| *Plaintiff*, ) | Case No. 1:05-cv-01548-RCL |
| v.  ) | **REDACTED PUBLIC VERSION** |
| RUSSIAN FEDERATION; RUSSIAN MINISTRY OF CULTURE AND MASS COMMUNICATION; RUSSIAN STATE LIBRARY; and RUSSIAN STATE MILITARY ARCHIVE,  ) ) ) ) ) | |
| *Defendants*. ) ) | |

**[PROPOSED] SUR-REPLY OF NON-PARTY TENEX-USA TO CHABAD'S
MOTION TO ATTACH PROPERTY OR, IN THE ALTERNATIVE,
TO REGISTER JUDICIAL LIENS**

**WHITE & CASE**LLP

Carolyn B. Lamm
Nicolle Kownacki
Ena Cefo
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600

August 1, 2022

*Counsel for Non-Party Tenex-USA,
Incorporated*

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ............................................................................................................1

ARGUMENT ...................................................................................................................4

I.      Tenex Is Not Before this Court...........................................................................4

II.     The Court Lacks Jurisdiction to Enter the Order Chabad Seeks ........................7

III.    Chabad Has Not Met the Threshold Requirements of § 1610(c).......................10

IV.     Chabad Has Not Satisfied its Burden to Pierce the Corporate Veil Between
        Tenex-USA, Tenex, and the Russian Federation................................................13

        A.      Tenex-USA's Experts Are Qualified and Credible for the Testimony They
                Submit................................................................................................14

                1.      Mr. Kunitsa .................................................................................14

                2.      Dr. Clark ....................................................................................17

        B.      Chabad Offers No Rebuttal Evidence—Only Baseless Argumentation and
                Conjecture.........................................................................................20

                1.      Chabad Has Not Rebutted the Presumption of Separateness
                        between Tenex-USA and Tenex .................................................21

                2.      Chabad Has Not Rebutted the Presumption of Separateness
                        between Tenex and Atomenergoprom ......................................22

                3.      Chabad Has Not Rebutted the Presumption of Separateness
                        between Atomenergoprom and Rosatom....................................28

                4.      Chabad Has Not Rebutted the Presumption of Separateness
                        Between Rosatom and the Russian Federation.........................30

CONCLUSION................................................................................................................34

# TABLE OF AUTHORITIES

**CASES** **Page(s)**

*Agudas Chasidei Chabad of United States v. Russian Federation* ("*Chabad I*"),
528 F.3d 934 (D.C. Cir. 2008) ..........................................................................7, 8

*Agudas Chasidei Chabad of United States v. Russian Federation*,
798 F. Supp. 2d 260 (D.D.C. 2011) ......................................................................10

*Agudas Chasidei Chabad of United States v. Russian Federation* ("*Chabad II*"),
19 F.4th 472 (D.C. Cir. 2021) ...............................................................................8

*Allen v. Russian Federation*,
522 F. Supp. 2d 167 (D.D.C. 2007) ......................................................................30

*Ambrosini v. Labarraque*,
101 F.3d 129 (D.C. Cir. 1996) ..............................................................................17

*Arch Trading Corp. v. Republic of Ecuador*,
839 F.3d 193 (2d Cir. 2016) ..........................................................................20-21

*Bennett v. Islamic Republic of Iran*,
604 F. Supp. 2d 152 (D.D.C. 2009) ........................................................................3

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
333 F. Supp. 3d 380 (D. Del. 2018).......................................................16, 18, 24

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)........................................................................................17, 18

*De Csepel v. Republic of Hungary*,
859 F.3d 1094 (D.C. Cir. 2017) ..............................................................................7

*Dinkel v. Medstar Health, Inc.*,
880 F. Supp. 2d 49 (D.D.C. 2012) ........................................................................22

*DL v. District of Columbia*,
109 F. Supp. 3d 12 (D.D.C. 2015) ........................................................................17

*Doe v. Exxon Mobil Corp.*,
573 F. Supp. 2d 16 (D.D.C. 2008) ........................................................................28

*Doe v. Ejercito De Liberacion Nacional*,
No. 15-cv-8652, 2015 U.S. Dist. LEXIS 167993
(S.D.N.Y. Dec. 16, 2015) .........................................................................................5

*DRC, Inc. v. Republic of Honduras,*
    71 F. Supp. 3d 201 (D.D.C. 2014) ......................................................................16

*Dusenbery v. United States,*
    534 U.S. 161 (2002) ...........................................................................................5

*Empresa Cubana Exportadora de Alimentos y*
    *Productos Various v. United States Dep't of Treasury,*
    606 F. Supp. 2d 59 (D.D.C. 2009) ...........................................................25, 29, 31

*Figueiredo Ferez Consultoria e Engenharia*
    *de Projecto Ltda v. Republic of Peru,*
    655 F. Supp. 2d 361 (S.D.N.Y. 2009) ....................................................... 16-17, 24

*First Nat'l City Bank v. Banco Para El*
    *Comercio Exterior De Cuba,*
    462 U.S. 611 (1983) ...............................................................................16, 23, 24, 31

*Friedman v. Mission of the Gabonese Republic,*
    No. 17-cv-8142, 2018 U.S. Dist. LEXIS 218105
    (S.D.N.Y. Dec. 28, 2018) ................................................................................ 10-11

*Foremost-McKesson, Inc. v. Islamic Republic of Iran,*
    905 F.2d 438 (D.C. Cir. 1990) ............................................................................20

*Groobert v. President & Dirs. of Georgetown College,*
    219 F. Supp. 2d 1 (D.D.C. 2002) ........................................................................19

*Grupo Televisa, S.A., v. Telemundo Communs. Group, Inc.,*
    No. 04-20073-CIV, 2005 U.S. Dist. LEXIS 45883
    (S.D. Fla. Aug. 16, 2005) ...................................................................................15

*Haig v. Agee,*
    453 U.S. 280 (1981) ...........................................................................................3

*Haim v. Islamic Republic of Iran,*
    902 F. Supp. 2d 71 (D.D.C. 2012) ........................................................................5

*Harris v. Koenig,*
    815 F. Supp. 2d 6 (D.D.C. 2011) ...................................................................17, 18

*HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.,*
    264 F.R.D. 146 (D.N.J. 2009) ............................................................................15

*Janvey v. Libyan Inv. Auth.,*
    164 F. Supp. 3d 910 (N.D. Tex. 2015) ............................................................ 18-19

*Jerez v. Republic of Cuba*,
    775 F.3d 419 (D.C. Cir. 2014) ......................................................................9, 13

*Kapar v. Islamic Republic of Iran*,
    105 F. Supp. 3d 99 (D.D.C. 2015) ....................................................................11

*Lelchook v. Syrian Arab Republic*,
    No. 16-cv-01550, 2019 U.S. Dist. LEXIS 88658
    (D.D.C. Jan. 31, 2019) .................................................................................14, 15

*Maggard v. O'Connell*,
    703 F.2d 1284 (D.C. Cir. 1983) ..........................................................................8

*Martinez v. Dow Chem. Co.*,
    219 F. Supp. 2d 719 (E.D. La. 2002) ................................................................14

*Ministry of Def. & Support for Armed Forces of*
    *Islamic Republic of Iran v. Cubic Def. Sys., Inc.*,
    984 F. Supp. 2d 1070 (S.D. Cal. 2013) ............................................................10

*Murphy v. Islamic Republic of Iran*,
    778 F. Supp. 2d 70 (D.D.C. 2011) ...................................................................5-6

*Nat'l Council of Resistance of Iran v. Dep't of State*,
    251 F.3d 192 (D.C. Cir. 2001) ............................................................................5

*NML Capital, Ltd. v. Banco Cent. De La Republica Argentina*,
    652 F.3d 172 (2d Cir. 2011) ..............................................................................18

*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) ........................................................................7, 9

*Philipp v. Fed. Republic of Germany*,
    894 F.3d 406 (D.C. Cir. 2018) ............................................................................7

*Practical Concepts, Inc., v. Republic of Bolivia*,
    811 F.2d 1543 (D.C. Cir. 1987) ..........................................................................7

*Schubarth v. Fed. Republic of Germany*,
    891 F.3d 392 (D.C. Cir. 2018) ............................................................................7

*Simon v. Republic of Hungary*,
    812 F.3d 127 (D.C. Cir. 2016) ............................................................................7

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
    549 U.S. 422 (2007) .............................................................................................8

*Sistem Mühendislik Insaat Sanayi Ve Ticaret, A.Ş. v. Kyrgyz Republic*,
    No. 12-cv-4502, 2020 WL 7890222 (S.D.N.Y. Nov. 5, 2020)...............................................12

*Siswanto v. Airbus Ams., Inc.*,
    No. 15-cv-5486, 2016 U.S. Dist. LEXIS 171027
    (N.D. Ill. Dec. 9, 2016) ....................................................................................................15

*Spirit of Sage Council v. Kempthorne*,
    511 F. Supp. 2d 31 (D.D.C. 2007) ......................................................................................8

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
    467 F.3d 107 (2d Cir. 2006) ..............................................................................................19

*\*Stansell v. Revolutionary Armed Forces of Colombia*,
    771 F.3d 713 (11th Cir. 2014) .............................................................................................5

*Tig Ins. Co. v. Republic of Argentina*,
    No. 18-mc-00129-DLF, 2022 U.S. Dist. LEXIS 71213
    (D.D.C. Apr. 18, 2022) ....................................................................................................20

*\*TransAmerica Leasing, Inc. v. La Republica de Venezuela*,
    200 F.3d 843 (D.C. Cir. 2000) ................................................................................. *passim*

*TMR Energy Ltd. v. State Prop. Fund of Ukraine*,
    411 F.3d 296 (D.C. Cir. 2005) ..........................................................................................16

*\*UAB Skyroad Leasing v. OJSC Tajik Air*,
    No. 21-7015, 2022 U.S. App. LEXIS 16977
    (D.C. Cir. June 17, 2022) .......................................................................................... *passim*

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ......................................................................................................25, 29

*United States v. Smith*,
    No. 19-cv-0324, 2022 U.S. Dist. LEXIS 25317,
    (D.D.C. Feb. 11, 2022) .....................................................................................................17

*Unterberg v. Exxon Mobil Corp.*,
    203 F. Supp. 3d 324 (S.D.N.Y. 2016) ...............................................................................27

*Vera v. Republic of Cuba*,
    867 F.3d 310 (2d Cir. 2017) ................................................................................................9

*Webb v. District of Columbia*,
    146 F.3d 964 (D.C. Cir. 1998) ..........................................................................................12

*Wye Oak Tech., Inc. v. Republic of Iraq*,
    72 F. Supp. 3d 356 (D.D.C. 2014) ...............................................................................16, 23

*Zurich Capital Markets Inc. v. Coglianese*,
383 F. Supp. 2d 1041 (N.D. Ill. 2005) ..................................................................15


**STATUTES AND RULES**

28 U.S.C. § 1605A..................................................................................................9

*28 U.S.C. § 1608 ........................................................................................ *passim*

*28 U.S.C. § 1610 ........................................................................................ *passim*

42 U.S.C. § 2012(a) ...............................................................................................3

Fed. R. Evid. 702 ....................................................................................2, 14, 15, 18

Fed. R. Civ. P. 44.1...........................................................................................2, 14, 15

Fed. R. Civ. P. 37(b) .............................................................................................12


**OTHER AUTHORITIES**

Restatement (Fourth) of Foreign Relations Law of the United States
§ 463..............................................................................................................12

Charles Alan Wright et al., Proof of Foreign Law,
9A Fed. Prac. & Proc. Civ. § 2444 (3d ed. 2016)...................................................15


*indicates authority on which counsel chiefly relies

Tenex-USA hereby submits this [Proposed] Sur-Reply in opposition to the Motion of Plaintiff Agudas Chasidei Chabad of United States ("Chabad") to Attach Property or, in the Alternative, to Register Judicial Liens ("Motion") (ECF 236), and in response to the new arguments raised in Chabad's Reply in Support of its Motion ("Reply") (ECF 253).

## INTRODUCTION

In its Reply, Chabad makes several new arguments—each of which is meritless.

*First*, Chabad claims now that the focus of its request for an order authorizing attachment is exclusively the assets of Tenex—not those of Tenex-USA. But Tenex itself is not before this Court, it was not served with the Motion to Attach (*see* Mot., Certificate of Serv.), and nothing in the record suggests otherwise.[1] To the extent Chabad argues that its service of the Motion on Tenex-USA is sufficient to give Tenex notice that it is seeking an order against Tenex's assets, Chabad is wrong. As Tenex-USA showed (Opp'n 23-28, ECF 244), Tenex-USA is *not* the "U.S. agent" of Tenex and Tenex-USA's assets in the United States are not the assets of Tenex. Therefore, Chabad's Motion as to both Tenex (which is not before the Court) and Tenex-USA (which is not the agent of Tenex—or of the Russian Federation) must fail.

*Second*, with respect to Tenex-USA's jurisdictional arguments, Chabad newly asserts that the D.C. Circuit in its 2021 opinion in this matter "confirmed" this Court's interpretation of the Russian Federation's immunity. The D.C. Circuit did no such thing. In addition, Chabad attempts for the first time (Reply 13) to support its argument that the Court has jurisdiction to institute judicial liens on the property of Tenex and Tenex-USA. Chabad's belated argument is unavailing,

---

[1] As stated in Tenex-USA's Opposition, Tenex-USA appears only for itself and does not appear for any of its parents or related companies. Opp'n 1.

because the Foreign Sovereign Immunities Act ("FSIA") does not authorize judicial liens against the property of a foreign state.

*Third*, Chabad newly contends (Reply 11) that the Sanctions Judgments are not "default judgments," and that they therefore are not subject to the requirements for service of default judgments under 28 U.S.C. § 1608(e).  Chabad's argument is unsupportable, and accordingly the Court should not permit enforcement of the Sanctions Judgments under § 1610(c) until Chabad has served the Sanctions Judgments on the Russian Defendants under the appropriate methods of § 1608(a) and (b)—which Chabad concedes it has not yet done.

*Fourth*, in an effort to sustain its strained attempt at multiple layers of veil-piercing, Chabad makes baseless attacks on Tenex-USA's experts, to which Tenex-USA must be given an opportunity to respond.  With respect to Tenex-USA's Russian law expert, Mr. Dmitry Kunitsa's qualifications are more than sufficient to present evidence of Russian law under Federal Rule of Civil Procedure 44.1.  In contrast, Chabad does not even present an expert on Russian law, relying instead on the interpretation of Russian statutes by its own U.S. counsel.  Likewise, Dr. Gene Clark, Tenex-USA's expert on the uranium industry, satisfies the applicable standard for a fact expert under Federal Rule of Evidence 702 and *Daubert*.  Chabad also does not present an expert from the uranium or nuclear fuel industry to contradict or even question Dr. Clark's conclusions; instead, Chabad relies solely on its counsels' own speculation as to the workings of this complex industry.

In any event, as discussed below, none of Chabad's rebuttals to Tenex-USA's abundant evidence and expert testimony satisfies Chabad's heavy burden to justify veil-piercing between Tenex-USA, its parent companies, and the Russian Federation.  And, indeed, the possibility of such veil-piercing is not a concern for this Court to take lightly.  Chabad's request for a § 1610(c)

order—against Tenex or Tenex-USA—poses a real threat to U.S. national security that Chabad fails to even acknowledge. Chabad does not deny that Tenex-USA and Tenex are critical suppliers of nuclear fuel products to U.S. utility companies for the domestic U.S. energy supply.[2] *See* Newton Decl. ¶ 8, ECF 176-2 (noting that Tenex-USA "enters into contracts directly as an independent entity with its U.S. customers," "separately from Tenex"); Mot. 3 (noting that attachment of Tenex-USA's uranium products could "disrupt[]" the "supply of uranium to U.S. utilities and other users").[3] And this Court in other cases has held that sovereign property implicating "sensitive national security concerns" should be immune from attachment. *Bennett v. Islamic Republic of Iran*, 604 F. Supp. 2d 152, 162-63 (D.D.C. 2009) (Lamberth, J.) (granting a motion to quash a writ of attachment for properties that once served as the Iranian Embassy complex due to "sensitive national security concerns"); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) (confirming, in other circumstances, that "[m]atters intimately related to . . . national security are rarely proper subjects for judicial intervention"). Attachment of any uranium and profits thereof would result in exactly the type of national-security risks that should be avoided

---

[2] The type of enriched uranium that Tenex-USA and Tenex provide to U.S. consumers, in fact, is used to power all 93 commercial nuclear reactors in the United States, which generate approximately 20 percent of domestic electricity. *See Nuclear Reactors, Materials, and Waste Sector*, Cybersecurity & Infrastructure Security Agency, https://www.cisa.gov/nuclear-reactors-materials-and-waste-sector (last visited Aug. 1, 2022); *U.S. Nuclear Industry*, U.S. Energy Information Administration, https://www.eia.gov/energyexplained/nuclear/us-nuclear-industry.php (Apr. 18, 2022).

[3] Unsurprisingly, it is widely recognized that domestic U.S. energy infrastructure is critical to national security because it ensures stable energy supply, health, and welfare for U.S. citizens—and the economy. *See* 42 U.S.C. § 2012(a) ("The Congress of the United States makes the following findings . . . [t]he development, utilization, and control of atomic energy for military and for all other purposes are vital to the common defense and security."); Energy Futures Initiatives, Inc., The U.S. Nuclear Energy Enterprise: A Key National Security Enabler 18 (Aug. 2017) ("A vibrant domestic nuclear energy industry, including a healthy supply chain . . . is essential for the achievement of U. S. national security objectives.").

during attachment, and Chabad's failure to satisfy its burden to justify veil-piercing in these highly sensitive circumstances is more than sufficient grounds to deny the Motion to Attach.

## ARGUMENT

### I.   TENEX IS NOT BEFORE THIS COURT

In its Motion to Attach, Chabad conflates Tenex and Tenex-USA, asserting—incorrectly and without any support—that Tenex-USA is Tenex's "U.S. agent." Mot. 2, 4, 22, 23, 31, 34; *see also* Reply 1. Presumably by virtue of this incorrect conflation, Chabad has elected not to serve the Motion to Attach on Tenex, a third party who—at least according to the docket—has never been summoned before this Court or provided with any notice of these proceedings. *See* Mot., Certificate of Serv. (indicating service of Tenex-USA, the U.S. Government, VEB, and the four Russian Federation Defendants); *see also generally* Docket, *Agudas Chasidei Chabad of United States v. Russian Fed'n*, No. 1:05-cv-01548-RCL (D.D.C.). Chabad failed to effect such service on Tenex despite the fact that Chabad's Motion sought an order authorizing the attachment of property of both Tenex and Tenex-USA. *See, e.g.¸* Mot. 34 (requesting the Court "enter an order authorizing Chabad's attachment of, and execut[ion] on, any uranium or other products in the United States, 1. [t]o which Tenex holds title, now or in the future; 2. [t]o which Tenex has transferred title to its U.S. agent, Tenex-USA, following importation into the United States").

Tenex-USA opposed Chabad's Motion and demonstrated that Chabad had failed to satisfy its burden with respect to any of the layers of veil-piercing between Tenex-USA and the Russian Federation. *See generally* Opp'n. Tenex-USA also made clear that it has no authority to accept service for Tenex nor does it have any authority to speak for Tenex, because it is not Tenex's "U.S. agent." *Id.* In its Reply, however, Chabad bizarrely pivots, suggesting that it seeks *none* of Tenex-USA's assets, and *only* Tenex's assets, and that the relationship between Tenex and Tenex-USA "is irrelevant." Reply 1 (citing Mot. 31). Chabad's confused approach reflects only one aim.

4

Plainly, Chabad is attempting to bypass an entire layer of veil-piercing, hoping that its conclusory assertions of an agency relationship between Tenex-USA and Tenex (*see* Mot. 21-23) carry the day. They do not.

*First*, if in fact Chabad intends in its Motion to target the assets of Tenex, Chabad would need to serve Tenex itself (in Russia) and provide it due process. Where a judgment creditor wishes to enforce its judgment against a third party who was not a party to the underlying proceeding leading to the judgment, due process requires that the targeted third party receive notice of the post-judgment motion. *See Dusenbery v. United* States, 534 U.S. 161, 167 (2002) ("[I]ndividuals whose property interests are at stake are entitled to notice and an opportunity to be heard."); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001) (a "foreign organization that acquires or holds property in this country" has due process rights "when that property is placed in jeopardy by government intervention"); *Doe v. Ejercito De Liberacion Nacional*, No. 15-cv-8652, 2015 U.S. Dist. LEXIS 167993, at *6 (S.D.N.Y. Dec. 16, 2015) (third parties are "entitled to due process in connection with any legal determination as to their status as agencies or instrumentalities"). The fact that the Russian Federation may have been served with Chabad's Motion (or with the 2010 Default Judgment) is irrelevant. *See Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 726 (11th Cir. 2014) (holding that providing notice of a judgment to the judgment debtor is insufficient to satisfy due process for a third party whose assets are subject to attachment on the original judgment, because the third party "cannot be expected to be on notice of the judgment"); *Haim v. Islamic Republic of Iran*, 902 F. Supp. 2d 71, 72 (D.D.C. 2012) (Lamberth, J.) (holding that separate service was required under § 1608 on *both* the state and instrumentality defendants); *Murphy v. Islamic Republic of Iran*, 778 F. Supp. 2d 70,

72, 74 (D.D.C. 2011) (Lamberth, J.) (holding that service on Iran was insufficient to constitute notice to an agency or instrumentality defendant).

And service of Chabad's Motion on Tenex-USA (via its counsel and the Court's electronic filing system) is also insufficient to provide notice to Tenex.  As Tenex-USA showed in its Opposition, and Chabad apparently has elected not to attempt to rebut (*see* Reply 1 (calling "the relationship between Tenex and Tenex-USA . . . irrelevant")), Tenex-USA is not the agent or alter ego of Tenex.  Opp'n 23-28.  Tenex-USA also made clear in its Opposition that it "appears only for itself and does not appear for any of its parents or related companies."  Opp'n 1.

*Second*, regardless of whether Tenex received proper notice of the Motion—and it appears not—Tenex-USA has an independent interest in this Court denying a § 1610(c) order with respect to the U.S. assets of Tenex.  Tenex is ██████████████████████████████

███████████████████████████████████████████████████████████

██████ (stating that ███████████████████████████████████████

███████████████████████████████████████████████████████████

██████  Chabad's request for an order authorizing Chabad's attachment of, and execution on, "any uranium or other products in the Unites States [t]o which Tenex holds title, now or in the future" (Mot. 34) thus poses an existential threat to Tenex-USA's contracts and business—not to mention the national security of the United States (*see supra*).  Accordingly, the Court may rely on Tenex-USA's arguments and evidence to hold that Chabad has failed to satisfy its burden to justify veil-piercing between Tenex-USA and Tenex—and between any alleged affiliates and/or parent companies.

## II.   THE COURT LACKS JURISDICTION TO ENTER THE ORDER CHABAD SEEKS

Chabad continues to err in its contention that the Court has subject-matter jurisdiction to enter the order that Chabad seeks.  As Tenex-USA has explained, a "foreign state itself does not lose immunity under the expropriation exception unless the allegedly expropriated property is located in the United States."  *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 401 (D.C. Cir. 2018); *see also Philipp v. Fed. Republic of Germany*, 894 F.3d 406, 414-18 (D.C. Cir. 2018) (holding same); *De Csepel v. Republic of Hungary*, 859 F.3d 1094, 1105-08 (D.C. Cir. 2017) (holding same); *Simon v. Republic of Hungary*, 812 F.3d 127, 146-48 (D.C. Cir. 2016) (holding same).  Here, the property underlying Chabad's expropriation claim is indisputably located in the Russian Federation, and the Court therefore lacks subject-matter jurisdiction over Chabad's claims as to the Russian "state itself."

Contrary to Chabad's assertion (Reply 5), the issue of subject-matter jurisdiction with respect to the claims against the Russian Federation was never addressed in 2008, and was only implicitly assumed in the default context in 2010.  *De Csepel*, 859 F.3d at 1105-06 ("The issue of the Russian state's immunity was completely unaddressed by the district court and neither raised nor briefed on appeal [in *Chabad I*, 528 F.3d 934 (D.C. Cir. 2008)].");  *see also* Opp'n 6, 11. Because the jurisdictional immunity determination with respect to the Russian Federation was made in the default context, Chabad's reliance on *Practical Concepts* (at Reply 6) is unavailing; the Russian Federation would indeed have grounds to raise in post-judgment proceedings the new issue of the Court's lack of subject-matter jurisdiction due to the location of the disputed property. *See Owens v. Republic of Sudan*, 864 F.3d 751, 770-73 (D.C. Cir. 2017) (addressing in post-judgment proceedings Sudan's immunity argument on the scope of the term "extrajudicial killing" despite Sudan having previously appeared and raised other jurisdictional immunity defenses).

Chabad's newest assertion—that the D.C. Circuit last year purportedly "confirmed" that the 2008 *Chabad I* decision conclusively determined jurisdiction over Chabad's claims against the Russian Federation (Reply 5-6)—is incorrect, and it is disingenuous for Chabad to suggest as much.  In the appeal by Tenex-USA that Chabad refers to, the D.C. Circuit affirmed this Court's July 28, 2020 Memorandum Order, which held only that Tenex-USA lacked standing for its motion under Rule 60(b) for partial vacatur of the 2010 default judgment.  *See Agudas Chasidei Chabad of United States v. Russian Federation* ("*Chabad II*"), 19 F.4th 472, 475 (D.C. Cir. 2021) (citing July 28, 2020 Mem. Order 3 (ECF 221)).  In its latest decision in this case, the D.C. Circuit did not make any holding with respect to the subject-matter jurisdiction question or include any reasoning addressing the issue whatsoever.  The court also did not necessarily address the jurisdictional issue by implication, because the threshold standing issues on which the court ultimately denied Tenex-USA's appeal did not require resolution of subject-matter jurisdiction. *See Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (there is "no mandatory sequencing of jurisdictional issues" (internal citations and quotation omitted)); *see also Maggard v. O'Connell*, 703 F.2d 1284, 1289 (D.C. Cir. 1983) (holding that, to bind a lower court by a mandate, "the issue must actually have been decided either expressly or by necessary application on that appeal" (internal citations and quotations omitted)); *Spirit of Sage Council v. Kempthorne*, 511 F. Supp. 2d 31, 38 (D.D.C. 2007) (stating that the court was "not bound" by the appellate court because the appellate court "specifically did not address the questions [at issue]"). The single sentence in the D.C. Circuit's *Chabad II* opinion pointing out that *this Court* previously rejected Tenex-USA's jurisdictional argument thus is not "confirmation" of the D.C. Circuit's position on the issue.

Separately, Chabad's latest iteration of its *res judicata* argument (at Reply 6-7) continues to confound.  "Jurisdictional determinations made in a default judgment"—such as this Court's decision on the Russian Federation's immunity in 2010—"are not entitled to res judicata effect if the defendant did not 'actually appear[]' in the proceedings."  *Vera v. Republic of Cuba*, 867 F.3d 310, 317-18 (2d Cir. 2017) (quoting *Jerez v. Republic of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014)).  Again, this is why the Russian Federation, like Sudan in *Owens*, 864 F.3d at 770-73, would have grounds to raise a new immunity issue that it did not raise previously, such as the effect on jurisdiction of the location of the disputed property.[4]

Finally, the Court also lacks jurisdiction to grant Chabad's request for an order authorizing it to "record judicial liens" on the property of Tenex and Tenex-USA.  Chabad belatedly attempts for the first time to justify this request (at Reply 13).  *See* Opp'n 17.  As Tenex-USA explained, however, and as Chabad appears to acknowledge, § 1610(a) does not expressly authorize judicial liens against the purported property of a sovereign state.  *See* Reply 13 (observing that the FSIA is silent on the issuance of judicial liens).  Indeed, where the FSIA authorizes liens—in the exception to sovereign immunity for state sponsors of terrorism (*see, e.g.*, 28 U.S.C. § 1605A(g)(1))—it does so expressly.  Further, Chabad's reference to case law involving the FSIA's

---

[4] Amidst its *res judicata* argument, Chabad misapprehends Tenex-USA's reference to *Wye Oak* and the law-of-the-case doctrine.  Reply 8 (citing Opp'n 5).  Tenex-USA had noted that the law-of-the-case doctrine might apply *not* in reference to the 2008 and 2010 decisions, which did not address the jurisdictional issues Tenex-USA raises, but rather, in reference to the 2020 and 2021 decisions of this Court on Tenex-USA's Motion to Quash the Subpoena and Motion for a Stay Pending Appeal.  In both the 2020 and 2021 decisions, this Court expressly rejected the same two jurisdictional issues Tenex-USA respectfully raised once again in its Opposition to the Motion to Attach.  Tenex-USA nevertheless again raised and argued those issues with the express purpose of preserving them for appeal—given that those jurisdictional issues have not yet been passed upon by the Court of Appeals.  *See* Opp'n 5, 9-12, 14-17.  Tenex-USA cited an *exception* to the law-of-the-case doctrine in the hopes that *this Court* would, within its discretion, revisit its own "clearly erroneous" jurisdictional holdings, rather than leave the issues to the Court of Appeals.

terrorism exception (§ 1605A) and the Terrorism Risk Insurance Act ("TRIA") is inapposite here, as there is no allegation that the terrorism exception applies in this case. *See Ministry of Def. & Support for Armed Forces of Islamic Republic of Iran v. Cubic Def. Sys., Inc.*, 984 F. Supp. 2d 1070, 1080 (S.D. Cal. 2013) (observing that the claimants' motion to attach liens relies on TRIA and § 1610(g)).

Even if judicial liens were available under § 1610(a) (and they are not), Chabad's request is not ripe for adjudication because Chabad has not identified the specific property upon which it seeks to assert a lien. *See Agudas Chasidei Chabad of United States v. Russian Fed'n*, 798 F. Supp. 2d 260, 270-71 (D.D.C. 2011) (Lamberth, J.) (observing that a § 1610(c) order "*does not authorize the attachment or execution of . . . any property at all*" and that courts must "evaluate a proposed attachment of *specific property*" under § 1610(a)-(b) (emphasis added)).

## III.    CHABAD HAS NOT MET THE THRESHOLD REQUIREMENTS OF § 1610(c)

In its Opposition (at 12-14), Tenex-USA argues that the Court should deny Chabad's Motion, because there is no evidence that Chabad served the Sanctions Judgments—*i.e.*, the default judgments that Chabad now seeks authorization to enforce against Tenex and Tenex-USA—on the Russian Defendants under the methods outlined in § 1608(a) and (b).  Indeed, Chabad concedes that it has not served those judgments under § 1608's required methods. *See* Reply 11 n.3.[5]  Accordingly, Chabad has not satisfied the requirements for notice of default judgments under § 1608(e), and thus the § 1610(c) order Chabad now seeks is premature. *See Friedman v. Mission of the Gabonese Republic*, No. 17-cv-8142, 2018 U.S. Dist. LEXIS 218105,

---

[5] Chabad's half-hearted contention (at Reply 10) that mailing courtesy copies to the Russian Defendants (and without any proof of service) somehow relieves Chabad of § 1608(e)'s service requirement is unavailing.  Section 1608(e) prescribes expressly that "any such default judgment shall be sent . . . in the manner prescribed for service in [§ 1608(a)-(b)]."  Section 1608(a) does not permit service by routine mail on a foreign state.

at *4 (S.D.N.Y. Dec. 28, 2018) (denying plaintiffs' motion for a § 1610(c) order because "notice as required under § 1608(e) ha[d] not been achieved").

Chabad contends that it satisfied § 1608(e)'s notice requirements by serving the 2010 Default Judgment on the Russian Defendants, and that there was no further requirement for Chabad to serve the Sanctions Judgments under § 1608. Reply 9. Chabad is incorrect. Although more than ten years ago, this Court held that Chabad satisfied § 1608(e)'s service obligations for *the 2010 Default Judgment* (ECF 101), this is irrelevant for the inquiry *now* before the Court.

Under § 1610(c), the "judgment" that must be served refers to a "judgment" entered "by default" for which a party is seeking authorization to begin enforcement under § 1610. In many circumstances, an initial default judgment finding liability will be the judgment being enforced, because it would include a monetary award of damages against the foreign sovereign. *See, e.g.*, *Kapar v. Islamic Republic of Iran*, 105 F. Supp. 3d 99, 108 (D.D.C. 2015) (issuing § 1610(c) order "authorizing the attachment and execution of the [US$ 11.3 million] uncollected portion of [plaintiff's] original judgment"). Here, however, the 2010 Default Judgment that Chabad served related to an injunctive order against the Russian Federation to return the disputed property—and did not include (nor did Chabad request) *any* monetary award. Chabad has never contended that it seeks to enforce the Default Judgment against Tenex-USA—appropriately so, as Chabad has never argued that Tenex-USA has anything to do with the return of the disputed property.

To be clear, Chabad is seeking authorization to enforce against Tenex and Tenex-USA the Sanctions Judgments, *i.e.*, the 2015 Interim Sanctions Judgment (ECF 143 & 144) and the 2019 Interim Sanctions Judgment (ECF 201), which enter specific monetary judgments against the Russian Defendants for failing to comply with the injunctive order. *See* Mot. 1-2. Those

judgments were entered in default—as the Russian Defendants were in default and had not appeared—and the judgments were never served under § 1608 on the Russian Defendants.

Chabad contends that the Sanctions Judgments are not "default judgments" under § 1608(e) because, it claims, a default judgment arises only where "establishing defendant's liability" whereas the Sanctions Judgments "were directed to enforcement" of the Court's injunctive order. Reply 9-10.  Chabad's narrow reading is wrong; judgments for post-judgment contempt sanctions can also be "default judgments" if the defendant does not appear to contest the contempt finding or sanctions.  In an analogous context, Federal Rule of Civil Procedure 37(b)(2)(A)(vi) allows a court to "render[] a default judgment" against a party—including in post-judgment proceedings against a sovereign—for not complying with a discovery order. *See Webb v. District of Columbia*, 146 F.3d 964, 971 (D.C. Cir. 1998) (explaining, *inter alia*, the deterrence rationale underlying Rule 37's default sanction); Restatement (Fourth) of the Foreign Relations Law of the United States § 463 cmt. e ("An unjustified failure to comply with discovery requests can result in entry of a default judgment against a foreign state pursuant to [Rule 37(b)(2)(A)(vi)], *so long as the statutory requirements for a default against a foreign state are met*." (emphasis added)).  The same rationale applies here to the Sanctions Judgments, which, as Chabad acknowledges, are monetary awards against the Russian Federation for the purpose of coercing the Russian Defendant's compliance with the 2010 Default Judgment.[6]

---

[6] *Sistem* (cited at Reply 11) is inapposite, as that case concerned a motion to increase the amount of daily contempt sanctions that would accrue against a foreign sovereign, and not a motion requesting the issuance of a sum-certain monetary award—which is what the Sanctions Judgments are that Chabad is seeking to enforce.  Moreover, unlike the instant case, § 1608(e)'s notice concerns were not in fact at play in *Sistem* because the foreign sovereign was still participating in the proceeding.  *See* Def.'s Ltr. of Oct. 7, 2020 (ECF 240), *Sistem Mühendislik Insaat Sanayi Ve Ticaret, A.Ş. v. Kyrgyz Republic*, No. 12-cv-4502 (S.D.N.Y.) (letter in opposition to plaintiff's motion to increase sanctions).

Chabad's narrow interpretation of "judgment by default" also cannot be squared with § 1608(e)'s purpose; namely, "provid[ing] foreign sovereigns a special protection" against default judgments. *Jerez*, 775 F.3d at 423.  Here, the entry of the Sanctions Judgments—the first and only judgments rendering monetary awards in this case against the Russian Defendants—radically altered the extent of the Russian Defendants' liability.  Given the FSIA's express protections for sovereigns in default proceedings, it is inconceivable that the 2010 injunctive order falls under § 1608(e), but the Sanctions Judgments, which resulted in tens of millions of dollars of *new liability* on the Russian Defendants, do not.

## IV.   CHABAD HAS NOT SATISFIED ITS BURDEN TO PIERCE THE CORPORATE VEIL BETWEEN TENEX-USA, TENEX, AND THE RUSSIAN FEDERATION

Chabad asserts that the "only issue Tenex-USA raises that is both appropriate and in dispute is whether Tenex (the Russian entity) is an agent or alter ego of the Russian Federation." Reply 2.  To this end, Chabad has declined entirely to rebut the extensive evidence Tenex-USA submitted demonstrating its legal separateness from and lack of agent relationship with Tenex.  If Chabad has truly abandoned its interest in Tenex-USA, then the Court can, and should, deny the § 1610(c) Motion with respect to Tenex-USA and its assets on that basis alone and dismiss any further proceedings against Tenex-USA.  To the extent Chabad maintains this interest on its unsupported (and unproven) agency theory, the Court also should deny the Motion.  Chabad fails to argue *any* basis supported by evidence to pierce the corporate veil between Tenex and Tenex-USA, and it likewise fails to satisfy its burden to pierce *three* layers of the corporate veil (not including the one between Tenex and Tenex-USA) between Tenex and the Russian Federation.  In particular, since Chabad presents very little evidence of its own (and no expert opinion), Chabad relies on baseless attempts to discredit Tenex-USA's experts and their testimony.  These latest

attacks are insufficient to get Chabad over the high hurdle of piercing multiple layers of the corporate veil.

## A. Tenex-USA's Experts Are Qualified and Credible for the Testimony They Submit

### 1. Mr. Kunitsa

Mr. Kunitsa "opine[s] on the Russian law relevant to the question of whether Tenex-USA is a separate and independent juridical entity from its parent companies." Kunitsa Op. ¶ 1, ECF 246. His opinion is based on 30 years of experience with Russian corporate law and matters involving wholly-owned subsidiaries established under Russian law. *Id.* ¶ 3; *id.* at 35, Annex A. He is a native Russian speaker and a Russian-qualified lawyer. *Id.* ¶ 3; *id.* at 35, Annex A. Mr. Kunitsa's report goes far beyond merely stating that the companies are "independent legal entity[ies] as a matter of Russian law," as Chabad alleges (Reply 17); rather, it aids the Court in understanding, as a matter of Russian law, each company's status, corporate structure, rights and responsibilities, and relationships with parent companies. It also explains how, within the context and design of Russian law, each company is structured to operate independently, rather than as agents of its parent company. As such, Mr. Kunitsa's opinion aids the Court's evaluation of Russian law.

Chabad is entirely off-base in suggesting (at Reply 17-19) that Mr. Kunitsa should be subject to a *Daubert* hearing or analysis. Courts have widely held that Federal Rule of Civil Procedure 44.1, not *Daubert* or Federal Rule of Evidence 702, governs the determination of foreign law. *Lelchook v. Syrian Arab Republic*, No. 16-cv-01550, 2019 U.S. Dist. LEXIS 88658, at *10-11 (D.D.C. Jan. 31, 2019) (stating that FRCP 44.1 governs the admissibility of expert testimony on foreign law, whereas FRE 702 governs the admissibility of a fact expert report); *see also Martinez v. Dow Chem. Co.*, 219 F. Supp. 2d 719, 723-24 (E.D. La. 2002) (applying FRCP 44.1 and finding a *Daubert* motion on the admissibility of an opinion on foreign law to be "legally

unfounded"); *Grupo Televisa, S.A., v. Telemundo Communs. Group, Inc.*, No. 04-20073-CIV, 2005 U.S. Dist. LEXIS 45883, at *23 (S.D. Fla. Aug. 16, 2005) (applying FRCP 44.1 and holding that *Daubert* "does not govern the admissibility of expert testimony introduced to assist a court in making decisions regarding foreign law"); *HFGL Ltd. v. Alex Lyon & Son Sales Managers & Auctioneers, Inc.*, 264 F.R.D. 146, 149 (D.N.J. 2009) ("The use of an expert report to assist the Court in its determination of foreign law is entirely different from use of an expert report, pursuant to Rule 702, Fed. R. Evid., to aid the jury in determining the facts." (quotations and citations omitted)).

Rule 44.1 permits the court to consider with regard to questions of foreign law "*any relevant material or source*, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."  Fed. R. Civ. P. 44.1 (emphasis added); *see also Lelchook*, 2019 U.S. Dist. LEXIS 88658, at *13 (relying on expert testimony because the expert's declaration "demonstrates that he is a knowledgeable expert on [foreign] law"); *Siswanto v. Airbus Ams., Inc*., No. 15-cv-5486, 2016 U.S. Dist. LEXIS 171027, at *13 (N.D. Ill. Dec. 9, 2016) (noting that Rule 44.1 provides the Court with "great discretion" in choosing its source materials and allows it to "give these materials whatever probative value [it] thinks they deserve") (citing *Zurich Capital Markets Inc. v. Coglianese*, 383 F. Supp. 2d 1041, 1053 (N.D. Ill. 2005) and Charles Alan Wright et al*., Proof of Foreign Law*, 9A Fed. Prac. & Proc. Civ. § 2444 (3d ed. 2016)); *Grupo Televisa*, 2005 U.S. Dist. LEXIS 45883, at *22 ("Rule 44.1 allows the introduction of any evidence to be brought before the court as long as the evidence 1) is relevant and 2) relates to a determination of foreign law.").  Indeed, Chabad implicitly acknowledges this when, in support of its own analysis of Russian law, it submits the bare speculation of non-Russian-speaking U.S. counsel.

Chabad's contention that "Mr. Kunitsa's testimony fails in an important respect" because it discusses the companies' relationship from the standpoint of Russian law is incorrect.  Reply 18-19 n.5.  While it is true that *Bancec*'s alter-ego inquiry is "informed both by international law principles and articulated congressional policies," *First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba* ("*Bancec*"), 462 U.S. 611, 622 (1983), the laws governing the entities at issue necessarily inform the *Bancec* analysis, particularly as to the entities' structure and functions.  *See, e.g.*, *id.* at 624-25 (discussing enabling laws, the capacity to sue and be sued, corporate governance, and ownership over property as relevant facets of legally separate government instrumentalities); *see also TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 301-02 (D.C. Cir. 2005) (analyzing, under *Bancec*, the "structural features" of a Ukrainian entity as laid out under Ukrainian law); *DRC, Inc. v. Republic of Honduras*, 71 F. Supp. 3d 201, 209-10 (D.D.C. 2014) (applying Honduran law to find that a Honduran entity has a "separate juridical identity, which is the defining characteristic of the independent instrumentality").  Indeed, it is standard practice under the FSIA for the court to have the benefit of foreign law experts in the analysis of a veil-piercing inquiry.  *See, e.g.*, *Wye Oak Tech., Inc. v. Republic of Iraq*, 72 F. Supp. 3d 356, 359-60 (D.D.C. 2014) (Lamberth, J.) (relying on opinion of Iraqi-trained lawyer to determine whether the Iraqi Ministry of Defense is "a legally separate entity from Iraq" under Iraqi law); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 413 (D. Del. 2018) (relying on two separate Venezuelan-trained lawyers opining on whether Venezuela and its state-owned oil company are one and the same as a matter of Venezuelan law); *Figueiredo Ferez Consultoria e Engenharia de Projecto Ltda v. Republic of Peru*, 655 F. Supp. 2d 361, 368-69 (S.D.N.Y. 2009) (using a Peruvian-trained lawyer to analyze "Peruvian law to determine

whether the [entity] and the Republic should be treated as separate parties for the purposes of this action") (*rev'd on other grounds*).

Furthermore, Mr. Kunitsa addresses many of the same Russian law sources as Chabad. *Cf.* Mot. 24-25 (analyzing Rosatom's Implementing Law, Law 317-FZ) *with* Kunitsa Op. ¶ 28 (same). Unlike Chabad's counsel, however, Mr. Kunitsa is trained in Russian law, speaks native Russian, and is qualified to opine on the meaning of these statutes.

### 2. Dr. Clark

Under Federal Rule of Evidence 702, expert testimony is admissible if it is "relevant" and "reliable." *Harris v. Koenig*, 815 F. Supp. 2d 6, 8 (D.D.C. 2011) (denying a *Daubert* motion to exclude expert testimony). Courts have only a "'limited gate-keep[ing] role' directed at excluding expert testimony that is based upon 'subjective belief' or 'unsupported speculation.'" *Id.* (quoting *Ambrosini v. Labarraque*, 101 F.3d 129, 135-36 (D.C. Cir. 1996)). But when, as here, the trier of fact is the judge, not a jury, "there is little need for the 'gate-keeping function'" because there is no concern of juries "being swayed by dubious scientific testimony." *United States v. Smith*, No. 19-cv-0324-BAH, 2022 U.S. Dist. LEXIS 25317, at *78 (D.D.C. Feb. 11, 2022) (declining to conduct a *Daubert* hearing to exclude expert testimony in a bench trial); *see also DL v. District of Columbia*, 109 F. Supp. 3d 12, 28 (D.D.C. 2015) (referencing the "dangers of excluding expert evidence" "at the summary judgment stage"). Here, Dr. Clark's report is both relevant and reliable.

*First*, Chabad does not (and cannot) challenge the relevance of Dr. Clark's report (ECF 247) which opines on the independent status and operations of the relevant entities—issues crucial to the alter-ego inquiry—in the context of the nuclear fuel industry. *See Harris*, 815 F. Supp. 2d at 9 ("An expert report is relevant if it will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993))).

*Second*, Dr. Clark's report is also reliable.  "Under Rule 702, expert testimony is reliable if (1) it is 'based upon sufficient facts or data,' (2) it is 'the product of reliable principles and methods,' and (3) 'the witness has applied the principles and methods reliably to the facts of the case.'"  *Harris*, 815 F. Supp. 2d at 8.  Here, Chabad appears to challenge the notion that Dr. Clark's opinion is based upon sufficient facts or data.  Specifically, Chabad contends that Dr. Clark cannot opine on Tenex-USA and its parent companies' operations in the industry without "first-hand information" as to their operations or must detail the "date, circumstances, [and] frequency" of every single interaction he has had with these companies.  Reply 20.  This is incorrect—and such familiarity has never been the standard under *Daubert*.  *See* 509 U.S. at 592 (noting that admissible expert opinions are based on "the knowledge and experience of [the expert's] discipline" and "an expert is permitted wide latitude to offer opinions, *including those that are not based on firsthand knowledge or observation*" (emphasis added)).  Indeed, in similar attempts at corporate veil-piercing, courts routinely rely on industry experts just like Dr. Clark to assess whether the government controls the day-to-day operations of a company.  *See, e.g.*, *NML Capital, Ltd. v. Banco Cent. De La Republica Argentina*, 652 F.3d 172, 189-90 (2d Cir. 2011) (relying on banking expert when discussing the history of a central bank's independence from the State); *Crystallex*, 333 F. Supp. 3d at 412 (relying on the expert opinion of a "professor of management at the Massachusetts Institute of Technology and Research Associate of the National Bureau of Economic Research," for the relationship between Venezuela and its state-owned oil company); *Janvey v. Libyan Inv. Auth.*, 164 F. Supp. 3d 910, 916 (N.D. Tex. 2015) (admitting expert opinion of U.S. professor on banking and securities to explain whether the Libyan Investment Authority's (LIA) "control rights over [the Libyan Foreign Investment Company (LFICO)] comport with best governance practices, whether it would be appropriate to disregard LFICO's separate corporate

18

existence, and whether it would be appropriate to hold LIA vicariously liable as LFICO's principal").

Here, Dr. Clark opines on the independent operations of the relevant entities through the lens of his expertise in the nuclear fuel industry—an industry with only a limited number of players to begin with. Dr. Clark has a B.S. in Physics, a Ph.D. in nuclear physics, and has worked in the nuclear fuel industry for 47 years. Clark Op. ¶ 2, Annex A. With experience in the government and private sectors, Dr. Clark has been involved in billions of dollars in sales in nuclear fuel products and process services, and he also actively participates in the industry through writing reports, consulting, and meeting with key players. *Id.* ¶ 3, Annex A.

Chabad also seemingly glosses over the fact that Dr. Clark has had regular commercial dealings with Tenex and its predecessor forms, as well as its subsidiaries, parent companies, and affiliates, for *more than 30 years*. *Id.*; *see also SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props.*, *LLC*, 467 F.3d 107, 132 (2d Cir. 2006) (holding that over 30 years of professional experience in the relevant industry was sufficient to form a reliable foundation for an industry expert's opinion); *Groobert v. President & Dirs. of Georgetown College*, 219 F. Supp. 2d 1, 11 (D.D.C. 2002) (finding expert testimony reliable and admissible because the expert "derived his estimates from his employment in, his research on, and regular interactions with others in the industry"). As noted, the nuclear industry involves a narrow circle of participants, and a large proportion of the world's uranium originates from Russia; thus, Dr. Clark, through his decades of experience, would necessarily come to know how major players in the industry, like Tenex-USA and its parent companies, operate day-to-day—that is, separately from one another, and separately from the Russian Federation. Clark Op. ¶ 3 ("I have had commercial dealings with TENEX and its predecessor forms, as well as its subsidiaries, companies, and affiliates, for over 30 years.").

In addition, Dr. Clark limited the scope of his report to his areas of expertise.  For example, contrary to Chabad's suggestion (at Reply 19), Dr. Clark never made conclusions "based on his reading of Russian law."  In fact, Dr. Clark never cited to Russian law throughout his report.  *See, e.g.*, Clark Op. ¶ 10 (concluding that Rosatom is structured differently than Russian governmental ministries based upon his review of a U.S. Department of Commerce Report, not Russian law).  Accordingly, Dr. Clark is deeply familiar with the subject of his opinion, *i.e.*, the business operations of companies in the nuclear fuel industry that he comments upon, including Tenex-USA, Tenex, and their parent companies—and thus he has more than sufficient facts and data upon which to base his opinions.

## B.  Chabad Offers No Rebuttal Evidence—Only Baseless Argumentation and Conjecture

In its Reply, Chabad re-asserts the supposedly six "critical points" (Reply 3) for the veil piercing inquiry "on which Chabad's motion rests" (*id.* at 16-17).  Chabad states that "even taking the testimony [of Tenex-USA's experts] at face value, it does not rebut" these "central points."  *Id.* at 17.  But, as Tenex-USA already demonstrated, Chabad's affirmative arguments and evidence fail to satisfy the high burden for piercing the corporate veil.  Opp'n 17-22; *see also Tig Ins. Co. v. Republic of Argentina*, No. 18-mc-00129, 2022 U.S. Dist. LEXIS 71213, at *22 (D.D.C. Apr. 18, 2022) (stating that the alter ego proponent "'bears the burden of asserting facts sufficient to' establish [] an agency relationship" (quoting *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 447 (D.C. Cir. 1990))).  In particular, Chabad has failed to provide *any* evidence of the Russian Federation's control over the day-to-day operations of Tenex, Tenex-USA, or any of the other entities in the Rosatom chain of companies.  *See Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 202 (2d Cir. 2016) (observing that "the touchstone inquiry for the extensive control required by *Bancec* is whether the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations" (internal citations and

quotations omitted)); *UAB Skyroad Leasing v. OJSC Tajik Air*, No. 21-7015, 2022 U.S. App. LEXIS 16977, at *2 (D.C. Cir. June 17, 2022) (explaining that *Bancec*'s extensive-control prong requires that the parent "'exceeds [its] normal supervisory control'" so as to "'to complete[ly] dominat[e]'" the subsidiary (quoting *TransAmerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 848 (D.C. Cir. 2000))).

Chabad then focuses the remainder of its veil-piercing analysis on why points raised by Tenex-USA's experts are purportedly "weak at best" (Reply 29) or "incomplete" (*id.* at 31).  As discussed below, those contentions—which are unsupported by any new evidence or expert testimony—are incorrect.  Moreover, Chabad has not in any way supplemented the arguments from its Motion, which continue to be entirely conclusory, unsupported, and incorrect.

### 1. Chabad Has Not Rebutted the Presumption of Separateness between Tenex-USA and Tenex

As noted above, Chabad in its Reply omits *any* discussion of the relationship between Tenex-USA and Tenex.  To the extent this means Chabad no longer seeks an order authorizing attachment of the assets of Tenex-USA, then the § 1610(c) motion should be denied with respect to Tenex-USA, *i.e.*, the entity Chabad served with its Motion to Attach.  However, to the extent Chabad maintains its conclusory position that Tenex-USA is Tenex's "U.S. agent," this argument also fails.

Because Chabad entirely has failed to respond to Tenex-USA's evidence and expert testimony on this point, Chabad necessarily admits that:

– Tenex-USA is an independent entity, with its own business operations.  *See* Rosatom and Tenex Verification Report 2019 (Clark Op. Ex. C) 6; *see also* Clark Op. ¶ 30.

– 
*See* Clark Op. ¶ 42; *see also* Kunitsa Op. ¶ 63.

– ██████████████████████████████████████████
██████████████████████████████████████████
███████████████████████████████.

– Tenex-USA conducts its day-to-day business in its own name and pursues its own commercial objectives, including obtaining its own customers. *See* 2019 Supplemental Response to TENEX-USA (Clark Op. Ex. F) 1; Clark Op. ¶ 43.

– Tenex-USA is represented independently before regulatory agencies, including before the Department of Commerce and at nuclear fuel industry conferences. *See* Ex Parte Meeting Agendas (Clark Op. Ex. AA); *see also* Clark Op. ¶ 51.



– Tenex-USA is not an "agent" of Tenex or any of its parent companies under either U.S. or Russian law. *See* Kunitsa Op. ¶ 79.

Given Chabad's failure to respond to or rebut any of these points, Chabad has failed to satisfy its burden to establish that Tenex-USA is Tenex's "U.S. agent." *Dinkel v. Medstar Health, Inc.*, 880 F. Supp. 2d 49, 58 (D.D.C. 2012) ("[W]here a party fails to respond to arguments in opposition papers, the Court may treat those specific arguments as conceded." (internal citations and quotations omitted)).

## 2. Chabad Has Not Rebutted the Presumption of Separateness between Tenex and Atomenergoprom

Chabad likewise wants this Court to pierce the corporate veil between Tenex and Atomenergoprom based on nothing more than conclusory allegations and semantic assertions by *Chabad's own counsel* (who are neither Russian-law trained nor experts in the uranium field) that Tenex is a "Russian Government-Owned entity" and that Rosatom influences Atomenergoprom's

"exercise[] [of] its shareholder rights" over Tenex.  *See* Reply 28.  Chabad does not submit any material evidence or testimony to support this contention and entirely fails to meet the burden of proof.[7]  Chabad also cannot rebut Mr. Kunitsa and Dr. Clark's professional opinions (supported by dozens of documents) that neither Atomenergoprom nor Rosatom exercise any control of Tenex's day-to-day operations.  Instead, in its Reply, Chabad, relying only on its counsels' own interpretation of vague statements in public source documents, resorts to baseless attacks that Mr. Kunitsa's and Dr. Clark's professional opinions in this regard are "sparse," "weak," have "no apparent foundation" and "suffer[] from [] flaws."  Reply 29-31.  This is unconvincing.  In any event, even if Chabad's assertions were correct (and they are not), those efforts to chip away at the experts' conclusions do not show any evidence of the kind of *day-to-day management or control* over Tenex's decision-making necessary for veil-piercing.  *See Tajik Air*, 2022 U.S. App. LEXIS 16977, at *3 (holding that veil-piercing requires control that "'significantly exceed[ed] the normal supervisory control exercised by any corporate parent . . . and . . . [that] amounts to complete domination'" (quoting *TransAmerica*, 200 F.3d at 848)).

*First*, Mr. Kunitsa's opinions are not "irrelevant" because they "rely on Russian law," as Chabad alleges (Reply 29 (citing *Bancec*, 462 U.S. at 621-22)).  As noted above, courts, including this very Court, routinely consider foreign law for the determination of corporate separateness.  *See, e.g.*, *Wye Oak*, 72 F. Supp. 3d at 359-60 (Lamberth, J.) (relying on a foreign-trained lawyer

---

[7] Chabad does not challenge Mr. Kunitsa's points that Tenex is an independent joint stock company under the laws of the Russian Federation; owns its own property; is self-managed and self-governed; acts on its own behalf, represents its own interest; pays its own staff; has its own corporate structure; is managed day-to-day by its Director; and is not legally liable for the obligations of Rosatom or the Russian Federation, or vice versa.  Kunitsa Op. ¶¶ 60-77.  Chabad also does not challenge Dr. Clark's points that Tenex sells uranium products directly to customers; negotiates its own price and contract terms with customers; and sells uranium products that it (and not the Russian Federation) owns.  Clark Op. ¶¶ 20-38.

opinion to determine whether an entity was separate from the foreign sovereign); *Crystallex*, 333 F. Supp. 3d at 413 (same); *Figueiredo*, 655 F. Supp. 2d at 368 (same).  This makes sense because the corporate structure of state-owned entities is often established under the respective state's laws.  If, as here, the law establishes the entities as clearly legally separate, veil-piercing may only occur if the proponent (here, Chabad) offers evidence that the entities, on a day-to-day basis, disregard that corporate structure designated under the law.  *Bancec*, which merely declines to give "conclusive" effect to the law of the chartering state (462 U.S. at 622), is not inconsistent.

*Second*, Chabad contends that Tenex-USA has not rebutted the vague publicly available statements that Chabad had cited, specifically that Atomenergoprom "exercises its shareholder powers . . . in accordance with applicable Russian corporate legislation"; that Rosatom "must 'ensure the exercise of governmental control over organizations engaged in the activity of atomic energy use'"; and that Tenex "operates to promote the interest of the Russian nuclear industry." Reply 29-30.  But none of these public statements show any kind of *day-to-day* management and control of Tenex by its shareholder, particularly in view of the formal structure of these companies under the law, as Mr. Kunitsa explains.  Kunitsa Op. ¶¶ 60-77.  Acting in accordance with a country's "corporate legislation" is a given for *any* corporation in the world, and shows absolutely no control outside of normal business operations.  References by Tenex to Rosatom's broad guidance in the atomic energy industry only underscore Mr. Kunitsa's explanation that Rosatom performs "*limited* supervisory functions over its own group of companies and other actors of the industry . . . to ensure compliance with the pertinent industry regulations (*e.g.*, safety, licensing, etc.)"—but these references do not indicate any control of day-to-day operations.  *Id.* ¶ 22.  Nor does Tenex's supposed pursuit of broad "Russian nuclear industry interest" show any day-to-day control, because even a state-owned entity's pursuit of sovereign interests could not establish an

alter ego relationship where, as here, the subsidiary "has its own assets" and is directed, administered, and legally represented by "its managing director, who is not a government employee." *Empresa Cubana Exportadora de Alimentos y Productos Various v. United States Dep't of Treasury*, 606 F. Supp. 2d 59, 78 n.25 (D.D.C. 2009).

*Third*, Chabad tries to make much of the fact that "senior Rosatom officials" sit on Tenex's supposed "supervisory board."   Reply 30.   As an initial matter, Tenex's management bodies include a *board of directors*, and not a "supervisory board."   *See* Kunitsa Op. ¶ 74.   Chabad's misstatement suggests again that Chabad lacks even a basic understanding of how Tenex operates—let alone offers sufficient evidence to meet the high-threshold for veil-piercing.   Chabad suggests that, through the "supervisory board," Rosatom "influences all of [Atomenergoprom's] shareholder decisions" and "decides what is and is not in Tenex's best interests."   Reply 29-30. But nothing about employees of a parent company sitting on the management boards of its subsidiaries is abnormal.   *TransAmerica*, 200 F.3d at 848, 854 (referencing the "normal supervisory control exercised by any corporate parent"); *see also United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (observing that "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary").   To pierce the corporate veil, Chabad would need to show that Atomenergoprom or Rosatom, via those board members, "significantly exceeds the normal supervisory control exercised by any corporate parent" through its employees on Tenex's board "amount[ing] to complete domination of" Tenex.   *TransAmerica*, 200 F.3d at 848, 854.   Merely having representatives of the parent company on the board does not imply sufficient day-to-day control over operations to justify veil-piercing.   *Tajik Air*, 2022 U.S. App. LEXIS 16977, at *3-4 (concluding that foreign sovereign's "sole ownership of [instrumentality] and appointment of

Supervisory Board members 'as a matter of law do not by themselves establish the required control'" (quoting *TransAmerica*, 200 F.3d at 851)).  There simply is no evidence of such control.

Chabad offers no actual evidence to rebut Mr. Kunitsa's explanation that, pursuant to Tenex's charter, "[t]he day-to-day management of the Company's business is carried out by Tenex's Director," who is not an employee of Atomenergoprom or Rosatom, or a government official.  Kunitsa Op. ¶ 74; Tenex Charter (Ex. Z), Art. 14.3.2.  Chabad also offers nothing to show that Tenex's board of directors is responsible for more than typical strategic and big-picture decisions, or that either Rosatom or Atomenergoprom oversee Tenex's actual day-to-day operations, involving hundreds of Tenex employees.  *See* Kunitsa Op. ¶¶ 64, 73-77; Tenex Charter (Kunitsa Op. Ex. Z), Arts. 12-13; 2020 DoC Rosatom Questionnaire (Clark Op. Ex. B) 177.  That day-to-day management function, Mr. Kunitsa explains, is the domain of the Director General. Kunitsa Op. ¶ 74.  And Chabad entirely ignores the fact that, aside from its rights as a shareholder (primarily regarding revenue and dividend payment), Atomenergoprom does not have the right to give Tenex "binding instructions" as a matter of Russian law.  Stock Company Law (Kunitsa Op. Ex. T), Art. 6(3); *see also* Kunitsa Op. ¶ 76.

*Fourth*, Chabad classifies Dr. Clark's professional opinions, based on decades of experience in the nuclear fuel industry, as "incorrect, or at least incomplete . . . *impression[s]*" that "'TENEX does not hold itself out as an agent of the Russian Federation.'"  Reply 31 (quoting Clark Op. ¶ 22) (emphasis added).  In support of this assertion, Chabad cites only vague public documents stating that Tenex is the "main" or "leading" organization "of ROSATOM" in the nuclear fuel industry.  *Id.*  Tenex-USA does not deny that Tenex is in the same corporate family as Rosatom, but this is not the question before the Court.  As Dr. Clark explains, "[w]ithin the nuclear fuel industry, TENEX does not hold itself out as an agent of the Russian Federation" and

the "industry generally views TENEX merely as a reliable supplier of commercial enriched uranium, a reputation that preceded the existence of Rosatom and Atomenergoprom." Clark Op. ¶ 22. Dr. Clark's opinion is based not only on his extensive work in the nuclear fuel field, but also on the fact that he had "commercial dealings with TENEX and its predecessor forms, as well as its subsidiaries, parent companies, and affiliates, for over 30 years." *Id.* ¶ 3. Respectfully, Dr. Clark (and not Chabad's counsel) is in a position to know how Tenex operates and presents itself in the context of the industry.

*Fifth*, Chabad tries to create issue with the fact that employees of Rosatom, Tenex, Tenex-USA, and TVEL jointly attended Department of Commerce meetings and were represented by the "same attorneys," and Chabad speculates that this "demonstrates how integrated [the entities] are." Reply 32. Chabad insists that Dr. Clark must show instances "in which Tenex's and Rosatom's views or interests have diverged." *Id.* As an initial matter, joint legal representation of several parties by the same counsel is not dispositive for veil-piercing. *See, e.g.*, *Unterberg v. Exxon Mobil Corp.*, 203 F. Supp. 3d 324, 331 (S.D.N.Y. 2016) (stating that plaintiff's evidence that two entities shared legal counsel failed "to raise a genuine issue of material fact sufficient to pierce the corporate veil"). Moreover, Dr. Clark has explained, "the Suspension Agreement [signed between the Department of Commerce and Rosatom] has maximum yearly limits for *all* Russian-origin uranium products imported into the United States." Clark Op. ¶ 26. This is why individual employees of *each* respective company attend Department of Commerce meetings (and why the company's interests are aligned in this regard).

*Sixth*, Chabad suggests (Reply 31) that Dr. Clark has described some sort of an "agent" relationship between Rosatom and Tenex based on the fact that Rosatom "assigned compliance" with the Department of Commerce Suspension Agreement to Tenex. As Dr. Clark explains,

Rosatom's delegation of authority to Tenex is narrowly circumscribed and was "made for the benefit of the United States to ensure 'one window' monitoring by the Department of Commerce of compliance." Clark Op. ¶ 26. In any event, an agent relationship for a single specific purpose is separate (and not dispositive) to a finding of a day-to-day alter ego relationship for veil piercing. *See, e.g.*, *Doe v. Exxon Mobil Corp*., 573 F. Supp. 2d 16, 31 (D.D.C. 2008) (explaining that agency liability is "[u]nlike liability under the alter-ego or veil-piercing test" and "does not require the court to disregard the corporate form" (citation and quotation omitted)).

### 3.    Chabad Has Not Rebutted the Presumption of Separateness between Atomenergoprom and Rosatom

Chabad's latest arguments with respect to the relationship between Atomenergoprom and Rosatom also are insufficient to justify piercing the corporate veil. Chabad asserts that Atomenergoprom is just a "corporate shell" that "performs no managerial functions" and is directed by Rosatom (Reply 26). But, Chabad still presents nothing more than semantics and threadbare conclusions in support of this assertion.[8] Instead, Chabad's Reply focuses on attacking the professional opinions of Mr. Kunitsa and Dr. Clark. Reply 26-28. Chabad's attempts fall flat.

*First*, Chabad contends that Mr. Kunitsa has not sufficiently contradicted its argument that Rosatom "controls" Atomenergoprom simply because Rosatom officials sit on Atomenergoprom's board. Reply 27. Again, Chabad flips the burden on its head. Chabad insists that Mr. Kunitsa should "disclose [a] basis on which to make judgment regarding the extent to which Rosatom

---

[8] Chabad does not challenge Mr. Kunitsa's points that, under Russian law, Atomenergoprom is an independent joint stock company; has its own corporate structure and management; pursues its own commercial purposes; own its own property; is managed day-to-day by its Director; represents its own interests; acts on its own behalf; is not legally liable for the obligations of Rosatom or the Russian Federation or vice versa. Kunitsa Op. ¶¶ 43-59. Chabad also does not challenge Dr. Clark's points that, in the context of the nuclear fuel industry, Atomenergoprom earns profits from its own activities; regularly distributes profits to its shareholders; and takes and gives loans and participates in profit generating investments. Clark Op. ¶¶ 16-19.

officials . . . direct Atomenergoprom's activities." *Id.*  As noted above, it is "entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary." *Bestfoods*, 524 U.S. at 69; *see also TransAmerica*, 200 F.3d at 848, 854 (referencing the "normal supervisory control exercised by any corporate parent").   And Mr. Kunitsa has explained that under Atomenergoprom's governance documents and Russian corporate law, Atomenergoprom's Director carries out all day-to-day management and Rosatom's powers are limited to those of a shareholder, including amendments to the Charter, approval of dividends, and other high-level organizational matters.  Kunitsa Op. ¶¶ 53, 56.  Chabad does not point to any law or evidence showing that Rosatom oversees (let alone extensively controls or dominates) Atomenergoprom's day-to-day activities.  *See id.* ¶¶ 55-59.  It is Chabad's (not Tenex-USA's or Mr. Kunitsa's) burden to show evidence that Rosatom controls the day-to-day operations of Atomenergoprom.  Chabad has no such evidence.

*Second*, Chabad asserts that Mr. Kunitsa "concedes that Atomenergoprom has to comply with Rosatom directives" regarding nuclear regulation.  Reply 27.  This is not evidence, however, of day-to-day control by Rosatom; it is merely a description of Rosatom's role as a regulator.  As Mr. Kunitsa explained, "Atomenergoprom and its subsidiaries are required to comply with rules and regulations affecting the atomic industry, including any such rules and regulations adopted by its parent company Rosatom (acting within its authority to regulate the industry)."  Kunitsa Op. ¶ 55.  Atomenergoprom's compliance with Rosatom's regulatory directives is not only entirely appropriate, but it also is not sufficient to justify veil-piercing.  *See Empresa Cubana*, 606 F. Supp. 2d at 77-78, n.25 (finding that state-owned entity was independent notwithstanding the fact that the entity acted "in accordance with the instructions issued to it by the Ministry of Foreign Trade").

*Third*, Chabad claims that Mr. Kunitsa and Dr. Clark do not rebut a cherry-picked quote from a third-party consulting report (which does not speak for Atomenergoprom or any other entity) that suggests Atomenergoprom is a "corporate shell" or "pass-through operation."  Reply 26-28.  This is wrong.  Mr. Kunitsa has explained that the concept of a "shell company" does not exist under Russian law, and that Atomenergoprom is a legally separate entity with its own tax liabilities.  Kunitsa Op. ¶ 54.  Dr. Clark likewise has explained that Atomenergoprom "regularly distributes profits to its shareholders" and "gives loans and participates in profit-generating investments, including in other industries."  Clark Op. ¶¶ 18-19.  And, Chabad itself acknowledges that Atomenergoprom is more than a passive vehicle.  Reply 28 (recognizing that Atomenergoprom issues its own dividends, incurs its own debt, and acquires its own stakes in other entities).  In any event, even if Atomenergoprom could, semantically, be considered a holding company, this is irrelevant.  "[A] holding company is not automatically rendered an alter ego of its parent."  *Allen v. Russian Federation*, 522 F. Supp. 2d 167, 184, n.12 (D.D.C. 2007) (citation and quotations omitted).

### 4.   Chabad Has Not Rebutted the Presumption of Separateness Between Rosatom and the Russian Federation

Finally, for its Motion to be granted as to Tenex or Tenex-USA, Chabad must also demonstrate that Rosatom is the alter ego of the Russian Federation.  It has not.  The crux of Chabad's argument is that, because Rosatom is the successor to a prior government agency, the Federal Atomic Energy Agency ("FAEA"), Rosatom therefore is the Russian Federation itself.  Reply 21-26.  Chabad—again relying only on its counsels' own interpretations of Russian law, with no apparent ability to read the source language, no material evidentiary support, and no expert analysis—claims that Mr. Kunitsa and Dr. Clark are mistaken in their professional opinions that

Rosatom is independent under Russian law and in its operations from the Russian Federation.[9] Chabad's arguments are unsupported by any evidence and unconvincing.

*First*, Chabad asserts that Mr. Kunitsa's testimony "confirms" that Rosatom must be an "agency" because he admits that Rosatom has been delegated "specific" authority by the Russian Federation. Reply 22. To start, the assertion that a delegation of authority from the state renders a company an agency is wrong at least as a matter of Russian law. *See* Kunitsa Op. ¶ 6 ("Although Rosatom may at times perform specially delegated authorities from the Russian Federation, Rosatom cannot be regarded as a general agent of the Russian Federation as a matter of Russian agency law."). In any event, it also is a fundamental misunderstanding of the *Bancec* analysis: namely, the presumption of corporate separateness *extends even to* a foreign sovereign's agencies and instrumentalities. *See Bancec*, 462 U.S. at 626-27; *see also Empresa Cubana*, 606 F. Supp. 2d at 77-78, n.25. Thus, *even if* Rosatom were considered an "agency" (which it is not, as Mr. Kunitsa explains in detail)—this does nothing to advance Chabad's veil-piercing attempts.

*Second*, Chabad claims that "[n]othing in Mr. Kunitsa's testimony supports [the] point" that "the supervisory board does not have the authority to participate in day-to-day operations" and "there is no reason to believe Mr. Kunitsa's conclusion is correct." Reply 24-25. Again, Chabad gets the burden backwards. Mr. Kunitsa, based on his Russian legal training and pursuant to Rosatom's Implementing Law, explained that, under Russian law, Rosatom has *three*

---

[9] Chabad does not dispute Mr. Kunitsa's points that, under Russian law, Rosatom is an independent entity; owns its own property (separate from the Russian Federation); has its own self-governance structure; is managed day-to-day by its General Director; is not responsible for the obligations of the Russian Federation; and does not distribute profits to the Russian Federation. Kunitsa Op. ¶¶ 11-42. Chabad also does not dispute Dr. Clark's points that, in the context of the nuclear fuel industry, Rosatom is an umbrella organization; is a not-for profit organization and not a governmental ministry; and provides administrative oversight of its family of affiliated companies to ensure regulatory compliance. Clark Op. ¶¶ 8-15.

management bodies independent of the Russian Federation: (1) the Supervisory Board; (2) the Director General; and (3) the Management Board.  Law 7-FZ (Kunitsa Op. Ex. B) Arts. 29-30; Law 317-FZ, ECF 235-10, Arts. 22-29; *see also* Kunitsa Op. ¶ 15.  Rosatom's Supervisory Board has "the type of authority that is typically given to any corporate shareholder," *i.e.*, setting broad strategic goals and policies.  Kunitsa Op. ¶¶ 38-39.  And under Rosatom's Implementing Law, the Director General, who is not a state official, is responsible for Rosatom's day-to-day operations.  Law 317-FZ, ECF 235-10, arts. 26-27; Kunitsa Op. ¶¶ 41-42.  Given the specificity of that law, it is Chabad's duty to show, with evidence, that the corporate structures dictated by the law are not followed and that the Russian Federation instead controls Rosatom's day-to-day operations.  *See Tajik Air*, 2022 U.S. App. LEXIS 16977, at *5 (holding there was no alter ego relationship where *inter alia* instrumentality's day-to-day operations "are performed by its Director General, an employee of the [instrumentality] rather than the government" (citation and quotation marks omitted)).  Chabad offers no evidence to advance its positions, and thus has not met its burden.

*Third*, Chabad claims—apparently on the basis of nothing more than its own U.S. lawyers' reading of the Russian law—that Mr. Kunitsa "misreads the Russian laws on which he relies" and that Law 317-FZ does not "insulate Rosatom from Russian sovereign control" but rather "is a supremacy clause" that "leaves the field clear for unfettered control in the nuclear field by the senior government officials on Rosatom's supervisory board."  Reply 23.  This is wrong.  As Mr. Kunitsa has explained, Law 317-FZ "explicitly prohibits the federal state bodies, the state bodies of subjects of the Russian Federation, and the bodies of self-governance of municipal authorities from interfering with the activities of Rosatom and its officers for any activities . . . [that] are in line with Rosatom's objectives."  Kunitsa Op. ¶ 26.  Law 317-FZ only gives the supervisory board

those powers of a stockholder, and certainly does not allow for "unfettered control," as Chabad alleges. *Id.* ¶¶ 38-39.

*Fourth*, Chabad misapprehends Mr. Kunitsa's argument regarding the prohibition on Russian governmental entities carrying out commercial activities.  Reply 24 (citing Law 79-FZ).  Mr. Kunitsa explains that employees of Russian state agencies may not engage in commercial activities.  Kunitsa Op. ¶¶ 24, 35.  That law alone would make it strange that Rosatom could simultaneously be part of the Russian state but also carry out its commercial activities.  Mr. Kunitsa, however, did not stop there.  He also reviewed "standard regulations governing operations of federal executive bodies" in the Russian Federation and explained that none of them grants federal executive bodies any authority for commercial activity—while Rosatom, in contrast, is expressly granted such authority under Law 317-FZ.  *Id.* ¶ 35.

*Fifth*, Chabad challenges Dr. Clark's analogies of Rosatom to the Korea Electric Power Company (South Korea) and Orano S.A. (France), claiming that he "glosses over the substantial differences between these companies and Rosatom."  Reply 25.  But, Dr. Clark invoked these examples to demonstrate that "[t]here is nothing unusual or strikingly different about Rosatom's structure in the context of the nuclear fuel industry" as a "large parent corporation" overseeing several subsidiaries.  Clark Op. ¶¶ 11, 13.  And Dr. Clark used these examples to show that companies in the nuclear fuel industry are regularly delegated authority from their respective government parents.  *See id.* ¶ 15 (explaining it is common in the nuclear fuel industry for foreign governments to assign other entities to act as their agents as to specific agreements or arrangements).  Chabad's argument that KEPCO and Orano have different characteristics (*e.g.*, different percentage of state ownership) is irrelevant to Dr. Clark's point.

*     *     *

In sum, Chabad's continued mischaracterizations of the facts and law do nothing to advance its attempts to pierce multiple levels of corporate separateness between Tenex-USA, Tenex, Atomenergoprom, Rosatom, and the Russian Federation.  Chabad falls far short of the burden required to pierce a single level of corporate separateness, much less four times over, and its Motion thus must be denied.

## **CONCLUSION**

For the foregoing reasons and those stated in Tenex-USA's Opposition (ECF 244), Tenex-USA respectfully requests that this Court deny Chabad's Motion to Attach Property or, in the Alternative to Register Judicial Liens.

Dated: August 1, 2022
Washington, DC

Respectfully submitted,

**WHITE & CASE**LLP

/s/ Carolyn B. Lamm
Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
Ena Cefo (D.C. Bar No. 1044266)
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3600

*Counsel for Non-Party Tenex-USA,*
*Incorporated*

34

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2022, a true and correct copy of the foregoing **SUR-REPLY OF NON-PARTY TENEX-USA IN OPPOSITION TO CHABAD'S MOTION TO ATTACH PROPERTY OR, IN THE ALTERNATIVE, TO REGISTER JUDICIAL LIENS** was served by electronic mail, in the format indicated (sealed or redacted) on the following counsel of record:

Robert P. Parker
Steven Lieberman
ROTHWELL, FIGG, ERNST &
MANBECK, P.C.
607 14th Street NW, Suite 800
Washington, DC 20005
Emails: rparker@rfem.com
slieberman@rfem.com

Nathan Lewin
Alyza Doba Lewin
LEWIN & LEWIN, LLP
888 17th Street, NW, 4th Floor
Washington, DC 20006
Emails: nat@lewinlewin.com
alyza@lewinlewin.com

*Counsel for Agudas Chasidei Chabad of
United States—Served Sealed Version*

Benjamin Thomas Takemoto
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
P.O. Box 883 Ben Franklin Station
Washington, DC 20044
Email: benjamin.takemoto@usdoj.gov

*Counsel for the United States of America—
Served Redacted Version*

David C. Tobin
TOBIN, O'CONNOR & EWING
5335 Wisconsin Ave., NW Suite 700
Washington, DC 20015
Email: dctobin@tobinoconnor.com

Wesley W. Whitmyer, Jr.
WHITMYER IP GROUP LLC
600 Summer St.
Stamford, CT 06901
Email: litigation@whipgroup.com

*Counsel for State Development Bank
VEB.RF—Served Redacted Version*

I further certify that on August 1, 2022, a true and correct copy of the Redacted Version of the foregoing **SUR-REPLY OF NON-PARTY TENEX-USA IN OPPOSITION TO CHABAD'S MOTION TO ATTACH PROPERTY OR, IN THE ALTERNATIVE, TO REGISTER JUDICIAL LIENS** was served by mail service on each of the following parties:

Ministry of Justice of the Russian Federation
Attn: Hon. Konstantin Chuychenko, Minister
14 Zhitnaya Street
GSP-1 Moscow, Russia 119991

Ministry of Culture of the Russian Federation
Attn: Hon. Olga Lyubimova, Minister
7/6, Bldg. 1,2 , Malyy Gnezdnikovskiy Pereulok
Moscow, Russia 125993

Russian State Military Archive
Attn: Vladimir N. Kyzelenkov, General Director
29 Admiral Makarov Street
Moscow, Russia 12512

Russian State Library
Attn: Vadim Valerievich Duda, General Director
3/5, Vozdvizhenka Street, 2nd Entrance
Moscow, Russia 119019

**WHITE & CASE**

*/s/* Carolyn B. Lamm
Carolyn B. Lamm (D.C. Bar No. 221325)
Nicolle Kownacki (D.C. Bar No. 1005627)
Ena Cefo (D.C. Bar No. 1044266)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:     + 1 202 626 3600
Facsimile:     + 1 202 639 9355
clamm@whitecase.com
nkownacki@whitecase.com
ena.cefo@whitecase.com

*Counsel for Non-Party Tenex-USA, Incorporated*